1
2
3
4
5
6
7
8

9                    **UNITED STATES DISTRICT COURT**

10                  **SOUTHERN DISTRICT OF CALIFORNIA**

11

12   DEAN PHILLIP CARTER,                    CASE No. 06cv1343-BEN(CAB)

13                            Petitioner,    *DEATH PENALTY CASE*

14           vs.

15                                           **ORDER DENYING PETITIONER'S**
     MICHAEL MARTEL, Acting Warden of         **MOTION FOR DISCOVERY**
16   the California State Prison at San Quentin,   **[Doc. No. 118]**

17                            Respondent.

18

19

20         On January 13, 2011, Petitioner filed a Motion for Discovery, requesting leave to serve

21   subpoenas duces tecum for 247 document requests from over twenty-five agencies and to depose

22   eighteen individuals, asserting that the discovery will provide support for his federal habeas claims.

23   Respondent has filed an Opposition to the Motion and Petitioner has filed a Reply.  Based on a review

24   of the materials and pleadings, the Court finds this issue appropriate for disposition without oral

25   argument.

26         Upon consideration of the issues raised in the filings, and for the reasons outlined below, the

27   Court **DENIES** Petitioner's Motion for Discovery.

28   ///

# I. BACKGROUND

Petitioner was convicted in the San Diego County Superior Court on May 22, 1991, of one count of first degree murder, two counts of robbery, one count of burglary, one count of forcible rape, and one count of forcible oral copulation in the murder of Janette Cullins and the attack on Barbara S. People v. Carter, 36 Cal. 4th 1215, 1220 (2005). The jury also found true the special circumstance allegations that the murder was committed while lying in wait, that the murder was committed while Petitioner was engaged in the commission or attempted commission of a robbery, and that the murder was committed while Petitioner was engaged in the commission or attempted commission of a burglary. (RT 6980.) At the conclusion of the penalty phase, the jury returned a verdict of death and the court entered judgment accordingly. Carter, 36 Cal. 4th at 1221. The conviction and sentence was upheld on appeal to the California Supreme Court, with the exception of the lying in wait special circumstance, which was set aside. Id. at 1281. The California Supreme Court denied Petitioner's state habeas petition on June 28, 2006, and amended the order denying the petition on September 13, 2006.

Petitioner initiated his federal habeas action on June 29, 2006, by filing a motion for appointment of counsel pursuant to Local Civil Rule HC.3(d)(1). The Court filed an order appointing counsel on September 22, 2006. On December 6, 2006, Petitioner filed a Protective Petition, and on June 20, 2007, filed a mixed Petition for Writ of Habeas Corpus with this Court, asserting seventeen (17) claims for relief, with eight (8) claims comprised of numerous sub-claims. On July 6, 2007, Petitioner and Respondent filed a Joint Stipulation and Motion to Stay Federal Proceedings pending the resolution of a state exhaustion petition, and on July 13, 2007, the Court granted the Motion.

On June 22, 2007, Petitioner filed a second state habeas petition containing the unexhausted claims. Petitioner also filed a third state habeas petition on February 16, 2010, based on newly discovered evidence. The second and third state habeas petitions were both denied by the California Supreme Court without an evidentiary hearing on June 17, 2010.

On July 12, 2010, Petitioner filed a Second Amended Petition ["SAP"]. On October 18, 2010, Respondent filed an Answer, and on December 8, 2010, Petitioner filed a Traverse.

///

///

1    The instant motion for discovery was filed on January 13, 2011.[1]  On February 1, 2011,

2    Respondent filed an Opposition, and on February 16, 2011, Petitioner filed a Reply.

3                                    **III. DISCUSSION**

4    Petitioner's motion contains 247 ennumerated document requests, seeking information from

5    "over 25 state agencies, spread across 4 different counties in 2 different states, relating to 5 murders and

6    2 rapes."  (Reply at 2.)  Petitioner also moves to depose eighteen individuals, including the trial jurors

7    and alternate jurors, the trial prosecutors and the trial judge.

8    Respondent objects to the motion in its entirety, asserting that Petitioner fails to establish good

9    cause for the requested documents and depositions.  (Opp. at 6.)  Respondent also generally asserts that

10   the requests are "overbroad, speculative, and evidences no more than a fishing expedition."  (Id. at 8.)

11   **A.     Discovery in Habeas Proceedings - Generally**

12   A habeas petitioner is not entitled to discovery "as a matter of ordinary course."  Bracy v.

13   Gramley, 520 U.S. 899, 904 (1997).  Instead, Rule 6 of the Rules Governing Section 2254 Cases reads

14   as follows:

15       (a)    Leave of Court Required.  A judge may, for good cause, authorize a party to
              conduct discovery under the Federal Rules of Civil Procedure and may limit the
16            extent of discovery.  If necessary for effective discovery, the judge must appoint
              an attorney for a petitioner who qualifies to have counsel appointed under 18
17            U.S.C. § 3006A.

18       (b)    Requesting Discovery.  A party requesting discovery must provide reasons for
              the request.  The request must also include any proposed interrogatories and
19            requests for admission, and must specify any requested documents.

20       (c)    Deposition Expenses.  If the respondent is granted leave to take a deposition, the
              judge may require the respondent to pay the travel expenses, subsistence
21            expenses, and fees of the petitioner's attorney to attend the deposition.

22   To determine whether discovery is appropriate, a court must consider the petitioner's claim and evaluate

23   whether "specific allegations before the court show reason to believe that the petitioner may, if the facts

24   are fully developed, be able to demonstrate that he is ... entitled to relief."  Bracy, 520 U.S. at 904, 908-

25   09, quoting Harris v. Nelson, 394 U.S. 286, 300 (1969).  Even if a court grants discovery, "the scope

26   and extent of such discovery is a matter confided to the discretion of the District Court."  Bracy, 520

27

28   _____

     [1] In citing to the filings on this Motion, the Court uses the pagination found in the Southern District's
     electronic docket, in which all page numbers are located on the top right-hand side of each document.

U.S. at 909. Courts should not permit a petitioner to "use federal discovery for fishing expeditions to investigate mere speculation." Calderon v. United States Dist. Ct. for the Northern Dist. of Cal. (Nicolaus), 98 F.3d 1102, 1106 (9th Cir. 1996); see also Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir. 1999), quoting Aubut v. Maine, 431 F.2d 688, 689 (1st Cir. 1970) ("Habeas corpus is not a general form of relief for those who seek to explore their case in search of its existence.")

Moreover, the United States Supreme Court recently held that, for claims previously decided on the merits by a state court, the Court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011). The Supreme Court also noted that "[a]lthough state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." Id. at 1401. Thus, pursuant to Pinholster, it may not serve the interests of judicial economy to consider allowing discovery prior to conducting a review under § 2254(d). In any event, the Court need not address the potential implications of Pinholster on this issue because, as discussed below, Petitioner's request is overbroad and lacks a showing of good cause.

**B.      Petitioner's Discovery Requests**

Petitioner seeks the production of documents and leave to depose witnesses regarding his claims of ineffective assistance of counsel, prosecutorial misconduct, Brady violations, jury misconduct, allegations of police failure to preserve evidence, alleged partiality of the trial judge, and denial of a full and fair suppression hearing. (See SAP Claims 1, 2, 3, 6, 7, 9, 11, 15.)

Petitioner generally states that he seeks discovery for two reasons: (1) "to compare discovery that trial counsel obtained at the time of trial with that material that trial counsel should have uncovered," asserting that "[a]ny discrepancy between what was in trial counsel's possession provides further support for Petitioner's allegation that trial counsel was ineffective at both the guilt and penalty phases of trial,"[2] and (2) "to ensure that the State fulfilled its duty of providing counsel with material

_____

[2] As a general matter, the Court notes that the record reflects instances demonstrating trial counsel's pursuit of extensive discovery on behalf of Petitioner. (See e.g. Lodgment No. 33, Mot. Hrg. 9/4/87 at 73-96 (trial court and counsel discuss defense discovery motion, including but not limited to, a list of potential witnesses, the criminal records or "rap" sheets of potential witnesses, lab reports on testing performed on evidence, photos and slides, potential mitigating evidence, and teletypes or other law enforcement communications); Lodgment No. 5, Mot. for Discovery dated 1/25/91, CT 680-712 (containing 127 enumerated requests, including but not limited to requests relating to Petitioner, law enforcement personnel, lay witnesses, the victim(s), informants, physical

evidence, *see Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct 1194, 10 L. Ed. 2d 215 (1963), and that the State fully complied with state discovery laws."[3]  (Mot. at 12.)  Petitioner states that once he receives the requested discovery, "he will be able to fully ascertain if there were additional instances of state misconduct and ineffective assistance of counsel."  (Reply at 4.)

For the reasons detailed in the discussion below, it is the Court's conclusion that Petitioner's motion for discovery, as currently constituted, is a fishing expedition.  Petitioner requests documentation from every agency even remotely involved in the investigation or prosecution of his case, and in many instances clearly duplicating prior efforts of trial counsel.  (See footnotes 2, 3.)  The extremely wide scope of discovery sought indicates to the Court that Petitioner's request is aimed at reinvestigating every aspect of his prosecution, including extensive requests regarding the background of every witness, potential witness, and other individuals with any connection to his case, rather than to develop "specific allegations before the court."  Bracy, 520 U.S. at 904.  As such, Petitioner fails to demonstrate good cause to warrant what would undoubtedly amount to a complete reinvestigation of the two charged crimes and five "other crimes" introduced into evidence at Petitioner's San Diego trial.

1.    Document Requests 1-51

At Petitioner's guilt phase trial, the prosecution presented "other crimes" evidence regarding the rape of Jennifer S. in Ventura County.  Carter, 36 Cal. 4th at 1226.  The prosecution also introduced the rape conviction as aggravating evidence during the penalty phase.  Id. at 1236.

Petitioner seeks leave to serve subpoenas duces tecum to command the production of any

---

evidence, and lab testing).)

[3] An examination of the trial record also reflects the government's compliance with discovery in Petitioner's case.  (See e.g. Lodgment No. 20 PHRT 215 (defense counsel states that he previously received approximately 334 pages of discovery materials regarding the San Diego investigation, and had more recently received 670 pages of discovery); Lodgment No. 19 PHRT 102 (Prosecutor states that the 670 pages of discovery were brought to him from Los Angeles the day before he turned the materials over to defense counsel); Lodgment No. 33, Mot. Hrg. 9/4/87 at 74-75, 89 (Prosecution voices a lack of objection to defense discovery requests 1-10, 14-33, 36-39, expresses the need for discussion on requests 11-13, 18-21, 34-36, and during discussion states that "they [defense counsel] are going to get everything I have got."); Lodgment No. 33 at 100 (prosecuting attorney states that "There is -- I have made every effort to obtain everything I can from the other law enforcement agencies and the other District Attorneys -- prosecuting agencies -- from other jurisdictions.  They have been fairly cooperative, and everything I have gotten, I have turned over to Mr. Bumer."))

documents from various city, county and state agencies[4] relating to the rape of Jennifer S., including requests for the entire police and prosecution case files,[5] potential <u>Brady</u> and/or witness impeachment materials,[6] statements, interviews, and current location of any individual identified as a potential witness,[7] criminal histories of the witnesses,[8] the substance abuse and mental health records of the witnesses,[9] and documentation on communication between the various agencies.[10]

Petitioner contends that "[t]o fully investigate the extent of trial counsel's ineffective assistance of counsel, Petitioner's counsel must examine all of the discovery that was or should have been provided to trial counsel." (Mot. at 40.)  This assertion presumes that either the prosecution failed to comply with <u>Brady</u>, or that trial counsel failed to request all they should have requested from the relevant agencies. However, Petitioner fails to demonstrate a likelihood that either situation occurred in his case, as he fails to identify any discovery that may have been withheld and fails to indicate any specific items that trial

_____

[4] These agencies include the Ventura County District Attorney's Office, Ventura Police Department, Ventura City Attorney's Office, Ventura County Sheriff's Department, the California Department of Corrections and Rehabilitation, Ventura County Behavioral Health Department, Los Angeles County District Attorney's Office, Los Angeles Police Department, Los Angeles City Attorney's Office, Los Angeles County Sheriff's Department, Los Angeles County Department of Mental Health, San Diego County District Attorney's Office, San Diego Police Department, San Diego City Attorney's Office, San Diego County Sheriff's Department, and the San Diego Health and Human Services Agency.

[5] This includes the entire case files of the Ventura County District Attorney's Office (document request 1), Ventura Police Department (document request 2), Los Angeles County District Attorney's office (document request 18), Los Angeles Police Department (document request 19), San Diego District Attorney's Office (document request 35), and San Diego Police Department (document request 36) relating to Petitioner's prosecution in their respective jurisdictions, as well as files the non-Ventura County agencies maintained relating to Petitioner's prosecution in Ventura County.

[6] This includes requests for documentation on prior inconsistent, false or biased statements by witnesses (document requests 4, 21, and 38), prior statements in which one witness statement is inconsistent with that of another witness (document requests 5, 22, and 39), offers for or agreements on potential consideration to a witness or potential witness (document requests 6, 23, and 40), documentation relating to the prosecution and/or plea bargains with any potential witness (document requests 7, 24, and 41), and any other favorable, impeachment or other exculpatory material (document requests 3, 20 and 37).

[7] Document requests 8, 9, 25, 26, 42 and 43.  Additionally, in document requests 15, 32 and 49, Petitioner separately and specifically requests any documentation on the "names, addresses, and present whereabouts of each person identified or interviewed" by multiple law enforcement or prosecutorial agencies in connection with the instant case.

[8] Document requests 10-14, 27-30, and 44-47.

[9] Document requests 14, 31, and 48.

[10] Document requests 16, 17, 33, 34, 50 and 51.

1    counsel should have, but did not, obtain.  Instead, Petitioner generally asserts that "[t]o the extent

2    Petitioner is unable to specifically ennumerate a document, file, record, and/or note that is in the

3    investigating and prosecuting agencies' files, it is only because of the exact thing Petitioner complains

4    about in his Second Amended Petition: Trial counsel's ineffective assistance and improper governmental

5    conduct has deprived him of the opportunity to compile a full and complete record."  (Mot. at 14-15.)

6        The request is overbroad, and Petitioner fails to demonstrate good cause for any discovery in this

7    category, much less the extremely expansive scope of discovery he requests.  As an initial matter,

8    Petitioner fails to indicate any specific documents he suspects are missing.  He instead requests *each*

9    *and every* document potentially related to the rape of Jennifer S. in order to "fully investigate" trial

10   counsel's allegedly ineffective assistance.  (See Mot. at 40.)  There is no indication that Petitioner has

11   been unable  to obtain the listed documents and materials through other sources, such as through prior

12   counsel.[11]  Instead, the instant request evidences an intention to gather material that would support

13   additional claims of ineffective assistance or Brady violations.  To the extent this is the case, the request

14   is unrelated to an existing claim, and thus speculative.  The Court will not allow Petitioner to conduct

15   discovery in order to investigate "mere speculation."  Calderon (Nicolaus), 98 F.3d at 1106.

16       Petitioner also specifically requests any favorable, impeachment or exculpatory evidence from

17   Ventura County (document request 3), Los Angeles County (document request 20) and San Diego

18   County (document request 37) regarding the Jennifer S. case despite the fact that Petitioner's federal

19   petition does not include a Brady claim which alleges violations regarding any aspect of the Jennifer

20   S. rape.  As such, these requests[12] appears to be calculated to obtain potential documents or information

21

22

23

---

24       [11] Petitioner generally alleges that "the incomplete state of trial counsel's files are indicative of their
     failure to thoroughly investigate and discover evidence in this case."  (Reply at 4.)  Based on the allegations in
25   the instant motion, Petitioner fails to offer any support to a conclusion that trial counsel's files are bereft of the
     material Petitioner now requests.
26

27       [12] The same reasoning applies to request for documentation on any "contemplated prosecution" or
     "possible plea bargain" made with witnesses prior to their testimony at Petitioner's Ventura County trial
28   (document request 7), Los Angeles trial (document request 24), and San Diego trial (document request 41).
     Among the witnesses listed in document request 7 are James Helverson M.D., Detective William Ragsdale,
     Officer Robert Dasper, and Detective Gary McEwen.

that could support a new and separate <u>Brady</u> claim.[13]  Accordingly, as the requested materials do not relate to "specific allegations before the court," the request is speculative and Petitioner fails to show good cause for his request.

Petitioner additionally asserts that this discovery "will also allow postconviction counsel to fully assess the significance of the discrepancies between the Ventura trial and the San Diego trial." (Mot. at 40.)  The Court is unpersuaded that this is an appropriate reason for the requested discovery.  It is apparent from the record that the Ventura case involved Petitioner's trial for the rape of Jennifer S., and the crime was introduced at the San Diego trial as other crimes evidence and in penalty phase aggravation.  It is not unreasonable that the witness lists would differ between the two jurisdictions.  Yet Petitioner asserts that "[a]t least to the extent they [the witness lists] differed because the respective prosecutors chose not to rely on certain witnesses because of impeachment issues with those witnesses, trial [sic] counsel should be allowed to discover that evidence."[14]  (Mot. at 41.)  This is a purely speculative assertion, and utterly fails to establish good cause for the requested discovery.

As a related matter, the Court agrees with Respondent's contention that "[n]ot one of the claims Carter asserts this discovery is necessary to establish even discusses the Jennifer S. rape." (Opp. at 10.)  Petitioner contends that document requests 1-51 are relevant to Claims 2 and 3 of the SAP, but the only mention of the Jennifer S. rape is contained in Petitioner's allegation that trial counsel's opening and closing statements were deficient for failing to "offer any meaningful argument that did not 'fit the theory' of the government as to charges and allegations in the Mills, Knoll, Guthrie, Kim, [Jennifer S.],

---

[13] Not only does Petitioner request information on prior inconsistent statements (document request 4), or statements inconsistent with a statement provided by other witnesses (document request 5), but also requests information related to "reward, compensation, or inducement to provide evidence or information" for each witness that testified in the Ventura trial (document request 6), listing both lay witnesses such as Jennifer S. and Vincent Stapleton, and *police and expert witnesses* such as James Helverson M.D., Detective William Ragsdale, Officer Robert Dasper, and Detective Gary McEwen.  The unsupported intimation that law enforcement and medical expert witness were provided with inducement or compensation to secure their testimony is but one example of the overbroad nature of the instant discovery motion.

[14] For instance, Petitioner requests criminal history information, (document request 11), arrest and incarceration records (document requests 12 and 13), and mental health records (document request 14) for several witnesses who testified at Petitioner's Ventura County trial and did not testify at the San Diego trial proceedings, including James Helverson M.D., Detective William Ragsdale, Officer Robert Dasper, and Detective Gary McEwen, to name a few.  Petitioner's suggestion that the mental health and correctional records of these individuals could provide a reason that they were not called to testify at the San Diego trial is wholly without basis in the record.

[Barbara S.] and Cullins cases." (SAP at ¶ 278.) A review of the arguments posed in Claims 2 and 3 reveals that the crime against Jennifer S. is not discussed in a substantive manner in either claim. Accordingly, document requests 1-51 are not reasonably calculated to produce relevant evidence in support of the cited claims as alleged in the SAP, and Petitioner fails to show good cause for the requested discovery.

### 2. Document Requests 52-68

In addition to the robbery and murder of Janette Cullins, Petitioner was charged with and convicted of robbery, burglary, forcible rape and forcible oral copulation in the attack against Barbara S. in San Diego. Carter, 36 Cal. 4th at 1221. The trial court imposed a sentence of 21 years 8 months for the crimes against Barbara S., to be served consecutively to the death sentence imposed for the murder of Janette Cullins. Id.

As with the requests relating to the crime against Jennifer S., Petitioner seeks leave to serve subpoenas duces tecum to command the production of any documents from various city, county and state agencies[15] relating to the attack against Barbara S., including but not limited to the complete police and prosecution case files,[16] potential Brady and/or witness impeachment materials,[17] statements, interviews, and current location of any individual identified as a potential witness,[18] substance abuse and

---

[15] These agencies include the San Diego County District Attorney's Office, San Diego Police Department, San Diego City Attorney's Office, San Diego County Sheriff's Department, San Diego Health and Human Services Agency, and the California Department of Corrections and Rehabilitation.

[16] This includes the case files of the San Diego District Attorney's Office (document request 52) and San Diego County Police Department (document request 53) relating to Petitioner's prosecution.

[17] This includes requests for documentation on prior inconsistent, false or biased statements by witnesses (document request 55), prior statements in which one witness statement is inconsistent with that of another witness (document request 56), offers for or agreements on potential consideration to a witness or potential witness (document request 57), documentation relating to the prosecution and/or plea bargains with any potential witness (document request 58), and any other favorable, impeachment or other exculpatory material (document request 54).

[18] Document requests 59-60. Additionally, in document request 66, Petitioner separately and specifically requests any documentation on the "names, addresses, and present whereabouts of each person identified or interviewed" by multiple law enforcement or prosecutorial agencies in connection with the instant case.

1    mental health records of the witnesses,[19] witness criminal histories,[20] as well as any communcations

2    between various agencies about the investigation and prosecution of Petitioner in the instant case.[21]

3         Again, Petitioner asserts that "[t]o fully investigate the extent of trial counsel's ineffective

4    assistance of counsel, Petitioner's counsel must examine all of the discovery that was or should have

5    been provided to trial counsel." (Mot. at 53.) Petitioner's assertions in support of these document

6    requests are speculative. For instance, Petitioner contends that the evidence against him regarding the

7    rape of Barbara S. was "extremely weak" and notes that "[t]here is little, if any, indication in the record

8    of how ...[the victim]... went from being a person who did not even consider Petitioner a suspect to then

9    identifying him at trial as the man who raped her. Discovery may provide insight into this marked

10   transformation." (Id.) He asserts that "discovery may prove the extent to which Petitioner was

11   prejudiced by the joinder of the [Barbara S.] rape with the Cullins homicide," and "may show" that a

12   reasonable investigation by counsel "could have uncovered evidence to further support his motion to

13   sever." (Id. at 54.) However, there is no indication what evidence Petitioner reasonably expects to

14   obtain from law enforcement, court files, or communication between these entities that will support the

15   claims in the SAP. As stated above, the Court will not allow Petitioner to conduct discovery in order

16   to investigate "mere speculation." Calderon (Nicolaus), 98 F.3d at 1106. Petitioner also intimates that

17   "[d]iscovery may also show that the prosecutor purposely misrepresented at least two facts to the trial

18   court," regarding the testimony of witness Polly Haisha and whether Petitioner possessed a key

19   belonging to Barbara S., and "may show that the prosecutor misrepresented facts to secure the joinder"

20   of the Barbara S. rape and Cullins homicide. (Id. at 54-55.) These suggestions are also speculative and

21   do not warrant discovery.

22        In a related matter, Respondent contends that the argument regarding the testimony of Polly

23   Haisha was barred by the California Supreme Court under the California contemporaneous objection

24   rule. (Opp. at 14); see Carter, 36 Cal. 4th at 1264. Several circuit courts have held, and this Court

25   agrees, that a petitioner cannot show good cause for discovery on a procedurally defaulted claim. See

26   _____

27        [19] Document request 65.

          [20] Document requests 61-64.

28        [21] Document requests 67-68.

1    Rucker v. Norris, 563 F.3d 766, 771 (8th Cir. 2009); Williams v. Bagley, 38 F.3d 932, 975 (6th Cir.

2    2004).  Accordingly, as this Court has not yet ruled on procedural default in the instant case, it would

3    be premature to consider allowing discovery on a claim that may be procedurally defaulted.

4         In sum, the broad discovery sought is not reasonably calculated to the discovery of material

5    pertinent to these claims.  Instead, Petitioner has evidently requested *each and every* document

6    potentially related to the investigation and prosecution of Petitioner for the crimes against Barbara S.

7    For the reasons discussed here, in addition to those discussed in relation to document requests 1-51,

8    Petitioner's request is overbroad, speculative, and fails to show good cause for discovery.

9         3.    Document Requests 69-110

10        At Petitioner's guilt phase trial, the prosecution presented "other crimes" evidence regarding the

11   murders of Susan Knoll and Jillette Mills in Los Angeles County.  Carter, 36 Cal. 4th at 1226.

12        As with the requests relating to the Jennifer S. and Barbara S. assaults, Petitioner seeks leave

13   to serve subpoenas duces tecum to command the production of any documents from various city, county

14   and state agencies[22] relating to the burglary and murders of Susan Knoll and Jillette Mills and the rape

15   of Mills, including but not limited to the complete police and prosecution case files for each case,[23] the

16   coroner's file,[24] potential Brady and/or witness impeachment materials,[25] statements, interviews, and

17   _____

18        [22] These agencies include the Los Angeles County District Attorney's Office, Los Angeles Police
     Department, Culver City Police Department, West Los Angeles Police Department, Los Angeles County Coroner,
19   Los Angeles County Sheriff's Department, Los Angeles City Attorney's Office, California Department of
     Corrections and Rehabilitation, Los Angeles County Department of Mental Health, San Diego County District
20   Attorney's Office, San Diego Police Department, San Diego City Attorney's Office, San Diego County Sheriff's
     Department, and San Diego County Health and Human Services Agency.
21
22        [23] This includes the case files of the Los Angeles County District Attorney's Office (document request
     69), Los Angeles Police Department (document request 70), Culver City Police Department (document request
23   71), West Los Angeles Police Department (document request 72), San Diego District Attorney's Office
     (document request 93) and San Diego Police Department (document request 94) relating to Petitioner's
24   prosecution in their respective jurisdictions, as well as files each of those agencies maintained relating to
     Petitioner's prosecution outside their jurisdiction.
25
          [24] Document request 73.
26
          [25] This includes requests for documentation on prior inconsistent, false or biased statements by witnesses
27   (document requests 75 and 96), prior statements in which one witness statement is inconsistent with that of
     another witness (document requests 76 and 95), offers for or agreements on potential consideration to a witness
28   or potential witness (document requests 77 and 98), documentation relating to the prosecution and/or plea
     bargains with any potential witness (document requests 78 and 99), and any other favorable, impeachment or
     other exculpatory material (document requests 74 and 95).

current location of any individual identified as a potential witness,[26] substance abuse and mental health records of the lay and expert witnesses,[27] lay and expert witness criminal histories,[28] prior complaints and/or discipline against certain expert and law enforcement witnesses,[29] any documents or other evidence discussing or relating to Ronald Tulio in connection with these crimes,[30] as well as any communcations between law enforcement and prosecutorial agencies about the investigation and prosecution of Petitioner in the instant case.[31]

For the same reasons relating to Petitioner's discovery requests regarding the Jennifer S. and Barbara S. assaults, the instant request is overbroad and speculative. Here, Petitioner repeats the contention that "[t]o fully investigate the extent of trial counsel's ineffective assistance of counsel, Petitioner's counsel must examine all of the discovery that was or should have been provided to trial counsel." (Mot. at 80.) Yet again, this assertion presumes that either the prosecution failed to comply with Brady, or that trial counsel failed to request all they should have requested from the relevant agencies, but Petitioner fails to demonstrate a likelihood that either situation occurred in his case. As stated previously, the Court will not allow Petitioner to conduct discovery in order to investigate "mere speculation." Calderon (Nicolaus), 98 F.3d at 1106.

Here, Petitioner does indicate certain specfic items that he seeks in discovery, such as a police report written by Detective White regarding Officer Bloor's identification of Ronald Tulio as a man Bloor spoke to on the night of the Knoll/Mills homicides. (See Mot. at 80.) Petitioner insists "[t]hat report should be turned over to Petitioner's counsel," and asserts that it would be contained in the investigating or prosecuting agencies' files. (Id.) However, the Court's review of the record

---

[26] Document requests 79, 80, 100, and 101. Additionally, in document requests 86 and 107, Petitioner separately and specifically requests any documentation on the "names, addresses, and present whereabouts of each person identified or interviewed" by multiple law enforcement or prosecutorial agencies in connection with the instant case.

[27] Document requests 85 and 106.

[28] Document requests 81-84 and 102-105.

[29] Document requests 90-92.

[30] Document requests 87 and 108.

[31] Document requests 88, 89, 109 and 110.

demonstrates that trial counsel was in possession of the police report during the trial proceedings. During an examination of Detective Cantrell outside the presence of the jury, lead counsel Bumer asked numerous questions regarding Bloor's photo identification of Tulio. Mr. Bumer introduced and quoted extensively from a police report in the possession of the defense, which he described as "a copy of a Culver Police Department report signed by Keith White." (RT 5965-68.) Later in the trial proceedings, Mr. Bumer again used the same report during an in-court examination of Officer Bloor. (See RT 6142-44.) As the trial record indicates that this particular report was in the possession of defense counsel, it appears likely that the report is contained in trial counsel's files. As such, Petitioner's counsel fails to explain why he seeks discovery from prosecutorial and law enforcement agencies for production of this document when it appears that these agencies are not in the sole possession of the report, and it would likely be more efficient to review trial counsels' files to obtain the report.

In general, as with the prior requests, Petitioner's assertions in support of the expansive document requests are largely speculative in nature. For instance, Petitioner asserts that "discovery may lead to evidence that could further undermine the questionable forensic evidence presented by" evidence technicians Dolan and Buchanan, criminalist Le, and medical examiner Dr. Sathyavagiswaran. (Mot. at 80.) In the SAP, Petitioner alleges that trial counsel failed to properly challenge the forensic testimony presented at trial, either through cross-examination and argument or by retaining and utilizing alternate forensic experts. (See SAP at ¶¶ 238-42.) Petitioner generally alleges that trial counsel failed to have wine glasses tested for blood and saliva, failed to challenge the evidence presented regarding the alleged sexual assault of Jillette Mills, and failed to adequately present evidence regarding a lack of physical evidence tying Petitioner to the crime scene.[32] He also asserts that the testimony regarding the location of Mills' white nightgown was contradictory, "thus suggesting that it could have been contaminated by evidence technicians, including, but not limited to, those technicians who testified at trial." (Mot. at 77.) Yet, Petitioner fails to indicate how discovery of records on prior arrests, detention or incarceration of the forensic witnesses (document requests 81-84 and 102-105), their mental health or substance abuse records (document requests 85 and 106), and prior complaints and/or discipline

---

[32] This includes the fact that twenty (20) usable latent prints were found in the Knoll/Mills apartment, only one of which was identified as Petitioner's, and hairs collected at the scene were not matched to Petitioner.

1  (document requests 90-92) are reasonably likely to assist him in developing his claims of ineffective

2  assistance of counsel.  These assertions, as currently constituted, are too broad and unsupported to

3  evidence anything more than a fishing expedition.

4      Petitioner also requests any documentation regarding Ronald Tulio, the ex-boyfriend of Susan

5  Knoll, asserting that "[d]iscovery may also lead to evidence that could cast considerable doubt on the

6  prosecution's theory that Petitioner was responsible for the Knoll/Mills murders." (Id. at 80.)  In Claim

7  2 of the SAP, Petitioner asserts that trial counsel failed to investigate and present evidence of third party

8  culpability, contending that "[c]ounsel was also in possession of police reports that suggested that

9  Ronald Tulio (Ms. Knoll's former boyfriend) was involved in the Culver City murders.  But counsel

10  failed to investigate this evidence." (SAP at ¶ 252.)  With respect to these allegations, it is unclear why

11  Petitioner's counsel seeks to discover material that he may already possess via trial counsels' files.

12      Finally, as with the prior requests, Petitioner asserts that discovery "will also provide clarity to

13  certain discrepancies that exist between the case-in-chief, as it was presented by the Los Angeles

14  prosecution, and the case-in-chief, as it was presented by the San Diego prosecution." (Mot. at 80.)

15  Petitioner contends that "[t]o the extent the San Diego prosecution's decision not to call James V. Gatlin

16  and/or Danita Schaumann was based on impeachment evidence not disclosed to trial counsel, then

17  Petitioner should be allowed to access that material now." (Id.)  Petitioner fails to indicate the basis for

18  his speculative assertion, and the Court is unpersuaded that Petitioner posits an appropriate reason for

19  the requested discovery.  It is apparent from the record that the Los Angeles case involved Petitioner's

20  trial for the murders of Jillette Mills and Susan Knoll (and Bonnie Guthrie, discussed below) and these

21  murders were introduced at the San Diego trial as other crimes evidence and in penalty phase

22  aggravation.  It is not unreasonable that the witness lists regarding each crime would differ between the

23  two jurisdictions.  At any rate, Petitioner fails to offer an indication that the difference in the witness

24  lists is relevant to the claims in his federal petition, as the SAP does not contain any claim alleging that

25  the prosecution withheld impeachment evidence regarding Gatlin or Schaumann, or that trial counsel

26  was ineffective for failing to request impeachment evidence regarding these witnesses, neither of whom

27  testified at Petitioner's San Diego trial.

28      In sum, the broad discovery sought is not reasonably calculated to lead to the discovery of

1   material pertinent to these claims.  Instead, Petitioner has evidently requested each and every document

2   potentially related to the investigation and prosecution of him for the murders of Susan Knoll and Jillette

3   Mills in Los Angeles and the introduction of the murders at the San Diego trial.  For the reasons

4   discussed here, in addition to those discussed in relation to the prior groups of document requests,

5   Petitioner's request is overbroad, speculative, and fails to show good cause for discovery.

6       4.   Document Requests 111-147

7       At Petitioner's guilt phase trial, the prosecution presented "other crimes" evidence regarding the

8   murder of Bonnie Guthrie in Los Angeles County.  Carter, 36 Cal. 4th at 1227.

9       As with the requests discussed above, Petitioner seeks leave to serve subpoenas duces tecum to

10  command the production of any documents from various city, county and state agencies[33] relating to the

11  rape, burglary and murder of Bonnie Guthrie, including but not limited to the complete police and

12  prosecution case files for the case,[34] the coroner's file,[35] potential Brady and/or witness impeachment

13  materials,[36] statements, interviews, and current location of any individual identified as a potential

14  witness,[37] substance abuse and mental health records of the lay and expert witnesses,[38] lay and expert

15

16      [33] These agencies include the Los Angeles County District Attorney's Office, Los Angeles Police
    Department, Culver City Police Department, West Los Angeles Police Department, Los Angeles County Coroner,
17  Los Angeles County Sheriff's Department, Los Angeles City Attorney's Office, California Department of
    Corrections and Rehabilitation, Los Angeles County Department of Mental Health, San Diego County District
18  Attorney's Office, San Diego Police Department, San Diego City Attorney's Office, San Diego County Sheriff's
    Department, and San Diego County Health and Human Services Agency.

19

20      [34] This includes the case files of the Los Angeles County District Attorney's Office (document request
    111), Los Angeles Police Department (document request 112), Culver City Police Department (document request
21  113), West Los Angeles Police Department (document request 114), San Diego District Attorney's Office
    (document request 131) and San Diego Police Department (document request 132) relating to Petitioner's
22  prosecution in their respective jurisdictions, as well as files each of those agencies maintained relating to
    Petitioner's prosecution outside their jurisdiction.

23      [35] Document request 115.

24      [36] This includes requests for documentation on prior inconsistent, false or biased statements by witnesses
    (document requests 117 and 134), prior statements in which one witness statement is inconsistent with that of
25  another witness (document requests 118 and 135), offers for or agreements on potential consideration to a witness
    or potential witness (document requests 119 and 136), documentation relating to the prosecution and/or plea
26  bargains with any potential witness (document requests 120 and 137), and any other favorable, impeachment or
    other exculpatory material (document requests 116 and 133).
27

28      [37] Document requests 121, 122, 138 and 139.  Additionally, in document requests 128 and 145, Petitioner
    separately and specifically requests any documentation on the "names, addresses, and present whereabouts of each
    person identified or interviewed" by multiple law enforcement or prosecutorial agencies in connection with the

1  witness criminal histories,[39] as well as any communcations between law enforcement and prosecutorial

2  agencies about the investigation and prosecution of Petitioner in the instant case.[40]

3       For the same reasons relating to Petitioner's previously discussed discovery requests, the instant

4  request is overbroad and speculative.  Petitioner again repeats his contention that "[t]o fully investigate

5  the extent of trial counsel's ineffective assistance of counsel, Petitioner's counsel must examine all of

6  the discovery that was or should have been provided to trial counsel."  (Mot. at 101.)  Again, this

7  assertion presumes that either the prosecution failed to comply with Brady, or that trial counsel failed

8  to request all they should have requested from the relevant agencies, but Petitioner fails to demonstrate

9  a likelihood that either situation occurred in his case.  As stated previously, the Court will not allow

10 Petitioner to conduct discovery in order to investigate "mere speculation." Calderon (Nicolaus), 98 F.3d

11 at 1106.

12      Petitioner asserts that "discovery may allow Petitioner to discover evidence that would have

13 impeached or otherwise undermined the testimony of the prosecution's witnesses at guilt or penalty,"

14 stating that "[f]or instance, discovery may lead to evidence that could further undermine the

15 questionable forensic evidence presented by Dr. Sathyavagiswaran, Marcus Kellman, and Lynn Herold."

16 (Mot. at 100.)  However, he fails to specifically indicate what questionable forensic evidence he seeks

17 to undermine, nor does Petitioner indicate how any records on prior arrests, detention or incarceration

18 of these witnesses (document requests 123-26 and 140-43) or the mental health or substance abuse

19 records of these individuals (document requests 127 and 144)[41] will assist him in developing his claims

20 of ineffective assistance of counsel.

21      Petitioner also generally asserts that "[d]iscovery may also lead to evidence that could cast even

22 more doubt on the prosecution's theory that Petitioner was responsible for the Guthrie murder," noting

23 _____

24 instant case.

25      [38] Document requests 127 and 144.

26      [39] Document requests 123-126 and 140-143.

27      [40] Document requests 129, 130, 146 and 147.

28      [41] Petitioner's suggestion that the mental health and/or criminal histories of these individuals will provide evidence that could undermine their trial testimony is conclusory and speculative, and does not appear to have any basis in the record.

that fingerprint and hairs found at the scene were not matched to Petitioner, and asserting that "[i]t is critical that Petitioner discover whether the prosecution tested that forensic evidence, and if so, what were the results of that testing." (Mot. at 100.) Petitioner maintains that "[w]ithout discovery, [he] lacks sufficient information to ensure that the prosecution complied with its duty to provide Petitioner with material exculpatory or impeachment evidence." (Id.) Yet the record clearly indicates that the physical evidence was tested and was not matched to Petitioner. (See e.g. RT 5022 (Detective Zolkowsky, questioned on whether latent prints were lifted from the Guthrie apartment, replied "None. None other than the victim's.")) In fact, Respondent does not contest Petitioner's assertion that seminal material contained in Guthrie's pantyhose and rape kit slides was not tested, and concedes that hair and fingerprints found at the crime scene were not matched to Petitioner. Moreover, the trial record contains exchanges between the trial court and counsel indicating that the prosecution turned over reports on the testing of forensic evidence regarding the Guthrie homicide. (See e.g. RT 5057-60, 5070-74.)

Petitioner asserts that "discovery may also explain the discrepancies in the Los Angeles and San Diego prosecutions' cases-in-chief," noting that Ronald Mancini, the victim's boyfriend, was called as a witness at the Los Angeles trial and not in San Diego, and that Dan Clark and Manny Glieberman were called as witnesses in the San Diego proceeding but were not called in Los Angeles. (Mot. at 101.) As stated above, it is apparent from the record that the Los Angeles case involved Petitioner's trial for the murders of Ms. Mills, Ms. Knoll, and Ms. Guthrie, and that these three murders were later introduced at the San Diego trial in a more limited manner - as "other crimes" evidence and in penalty phase aggravation. Thus, it is not unreasonable that the witness lists regarding each crime would differ between the two jurisdictions. Petitioner also fails to offer any indication that the difference in the witness lists is relevant to the claims in his federal petition, as the SAP does not contain any claim alleging a consitutional violation emanating from the differences in the witness lists between the two proceedings, and Petitioner fails to identify which claim in his SAP the discovery of such evidence would develop. As such, Petitioner fails to show good cause for the requested discovery.

In sum, the broad discovery sought is not reasonably calculated to the discovery of material pertinent to these claims. Instead, Petitioner has evidently requested each and every document potentially related to the investigation and prosecution of the murder of Bonnie Guthrie in Los Angeles

and the introduction of the murder at the San Diego trial.  For the reasons discussed here, in addition to those discussed in relation to the prior groups of document requests, Petitioner's request is overbroad, speculative, and fails to show good cause for discovery.

5.      Document Requests 148-195

At Petitioner's guilt phase trial, the prosecution presented "other crimes" evidence regarding the robbery and murder of Tok Kim in Alameda County.  Carter, 36 Cal. 4th at 1226.

As with the requests discussed above, Petitioner seeks leave to serve subpoenas duces tecum to command the production of any documents from various city, county and state agencies[42] relating to the robbery and murder of Tok Kim including but not limited to the complete police and prosecution case files for the case,[43] the coroner's file,[44] potential Brady and/or witness impeachment materials,[45] statements, interviews, and current location of any individual identified as a potential witness,[46]

---

[42]  These agencies include the Alameda County District Attorney's Office, Oakland Police Department, Alameda County Coroner's Office, Los Angeles County District Attorney's Office, Los Angeles Police Department, Culver City Police Department, West Los Angeles Police Department, Los Angeles County Sheriff's Department, Los Angeles City Attorney's Office, California Department of Corrections and Rehabilitation, Los Angeles County Department of Mental Health, San Diego County District Attorney's Office, San Diego Police Department, San Diego County Medical Examiner, San Diego City Attorney's Office, San Diego County Sheriff's Department, and San Diego County Health and Human Services Agency.

[43] This includes the case files of the Alameda County District Attorney's Office (document request 148), Oakland Police Department (document request 149), Los Angeles County District Attorney's Office (document request 156), Los Angeles Police Department (document request 157), Culver City Police Department (document request 158), West Los Angeles Police Department (document request 159), San Diego District Attorney's Office (document request 177) and San Diego Police Department (document request 178) relating to Petitioner's prosecution in their respective jurisdictions.  In requests 148 and 149, Petitioner also requests documents, records, files and notes from the Alameda County District Attorney and Oakland Police Department relating to the crimes committed against Susan Knoll, Jillette Mills, Bonnie Guthrie, and Janette Cullins.

[44] Document requests 151 and 179.

[45] This includes requests for documentation on prior inconsistent, false or biased statements by witnesses (document requests 153, 162 and 181), prior statements in which one witness statement is inconsistent with that of another witness (document requests 163 and 182), offers for or agreements on potential consideration to a witness or potential witness (document requests 164 and 183), documentation relating to the prosecution and/or plea bargains with any potential witness (document requests 165 and 184), and any other favorable, impeachment or other exculpatory material (document requests 150, 160 and 180).

[46] Document requests 152, 166, 167, 185 and 186.  Additionally, in document requests 173 and 192, Petitioner separately and specifically requests any documentation on the "names, addresses, and present whereabouts of each person identified or interviewed" by multiple law enforcement or prosecutorial agencies in connection with the instant case.

substance abuse and mental health records of several lay, police, and expert witnesses,[47] lay, police and and expert witness criminal histories,[48] prior complaints and/or discipline against the prosecuting attorney,[49] any documents or other evidence discussing or relating to Ray Blevins in connection with this crime,[50] as well as any communcations between law enforcement and prosecutorial agencies about the investigation and prosecution of Petitioner in the instant case.[51]

For the same reasons relating to the previously discussed discovery requests, the instant request is overbroad and speculative. Here, Petitioner contends that "[t]o fully investigate the extent of trial counsel's ineffective assistance of counsel and the improper conduct of the investigating and prosecuting agencies involved in this case, Petitioner's counsel must examine all of the discovery that was or should have been provided to trial counsel." (Mot. at 127.) Again, this assertion presumes that either the prosecution failed to comply with Brady, or that trial counsel failed to request all they should have requested from the relevant agencies, but Petitioner fails to demonstrate a likelihood that either situation occurred in his case. As stated previously, the Court will not allow Petitioner to conduct discovery in order to investigate "mere speculation." Calderon (Nicolaus), 98 F.3d at 1106.

With respect to the crimes against Ms. Kim, Petitioner asserts that his discovery requests could not only support his claims of ineffective assistance of counsel (Claims 2 and 3 of the SAP), but could also support Claims 6 and 7, in which he contends that the prosecution committed misconduct and withheld material, exculpatory evidence from defense counsel. (SAP ¶¶ 289-426; 499-520.) Petitioner argues that the Los Angeles prosecution "failed to timely disclose a 1986 laboratory report from the Oakland Police Department, which eliminated Petitioner as a donor of semen found on a bedspread in Tok Kim's apartment." (Mot at 124.) He maintains that the "exculpatory evidence was available to the State in January 1986, yet only came into the possession of the defense on or about June 15, 1989, the first week of trial." (Id.) However, Petitioner appears to be referring to the first week of the Los

---

[47] Document requests 172 and 191.

[48] Document requests 168-71 and 187-90.

[49] Document request 161.

[50] Document requests 174 and 193.

[51] Document requests 154, 155, 175, 176, 194 and 195.

Angeles trial, as Petitioner's San Diego trial took place in 1991, over two years after the report was evidently provided to the defense.  In the SAP, Petitioner argues that had the report excluding Petitioner as a source of the semen been timely disclosed to the Los Angeles defense counsel, counsel "would have been justified in obtaining a court order for a blood sample from Mr. Blevins's [sic] on the ground that he was a viable third-party suspect.  And that evidence would have been presented in the San Diego case." (SAP at ¶ 515.)  Notably, this statement presupposes that the trial court would have granted a request for a blood sample for Mr. Blevins, that there would have been a match to the sample on the Kim bedspread, and that the evidence would have been admissible at trial.  Even if all three of these assumptions prove true, the allegations, as currently constituted, are wholly conclusory and do not establish good cause for the broad discovery sought by Petitioner.

As a related matter, Petitioner specifically asserts that document request 161, in which he seeks to discover any prior complaints or discipline against the prosecuting attorney in Los Angeles, "would establish whether the Los Angeles District Attorney had a history of *Brady* violations or other infractions." (Mot. at 125.)  Respondent persuasively notes that "[i]t is not clear how the Los Angeles prosecutor's history of misconduct is in any way relevant to [Petitioner's] claims relating to the San Diego trial." (Opp. at 25.)  Indeed, Petitioner fails to indicate how discovery regarding the Los Angeles prosecutors would support the claims alleged in the SAP regarding the performance of the San Diego trial defense counsel or the allegations of misconduct by the San Diego prosecutors, other than in the conclusory manner asserted above.

Petitioner also generally asserts that discovery "may lead to evidence that could further undermine the questionable forensic evidence presented by Drs. Rogers and Blackbourne" and "may also lead to evidence that could cast even more doubt on the prosecution's theory that Petitioner was responsible for the Kim death." (Mot. at 125.)  At trial, Dr. Rogers testified that he performed the Kim autopsy, but could not conclusively determine the time of death or cause of death, yet stating that strangulation was a possible cause of death.  (RT 5369-75.)  Dr. Blackbourne testified that after reviewing the Kim autopsy photos and report, he concluded it was possible that her death was caused by asphyxiation from ligature strangulation.  (RT 5541-51.)  Yet, Petitioner fails to identify any evidence sought that is reasonably expected to undermine the expert testimony of these witnesses. There is no

06cv1343

1  evidence to indicate that the production of arrests, detention or incarceration records of these witnesses

2  (document requests 168-71 and 187-90), or the mental health or substance abuse records of these

3  individuals (document requests 172 and 191)[52] even exist, much less that such records will assist

4  Petitioner in developing his claims of ineffective assistance of counsel.

5       Petitioner also asserts that "[f]ingerprints and hairs found at the scene were not identified as

6  belonging to Petitioner," and alleges that "[i]t is critical that [he] discover whether the prosecution tested

7  that forensic evidence and, if so, what were the results of that testing and the discussion that followed."

8  (Mot. at 125.)  The record indicates that the fingerprint evidence, including the fact that Petitioner's

9  prints were not found in Kim's home, was introduced at trial.  (RT 4257-61.)  Moreover, Respondent

10 does not contest Petitioner's assertion that the hair or semen collected did not match Petitioner.  (Opp.

11 at 24.)  It is also evident that Petitioner (or prior counsel) possesses at least some of the reports he

12 currently seeks; Petitioner repeatedly asserts that the Los Angeles prosecutor failed to timely provide

13 the report regarding the semen stain on Kim's bedspread, in doing so acknowledging that the report was

14 turned over to the defense in 1989.  Again, Petitioner fails to indicate any specific documents or

15 evidence he seeks to discover, instead requesting *every document* relating to this case.  Petitioner fails

16 to provide good cause to justify such a broad discovery request.

17      Petitioner also requests material (document requests 174 and 193) that would allow him to

18 "discover the full extent of the prosecution's investigation into Ray Blevins's role as the murderer in

19 Tok Kim's case."  (Mot. at 126.)  However, as previously noted regarding the allegations concerning

20 the testimony of Polly Haisha, the California Supreme Court imposed state procedural bars on several

21 claims in the SAP concerning Mr. Blevins' involvement in the murder of Tok Kim.  (See Supp.

22 Lodgment No. 1; Lodgment No. 113.)  Because this Court has not yet ruled on procedural default in this

23 case, it would be premature to consider allowing discovery on claims that may prove to be procedurally

24 barred from federal review.  See Rucker, 563 F.3d at 771; Williams, 38 F.3d at 975.

25      Petitioner also asserts that "the materials requested will also help explain the discrepancies in

26 the Los Angeles and San Diego prosecutions' case-in-chiefs," stating that:

27

28       [52] Petitioner's suggestion that the mental health and/or criminal histories of these individuals will provide evidence that could undermine their trial testimony is conclusory and speculative, and does not appear to have any basis in the record.

> It is unclear why the San Diego prosecution decided not to call Alfredo D. Lopez, Vinay Brasad, and Ingrid Maleska-King, and not introduce the testimony of Ray Blevins. It is also unclear why the San Diego prosecution chose to call Jeffrey Eddis and Polly Haisha but the Los Angeles prosecution did not.

(Mot. at 126-27.) This assertion is inaccurate. The state trial record clearly shows that Alfredo D. Lopez (see RT 4213-30) and Ingrid Maleska-King (see RT 386-4400) testified at the San Diego trial and shows that the prosecution introduced the transcript of Ray Blevins' prior testimony (see RT 4271-81) at that proceeding. Aside from the inaccuracies, Petitioner fails to offer any indication that the difference in the witness lists is relevant to the claims in his federal petition. The SAP does not contain a claim alleging a consitutional violation arising from differences in the witnesses called at each proceeding, and Petitioner fails to allege which claim in his SAP this discovery would develop.

In sum, the broad discovery sought is not reasonably calculated to lead to the discovery of material pertinent to any claim in the SAP. Instead, Petitioner appears to have requested each and every document potentially related to the investigation of Petitioner for the murder of Tok Kim and the introduction of the murder at the San Diego trial. For the reasons discussed here, in addition to those discussed in relation to the prior groups of document requests, Petitioner's request is overbroad, speculative, and fails to show good cause for discovery.

### 6.    Document Requests 196-235

Petitioner was charged with and convicted of the robbery and murder of Janette Cullins and the burglary of her residence. Carter, 36 Cal. 4th at 1220. After the penalty phase, the jury returned a verdict of death for the murder, and the trial court later imposed a death sentence. Id. at 1221.

As with the requests discussed above, Petitioner seeks leave to serve subpoenas duces tecum to command the production of any documents from various city, county and state agencies[53] relating to the robbery and murder of Janette Cullins, including but not limited to the complete police and prosecution

---

[53] These agencies include the Los Angeles County District Attorney's Office, Los Angeles Police Department, Culver City Police Department, West Los Angeles Police Department, Los Angeles County Sheriff's Department, Los Angeles City Attorney's Office, California Department of Corrections and Rehabilitation, Los Angeles County Department of Mental Health, San Diego County District Attorney's Office, San Diego Police Department, San Diego County Medical Examiner, San Diego City Attorney's Office, San Diego County Sheriff's Department, and San Diego County Health and Human Services Agency.

case files for the case,[54] the coroner's file,[55] potential <u>Brady</u> and/or witness impeachment materials,[56] statements, interviews, and current location of any individual identified as a potential witness,[57] substance abuse and mental health records of the lay and expert witnesses,[58] lay and expert witness criminal histories,[59] prior complaints and/or discipline against the prosecuting attorneys and certain law enforcement witnesses,[60] personnel documents relating to prosecutor Pippin's prior role as colleague and/or supervisor to Judge Melinda Lasater,[61] as well as any communcations between law enforcement and prosecutorial agencies about the investigation and prosecution of Petitioner in the instant case.[62]

As with prior requests, Petitioner asserts that in order "[t]o fully investigate the extent of trial counsel's ineffective assistance of counsel, petitioner's counsel must examine all of the discovery that was or should have been provided to counsel."  (Mot. at 154.)  Yet again, Petitioner's request is overbroad, the arguments advanced in support of the discovery request are speculative and conclusory, and the Court will not allow Petitioner to conduct discovery in order to investigate "mere speculation." <u>Calderon (Nicolaus)</u>, 98 F.3d at 1106.

---

[54] This includes the case files of the Los Angeles County District Attorney's Office (document request 196), Los Angeles Police Department (document request 197), Culver City Police Department (document request 198), West Los Angeles Police Department (document request 199), San Diego County District Attorney's Office (document request 215), and San Diego Police Department (document reqeust 216) relating to Petitioner's prosecution in their respective jurisdictions and in San Diego.

[55] Document request 217.

[56] This includes requests for documentation on prior inconsistent, false or biased statements by witnesses (document requests 201 and 221), prior statements in which one witness statement is inconsistent with that of another witness (document requests 202 and 222), offers for or agreements on potential consideration to a witness or potential witness (document requests 203 and 223), documentation relating to the prosecution and/or plea bargains with any potential witness (document requests 204 and 224), and any other favorable, impeachment or other exculpatory material (document requests 200 and 218).

[57] Document requests 205, 206, 225 and 226.  Additionally, in document requests 212 and 232, Petitioner separately and specifically requests any documentation on the "names, addresses, and present whereabouts of each person identified or interviewed" by multiple law enforcement or prosecutorial agencies in connection with the instant case.

[58] Document requests 211 and 231.

[59] Document requests 207-10 and 227-30.

[60] Document requests 219 and 233.

[61] Document request 220.

[62] Document requests 213, 214, 234, and 235.

For instance, Petitioner alleges that "discovery may lead to evidence that could further undermine the questionable forensic evidence presented at trial," stating that as "[f]ingerprints and hair found at the scene were not identified as belonging to Petitioner," and asserting that "[i]t is critical that Petitioner discover whether the prosecution tested that forensic evidence and, if so, what were the results of that testing and the discussion that followed." (Mot. at 153.)  Petitioner maintains that "[w]ithout discovery, [he] lacks sufficient information to ensure that the prosecution complied with its duty to provide Petitioner with material exculpatory or impeachment evidence." (Id.)  A review of the state record indicates that hair and fingerprint evidence was tested and was not matched to Petitioner.  (See e.g. RT 6112-16 (Criminalist William Loznycky tetstified that fibers found inside the hand of Ms. Cullins were not a match to those from a sweater worn by Petitioner, and hairs from several blankets and sheets in her residence were not a match to hair samples taken from Petitioner).)   In fact, Respondent does not contest Petitioner's assertions that (1) no tool was identified in support of the prosecution's argument that there was forced entry into Ms. Cullins' apartment, (2) there was no evidence that Ms. Cullins was sexually assaulted, and (3) while blood stains were found to be similar to Petitioner's blood, no significant wounds were found on Petitioner.  (Opp. at 27.)  The trial record also contains exchanges between the trial court and counsel indicating that the prosecution turned over reports on the testing of forensic evidence regarding the crimes against Ms. Cullins.  (See e.g. RT 5397-5400, 6112.)

Petitioner also asserts that certain discovery requests concerning the Cullins case could provide support for Claim 6 in the SAP, in which he contends that the prosecution committed misconduct, and Claim 11, in which he contends that the trial judge was not impartial.  Petitioner states that document request 219 would provide information on "whether the district attorneys had a history of engaging in such unlawful and prejudicial behavior," and that document request 220 would assist in establishing "whether the relationship between deputy district attorney Pippin and Judge Lasater was even more extensive and prejudicial to Petitioner than was already established at trial." (Mot. at 153.)  Both requests appear to be nothing more than a fishing expedition.  "Ordinarily, we presume that public officials have 'properly discharged their official duties.'" Bracy, 520 U.S. at 909, quoting United States v. Armstrong, 517 U.S. 456, 464 (1996).  Petitioner's unsupported assertions to the contrary are speculative and do not establish good cause for discovery.

06cv1343

1         Petitioner also requests discovery regarding his claim that the prosecutor committed misconduct

2    in insinuating that Petitioner abused his children, contending that there was no evidence before the trial

3    court indicating abuse.  Petitioner indicates it is his intention to determine whether the prosecutor was

4    in possession of any evidence of abuse prior to making that insinuation, and maintains that he "has

5    reason to believe that no such evidence will be in the prosecution's possession, thus supporting his

6    claim" of misconduct.  (Mot. at 154.)  Respondent notes that "[f]or purposes of Carter's claim, it has

7    been assumed that there are no documents in the prosecutor's file that Carter abused his children."

8    (Opp. at 28.)  Petitioner fails to demonstrate good cause to conduct a review of the prosecution's file

9    in search of an absence of documentation.

10        Petitioner additionally asserts that it is "critical that [he] discover the full extent of prosecution's

11   investigation into the lying in wait charges," asserting that there are "major discrepancies" in the

12   evidence presented regarding wood chips collected from outside the victim's apartment, which were not

13   preserved as evidence.  (Mot. at 153.)   He maintains that documentation regarding the wood chips

14   would support Claim 9 of the SAP, in which he alleges that his "Constitutional Rights Were Violated

15   When Secondary Evidence of Purported Forced Entry to the Cullins Apartment Was Admitted at His

16   Trial, Where Police Failed to Preserve "Wood Chips" that Were Allegedly Observed By Officers at the

17   Crime Scene."  (Id. at 150.)  Petitioner seeks an explanation as to "what happened to this critical

18   evidence" and to "establish whether the officers who abrogated their duties had a history of such

19   failures."  (Id. at 153.)  However, the direct appeal opinion clearly states that the lying in wait special

20   circumstance was set aside.  See Carter, 36 Cal. 4th at 1281.  Moreover, Petitioner does not limit his

21   request to records on prior complaints and/or discipline, but requests documentation on prior arrests,

22   detention or incarceration of these witnesses as well as the mental health or substance abuse records of

23   these individuals, speculating that this information exists and that it would support his federal claims.[63]

24   These conclusory assertions do not establish good cause for the broad discovery sought.  See Calderon

25

26       [63] Petitioner has also requested criminal history records (document request 207-10 and 227-30) and

27   mental health and/or substance abuse records (document request 211 and 231) regarding Mr. George Cullins, the father of victim Janette Cullins.  Mr. Cullins is mentioned only briefly in the SAP, in Claim 6 (which alleges that the prosecutor committed misconduct by improperly introducing Mr. Cullins to the jury during voir dire), and

28   it is unclear what relevance these records would have to developing Claim 6, or any of Petitioner's other federal claims.  This appears to be yet another example of the overbroad and speculative nature of Petitioner's motion for discovery.

1   (Nicolaus), 98 F.3d at 1106.

2       Petitioner also maintains that the requested discovery "may also explain the discrepancies in the

3   cases-in-chiefs as they were presented by the Los Angeles and San Diego prosecutions," stating that

4   "[n]otably, the Los Angeles prosecution did not present the testimony of individuals who testified about

5   the 'wood chips.' With discovery, Petitioner will be able to determine if that strategic decision was

6   made because the evidence was questionable." (Mot. at 154.) He highlights additional differences

7   between the witnesses called at the two trial proceedings, stating that:

8       Thus, in contrast to the Los Angeles prosecution, the San Diego prosecution chose not
        to introduce the testimony of Judith Elaine Adams and Rodney Beverly, both of whom
9       testified that Petitioner used Jannette Cullins's ATM card after her death. Also in
        contrast to the Los Angeles prosecution, the San Diego prosecution introduced the
10      testimony of Charles Edward Byron and Bruce Allen Furnice, both of whom had
        appointments with Jannette Cullins which she never met; David Susi, who identified
11      Petitioner as being in San Diego around the time of the murder; Fred Dreis and Dannis
        G. Nucholls, both of whom worked for the San Diego Police Department, and whom
12      were called to establish that Petitioner committed the murder while lying in wait; and
        Sandra Homewood of the San Diego County District Attorney's Office, who compared
13      a handwriting exemplar.

14  (Id. at 144.) As a related matter, Petitioner's account of the proceedings is again inaccurate, as a review

15  of the trial record shows that Mr. Beverly did in fact testify at the San Diego trial. (See RT 4904-13.)

16      Petitioner's assertion that the questionable quality of certain evidence resulted in differing

17  prosecutorial decisions at the Los Angeles and San Diego trials is also speculative. In fact, there are any

18  number of reasons why the witnesses and evidence may have differed between the two proceedings.

19  For instance, the San Diego proceeding took place several years after the one in Los Angeles, and the

20  investigation into the charged crimes likely continued to develop after the conclusion of the Los Angeles

21  case. Additionally, and more likely, the witness lists and evidence differed because in Los Angeles, the

22  death of Ms. Cullins by strangulation was offered as other crimes evidence, while in the San Diego

23  proceeding, Petitioner was on trial for the robbery and murder of Ms. Cullins, and the burglary of her

24  home.[64]  See People v. Carter, 36 Cal. 4th 1114, 1132-33 (2005) (Los Angeles convictions and

25  sentence); Carter, 36 Cal. 4th at 1220 (San Diego convictions and sentence). Moreover, for the reasons

26  stated above in the discussion of the prior requests,  Petitioner fails to offer any indication that the

27

28      [64] Petitioner acknowledges that witnesses Dreis and Nucholls were called to establish the lying in wait
    special circumstance charges with respect to Ms. Cullins's murder. (See Mot. at 144.) Again, the San Diego
    proceedings would necessarily differ from Los Angeles, as the special circumstances charged and found true in
    Los Angeles were rape, burglary and multiple murder. See Carter, 36 Cal. 4th at 1127.

difference in the witness lists bears any relevance to the claims in his federal petition.

In sum, the broad requests at issue here are not reasonably calculated to the discovery of material pertinent to any claim in the SAP. Instead, Petitioner has evidently requested *each and every* document potentially related to the investigation and prosecution of Petitioner for the robbery and murder of Janette Cullins and the burglary of her home. For the reasons discussed, Petitioner's request is overbroad, speculative, and he fails to show good cause for discovery.

### 7. Document Requests 236-245

Petitioner requests documents pertaining to his April 17, 1984 arrest in Yavapai County, Arizona, and the subsequent search of the vehicle he was driving when arrested. The clothing Petitioner was wearing at the time of his arrest and contents of the vehicle were introduced into evidence at his guilt phase proceedings. See Carter, 36 Cal. 4th at 1233-34. Specifically, Petitioner seeks all documents (1) relating to his traffic stop, detention, arrest and evidence collection,[65] (2) relating to complaints or disciplinary action against Officer Dasper and Detectives McEwen and White,[66] and (3) incident reports, investigative reports and communcations between the Arizona Department of Public Safety and numerous agencies in California regarding Petitioner's arrest in Arizona.[67] (Mot. at 155-57.)

As with prior requests, Petitioner generally asserts that in order "[t]o fully investigate the extent of trial counsel's ineffective assistance of counsel, petitioner's counsel must examine all of the discovery that was or should have been provided to counsel." (Id. at 159.) Petitioner contends that he "can then compare that evidence to the discovery that was in trial counsel's files. Similarly, to fully investigate the extent of prosecutorial misconduct, Petitioner must discover whether the prosecutor knew that the car had been illegally searched." (Id.) Petitioner's request for all documents related to his detention, arrest, and the personnel involved is overbroad, not reasonably calculated to the discovery of materials relevant to Petitioner's claims, and based on speculative assertions.

Petitioner asserts that this discovery is relevant to Claims 2 (Ineffective Assistance of Counsel at the Guilt Phase), 3 (Ineffective Assistance of Counsel at the Penalty Phase), 6 (Prosecutorial

---

[65] Document requests 236, 239, 241, and 244.

[66] Document requests 237 and 243.

[67] Document requests 238, 240, 242 and 245.

- 27 -

1   Misconduct), and 15 (Denial of a Full and Fair Suppression Hearing) of the SAP.  (Id. at 159.)

2   Petitioner states that the requested discovery "will allow Petitioner to determine whether investigating

3   agencies in this case should have obtained a warrant before searching the car," and "may also establish

4   that the detectives and officers involved in his stop, arrest, and warrantless search and seizure had a

5   history of committing these types of violations." (Id. at 161-62.)  However, Petitioner fails to offer any

6   "specific allegations" to rebut the Court's presumption that the public officials cited here "properly

7   discharged their official duties."  Bracy, 520 U.S. at 909.  Petitioner fails to explain how discovery on

8   all aspects of his arrest in Arizona are reasonably calculated to the production of material that would

9   support his claims as detailed in the SAP.  The overbroad discovery evidences a fishing expedition.

10   Accordingly, Petitioner fails to show good cause for the requested discovery.

11          8.       Document Requests 246-247

12          In Claim 1 of the SAP, Petitioner asserts that incidents of juror misconduct violated his right to

13   a fair trial by an impartial jury, in part due to the jurors' viewing extrinsic evidence in the jury room,

14   namely, a stocking concealed in another piece of evidence, discovered by the jury during deliberations

15   in the jury room.  (SAP at ¶¶ 112-228.)  Petitioner requests documents relating to the jurors' viewing

16   of extrinsic evidence in his case.  (Mot. at 162-63.)

17          Petitioner requests all documentation, records, files and notes from the California Bureau of

18   Investigation (document request 246) and the California Attorney General's Office (document request

19   247) relating to the jurors' viewing of extrinsic evidence.  As both parties acknowledge, this claim was

20   raised after the Attorney General's Office provided Petitioner with a letter regarding: 1) a conversation

21   that prosecuting attorney Pippin had with a trial juror regarding an item the jury viewed during

22   deliberations that was not marked as an exhibit, and 2) the investigation undertaken by the California

23   Bureau of Investigation at the request of the Attorney General's Office, including interviews with trial

24   prosecutors Pippin and Eichler.  (See id. at 164; Opp. at 32.)

25          Petitioner asserts that he has "thus far been denied full access to the Attorney General Office's

26   and California Bureau of Investigation and Intelligence's files relating to this case and their

27   investigation of James Pippin and Robert Eichler," and requests discovery in order to obtain "all

28   relevant information pertaining to the State's investigation of the serious impropriety that occurred in

this case." (Mot. at

165.)  Yet the record reflects, and the parties acknolwedge, that Petitioner is already in possession of materials regarding this investigation.  (See id. at 163-64; Opp. at 32; Exs. 95, 99 to SAP.)  Moreover, Respondent asserts that, in addition to the materials already provided, he "will be providing forthwith an audiotape of an interview with Deputy District Attorney Robert Eichler that was referenced in the materials already provided."  (Opp. at 32.)  While Petitioner speculates that there is additional relevant evidence that has not been provided to him, the Court finds nothing to indicate this is the situation.  As stated previously, the Court will not allow Petitioner to conduct discovery in order to investigate "mere speculation."  Calderon (Nicolaus), 98 F.3d at 1106.

9.   Depositions 1-15

Petitioner seeks to depose fifteen jurors and alternate jurors, including the twelve jurors who rendered the guilt and penalty decisions in Petitioner's case, one juror who was removed by the Court, and two individuals who served as alternate jurors on his case.  (Mot. at 165-66.)  Petitioner asserts that these depositions are relevant to Claim 1 of the SAP, in which he alleges that jury selection and instances of juror misconduct violated his right to a fair trial by an impartial jury.  (Id. at 166.)

Petitioner asserts that the depositions would allow him to investigate four incidents of juror misconduct, stating that:

(1)     Depositions 1-15 would "allow Petitioner to demonstrate that Juror Cigainero was actually biased" when he sat as a member of Petitioner's trial jury, adding that "this jury was a particularly tight-knit group, thus making it likely that Juror Cigainero shared his thoughts and biases with the other jurors."  (Id. at 168.)

(2)     Depositions 1-15 will also allow Petitioner "to determine exactly what was discussed at the clandestine meeting between Mr. McAlpine and the other jurors at a location away from the courthouse," stating that "[b]ecause the trial court issued a 'no-contact' order, Petitioner has been unable to properly investigate this claim.  (Id. at 168-69.)

(3)     Depositions 1-15 will allow him to "determine the exact scope of the jurors' diminished sense of responsibility" resulting from their assumption that Petitioner had already been sentenced to death in Los Angeles County.  (Id. at 169;167.)

(4)     Depositions 1-13 will allow him to "determine which juror originally found the extrinsic evidence," "how many jurors viewed that evidence," and "how the jurors used the extrinsic evidence in reaching their verdicts."  (Id. at 169.)

However, Petitioner's request to depose these fifteen individuals is overbroad and based on speculative assertions.

First, Petitioner's request to depose all members of the jury panel in support of his claim that Juror Cigainero was a biased juror is based on the speculative assertion that because the jury in this case was a particularly "tight-knit group," it was likely that Juror Cigainero shared his feelings on the death penalty with the other jurors.  Petitioner offers no indication that any juror or alternate juror (other than Juror Cigainero, who Petitioner already interviewed in 2008 and 2009)[68] is likely to have discoverable information regarding this allegation, and as such, Petitioner fails to show good cause to depose the fifteen named individuals.

Regarding the second allegation of jury misconduct, Petitioner repeatedly refers to a "clandestine" meeting between former juror McAlpine and the other jurors "at a location away from the courthouse," and asserts that these individuals may have spoken to Mr. McAlpine about improper matters.  (Id. at 169-69.)  In fact, the "clandestine" meeting was a juror potluck, which was approved by the trial court and both parties, that former Juror McAlpine attended only after being contacted and invited by another juror, and prior to which the court admonished the jurors and Mr. McAlpine to refrain from discussing anything related to the case.  (RT 7608-10; 8016-19; 8033-36.)  Petitioner's assertion that deposing the jurors would  reveal improper discussions the jurors had at the potluck is conclusory and speculative.  Petitioner fails to show good cause to warrant deposing fifteen individuals on this speculative basis.

Petitioner's third allegation is based upon statements made by Juror Ridge, who was interviewed by counsel for Petitioner and Respondent in 2008 and 2009.  In the 2008 interview, Mr. Ridge stated that articles after the trial regarding Petitioner's Los Angeles death sentence "confirmed everything that we kind of thought we knew, but we didn't discuss it."  (Ex. 94 to SAP at 1084.)  In the same interview, Mr. Ridge was also specifically asked "Did you know that Mr. Carter had already been convicted in a separate prosecution in Los Angeles county at the time of the San Diego trial?" to which he answered "No," stated that he found out "[s]ometime afterwards," and added "I don't remember exactly when, but it wasn't known during the deliberations."  (Id. at 1083-84.)  Based on these statements, Petitioner requests leave to depose all fifteen jurors, which includes the alternates and the removed juror, in order to discover the "exact scope" of the jury's diminished sense of responsbility.  However, Mr. Ridge's

---

[68] See Exhibits 94 and 96.

statments are equivocal at best, and Petitioner's conclusory assertions based on these statements are insufficient to show good cause for discovery.

Petitioner's final allegation of juror misconduct concerns extrinsic evidence that was evidently concealed in a tear in Petitioner's jacket, which was in evidence at trial, and which was discovered by an unidentified juror during deliberations.  To date, three trial jurors have already been questioned at length regarding this incident.  Petitioner presently requests leave to depose thirteen individuals on this incident - the twelve deliberating jurors and removed juror McAlpine.

Several reasons inform the Court's decision denying the requested discovery.  First, Petitioner fails to provide a reason for re-interviewing Jurors Ridge, Hughes and Cigainero, as these individuals have already been subject to extensive interviews on the record regarding this case, and regarding this incident in particular.  None of these three individuals have indicated that the additional evidence played any role in deliberations.  As such, Petitioner's assertion that discovery will allow him to determine "how the jurors used the extrinsic evidence in reaching their verdicts" appears to be purely speculative and conclusory.  Second, removed Juror McAlpine appears wholly unconnected to this allegation of error.  The record indicates that jury deliberations began on May 21, 1991, the same day that Juror McAlpine was excused from service. (CT 2651.)  However, Juror McAlpine was excused at 11:54 a.m. and the record reflects that the exhibits were placed in the deliberation room by 1:36 p.m.  (Id.) Moreover, the trial court issued concluding jury instructions and placed Juror Pinto on the jury in place of departed Juror McAlpine at 2:02 p.m., and the jury began deliberations at 2:25 p.m. (CT 2651-52.) Therefore, there is no indication that Juror McAlpine was ever in the jury deliberation room at the same time as the exhibits, and as he was replaced prior to the commencement of deliberations, there is no evidence that he would have been privy to the discovery of extrinsic evidence as indicated in the materials submitted by Petitioner.

Generally, with respect to the requested juror depositions, the parties agree that a protective order remains in place, prohibiting Petitioner from contacting the trial jurors without the consent of the state trial court.  On several prior occasions, Petitioner petitioned this Court for permission to interview the trial jurors (see doc. nos. 18, 45), and the Court declined to issue such an order, recommending that Petitioner raise the issue with the trial court.  (See Doc. Nos. 38, 47.)  Petitioner thereafter sought the

trial court's consent and as a result, both parties to the instant action and the trial judge conducted interviews with three jurors in November 2008 and October 2009, at which the jurors were questioned about the matters discussed here. Petitioner has already received discovery on this matter, and fails to demonstrate good cause for additional inquiry. At any rate, Petitioner fails to offer the Court a "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief" on this claim. Bracy, 520 U.S. at 908-09. Accordingly, discovery is not warranted.

### 10. Depositions 16-17

Petitioner seeks to depose James Pippin and Robert Eichler, who prosecuted his case as San Diego County Deputy District Attorneys. (Mot. at 170.) Petitioner contends that the depositions could offer support for several claims alleged in the SAP: Claim 1 (Juror Misconduct- Viewing of Extrinsic Evidence), Claim 6 (Prosecutorial Misconduct), Claim 7 (Failure to Disclose Exculpatory Evidence and Allow Inspection of Evidence) and Claim 11 (Impartiality of the Trial Judge).

Regarding Claim 1, Petitioner asserts that he seeks discovery to discern "among other thing, whether Robert Eichler also knew about this juror's post-trial conversation with James Pippin and why it took James Pippin so long to disclose this improper instance of juror misconduct." (Id. at 171.) Yet as stated above in the discussion of document requests 246-47 (see section II.8, supra), the record reflects, and the parties acknowledge, that Petitioner is already in possession of reports regarding this investigation. (See id. at 163-64; Opp. at 32; Exs. 95, 99 to SAP.) Respondent also states an intention to provide Petitioner with an audiotape of the interview with Mr. Eichler. (See Opp. at 32.) This audiotape would, in all likelihood, reveal whether Mr. Eichler possessed any knowledge of the conversation. With respect to the timing of Mr. Pippin's disclosure of the conversation, Petitioner fails to state what relevance this has on the juror misconduct claim, and fails to demonstrate that there is additional information that the trial prosecutors could reasonably provide in support of this claim.

Regarding Claim 6, Petitioner reiterates the contentions advanced in the SAP, which includes allegedly improper actions, motions, questions to witnesses, arguments to the jury, and false or misleading statements to the trial court regarding witnesses and evidence, and generally asserts that discovery will "allow Petitioner to gather additional support for this claim." (Id. at 171-72.) This vague assertion fails to provide good cause for the requested discovery. For Claim 7, Petitioner repeats the allegation that because the prosecution failed to timely disclose evidence of testing that eliminated him

as a source of semen found on Tok Kim's bedspread, he was unable to properly investigate a theory of third party liability.  (Id. at 173.)  Here too, Petitioner fails to indicate how discovery would aid in the development of this claim.

In Claim 11, Petitioner reiterates that prosecutor Pippin had a "uniquely close relationship" with Judge Melinda Lasater, asserts that the defense motion to recuse Judge Lasater should have been granted, and states that "[d]eposing James Pippin will allow Petitioner to further develop this claim." (Id. at 173.)  Again, Petitioner fails to provide good cause for discovery based only on the vague and conclusory assertion that deposing Mr. Pippin will aid in developing his habeas claim.

       11.   <u>Deposition 18</u>

Petitioner seeks to depose the Honorable Melinda Lasater, the trial judge in his case.  (Mot. at 173.)  Petitioner asserts that the deposition is relevant to Claim 11 in his SAP, in which he alleges that the trial judge who presided over his case was not impartial.  (Id.)

The state record reflects that prior to trial, Petitioner's defense counsel filed a motion to disqualify Judge Lasater from presiding over his case, alleging that prosecutor James Pippin had known Judge Lasater for a long time, had supervised her for a short time when both were employed at the San Diego District Attorney's Office, and had participated in Pippin's daughter's wedding.  The defense also argued that Judge Lasater had a preconceived opinion on the constitutionality of the death penalty.  (CT 247.)  Another San Diego Superior Court judge heard and denied the motion to disqualify Judge Lasater from Petitioner's case.  (RT 50-53.)  In support of this deposition request, Petitioner reiterates that prosecutor Pippin supervised Judge Lasater at the District Attorney's office, and repeats several instances of social contact between Judge Lasater and prosecutor Pippin or his family members, all of which is currently contained in the state court record.  Petitioner maintains that "[a]llowing this deposition will allow Petitioner to further develop this claim."  (Id. at 174.)  However, Petitioner provides no support, other than his own speculation, that this deposition would result in relevant evidence in support of his claim.  As such, Petitioner fails to demonstrate good cause for discovery.

**III. CONCLUSION**

Petitioner fails to demonstrate good cause for the overbroad discovery sought which, if granted, would likely amount to a complete reinvestigation of the two charged crimes and five other crimes

1    introduced into evidence at Petitioner's San Diego trial.

2          Petitioner requests that "if this Court denies Petitioner's motion to conduct discovery but grants

3    the motion for evidentiary hearing, Petitioner requests leave to file a motion for discovery narrowly

4    tailored to those claims on which an evidentiary hearing is being held." (Mot. at 10.) This request

5    appears reasonable.

6          Accordingly, Petitioner's Motion for Discovery is **DENIED** without prejudice.

7          **IT IS SO ORDERED.**

8    DATED:  July 25, 2011

9

10                                         _____
                                           Hon. Roger T. Benitez
11                                         United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28