**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

DEAN PHILLIP CARTER,

Petitioner,

vs.

KEVIN CHAPPELL, Acting Warden of the San Quentin State Prison,

Respondent.

CASE NO. 06cv1343 BEN (KSC)

*DEATH PENALTY CASE*

**ORDER:**

**(1) DENYING PETITIONER'S REQUEST FOR EVIDENTIARY DEVELOPMENT OF CLAIMS 1-5, 7, 13, 16.C AND 16.E OF THE SECOND AMENDED PETITION;**

**(2) DENYING RESPONDENT'S REQUEST TO DISMISS CERTAIN CLAIMS ON THE BASIS OF PROCEDURAL DEFAULT; AND**

**(3) DENYING HABEAS RELIEF ON CLAIMS 1-16**

On January 3, 2012, Petitioner filed a 28 U.S.C. § 2254(d) Brief, contending that he is entitled to habeas relief on each claim contained in the Second Amended Petition. (Doc. No. 158.) On February 23, 2012, Respondent filed a Response to Petitioner's Section 2254 Brief, requesting dismissal of all claims contained in the Second Amended Petition with prejudice. (Doc. No. 162.) On March 9, 2012, Petitioner filed a Reply. (Doc. No. 163.) The Court has also considered the arguments set forth in the Second Amended Petition, Answer, Traverse, the briefings filed in support of, and in opposition

to, Petitioner's Motion for an Evidentiary Hearing, as well as the supplemental briefs filed addressing the Supreme Court's decision in Cullen v. Pinholster, 563 U.S. ___, 131 S. Ct. 1388 (2011).

For the following reasons, and based on the arguments presented in the pleadings and at oral argument, the Court **DENIES** Petitioner's request for evidentiary development on Claims 1-5, 7, 13 16.C and 16.E in the Second Amended Petition, **DENIES** Respondent's request to dismiss certain claims on the basis of state procedural default, and **DENIES** habeas relief on Claims 1-16.

## I. PROCEDURAL HISTORY

By an amended information filed on September 26, 1990, Petitioner Dean Phillip Carter was charged in the murder and robbery of Janette Cullins and the burglary of her home on April 13, 1984, and the forcible rape, forcible copulation, and robbery of Barbara S.[1] on March 25, 1984.

On May 22, 1991, Petitioner was convicted of one count of first-degree murder in violation of California Penal Code § 187(a), two counts of robbery in violation of Cal. Penal Code § 211, two counts of burglary under Cal. Penal Code § 459, one count of forcible rape under § 261(2), and one count of forcible oral copulation under Cal. Penal Code § 288(c). The jury further found that in the crimes against Ms. Cullins, Petitioner had personally inflicted great bodily injury in violation of Cal. Penal Code § 12022.7 and that in the crimes against Barbara S., Petitioner had used a deadly weapon in violation of Cal. Penal Code §§ 12022(b) and 12022.3(d).

Petitioner was also found guilty of four special circumstances within the meaning of Cal. Penal Code § 190.2: (1) murder committed while lying in wait, (2) murder committed in the course of a robbery, (3) murder committed in the course of a burglary,

[1] The Court will refer to sexual assault victims by first name and last initial only, consistent with the manner of reference utilized by the California Supreme Court in adjudicating the direct appeal.

and (4) Petitioner had previously been convicted of the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie in Los Angeles County Superior Court.[2]

On June 18, 1991, the jury returned a sentence of death for the murder of Janette Cullins. On September 9, 1991, the trial court sentenced Petitioner to death, with an additional consecutive sentence of 21 years and 8 months for the crimes committed against Barbara S.

On automatic appeal of this conviction and judgment to the California Supreme Court, Petitioner filed an opening brief on July 2, 1999, raising over twenty-three (23) issues, including numerous claims of trial court errors, voir dire errors, prosecutorial misconduct, jury instruction errors, insufficient evidence, infirmities in the death penalty statute, and cumulative error. Petitioner also filed a reply brief on January 3, 2001, and oral argument was held on May 24, 2005. The California Supreme Court affirmed the conviction and sentence on August 15, 2005. People v. Carter, 36 Cal.4th 1215 (2005). On October 26, 2005, the California Supreme Court denied Petitioner's request for a rehearing, and on April 24, 2006, the Supreme Court of the United States denied his petition for a writ of certiorari.

On April 16, 2001, Petitioner filed a habeas petition with the California Supreme Court, raising over twelve (12) grounds for relief, including claims of the use of improper evidence in aggravation, a denial of his right to competent psychiatric assistance, prosecutorial misconduct, a warrantless search of his person and property, trial court errors, state failures to disclose exculpatory evidence, and ineffective assistance of counsel during the guilt and penalty phases. Petitioner also filed a reply on August 9, 2002. Petitioner was not granted an evidentiary hearing on these claims and his petition was denied on June 28, 2006, and an amended order of denial was issued on September 13, 2006.

///

[2] Trial on the special circumstance relating to the Mills/Knoll/Guthrie murder convictions was bifurcated. (See CT 590-606, 1003-04, 2571, 2584.) On June 4, 1991, Petitioner waived trial and admitted the truth of the prior convictions. (CT 2672.)

On June 29, 2006, Petitioner filed a request with this Court for appointment of counsel and to stay the execution of his death sentence. On December 6, 2006, Petitioner filed a Protective Petition, and on June 20, 2007, Petitioner filed a mixed Petition for Writ of Habeas Corpus with this Court, asserting 17 claims for relief, with eight claims comprised of numerous sub-claims. On July 6, 2007, Petitioner and Respondent filed a Joint Stipulation and Motion to Stay Federal Proceedings pending the resolution of the state petition, and on July 13, 2007, the Court granted the Motion.

On June 22, 2007, Petitioner filed a second state habeas petition, containing the unexhausted claims, and filed a Reply on April 23, 2009. Petitioner also filed a third state habeas petition on February 16, 2010, based on newly discovered evidence, and filed a Reply on May 14, 2010. The second and third state habeas petitions were both denied by the California Supreme Court without an evidentiary hearing on June 17, 2010.

On July 12, 2010, Petitioner filed a Second Amended Petition ["SAP"] in this Court, the operative pleading in this action.[3] On October 18, 2010, Respondent filed an Answer, and on December 8, 2010, Petitioner filed a Traverse. On December 22, 2010, Petitioner filed a Motion for Evidentiary Hearing ["Mot."] on Claims 1-5, 7, 13, and parts of Claim 16 of the Second Amended Petition. On January 11, 2011, Respondent filed an Opposition to Petitioner's Motion ["Opp."], and on January 27, Petitioner filed a Reply. On August 12, 2011, the Court denied Petitioner's Motion for an Evidentiary Hearing without prejudice, holding that "pursuant to [the Supreme Court's decision in Cullen v.] Pinholster, [563 U.S. ___,131 S.Ct. 1388 (2011)], it does not serve the interests of judicial economy to hold an evidentiary hearing, or decide whether an evidentiary hearing is warranted, prior to conducting a review under section 2254(d)." (Doc. No. 150 at 3.)

///

---

[3] In citing to the filings in this case, the Court will refer to the pagination assigned by the Southern District's Electronic Case Filing ("ECF") system, in which all page numbers are located on the top right-hand side of each document.

On November 10, 2011, Petitioner filed a Supplemental Brief addressing Pinholster. On November 30, 2011, Respondent filed an Opposition, and on December 14, 2011, Petitioner filed a Reply. On January 3, 2012, Petitioner filed a Supplemental Brief addressing the merits of his federal claims under section 2254 ["Pet. Merits Brief"]. On February 23, 2012, Respondent filed a Response ["Merits Resp."], and on March 9, 2012, Petitioner filed a Reply ["Merits Reply"].

## II. TRIAL PROCEEDINGS

The Court refers the parties to the lengthy statement of evidence issued by the California Supreme Court in Carter, 36 Cal. 4th at 1221-37 (San Diego convictions and death sentence) and People v. Carter, 36 Cal. 4th 1114, 1128-37 (2005) (Los Angeles convictions and death sentences). The California Supreme Court's factual findings are presumptively reasonable and entitled to deference in these proceedings. See Sumner v. Mata, 449 U.S. 539, 545-47 (1981).

In order to provide a context for the Court's discussion of Petitioner's habeas claims, set forth below is a summary of evidence presented during the guilt and penalty phases.

### A. Guilt Phase

While Petitioner was charged with the robbery and murder of Janette Cullins, burglary of Cullins' apartment and the sexual assault and robbery of Barbara S., both acquainted with Petitioner, the prosecution also introduced evidence relating to a prior Ventura County sexual assault and the deaths of four women in Los Angeles and Alameda Counties previously acquainted with Petitioner. Property belonging to each of these women was found in a vehicle Petitioner was driving when arrested and the car in question belonged to one of the Los Angeles County victims. Petitioner was also in possession of a bank card belonging to Ms. Cullins, Cullins' bank passcode was found on a slip of paper in the car, and a man resembling Petitioner appeared on an ATM video recording withdrawing funds from Cullins' bank account. Barbara S. identified Petitioner, who had been dating her roommate Susan Loyland, as her assailant, and a

neighbor identified Petitioner as being in the neighborhood the evening of the attack. Ms. Loyland noted that money in a hidden location, which Petitioner was aware of, went missing from the apartment after the attack.

The defense introduced evidence pointing to an alternate suspect in the murders of Susan Knoll and Jillette Mills: an ex-boyfriend of Knoll named Ronald Tulio. The defense also introduced the fact that latent prints recovered from the Cullins' apartment did not match Petitioner's fingerprints, nor did fibers or hairs recovered from her apartment. The defense also introduced evidence pertaining to Barbara S.'s failure to identify Petitioner as her assailant in the days following the crime.

**1. Prosecution's Case-In-Chief**

In addition to evidence presented with respect to the charged crimes against Janette Cullins and Barbara S., the prosecution introduced evidence of other crimes under California Evidence Code section 1101(b), including evidence relating to the sexual assault of Jennifer S. in Ventura County, the murders of Jillette Mills, Susan Knoll, and Bonnie Guthrie in Los Angeles County, and the death of Tok Kim in Alameda County.

**a. Sexual Assault of Jennifer S.**

Jennifer (also known as "Rose") S., who lived in Ventura County in March 1984, testified that she met Petitioner through her neighbor Vince Stapleton, when Petitioner was a guest at Stapleton's home. (RT 3356-77.) Jennifer and Petitioner socialized on a few occasions over the course of several weeks in March, along with Stapleton and Stapleton's girlfriend Leanne. (RT 3377-93.) Jennifer stated that over the period of their acquaintance, Petitioner made advances on her, including kissing her, hugging her, and inviting her to Alaska, which she gently rebuffed each time. (RT 3393-3414.) After one such incident, she asked Stapleton to intervene, and Petitioner was asked to leave. (RT 3422-24.) Approximately a week later, in the early hours of March 29, Petitioner entered her apartment without permission, wearing a bandana and carrying a knife, and proceeded to repeatedly sexually assault Jennifer over a period of several

hours, nearly strangling her at one point during the assaults. (RT 3440-55.) She and Petitioner spoke at various times during interim periods between assaults, and after assuring Petitioner that she would not call the police, Petitioner left. (RT 3456-3500.) Jennifer then ran to Stapleton's apartment to inform him what had happened; she later noticed a bracelet was missing from her home. (RT 3501-09.)

Leanne Thompson-Simandle, who was Vince Stapleton's girlfriend in March 1984 and knew Jennifer by the name of Rose, testified that while Petitioner was only supposed to stay with Stapleton for a few days, he instead stayed several weeks. (RT 3543-49.) Stapleton, who intended to go out of town after March 28, asked Petitioner to leave at that time; the next morning, Rose was hysterical, and said she had been raped and almost killed by Petitioner. (RT 3553-64.) Vince Stapleton, who met Petitioner at his brother's wedding in Alaska in the early 1980's, stated that when Petitioner came to visit him, Petitioner's only concern was making advances on the women in the complex, including Rose and Rose's prior roommate Debbie. (RT 3581-86.) After asking Petitioner to leave on March 21, Petitioner said he would be returning to Alaska. (RT 3619-25.) On March, 29, Rose woke Stapleton by pounding on the door, and informed him that Petitioner had returned the prior night and attempted to kill her. (RT 3625-29.)

Deborah Lee Johnson, Rose's roommate, testified that she also met Petitioner through Stapleton in March 1984. (RT 3684-93.) Johnson stated that, one day after their first meeting, she and Petitioner had a consensual sexual encounter on the floor of Stapleton's home, during which Petitioner was rough and quick, scaring her. (RT 3693-3700.) After the encounter, Johnson declined to socialize with Petitioner again, which caused him to storm out and slam a door. (Id.) Johnson did not inform Rose of the encounter, and moved out of their shared apartment shortly thereafter. (RT 3700-01, 3705-08.) Johnson recalled previously testifying that she had sex with Petitioner twice and later left to reconcile with a prior boyfriend, but did not recall testifying that she wanted to continue a relationship with Petitioner until she saw him leaving another

girl's apartment. (RT 3708-14.)

David Finestone testified that he lived in Ventura County in 1984, and after working a late evening shift on March 28, he heard noises that caused concern, including a scream and the words "no please don't. I promise I'll be quiet" in a female voice. (RT 3752-57.) Finestone stated that he got his shotgun and went to his balcony in an attempt to locate the noise, but did not hear anything else when he got outside. (Id.) Finestone acknowledged that he did not report this information until a detective came by in July 1984 asking if he had heard anything. (RT 3759-61.)

Nancy Hughes Sharp testified that she met Petitioner when living in Ventura County in March 1984, and that she gave him a haircut in exchange for him doing some yard work for her. (RT 3784-95.) Sharp stated she gave him her key for this purpose, and arrived home to find him using her telephone without her permission, although he told her the calls had been made collect. (Id.) On one occasion, a woman called him from Alaska, and she retrieved Petitioner to take the call. (Id.) Sharp stated that a number of calls to Hawaii and Alaska were made from her phone, but Petitioner failed to reimburse her for the calls. (Id.) On the morning of March 29, Sharp was asked by police if she heard anything the prior evening, to which she stated that her dogs had barked and she heard someone walking from her apartment; she later found a slit had been made in her screen door. (RT 3801-04.) Sharp stated that after Petitioner used her phone, she became curious if he had taken anything of hers, and found one diamond earring was missing from a jewelry box. (RT 3842-45.) Sharp told police about the missing earring the morning after Jennifer's assault, after the police asked her if anything of hers was missing, and stated that a Los Angeles detective later located her earring. (Id.)

**b. Sexual Assault of Barbara S.**

Janelle Starr Barksdale, who was a neighbor of Barbara S. in March 1984, testified that she recalled a stranger in the neighborhood one evening, walking in the direction of Barbara's home. (RT 3721-26.) Barksdale stated that the police later

informed her that there was a rape, to which she mentioned the stranger she saw in the area. (RT 3726-32.) Years later, Barksdale again contacted police when she saw a photo of that same man in the newspaper. (RT 3730-33.) Barksdale recalls telling police the man was under six feet tall, when Petitioner was over six feet tall, but stated that her identification was about his face, not his height. (RT 3742-50.)

Susan Loyland, who lived with Barbara S. in early 1984, stated that she met Petitioner when working at a San Diego cocktail lounge in February 1984. (RT 3815-27.) She and Petitioner dated, which included visits to Hollywood, the boat where he was living, and her home. (Id.) Loyland stated that her relationship with Petitioner was sexual and that Petitioner had met Barbara on more than one occasion. (RT 3827-29.) Loyland stated that she and Petitioner planned to go to Rosarita Beach in Mexico, but that Petitioner missed the bus and she went without him. (RT 3829-35.) Loyland was in Mexico the day Barbara was assaulted. (Id.)

After the assault on Barbara, Loyland noticed that her tip money, which she kept in a jar in her room, was missing, noting that whoever took it would know that she kept it there. (RT 3897-3903.) Loyland spoke to Petitioner several times when he was in the Los Angeles area during the week before the assault, but because Petitioner's arrival was delayed multiple times she finally went to Mexico without him. (RT 3903-13.) Petitioner also once left an eight inch knife in Loyland's car which she later found in her home, but did not know how it got in her home. (Id.) Loyland also noted that she and Petitioner had previously remained in contact when he went out of town, but that after Barbara's assault, she did not hear from Petitioner again. (RT 3913-16.) Loyland stated that she went to see Barbara that evening in the hospital, acknowledged that Barbara stated her inability to identify the assailant, and noted that she was the one who suggested the possibility that it was Petitioner, asking Barbara, "It couldn't be Dean, could it?" (RT 3916-19.)

Prior to her testimony, the trial court instructed the jury that Barbara S. would be typing her responses to the posed questions, and the responses would be read aloud by

a court intern, stating that "I want to remind you that [Barbara S.'s] physical condition is not related to the events of March 25." (RT 3851.)  Barbara S. testified that in early 1984, she rented a room at her home in San Diego to Susan Loyland.  (Id.)  Barbara stated that she first met Petitioner when she woke him from where he was sleeping in Loyland's room early one morning, in order to prevent him being assaulted by Loyland's boyfriend Duane. (RT 3854-58.)  Barbara stated that she only spoke with Petitioner on a few occasions when he was in the company of Loyland at her home. (Id.)  On the day of the assault, Barbara stated that she did yard work, that Loyland was in Mexico, and that she did not notice anything wrong with the bedroom window to Loyland's room.  (RT 3858-68.)  Barbara stated that after consuming a few drinks, eating, and going to bed, she was awoken by a man dragging her out of bed by her arm. (RT 3868-71.)  The man put a six inch fishing-type knife to her throat, asked about money, to which she pointed to her purse, and then sexually assaulted her.  (RT 3871-74.)  During the assault, the assailant asked about Barbara's roommate, and tied Barbara's hands and feet with pantyhose.  (RT 3874-87.)  After the assailant left, Barbara cut her hands and feet free with a knife from her dishwasher.  (Id.)  Barbara stated that she heard her car starting from the driveway, and noted that the assailant had her keys.  (RT 3887-88.)  Barbara stated that she had two suspicions as to who committed the assault, one individual was with his girlfriend and her parents at the time of the assault and the other individual was Petitioner, and that she therefore believed it was Petitioner who had broken in and raped her.  (Id.)

Barbara stated that after the assailant left, she opened the front door, still bound and without clothes, and screamed for assistance, to which her neighbor Helen responded and cut free her hands and feet.  (RT 3996-4001.)  Barbara stated that she heard her car start, and had earlier heard her keys rattle at one point when the assailant had gone into her purse for money.  (Id.)  Barbara stated that her car was never returned and she was later informed what happened to it.  (RT 4001-07.)  Barbara said that after the assault, Susan Loyland's tip money was also missing, as was Barbara's address

book and keys from her purse.  (Id.)  Barbara conceded that she initially told police she could not identify the assailant, and stated that she placed the assailant's voice when she saw Petitioner in the news, and at that point she was "certain" and it "scared [the] hell out of me."  (RT 4010-13.)  After further questions pertaining to Barbara's initial inability to describe or identify the assailant, Barbara clarified that she told the police that he was part Eskimo, and in doing so, the police erroneously assumed the assailant was short and fat when she actually meant he was slim and tall.  (RT 4040-44.)

On the night of Barbara S.'s assault, neighbor Helen McGirr noted a car starting at approximately 8:20 p.m., after which she heard a loud cry and responded, seeing Barbara bound, naked, and calling for help.  (RT 4116-23.)  McGirr stated that she asked her husband to call the police and went to help cut the ties, which had rendered Barbara's hands dark blue and almost black from the bindings.  (RT 4123-27.)  McGirr stated that she retrieved a robe for Barbara, who was crying, and the police took Barbara to a rape center for an exam.  (Id.)  McGirr stated that she went to the hospital in a police car, stayed in the hall when they took Barbara's history, but came in for the exam upon Barbara's request.  (Id.)  McGirr recalls the doctor asking Barbara if the suspect was black, to which Barbara replied "I don't know."  (Id.)  McGirr added that Susan Loyland arrived at the hospital to speak with Barbara that evening and they spoke outside her presence and that she, a retired registered nurse, was sure Barbara was not under the influence of alcohol.  (RT 4127-29; 4131-32.)

San Diego Police Department Detective Ken Creese interviewed Barbara S. the day after the assault at her home, at which time she was still upset and only provided a limited description of the assailant, of a male in his twenties.  (RT 4132-39.)  Barbara stated that she was unable to identify her assailant, as she never saw his face.  (RT 4139-41.)

Barbara S. was again called to the stand, conceded that she told Detective Creese that she was unable to identify the assailant, but explained that "I had an idea, at that time."  (RT 4154-57.)  Barbara acknowledged being shown photos which included

Petitioner's photo in April 1984 by a Detective Fragoso, and stated that she identified Petitioner as her assailant at that time. (Id.) Barbara also recalled speaking to a Ventura County detective in June 1984 but denied that she was unable to identify Petitioner prior to that interview. (RT 4157-59.)

Detective Creese elaborated that it was routine to re-interview victims of crimes such as assault, as once the trauma settles, additional information often surfaces. (RT 4185-86.) Creese stated that the day after the assault based on information provided by Susan Loyland, he was looking for a suspect named Dean, described as an Eskimo, but appearing Caucasian, mid twenties, 6'2", 190 lbs, possibly working or staying on a boat called Sea Quest. (RT 4186-87.)

San Diego police officer Leonard Lefler responded to the call regarding a suspected rape on March 25, and stated that while the victim had already left in an ambulance, he remained at the home and conducted an interview of Susan Loyland when she returned to the residence. (RT 4209-13.) Lefler wrote a report that same night, which included information and a description Loyland provided regarding a potential suspect named Dean. (Id.)

Allen Fragoso, a member of the San Diego Police Department's sex crimes unit, showed Barbara S. a photo lineup on April 25, 1984. (RT 5487-92.) Fragoso stated that Barbara S. identified Petitioner's photo as the man she met with her roommate, but could not say he was the man who raped her. (Id.) However, Barbara stated that Petitioner and the man who raped her had similar voices. (Id.)

**c. Death of Tok Kim**

Kim's ex-husband Alfred Lopez identified her car, which they purchased together and she kept after their divorce. (RT 4213-28.) Lopez also identified Kim's gold necklace, suitcase, knives, gloves and other items found in Petitioner's possession or in the car he was driving at the time of his Arizona arrest. (Id.)

Raymond Conner, a homicide detective with the Oakland Police Department in 1984, explained that he was called to the scene of the unexplained death of Tok Kim,

and stated that authorities were unable to determine whether she died from natural causes or homicide. (RT 4230-41.) Conner explained that Kim's body was in advanced stages of decomposition, was identified through fingerprints, and the open window and location of the body near a floor heater contributed to rate of decomposition. (Id.) Conner stated that there was a length of fabric beneath the victim's neck area, like a drape. (Id.) Conner acknowledged that the police did not find signs of forced entry, nor did they find blood splatters, bullets, blunt instruments or knives. (RT 4241-47.) Conner stated that he located several receipts, one from a Lafayette restaurant and another from a service station. (Id.) After follow up investigation and obtaining information and a photo of Petitioner from the Culver City Police Department, Conner conducted photo lineups with several witnesses, all of whom identified Petitioner as having been in Kim's company in early April 1984. (RT 4245-54.) Conner stated that when he took Kim's ex-husband Alfred Lopez to her home, he identified several missing items, including gloves, jewelry, coins, and other personal items. (Id.) Conner conceded that Petitioner's fingerprints were not matched to latents found in the victim's home. (RT 4257-61.)

The trial court then explained that they would be reading a transcript of the earlier testimony of Ray Blevins, an ex-boyfriend of Kim's who died of natural causes prior to trial. (RT 4269-71.) Blevins lived in same apartment building, paid her rent and had a relationship with Kim prior to April 1984, when he discovered in early April that Kim also had a relationship with Petitioner. (RT 4271-76.) Blevins stated that Kim was the only one to drive her car, and identified a suitcase, rubber gloves, and other items belonging to her. (Id.) Blevins stated that he saw Petitioner leaving Kim's apartment on April 1 around noon, and saw him once more at the apartment building's market. (RT 4276-81.)

Connie Santos, Kim's next door neighbor, stated that while she did not become aware of Kim's death until April 13, she noted an odor earlier, and heard a fight between a young man and a woman at 11 p.m. one evening earlier that week which

included yelling and swearing. (RT 4348-55.) However, as it was late at night and Santos was tired, she went to bed. (Id.) Santos stated that she knew Blevins, that the voice she heard yelling did not belong to him, and that she did not see Kim after hearing that argument. (RT 4355-57.) Santos stated that Blevins appeared to be in his 50's, and the argument she heard was between Kim and a younger man and sounded "real serious." (RT4361-67.)

David James Hogan, who worked at a Shell station in Lafayette, California in April 1984, stated that he came into contact with Petitioner and Kim after they coasted their car to the station for repairs. (RT 4373- 79.) Hogan stated that they picked up and paid for the repairs on April 2, at which time Hogan noticed a hickey on Petitioner's neck, and after stating that Petitioner must have had a good evening, Petitioner giggled and said he did not know why he had done that, as he did not even know the lady. (RT 4379.)

Ingrid Maleska-King, a co-worker of Kim's at Macy's in Concord, California, stated that Ms. Kim sometimes drove her home from work. (RT 4386-93.) Maleska-King stated that Kim had Wednesdays off, and would call the store or Maleska-King if she was unable to come to work. (Id.) Maleska-King stated that they worked for salary, commission, as well as cash tips, and that she last worked with Kim on Saturday, April 7, after which time she didn't see Kim again. (Id.) Maleska-King stated that when Kim did not show up to work or call by Thursday, April 12, she reported Kim missing. (RT 4393-96.)

Margo Fulton, a waitress at the Rocking Horse bar and restaurant in Lafayette, California in April 1984, stated that Petitioner entered the establishment on April 1 at 8 or 9 p.m., and made small talk with her and the bartender. (RT 4498-4502.) That same evening Tok Kim also came in, sat and drank a glass of wine, made small talk with Petitioner, then left alone. (Id.) Kim then returned to the bar, stated she had car trouble, and Petitioner left with Kim. (Id.) Fulton noted that it was difficult to communicate with Kim due to Kim's broken English, and noted that Petitioner later

returned to the bar for a brief time to retrieve a bag he had left there. (RT 4502-06.)

William Elson, the apartment manager at Ms. Kim's complex, stated that her employer called in April 1984 in an attempt to locate Ms. Kim. (RT 4747-52.) On Thursday, April 12, Elson stated that nothing in the apartment was in disarray and he was unable to locate her, but admitted that he did not look under the bed at that time. (Id.) On Friday, Elson checked again, and located Kim's body between the heater and the end of the bed. (Id.) Elson also made an unsuccessful attempt to locate Kim's car. (RT 4752-57.) Elson stated that, on Monday of that week, he noticed an individual he identified as Petitioner attempting to gain entry into the complex, and when Elson spoke to him, Petitioner asked if Kim lived there, pointed to a mailbox, asked to be let in, and pressed the buzzer. (Id.) Elson stated that Kim was not there, and did not allow Petitioner to enter, stating that Petitioner appeared disheveled, as if he had been sleeping on the streets, and was carrying a backpack. (Id.) Elson acknowledged that Mr. Blevins also lived in the complex, previously paid Ms. Kim's rent, but had notified management that he was angry with her and would cease paying her rent. (RT 4758-68.) Elson dropped off an application that Monday to allow Kim to apply to get the apartment on her own, but the application was never returned and he did not see Kim alive after that date. (Id.)

Nicole Didion Forth, a bartender and waitress, stated that an Asian woman entered the Rocking Horse restaurant at 7:30 Sunday evening, ordered a drink, and sat at the bar. (RT 4984-89.) Forth stated that while they conversed, it was difficult to understand the woman's broken English, and that the woman left after 15-20 minutes. (Id.) The woman returned five minutes later, stating she had car trouble, and Forth, Fulton, and Petitioner, who was also at the bar, attempted to understand her; Petitioner offered assistance and left with the woman. (Id.) Petitioner returned, stating that it was a dead battery and asked for jumper cables, then returned once again to retrieve his possessions, before leaving the bar. (Id.)

Dr. Thomas Rogers, an Oakland pathologist who performed the Kim autopsy on

April 14, 1984, stated that the body was in the moderate, not early, stages of decomposition when brought to his office, and that there was no way to visually determine how long the victim had been deceased at that point, as it depended on a combination of the body and the environment.  (RT 5365-69.)  Dr. Rogers stated that he could not conclusively determine her cause of death, but could exclude causes of which there was no evidence, finding no gunshot wound, no stab wounds, no evidence of beating, nor of heart disease or stroke, and no evidence of drug overdose.  (RT 5369-75.)   Dr. Rogers stated that while the cause of death remained undetermined, strangulation remained a possibility.  (Id.)  Rogers conceded that death could have occurred 2-3 days or 2-3 weeks prior to the examination and that he could not eliminate natural or unnatural causes as cause of death in this case.  (RT 5375-78.)

Dr. Byron Blackbourne, the San Diego County medical examiner, stated that he reviewed the autopsy and coroner's report regarding Ms. Kim, as well as the crime scene photos and police reports.   (RT 5502-12; 5541-48.)   He stated that an undetermined cause of death was not inconsistent with asphyxia, that he was able to eliminate some potential causes of death, as there were no perforating wounds, no obvious fractures, no obvious injury to organs, no indication of natural diseases, and while alcohol was present, there were no other drugs in her body.  (Id.)  Soft ligature strangulation was a possible cause of death as he felt decomposition would mask any bruising or bleeding.  (Id.)  He stated that her death was suspicious and asphyxia was a good possibility, especially considering the fact that her car and money were stolen. (RT 5548-51.) Dr. Blackbourne conceded that while he could not definitively conclude it was a strangulation homicide, there was no evidence of suicide.  (Id.)

Eddis Jeffery, who worked in apartment maintenance in Oakland in 1984, stated that he knew both Kim and Ray Blevins, and that he last saw Kim on April 9 at about 2 or 3 p.m. with someone other than Blevins.  (RT 5554-63.)  Jeffery stated that Kim and the man, an approximately 6 foot 3 inch Caucasian who he identified in 1984 as Petitioner, arrived in her car, went towards the apartment, then came out again at about

5 p.m., went to her car and left. (Id.) Jeffery stated that he never saw Kim alive after that, nor did he see her car again. (Id.)

Detective McEwen stated that a Honda was located outside the Knoll/Mills apartment with parking tickets on it, and was later identified as Tok Kim's car. (RT 5824-28.) McEwen stated that police removed items from the car, including a red dress, school books, bag, and sunglasses, and removed the rearview mirror. (Id.)

Cynthia Cowart, who lived down the hall from Tok Kim in 1984, stated that she last saw Kim on a Monday, and heard about the murder on a Wednesday or Thursday. (RT 5828-32.) Cowart stated that she saw Kim that Monday at 9:30 or 10 p.m., when Kim, carrying a laundry basket, asked to talk to Cowart and her boyfriend about papers she had received from the apartment manager, as she feared she was being evicted. (Id.) Cowart looked at the papers, which were simply requesting application and rental information, yet found it hard to communicate to Kim that they were not eviction papers. (RT 5832-37.) Kim explained that she had an argument with her boyfriend Ray Blevins and that he would no longer be paying her rent. (Id.) Cowart assisted Kim in setting up a meeting with the apartment management for Wednesday, and Kim left her apartment at 11:30 p.m. (Id.)

**d. Murders of Jillette Mills, Susan Knoll, and Bonnie Guthrie**

Sandra Pender, Susan Knoll's sister, stated that Knoll, who lived with Jillette Mills in Culver City in 1984, was best friends with Bonnie Guthrie, who Knoll grew up with in Wisconsin, and that Guthrie lived in West Hollywood in 1984. (RT 4328-35.) Pender stated that Knoll's car was a 1980 Toyota Celica, and Guthrie made sweaters for a living. (Id.) Pender owned three of Guthrie's sweaters, each with a similar label in the same area, which was the same area where the sweater in evidence contained a hole. (RT 4336-42.) Pender noted that the address book in evidence contained the name of Knoll's bank and her place of employment, each in Knoll's handwriting, and stated that the sweaters in evidence appeared to be the work of victim Bonnie Guthrie. (Id.)

Jennifer Bollman, Jillette Mills' sister, stated that Mills moved to Culver City in

March 1984 with the assistance of several friends. (RT 4409-17.) Bollman stated that Knoll's room contained a photo of a person with sleeveless shirt, dark sunglasses, and cigarette in his mouth, which Bollman ridiculed. (RT 4409-20.) After Mills' death, Bollman cleaned out the apartment and noted that the photo was no longer present. (RT 4417-25.) Bollman stated that Mills' car was a one of a kind 280 white Z with a license plate reading PHANTMZ, and identified a key chain, jogging suit, sun visor, racquetball equipment, towels, tennis racket, camera, and binoculars found in the car as belonging to Mills. (Id.) Bollman added that she saw a sweatshirt belonging to Mills on the news when Petitioner exited an airplane, and that when cleaning the Knoll/Mills apartment, she found the womens' purses cleaned out and located in a kitchen cabinet. (RT 4438-41.)

Christopher Thurman, a friend of the Mills family, stated that he helped Ms. Mills move from Pasadena to Culver City, had met Susan Knoll, and based on a worried phone call from Mills' brother Jeff on April 10, 1984, Thurman left work and accompanied Jeff Mills to her apartment. (RT 4582-89.) Upon arrival, they found the gates locked and Mills' car absent, after which they went to Mills' place of employment and California State University -Los Angeles in unsuccessful attempts to locate either Mills or her car. (RT 4589-98.) Thurman and Mr. Mills returned to the apartment and gained entry by climbing over the security gate and entering the unlocked apartment door to a ringing phone, which Mr. Mills answered. (Id.) Thurman stated that the lights were out, the phone kept ringing and occupied Mr. Mills' attention, and that he inspected the apartment. (Id.) When Thurman looked in a closet with a flashlight, he saw four feet, called for Mr. Mills, and they found the bodies of Knoll and Ms. Mills. (Id.) Prior to opening the closet, Thurman stated that it had been closed with a box and painting in front of it. (Id.) Thurman stated that Mr. Mills moved a lamp nearer to the closet to see better, they contacted the police, and Thurman went outside to direct the police. (RT 4598-4604.) Thurman went into the street and leaned on a car, and later saw that same car when he went to help clean out the apartment later, now with several

parking tickets on it and he then informed the Los Angeles prosecutor about it. (Id.) Thurman acknowledged that he did not note anything wrong with Ms. Mills' apartment door aside from the fact that it was unlocked. (RT 4605-06.)

Gary McEwen, one of the investigating officers in the Knoll/Mills homicides, introduced several items including a shirt, hammer, and Swiss army knife, identified crime scene photos relating to the Mills/Knoll case, and stated that Knoll's car was later located down the block from the Culver City apartment. (RT 4608-16.) McEwen stated that on April 24, a parking enforcement officer did a license check on a blue Honda with several tickets on it, and discovered that the car had a law enforcement stop on it due to an Oakland homicide. (RT 4616-24.) McEwen stated that photos of Petitioner's hand taken at the time of his arrest showed injuries to the fingers. (RT 4621.) McEwen acknowledged that there were not signs of forced entry into the Knoll/Mills apartment, that wine glasses appeared to have been wiped clear of prints, and that they compared prints found on a bathroom sink to those of Petitioner. (RT 4623-42.)

McEwen stated that he flew to Arizona on April 18 after hearing of Petitioner's arrest in order to visually inventory, search, and process the vehicle Petitioner was driving at the time of his arrest. (RT 4643-58.) McEwen conceded that while he brushed for prints, he did not perform anhydride spraying, that he did not give Arizona authorities a list of items removed from the vehicle, and did not list the items left in the vehicle. (Id.) McEwen also acknowledged that he received a box of items from the car from law enforcement in Ventura County. (Id.)

Lynne Herold, a criminalist with Los Angeles County who worked on the Mills, Knoll and Guthrie cases, collected samples from each victim's body, including hair, fluids, fibers and fingernail clippings as well as known samples from each person. (RT 4694-4705.) Sam Le, a Los Angeles County supervising criminalist who worked in serology in 1984, collected evidence at the Knoll/Mills crime scene including two nightgowns, received the rape kits from other evidence collectors, and obtained samples from Petitioner for comparison. (RT 4708-16.) Le stated that Petitioner could not be

excluded as the donor of a seminal stain found on a nightgown, but conceded that 16 percent of the population had the same type and status as Petitioner. (RT 4716-28.) Le stated that the rape kits from Mills and Knoll were insufficient for typing, but semen was present in the Mills kit. (RT 4728-30.)

Robin Snyder, an employee at check center Cashex West, identified a card belonging to Susan Knoll and confirmed the address in Culver City. (RT 4743-47.)

Jeff Mills, Jillette Mills' brother, stated that he helped her move to Culver City in April 1984, and became concerned about her on April 11, after a call from their mother the previous day. (RT 4770-80.) He and Thurman attempted to locate her by going to places she frequented without success, then went to her apartment, unable to locate either her car or that of her roommate Susan. (Id.) After checking several locations, they gained access to her apartment complex at about 10 p.m., entered her unlocked and dark apartment, and Thurman explored the unit while Mills answered a ringing phone. (Id.) Thurman notified him of a problem upon opening a closet door. (Id.) Mills found it odd that a picture was leaning on the closet door, saw the bodies, moved a lamp to see better, and touched one body, finding it cold. (RT 4780-89.) Mills stayed in the apartment to call his mother and the police while Thurman went outside to direct the police. (Id.) Mills identified several items belonging to his sister that were found in her vehicle upon Petitioner's arrest, including clothing, an embroidered towel and camera equipment. (Id.)

Martin Collins, a latent print examiner with the California Department of Justice, compared latent prints from the Knoll/Mills scene with those of Ron Tulio, Petitioner, and the victims. (RT 4861-80.) Collins stated that while Tulio's prints were not found at the scene, nine latent prints were matched to Mills, seventeen to Knoll, and one palm print was matched to Petitioner. (RT 4880-85.)

Hardy Buchanan, a Culver City police evidence technician, stated that while he attempted to collect latents from wine glasses, it appeared as though they had been wiped clean, as did a tan Toyota he also processed for prints. (RT 4971-77.) Buchanan

acknowledged that he also took all of the photos at the scene, which included photos of two cocaine paraphernalia kits, and collected hairs and fibers. (RT 4977; 4982-84.)

Detective Richard Zolkowsky responded to the Guthrie crime scene on April 12, noting that Guthrie's body was on the floor of the apartment, there was yarn and thread on a table, a knitting machine, and a box of sweaters labeled with the name Bonnie Guthrie. (RT 5004-13.) Zolkowsky stated that bags were placed on Guthrie's hands to contain evidence, and that when the coroner's office turned over the body and blood settled, a ligature strangulation mark appeared. (RT 5013-17.) Zolkowsky added that Guthrie also had an abrasion on her nose and a blood stain in the crotch area of her pants. (Id.) Zolkowsky stated that the apartment entry did not appear to have been forced, the sliding door was unlocked but closed, that no identification or keys were found in the apartment, and no prints aside from those of the victim were found in the apartment. (RT 5017-28.) Zolkowsky later accompanied Detective McEwen to Arizona, and identified three sweaters from that car as similar to those found in the Guthrie apartment. (Id.) In examining the mail at the Guthrie apartment, Zolkowsky found a property notification card from the San Diego Police Department. (RT 5038-41.) Zolkowsky also stated that Guthrie had one earring in her ear when found, that the other was on the floor in the bedroom, and stated that the knitted scarf found on her bed could have been the ligature used in the strangulation. (Id.) Zolkowsky stated that Guthrie's car was located in her parking space in the garage. (RT 5049.)

Marcus Kellman, an LAPD criminalist, examined the rape kit evidence, pantyhose and panties in the Guthrie case for seminal stains. (RT 5062-70.) Kellman found no stains on the panties, but found a stain on the pantyhose, as well as on both the vaginal and anal rape kit slides. (Id.) Kellman stated that the presence of sperm was also found on Guthrie's external genitalia. (RT 5074-76.)

Guela Vahab, who lived in Los Angeles and knew and had worked with Bonnie Guthrie in 1984, stated that she and Guthrie shopped together on April 11 from approximately 11 a.m. to 1:30 p.m. (RT 5196-5202.) Vahab stated that Guthrie knitted

sweaters for a living, identified Guthrie's knitting machine, and stated that Guthrie labeled the sweaters she made.  (Id.) Vahab stated that Guthrie made one-of-a-kind sweaters, and identified a photo of one.  (Id.)

Susan Anshus, who met Bonnie Guthrie in 1978 and worked with her in Milwaukee, Wisconsin, stated that they kept in touch and Anshus mailed Guthrie a letter on April 11, returning photos Guthrie had sent. (RT 5293-98.) Anshus identified the type of sweaters Guthrie made.  (Id.)

Dr. Lakshanan Sathyavagiswaran, a supervisor at the Los Angeles County Coroner's office, stated that while Dr. Allen, a medical examiner in the office, had performed the Mills, Knoll and Guthrie autopsies, he had reviewed the records of all three autopsies.  (RT 5298-5307.)  Dr. Sathyavagiswaran testified that the cause of death in Jillette Mills' case was asphyxia due to ligature strangulation, that she had petechial hemorrhages in the eye, abrasions on the neck, and compression of the neck. (RT 5307-24.)  Dr. Sathyavagiswaran stated that there was no fracture of the neck bones, which eliminated manual strangulation, and that there were also injuries to the genital area, evidence of sexual assault, and an injury to left side of her head.  (Id.) Dr. Sathyavagiswaran stated that Mills was dead at least fifteen hours prior to being discovered.  (Id.)

With respect to Susan Knoll, Dr. Sathyavagiswaran stated that her cause of death was asphyxia due to manual and/or ligature strangulation, as she had neck bone injuries in addition to other neck injuries and no clear cut ligature abrasion.  (RT 5324-39.) Knoll also sustained injuries of mostly scrapes or bruising to her forehead, lower lip, wrist, tongue, and ankle in addition to bruising near her abdomen and to the genitalia. (Id.) Dr. Sathyavagiswaran stated there was no strong evidence of sexual assault, but intercourse had taken place, as there was evidence of seminal fluid.  (Id.)  Dr. Sathyavagiswaran opined that Knoll had also been dead more than twelve hours prior to the early morning of April 12, but he could not conclusively determine who died first, as the victims' liver temperatures were taken several hours apart.  (Id.)

With respect to Bonnie Guthrie, Dr. Sathyavagiswaran stated that her cause of death was asphyxia due to ligature strangulation with a soft type ligature, noting that nylon could have caused the injuries.  (RT 5339-50.)  He noted scrapes and blows to Guthrie's nose and hip, as well as abrasions on her genital area consistent with forced sexual activity, and noted that seminal fluid had also been found.  (Id.)  Dr. Sathyavagiswaran concluded that Guthrie had been dead a minimum of twelve hours prior to her discovery, as rigor mortis was fully developed.  (Id.)  He stated that the findings were consistent with the possibility that Guthrie died between 1:30 and 3:00 p.m. on April 12.  (RT 5355-57.)

Evidence technician Peter Carl Dolan with the Culver City Police Department collected the latent print matching Petitioner that had been found on the Knoll/Mills bathroom sink, and conceded that there was no way to ascertain the age of a fingerprint.  (RT 5379-86.)

Manny Glieberman, a plumbing contractor, did work at the Guthrie apartment on April 11, 1984.  (RT 5453-57.)  After speaking with Spiro, the building manager, Glieberman knocked at Guthrie's door, opened it with the key, and carried his tools to the bathroom.  (Id.)  Glieberman stated that the bedroom door was closed and that Spiro knocked at that door but received no response, then opened and closed the door.  (Id.)

Annette Cheng, a loan processor in Los Angeles, stated that she received a phone call about her co-worker Susan Knoll at about 10 a.m. on April 11.  (RT 5492-5502.)  The caller was a man with a deep voice and a mild regional, but not foreign accent, who stated that Knoll had been in a car accident and would not be in to work that day.  (Id.)  The caller said he was at the accident scene, that Knoll asked him to make the call, and that she was going to the hospital to get checked out.  (Id.)  Cheng asked for the caller's name, but he did not provide it.  (Id.)

Matt Spiro, the apartment manager at Bonnie Guthrie's West Los Angeles apartment building, stated that the building had a plumbing problem in April, and he made arrangements to fix it.  (RT 5837-42.)  On the afternoon of April 11, he used the

master key to enter the unit, and saw Guthrie lying on floor of her bedroom, upon which he told the plumber that she was sleeping on the floor, and closed the door. (Id.) Spiro stated that he knocked on the door again the next day, used the key, only to discover Ms. Guthrie still lying on the floor, which is when he realized she was dead and called the police. (RT 5842-45.)

**e. Murder of Janette Cullins**

Richard Thwing, a homicide detective with the San Diego Police Department in 1984 and assigned to the Cullins' homicide, stated that he, several other detectives and evidence technicians were dispatched to the Cullins apartment mid morning on April 14. (RT 4509-16.) Thwing noted a pry mark on the door, stated that it appeared someone had attempted to force entry into the apartment, and stated that Cullins' body was in the closet. (RT 4516-20.) Thwing stated that Cullins had a ligature mark on her neck and a laceration on her arm, and that her car was found parked several blocks from her apartment. (RT 4520-23.) Thwing stated that he later learned there had been activity on Cullins' ATM card, after which he spoke with someone at the bank and obtained a videotape. (RT 4523-25.) Thwing noted that while he believed some fingerprints had been recovered from the scene, had an individual wore nylons, it would obscure prints. (RT 4527-30.) On cross-examination, Thwing identified the other members of the investigation, stated that he interviewed neighbors while Detective Shively conducted the crime scene investigation, and denied trying a key in the apartment door, and denied removing wood or seeing anyone remove wood from the scene. (RT 4530-34.)

George Cullins, Janette's father, stated that at the time of her death she was between roommates, as Nancy Schick had moved out and Cheri Hofer had yet to move in. (RT 4537-40.) Mr. Cullins stated that the last time he spoke to Janette was April 4, when she informed him she would be unable to attend their weekly family dinner on April 11, and that when Nancy called on April 14 after being unable to locate Janette, Mr. Cullins became concerned and asked Nancy to look for Janette's car. (Id.) Mr.

Cullins stated that Janette's car had a license plate containing the word SHYLAS, and that on April 14, leaving her apartment to be with his wife, he saw her car parked on an adjacent street, which was not where she normally parked the car. (RT 4540-49.) Mr. Cullins also stated that when he went to the bank to close her account, he was informed of unusual activity and informed the police. (Id.) Cullins stated that approximately three or four days after the police were there, he noticed loose screws on the door jamb of her apartment, which came off in his hand. (RT 4579-82.)

William Green, an investigator for the San Diego District Attorney, stated that he located the boat named Sea Quest docked within walking distance to the Lost Knight Bar, and that he served the warrant on Ms. Cullins' bank to obtain the videotape of the ATM transaction, which only left his custody when the district attorney checked it out. (RT 4549-66.)

Forensic pathologist Hormez Guard, stated that when employed at the San Diego County Coroner's office in 1984, he performed the autopsy on Janette Cullins. (RT 4658-71.) Dr. Guard stated that the cause of death was asphyxia caused by strangulation, that there were marks on her neck, linear abrasions, contusions, and that it was possible for a nylon to make the marks. (Id.) Dr. Guard noted that some loss of pattern in the wound indicated movement, that more prominent marks on front of the victim's neck indicated strangulation from behind, and that the victim would have been unconscious from the strangulation before death occurred. (Id.) Dr. Guard also noted muscle hemorrhages, bone damage to the neck, marks on the victim's larynx, small marks or bruises on her chin, and a cut on the front chest area consistent with a knife. (RT 4571-78.) Dr. Guard also examined the victim's body for signs of sexual assault, did not find semen in the genital or mouth area, or evidence of force, yet conceded that the possibility of sexual contact of some sort remained. (Id.) Dr. Guard conceded that he was unable to establish a time of death, which became more difficult to ascertain after 24 hours, but that his estimate was that the time of death occurred between 24 hours and 48 hours prior to the autopsy, which had been conducted on Sunday, April

15 at 9 a.m.  (RT 4383-87.)

Detective Fred Dreis stated that in the course of his work on the Cullins' homicide, he went to the crime scene, and that his report included a mention of pry marks and wood chips scattered about by bottom of door.  (RT 4796-4803.)  Dreis conceded that since the report, he had not personally seen the wood chips, noting that any evidence collected would have been stored in the property room.  (RT 4803-06.)  Based on the observed pry marks, Dreis concluded that someone attempted to force entry into the apartment, as the marks appeared sufficient to gain entry; Dreis stated that even if the intrusion had been unsuccessful, it was evident that someone attempted to gain access to the apartment in that manner, as the wood chips appeared to be fresh. (RT 4806-07.)

Bruce Furnice, a carpet technician at Stanley Steamer, stated that he was assigned to clean a carpet at the Cullins' apartment on April 13, but the occupants were not home when he arrived at 8 a.m., so he left a card and went to another job.  (RT 4808-10.)

Robert Pack, who worked as a fish buyer on North Harbor Drive, stated that in April 1984, Adolph Romero gave him a brown purse containing a wallet and identification but no money.  (RT 4810-17.)  Pack stated that they first attempted to call the phone number on the card, but when there was no answer, they called the police later that same day.  (Id.)  Pack stated that the purse also contained checks bearing the name Bonnie Guthrie and a social security card in her name, that the number they called was a San Diego number, and that Romero found the purse on a roadway leading to the pier.  (Id.)

Cheri Hofer Phinney had planned to move from La Jolla to San Diego the week of April 9, 1984, in order to move in with Janette Cullins.  Hofer stated that on April 12, she did not yet have a key, but was at the apartment between 10 a.m. and 7:15 p.m. with Ms. Cullins present in order to paint her bedroom and bathroom, and spoke to Ms. Cullins a bit that day, noting that Cullins vacuumed the apartment that day.  (RT 4819-25.)  Hofer stated that some of the conversation between her and Cullins concerned

meeting people in bars, and that when Petitioner came by, Cullins asked Hofer to make her presence known, said this was "one of the other kind" of people met in bars, and introduced Hofer to Petitioner, who stayed about one hour.  (RT 4828-32.)   Hofer stated that Cullins remained at the apartment until approximately 6:30 p.m., then left to attend the symphony with Catherine Tiner.  (Id.)  Hofer finished painting, during which time she took a phone message for Cullins on a note pad that did not contain the word SHYLAS, and stated that the blinds were open and the door undamaged when she left.  (RT 4832-42.)  Hofer called Cullins the next morning starting at 8 a.m., and tried calling a total of four times that day without any answer.  (Id.)  When Hofer called again on Saturday, April 14 at 8 a.m., Nancy, the vacating roommate, answered the phone, and said Cullins was not at home; Hofer went over to move some items into the apartment.  (Id.)  When Hofer arrived, she noticed chips and dirt on the floor that were not previously present due to the recent cleaning Cullins had performed,  and that the drapes and curtains were closed, again different from the last time she had been at the apartment.  (RT 4842-46.)  Nancy and her boyfriend Lee were also present, and all three tried to ascertain where Cullins was by looking around the apartment for a note or other indica of her whereabouts.  (Id.)  Nancy opened the closet, found Cullins' body, and went to call the police.  (Id.)  When painting on April 12, Hofer had a brief conversation with Petitioner in the bathroom, during which she informed him that she would attempt to complete the painting that evening.  (RT 4850-52.)  Later, although Hofer did not personally observe it, Cullins informed her that Petitioner had left.  (RT 4852-57.)

Susan Seminoff, who worked and was friends with Janette Cullins for four years, stated that they went to open checking accounts in December 1980 at San Diego Federal.  (RT 4895-4904.)  In picking a code for their ATM cards, Cullins chose SHYLAS, informing bank personnel that the word was on her license plate.  (Id.) Seminoff stated that Cullins was relatively secretive about the code and covered it up when she entered it at ATM machines.  (Id.)

Rodney Beverly, an internal investigator with Wells Fargo, which was now

associated with San Diego Federal, stated that on April 13, there were several entries on Cullins' ATM card. (RT 4904-10.) These included an inquiry without a withdrawal, as well as a second entry which withdrew $60 from the account and left a balance of $4.06; Beverly noted that money could only be withdrawn in $20 increments. (Id.) Beverly obtained a videotape of the ATM transactions, later viewed it with a police officer, and stated that the transactions began on April 13 at 6:57 p.m. (RT 4910-13.)

Nancy Schick McEachern stated that she moved out of the apartment she shared with Janette Cullins on April 6, yet kept the key and planned to have a garage sale on April 14. (RT 4913-22.) McEachern stated that the drapes in the apartment were usually closed at night, the blinds were never completely closed, and that Cullins' car was usually parked curbside. (Id.) McEachern came to clean the apartment on April 11 and Cullins was home at that time. (Id.) McEachern stated that while she had originally planned to return to the apartment on Thursday, April 12, she did not, and called to apologize on Friday morning, yet there was no answer to her 3-4 attempts at calling, nor did the answering machine turn on. (RT 4922-25.) McEachern also stopped by during her lunch hour, approximately 11:30 a.m., and another car arrived when she did and a man identifying himself as Dean and driving a white Z car asked if Cullins was home, as they had a lunch date, to which McEachern pointed out that it was only 11:30. (Id.) McEachern took several items into the apartment, wrote a note for Cullins and placed it on the dining table, and did not see Dean, who she identified as Petitioner, when she left the apartment. (RT 4925-28.) McEachern stated that blinds were closed, which was unusual, and that while she went into Cullins' room, she did not enter or look in the closet. (Id.) McEachern next went to the apartment on Saturday morning to set up for the sale, used her key to gain entry, and called Cullins' mother when she saw her note was still on the table. (RT 4928-34.) Hofer also called and came over, and McEachern also called several others, including Susan, her boyfriend Lee, and Cullins' father. (Id.) When they looked in the bedroom closet, they found Cullins and called the police. (Id.) McEachern recalled that sometimes when the phone

rang, Cullins had stated, "If that's Dean, I don't want to talk to him," but McEachern stated that she never met or saw Petitioner prior to 11:30 a.m. on April 13. (RT 4934-35.) McEachern acknowledged that she did not have difficulty using her key to gain entry to the apartment on April 13 and 14 and did not notice pry marks or damage to the door. (RT 4935-38.)

Charles Byron, who lived in Poway, California in 1984, stated that Cullins contacted him about a job, that they had a tentative appointment on April 13, as well as an alternate appointment on April 17. (RT 4996-5001.) Byron called her on Friday, April 13, without receiving an answer, after Cullins had called and left a phone message for him at 10:52 a.m. on Thursday, April 12. (Id.)

Sharon (Hudson) Bergan stated that when she worked for San Diego Harbor Police in 1984, she collected a brown purse from a man named Dan on April 14 and turned it over to the San Diego Police Department. (RT 5001-04.)

Cathleen Tiner, who first met and became friends with Janette Cullins in 1983 through work, stated that she was with Cullins when they met Petitioner and his friend Antoine Masure at a nightclub and café the weekend of February 25-26, 1984. (RT 5093-5101.) Tiner stated that during this evening, she heard Petitioner ask Cullins for her phone number, which she eventually gave to him. (Id.) Antoine asked for Tiner's number, but after initially taking his number instead, she also gave him hers. (RT 5101-03.) Tiner recalled that Petitioner asked both Tiner and Cullins whether they had roommates or lived alone. (Id.) Cullins told Tiner in a later conversation that she wished she had not given Petitioner her phone number. (Id.)

Masure called Tiner on Tuesday, February 28 to invite her to dinner on the boat Sea Quest on Friday, March 2, and Tiner spoke to Cullins, who had received a similar invitation from Petitioner. (RT 5107-11.) Tiner stated that she and Cullins had a code word worked out in advance to end the evening, and they left after dinner, drinks and conversation. (RT 5114-19.) Tiner stated that when leaving, Cullins' car would not start, but they were able to jump start it with assistance. (Id.) Tiner stated that when

Cullins started to get into her car, Petitioner grabbed and hugged her, after which they went home.  (Id.)  Petitioner called Tiner on Sunday, March 4, stating that he and Cullins had gone sightseeing to Cabrillo that day, that she left for a dinner date that night, and asked Tiner to dinner that evening, to which Tiner declined, stating she had a dinner date as well.  (RT 5119-21.)

Petitioner again called Tiner on March 24, stated that he was in Los Angeles and was looking for Cullins, to which Tiner lied and said she did not know where Cullins was.  (Id.)  Petitioner stated that he was returning to San Diego and wanted to see Cullins again before he went back to Alaska, and asked Tiner to run off to Mexico with him and get married or go on a date; Tiner declined both.  (RT 5128-31.)  Tiner called Cullins immediately after ending the conversation with Petitioner.  (Id.)

Tiner last saw Cullins on April 12 when they went to the symphony together from her apartment in Hillcrest, stating that Cullins arrived at 6:10 p.m. wearing a white and gray dress, and that they went to dinner afterwards at 8:40 p.m.  (RT 5131-35.) Cullins, who was not working at the time, borrowed money for dinner, and both women went to Tiner's home at 9:40 p.m. and watched television until 11:00 p.m., at which time Cullins left.  (Id.)

Tiner had plans to attend a baseball game with a friend the next evening when Petitioner came by at 6 p.m., appearing groomed, calm, and initially pleasant, wearing pants, a sweater, and a jacket.  (RT 5135-39.)  Tiner was surprised to see him, informed him that she had company coming over, and said he should have called first.  (Id.) Petitioner asked if Cullins informed her that he was in town, to which Tiner said yes. (Id.)  Petitioner said he asked Cullins not to tell her that, to which Tiner said he needed to leave, repeating that she had company coming over.  (Id.)  Petitioner then asked if Tiner was aware that Cullins had stood him up that day, to which Tiner replied no.  (Id.) Tiner stated that Petitioner was pleasant at first, but stiffened when he found out Cullins had informed her he was in town.  (RT 5139-41.)  Tiner stated that she went to get ready, and twice tried to call Cullins, but received no answer.  (Id.)

After the March 2 dinner with Masure and Petitioner, Tiner informed Cullins that Masure thought Cullins wanted to stay with Petitioner, which Cullins denied, stating that she had no intention of spending the night with Petitioner and would tell him that if he called her again.  (RT 5202-04.)  Tiner contacted Cullins, who was at Susan Semioff's, after her March 24 conversation with Petitioner, to which Cullins stated she thought she had gotten rid of Petitioner, and stated that now she could not answer the phone.  (RT 5204-08.)  Prior to leaving to meet Petitioner and Masure on March 2, she and Cullins left a note for Cullins' roommate Nancy because they were uncomfortable going to a secluded non-public place with people they hardly knew.  (RT 5208-12.)

David Susi, who lived in Pacific Beach in 1984, saw Petitioner driving a Datsun with the license plate PHANTMZ at the intersection of Grand and Ingraham the afternoon of April 12 when Petitioner asked Susi how to get to Mission Beach.  (RT 5242-50.)  Seeing the newspaper later, Susi realized that the exchange might have been significant and contacted police.  (Id.)  On cross-examination, Susi did not recall being initially unsure whether the exchange took place on Wednesday, April 11 or Thursday, April 12, and denied being unsure of his identification of Petitioner.  (RT 5250-57.)

Dannis Nuckolls, a police evidence technician, took the crime scene photos at the Cullins apartment, and noted photos reflecting the appearance of forced entry, including wood fragments and tool marks.  (RT 5387-97.)  Nuckolls also took photos of the victim's body, red stains on the bed sheet at the apartment, and took photos of Cullins' autopsy.  (Id.)  Nuckolls removed a piece of wood from the doorjamb and photographed the area, but did not personally retain the wood particles and does not know what happened to them.  (RT 5400-05.)  Nuckolls also did fingerprint work at the scene, while another technician did the criminalistic work, and acknowledged that part of his job was to take evidence from crime scenes and see that it is properly preserved.  (Id.)  Nuckolls stated that he removed a section of the apartment's doorjamb, but did not impound the wood chips; he also impounded and inventoried a brown leather wallet.  (RT 5405-06.)

Adolph Romero, who worked on a fishing vessel off of North Harbor Drive in San Diego in 1984, found a wallet on April 14, opened it to look for contact information for the owner, tried calling, and pressed for time, gave the wallet to his friend Robert Pack to make further attempts at contact with the owner. (RT 5420-28.) That same day, Romero reported seeing a white Z car in the area, and acknowledged that he only located a wallet, not a purse. (Id.) Romero recalled the driver's license, credit cards, and a calling card with the Cullins' phone number on it, which he called. (RT 5433-37.) Nuckolls was recalled to the stand to testify as to the inventoried contents of the wallet, including business cards, a copy of a birth certificate, two keys, credit cards, calling card, the driver's license of Jan Cullins, in addition to the drivers license of Bonnie Guthrie, and credit and bank cards in the name of Bonnie Guthrie. (RT 5437-47.) Nuckolls also listed the inventoried purse contents, including cards, a checkbook with checks in the name of Bonnie Guthrie, business card, bank cards, and social security cards. (Id.) Nuckolls stated that police received the wallet on April 16 and the purse on April 23. (RT 5447-48.)

Dan Clark, a dockmaster in the San Diego marina in 1984, came into possession of a purse in April 1984 and called the harbor police. (RT 5470-75.) Clark did not remove anything, nor did he perform an inventory of the contents prior to turning it over. (Id.) Sharon (Hudson) Bergan received the purse on April 14, 1984 from Dan Clark and inventoried its contents, which included a wallet, checkbook, and social security cards with two last names. (RT 5476-79.)

District Attorney investigator Green drove the distance from Catherine Tiner's home to the bank, which was 4.6 miles and took slightly over ten minutes. (RT 5480-85.) Green also interviewed David Susi and showed him a photo lineup concerning the person Susi saw in the PHANTMZ car; Susi picked out Petitioner's photo. (Id.) Green conceded that Susi added a caveat to the identification of Petitioner, stating, "I think that's him, but I can't be sure." (RT 5486-87.)

Leanne Johnson, who lived across the street from Ms. Cullins and was

babysitting her granddaughters on the evening of Thursday, April 12, 1984, stated that she heard noises outside that sounded like a party coming from across the street between 10 and 11 p.m. (RT 5816-24.) Johnson also heard and saw a white car with a black stripe running at 11:10 or 11:15 p.m., stated that it ran for 15 minutes or so and then left, and that it nearly hit a pickup doing a U-turn on its way out. (Id.) Johnson was unable to see the driver of the car, as it was too dark outside. (Id.)

**f. Petitioner's Arrest in Arizona**

Arizona Highway Patrol Officer Robert Dapser testified that on the evening of April 17, 1984, he made a traffic stop of Petitioner for erratic driving at 10:50 p.m. on Interstate 40. Petitioner had an expired Alaska driver's license, and was unable to produce the registration on the car he was driving, a white Datsun with the California license plate "PHANTMZ." (RT 3956-63.) Dapser stated that he saw a burnt portion of a marijuana cigarette on the center console area of the car, after which he placed Petitioner in custody on suspicion of driving under the influence of alcohol or drugs. (RT 3963-66.) Dapser handcuffed Petitioner and placed him in the patrol car and noted empty beer bottles in the car Petitioner had been driving, as well as personal items scattered about the car, including a card from the San Diego Federal Savings and Loan in the name of Janette Cullins. (Id.)

Dapser explained that he later did a visual inventory of the car's contents, and that the vehicle was impounded by the Culver City Police Department. (RT 3966-78.) Dapser stated that the car's contents included items such as a key ring containing the ignition key which had a red medallion and the word "leo" on it, clothing and personal items, a camera with accessories and case, tennis racket, suitcase, binoculars, two knit sweaters, green backpack, cassette tape, as well as the aforementioned bank card belonging to Ms. Cullins. (RT 3966-77.) Upon booking Petitioner into the Yavapai County Jail, Dapser inventoried numerous items from Petitioner's person, including a billfold, address book, business card containing the written names, numbers and addresses of Catherine Tiner and Janette Cullins, a pocket knife, a man's watch, golf

glove, shaving razor, a key chain containing a chip from a casino in Las Vegas, a used book of matches, and a gold chain around his neck.  (RT 3978-86.)  Officer Dapser stated that officers from Culver City came to impound the vehicle and inventory and remove items. (RT 4044-55.)  An officer from Ventura County came to place Petitioner in their custody and transport him to California.  (Id.)  Officer Dapser conceded that Petitioner was cooperative and followed instructions when first stopped, and stated that while Petitioner was unbalanced at the time of the arrest, Petitioner's blood alcohol content was .078 when tested approximately 90 minutes after arrest.  (RT 4061-66.)

Culver City Detective Gary McEwen testified that after the murder of Jillette Mills and Susan Knoll, they learned two vehicles belonging to the victims were missing, including a 1980 Datsun 280Z with the California license plate PHANTMZ. (RT 4071-79.)   The officers placed the vehicle information in a national system, received information on April 18, and flew to Arizona in response to this information. (Id.) McEwen stated that the owner of the tow yard let them in, they started processing the car, and that Arizona Highway Patrol personnel showed up soon after. (Id.) McEwen stated that the officers inventoried the car and contents, and the keys were released to the Mills family in order to return the car to them.  (Id.)  McEwen noted several additional items inventoried, including the business card with Ms. Cullins and Ms. Tiner's names on it, a phone book, a receipt from an Oakland restaurant, and a cashex card. (RT 4079-91.) McEwen also identified a Members Only jacket containing nylon stockings.  (Id.)  The word "Shylas" had been written on the back of a grocery receipt, and while McEwen was aware of the Cullins murder in San Diego, he did not know what "Shylas" referred to at that time.  (RT 4091-4100.)  The car's contents also included a spa member card belonging to Ms. Cullins, in addition to items previously mentioned by Officer Dapser.  (RT 4100-07.)   McEwen also added that a ladies bracelet, cigarettes, earrings, and a claw hammer were found in the car, and a knife with a 6-7 inch blade was found in the suitcase.  (RT 4107-15.)

Sheriff Jerry McKeand, who worked at the Arizona jail where Petitioner was

booked in 1984, stated that at the time of booking, Petitioner was wearing jeans, a gray sweatshirt, tennis shoes and green socks, and had some cash in his possession. (RT 5076-79.) McKeand stated that the clothes would have been returned to Petitioner upon his release. (Id.)

Ventura police officer William Ragsdale stated that he, along with two Ventura County Sheriffs, traveled to Arizona to pick up Petitioner, who was wearing a gray sweatshirt, long sleeved undershirt, jeans and tennis shoes. (RT 5079-85.)

**g. Other Testimony**

Polly Haisha met Petitioner on February 18, 1984 at a birthday party for a friend, and found him to be charming, nice, and not at all aggressive. (RT 4296-4306.) Petitioner asked Haisha if she and her friends had been sailing, as he had a boat; Haisha and her friends gave Petitioner their phone numbers, which Haisha identified in Petitioner's address book. (Id.) Petitioner called Haisha the day after the party, and as she was not home, he then called her friend's home, inviting her sailing when he was in town later in the week. (RT 4307-10.) After Haisha spoke to friends at school to secure the attendance of another person, she stated that she later felt weird about it and called him to cancel. (Id.) Haisha stated that she talked to Petitioner periodically over the next few weeks and continued to make dates which she then canceled. (Id.) At one point during a conversation, Petitioner said Haisha should quit school and sail to France with him; Haisha noted Petitioner became more aggressive and mean when she canceled dates. (RT 4310-16.) Petitioner also informed Haisha that he had been married and divorced, did not mention he had children, and alternately spoke amiably about his ex-wife or called her a bitch. (Id.) Haisha's last conversation with Petitioner was on the evening of March 24, when Petitioner stated he would be in San Diego the next day. (Id.) Haisha asked him to stop calling her, to which he sounded irritated, but she did not think he called again. (Id.) On cross-examination, Haisha acknowledged that she was currently a law student, intended to work for the San Diego district attorney's office over the summer, had interned there in the past, and also intended to work there

after taking the California bar exam. (RT 4316-25.)

Sandra Homewood, a document examiner with the San Diego District Attorney's office, examined a number of writing samples from individuals involved in the case, and testified that Petitioner was the primary author of the entries in the address book found in his possession at the time of his arrest. (RT 4442-80.) Homewood opined that Petitioner made the entries in the address book corresponding to the names Catherine Tiner, Janette Cullins, and Susan Knoll, and while the sample was limited, Petitioner's handwriting was also consistent with the entry made regarding Polly Haisha. (RT 4480-85.) With respect to the business cards found in Petitioner's possession, Homewood stated that Petitioner also wrote the name Jan Cullins, the phone number, and the Tiner entry on that card. (RT 4485-98.) Homewood also compared Petitioner's writing to the Shylas note, but that document was limited for identification purposes and she was not able to identify or eliminate him as its author, noting that Janette Cullins' handwriting was more consistent with the writing. (Id.)

Andrew Holtz, who lived in Hollywood in 1984, knew Petitioner and allowed him to make phone calls from his home. (RT 5789-98.) Holtz identified a number of phone calls he did not make, including ones to the Lost Knight Bar, Philadelphia, Washington state, Alaska, Cathleen Tiner, Polly Haisha, and Janette Cullins' home. (Id.) Holtz stated that the name Susan Loyland was familiar to him, and that he recalled Petitioner bringing a woman to his home but did not recall her name. (Id.) Holtz recalled Petitioner telling him that he planned to go to San Diego and then to Mexico with some friends, and recalled Rob Stapleton telling him about a rape accusation in Ventura. (RT 5798-5806.) When Holtz asked Petitioner about the Ventura accusations, Petitioner denied them, stating that he had an argument with a woman, had been drinking heavily and did not exactly recall what happened, but planned to call Ventura and get it straightened out. (RT 5806-12.)

**2. Defense Case**

The defense presentation at the guilt phase introduced witness testimony

regarding: (1) Susan Knoll's ex-boyfriend Ron Tulio, who one eyewitness previously identified as being in the area around the day of the Knoll/Mills murders; (2) that prints not matching Petitioner's were found at the Cullins' apartment, the hair and fibers found did not match Petitioner, and the blood type match also matched fifty percent of the general population; and (3) that Barbara S. did not immediately identify Petitioner as her attacker or offer a specific description of her assailant.

Richard Haas, a district attorney's office investigator in Ventura County who worked on the Jennifer S. case, stated that he spoke to Andrew Holtz about that witness's phone calls with Petitioner. (RT 5935-40.) Petitioner told Holtz that he was returning to Los Angeles March 22 or 23, stayed with Holtz during this time, then left on March 25, after mentioning plans to meet some friends and go to Ensenada from San Diego. (Id.) Haas also spoke to Barbara S. in order to attempt to ascertain similarities, if any, between that attack and the attack against Jennifer S. (RT 5946-51.) Barbara S. stated that at the time of the attack, she did not think of Petitioner, but when Loyland mentioned him, Barbara thought the voice she heard may have been that of Petitioner, and that the size and build of the assailant was similar to that of Petitioner. (Id.)

Culver City police officer Lee Cantrell recalled that Officer Bloor made an April 12 identification of a photo to Officer White, who was no longer with the police department. (RT 5953-91.) Bloor, who lived in that area, identified a photo of Susan Knoll's ex-boyfriend Ron Tulio as a man he saw in the vicinity a few days earlier. (Id.) Cantrell also interviewed Ron Tulio, and in the course of that interview, discussed or shared some of the details of the crime, such as mentioning that the victims were found in a closet. (Id.) Cantrell also recalled Tulio asking if the victims had been shot or stabbed, and asked about sex, to which Cantrell replied that the victims had been fully clothed. (RT 5997-6001.) Cantrell stated that Tulio was cooperative, never hesitated to answer any of the questions, and that they did not discuss the Guthrie homicide, as Cantrell was not aware of that homicide at the time of the interview. (RT 6001-07.) During the interview, Tulio also asked about fingerprints at the crime scene. (RT 6007-

18.)

Lauren Carville, who lived in the apartment below Janette Cullins in 1984, last saw Cullins on Thursday, April 12, when both women were sunbathing in the yard. (RT 6136-42.) Carville stated that a man came by to speak with Cullins that afternoon, and that Carville saw Cullins leave the residence at about 7 p.m., after which time Carville left as well, returning at about midnight. (Id.) Carville stated that the walls in the units were thin, that she did some work until 1 a.m., and that she is a light sleeper but was not awakened that night before rising at 6 a.m. to go to work. (RT 6139-47.)

Annie McFadden recalled plans she had to go to Mexico with her boyfriend Marshall, her friend Susan Loyland, and Petitioner. (RT 6047-52.) McFadden stated that these plans were the same day that Loyland's roommate was later attacked. (Id.) McFadden picked up Loyland at 11 a.m. and went to the bus station to pick up Petitioner, but after the group waited in the car and were unable to locate Petitioner for 45 minutes, they went to Mexico without him. (Id.)

Detective McEwen was recalled to discuss his recollections regarding Officer Bloor's photo identification, but was unable to locate the photo Bloor had identified. (RT 6060-67.) McEwen stated that the photo was in an album later released to the Knoll family, that he did not remove any photos from the album prior to releasing the album to the victim's family, and that he did not recall the specific photo identified by Bloor. (RT 6067-75.) Upon further questions by the prosecution, McEwen identified a Las Vegas casino fun book dated April 17, 1984, which was found in the car Petitioner was driving at the time of his arrest. (RT 6075-78.)

San Diego police officer Gene Loucks took Barbara S. to the hospital on the night of the attack, and they discussed the description of her attacker. (RT 6078-81.) Barbara stated that he was a white male in his twenties of average build and height, but was unable to provide any additional details, or any details about his speech and voice, nor did she mention or name anyone as her assailant. (Id.)

Evidence technician Michael Palermo examined the latent prints in the Cullins

case and was able to match 17 latent prints to Cullins, but was unable to match 31 other latent prints. (RT 6089-96.) Palermo stated that he was only provided with prints from Cullins and Petitioner. (Id.) Palermo acknowledged that it was very possible for someone to be in the apartment and not have any latent prints show up, and conceded that someone wearing gloves would not leave prints. (RT 6096-6100.)

San Diego police criminalist William Loznycky conducted fiber and hair comparisons in the Cullins case and was unable to match either the fibers found in the victim's hand or hairs on a blanket to either Petitioner or Petitioner's clothing. (RT 6111-17.) Loznycky stated that an O type blood stain was found at the scene that did not match Cullins, but could match Petitioner, but conceded that fifty percent of the population was also type O. (RT 6117-25; 6136.)

Culver City Police officer Craig Bloor, who lived in a building in the same apartment complex as Ms. Knoll and Ms. Mills, stated that on April 10, he saw a man he did not recognize walking from the parking area to the street, and having been burglarized recently, paid attention to the individual. (RT 6137-42.) Later, after learning about the homicides, Bloor told officers about the man he saw at the complex. (Id.) Looking at a photo album, Bloor pointed to a photo of Ron Tulio, stating that he looked like the guy Bloor saw that night. (RT 6142-44.) On cross-examination, Bloor currently believed that Petitioner, not Tulio, was the man he saw that evening. (Id.) Bloor spoke to Petitioner on April 10, who stated he was looking for a friend's house, was holding a blue folder, and asked Bloor if he looked suspicious, and said it was good Bloor checked. (RT 6149-54.) Bloor recalled that Petitioner had a lighter skin tone than Tulio, and that while Tulio bore some similarities, such as hair color, style, and mustache, Tulio was not the right height, had a different skin tone, and spoke differently than the man Bloor spoke to that evening. (RT 6153-58.)

Ronald Tulio, who was acquainted with Jillette Mills and Bonnie Guthrie, dated and lived with Susan Knoll in Pasadena from July 1983 until February 1984, after which Knoll moved out to live with Mills in Los Angeles. (RT 6161-66.) Tulio was

interviewed by several police officers after the homicides, and noted that when they broke up, Knoll took a photo album containing some photos of him and his family members. (RT 6166-67.) Tulio stated that he met Knoll in 1982 and took trips to San Diego to see her, where she lived at the time with a boyfriend. (RT 6166-71.) Knoll used a friend in Los Angeles named Bonnie as an excuse to see him when she was in town, and later, Knoll and Mills met through Tulio's friend Leon Herrera, who Mills had been dating. (Id.) Tulio acknowledged that Knoll would not let him help her move, that she did not want him to know her new address, and that they only maintained contact through her work. (RT 6171-73.) Tulio denied ever going to the Knoll/Mills apartment or knowing its location, stating that his relationship with Knoll ended when he was caught with another woman. (RT 6173-77.) The last time Tulio spoke to Knoll was on April 8; Knoll had the flu. (Id.) A woman named Alice called Tulio on April 11, asking if he had heard from Knoll, and he directed Alice to call Knoll's sister Sandra Pender in San Diego. (RT 6177-82.) Alice called back Thursday morning crying, said the girls were dead in the apartment, and Tulio contacted the police, who refused to give him information over the phone. (Id.) Tulio spoke to police on April 12 and came into contact with Officer Bloor at this time. (RT 6182-88.) Tulio also tried to contact Guthrie after learning of the Knoll/Mills murders, and on one occasion a police officer answered, but again did not provide details. (Id.) Tulio acknowledged that he was arrested by the Culver City Police on Thursday, April 12 at 4 p.m, and that in the few days he was in custody, Janette Cullins was murdered in San Diego. (RT 6188-91.) Tulio stated that defense counsel spoke to him before calling him as a witness, and recalled counsel stating that if Culver City made a mistake in arresting him, they could have also made a mistake in arresting Petitioner. (RT 6191-92.)

**B. Penalty Phase**

The prosecution's penalty phase presentation rested largely on the circumstances of the crimes charged and other crimes evidence. Additional evidence was introduced regarding two prior felony convictions Petitioner suffered for burglaries in Oregon and

Alaska, and regarding weapons (shank and pipe) found in Petitioner's jail cell during his county jail incarceration in early 1991.

The defense presentation focused on Petitioner's harsh childhood and upbringing in Nome, Alaska, as well as his drive to better himself once released from jail by becoming a successful cameraman. The defense presented evidence that Petitioner descended into drug and alcohol abuse once his marriage ended and his contact with his children limited.

**1. Prosecution's Presentation**

William McFarland, a sheriff working at the San Diego Central Jail, stated that on February 4, 1991, during an unscheduled cell check that day, he found two weapons in Petitioner's cell, including a homemade knife (or shank) in the mattress lining of his bunk bed, as well as a long metal pipe, which could also be used as a weapon. (RT 7294-7303.)

Detective Carlos Chacon, a former prison gangs officer with the San Diego Police Department, testified that in his experience a shank such as the one found in Petitioner's cell is an offensive weapon, often used to inflict serious bodily harm. (RT 7348-58; 7396-99.)

The prosecutor introduced the judgments from Petitioner's burglary convictions in Oregon in 1974 and Alaska in 1977, with Petitioner's stipulation. (RT 7411-17.) Over Petitioner's initial objection but eventual stipulation, the prosecution also introduced Petitioner's Ventura County convictions for forcible rape, forcible oral copulation, assault and residential robbery. (Id.; RT 8547.)

**2. Defense Presentation**

Jerry Lee Carter, Petitioner's older brother, testified that the family grew up in Nome, Alaska, a town of about 3,000 people, and that his mother, who was half-Eskimo, married Jim Carter, his stepfather, when Petitioner was five. (RT 7435-36.) Carter stated that their mother and stepfather drank heavily, argued, and often became physically violent with one another after drinking. (RT 7436-39.) Carter also recalled

that his mother was excessive in disciplining the children, as the children "would have to go pick out a branch, or we had a belt, we had a razor strap." (RT 7438.)  Carter stated that Petitioner ran away several times, sometimes for several days at a time before being found. (RT 7439-45.)  Carter stated that their parents often returned home at 5 a.m., when the bars closed, and the children often hid to avoid confrontations. (RT 7444-45.)  Carter recalled an incident when Petitioner was five or six, when Petitioner attempted to stop their mother from going to the bar by holding onto the bumper of the car, cutting up his feet in the process, stating that their mother merely cleaned Petitioner up and returned to the bar. (RT 7449-51.)  Carter also recalled an occasion when their parents had set up testing for Petitioner and did not want him to run away beforehand, so "they put a length of chain on him to the bed to keep him home so he wouldn't run away," lasting a day or two. (RT 7452.)  Carter also recalled Petitioner was later sent away by their parents. (RT 7446-47.)

Carter recalled seeing Petitioner as an adult, happy, with his wife and twin boys. (RT 7454.)  After Petitioner's divorce, Carter recalled that while Petitioner was "pretty bitter against his wife, but he was great with my children." (RT 7455.)  Carter stated that alcoholism was rampant in Nome, the suicide rate was high, as was the rate of depression. (RT 7456.)

On cross-examination, Carter conceded that when he was punished as a child, he generally deserved it. (RT 7460-61.)  Their mother worked in Nome as a prison matron and they attended church and Sunday school as children. (RT 7462-65.)  Carter conceded that Petitioner lived away from their residence a substantial amount of time starting at the age of eight, that they did not have much contact with one another after that point, and that Petitioner's behavior was the impetus for the testing. (RT 7465-71.)  Carter also acknowledged that the chains used on Petitioner were lengthy enough to allow him movement throughout the home, while still confining him to the residence. (Id.)

Carter had contact with his brother in later years, once possibly when Petitioner

was incarcerated, and on another occasion when Petitioner visited him at college.  (RT 7473-74.)   Carter did not attend his brother's wedding.  (RT 7476.)   Carter was embarrassed by Petitioner's legal troubles and tried to stay separate from it, and thus didn't recall some of the dates of conviction, incarceration, or other dates as they pertained to Petitioner's life. (RT 7476-77.) Carter did recall a period, when Petitioner was married, that he and Petitioner both lived in Anchorage and they had dinner together on several occasions.  (RT 7478.)  Carter also recalled seeing Petitioner in 1983, after the breakup of his marriage, and recalled Petitioner being unhappy with the child support and inability to see his children.  (RT 7480.)  After that, Carter spoke to Petitioner on a few occasions, over the phone, but did not recall anything out of the ordinary.  (RT 7485-86.)  Carter spoke to Petitioner at some point after his arrest and did not detect any sort of mental problems.  (RT 7493.)

Polly Reasner, Petitioner's younger sister, stated that she was born and raised in Nome, then the family moved to Anchorage after her father died in 1973 or 1976.  (RT 7523-25.)  Reaser identified a photo taken of her and Petitioner when she was eight or nine, and stated that while she knew he was her brother, she had not seen Petitioner prior to that time.  (RT 7531.)  Reaser concurred that both parents worked and that her parents spent additional time away from home, drinking in bars until 4 a.m.  (RT 7543-45.)  Reaser recalled incidents of violence between her parents, but did not recall Petitioner being with the family when she was younger, and did not recall either her parents or brother Jerry talking about him.  (RT 7545-46.)

On cross-examination, Reaser reasserted that she had no recollection of contact with Petitioner when she was younger.  (RT 7547-48.)  Reaser stated that while she did not recall Petitioner being present when she was younger to witness the incidents of violence, she did recall that Petitioner was home again after she was nine or ten, and he would have witnessed those incidents, noting that her parents "got drunk all the time. It wasn't just once a month."  (RT 7549-50.)  Reaser acknowledged that she and her sister stayed in their room during these incidents, and that their parents did not

physically abuse them after drinking. (RT 7551.) Reaser acknowledged that her parents sometimes worked twelve hour shifts opposite one another and that for a time her father was Chief of Police in Nome. (RT 7565-66.) Reaser stated that she recalled two instances of contact with Petitioner in Nome, that she "knew him from all of the time in Anchorage," and that they "lived together in Fairbanks too." (RT 7567.)

Bertha Adsuna, an Eskimo elder who has lived in Nome for nearly 50 years, knew Petitioner and his family both before and after his mother married Jim Carter. (RT 7578-83.) Adsuna stated that she knew Petitioner's mother frequented the bars, acknowledged that alcoholism was a significant problem in Nome, and recalled Petitioner spent a lot of time alone. (RT 7583-84.) Adsuna stated that she never saw Petitioner well dressed or treated well, unlike his brother Jerry, who was always better dressed and more protected. (RT 7584-85.) Adsuna stated that she worked with Petitioner's mother in corrections, reasserting that Petitioner was treated differently than his brother. (Id.) After Petitioner's mother married, Adsuna recalled them frequenting bars together. (RT 7589.)

On cross-examination, Adsuna conceded that she knew what it was like to be neglected, as she was a middle child who received hand-me-down clothing. (RT 7591.) Adsuna did not recall Petitioner running away, and conceded that she only saw Petitioner on occasion, as she did not associate with his family outside of work. (RT 7592-93.) Adsuna was aware that Petitioner had been in legal trouble and had been arrested. (RT 7594.)

On redirect, Adsuna recalled Petitioner moving back to Nome as an adult, married, with twin boys. (RT 7596.) Adsuna's son worked with Petitioner, and after her son was later killed, Petitioner brought her a photo of her son and refused compensation for it. (RT 7596-97.) Petitioner attended an Eskimo Elder's conference and filmed it and appeared proud of his heritage, while Adsuna noted that Petitioner's mother had never attended such conferences. (RT 7597-98.)

Harriet Brown, a missionary in Nome between 1947 and 1967, was a pastor at

a mostly Eskimo church, and stated that the largest problem with the native population was alcohol.  (RT 7616- 18.)  Child neglect was also a problem she frequently saw, and Brown kept her doors open to take in those that needed help.  (RT 7618-19.)  Brown knew Petitioner's family, would pick up the children, including Petitioner, for Sunday school, as the parents were not involved in the church. (RT 7620-21.)  Brown recalled the young girl and older boy were always dressed well, but Petitioner was consistently not dressed as nicely, nor was he treated nicely by his mother.  (RT 7621-24.)  Brown did not recall Petitioner presenting any problems in Sunday school.  (Id.)

On cross-examination, Brown acknowledged that her contact with the family was largely through the Sunday school program, except for Jim Carter, who was police chief for a period of time.   (RT 7625.)   Brown believed she knew Petitioner for approximately two or three years, when he was ten to twelve.  (RT 7628-29.)  Brown stated that it was the father that wanted the children to attend Sunday school, and Mrs. Carter did not appear anxious to have them attend.  (RT 7632-33.)  Brown had not seen Petitioner since his involvement in the Sunday school program.  (RT 7635-36.)

Beth Farley, who grew up and attended school with Petitioner as a child, recalled Petitioner leaving Nome as a child.  (RT 7636-40.)  Petitioner being alone a lot, was ignored by his own family, and spent more time with Farley's family than his own.  (RT 7641-43.)  In later years, Farley recalled seeing Petitioner in Nome a few times, and later in Anchorage, recalled meeting his wife and sons, and saw him as a doting and proud father. (RT 7648-51.)  After the break up of Petitioner's marriage,  "[h]e looked lost."  (RT 7651.)  Farley left Nome because of the alcohol abuse, stating that even children drank, and many died, either freezing to death or suicide.  (RT 7653-56.)  Farley also stated that she had witnessed and experienced prejudice against people of mixed race in that area, as her son was part Eskimo.  (RT 7656-60.)

On  cross-examination,  Farley  acknowledged  that  she  was  friends  with Petitioner's mother, and they were neighbors for a time.  (RT 7662-63.)  Farley stated that Petitioner's mother was part Eskimo, and had a job with the city of Nome, and it

did not appear she was suffering consequences of prejudice in that regard.  (RT 7664.)
Farley stated that Jerry Carter suffered prejudice, as some parents told their children not
to spend time with him as he was part Eskimo, yet some girls dated him anyways.  (RT
7665.)  Farley heard about the murders on the radio.  (RT 7670-71.)  When shown a
phone bill containing her phone number, she did not recall speaking to Petitioner a few
weeks before the murders, but noted that she shared a phone with Petitioner's mother
at that time.  (Id.)  Farley had a conversation with Petitioner several weeks after his
arrest, in which he sounded depressed and sad.  (RT 7673.)  When they heard about
Petitioner's arrest, his mother became very depressed and Farley removed all the guns
from her home.  (RT 7675.)  When she spoke to Petitioner on the phone, she did not
ask, and he did not discuss, the crimes or charges.  (RT 7679-80.)

Ruth Butts, who grew up in Nome and attended the same elementary school as
Petitioner, recalled a time when something happened and people were searching for
him.  (RT 7681-87.)  The population of the school at that time was mostly native or part
native, and the minority was white.  (RT 7694.)  Those of mixed race were treated better
than those who were full-blooded Eskimo.  (Id.)  It was common knowledge that Mr.
Carter was not Petitioner's or Jerry's father, which subjected them to teasing.  (RT
7695.)  Butts accompanied her step-father to a bar after Sunday church and often saw
Mr. Carter there as well, drunk.  (RT 7696-97.)  Her family later moved, but Butts
recalled seeing Petitioner on occasion after that, both in Nome and having visited him
at the McLaughlin youth detention center when he was a teenager.  (RT 7697-7700.)
Butts also saw Petitioner in later years, when he was in a work release program at a
university, when he worked for a news station in 1979, and when they both attended a
conference in 1980.  (RT 7701.)

On cross-examination, Butts stated that when visiting Petitioner at the
McLaughlin youth facility, she did not talk to him about why he was there, other than
he was not happy that he was not at home.  (RT 7705-06.)  On redirect, Butts stated that
the juvenile facility was the only one in Alaska, and was not solely for children who

committed crimes, but also included those who ran away or left home due to abuse, although Butts did not know why Petitioner was there.  (RT 7711-12.)

Susan Broughton stated that she worked as a house parent at the Jesse Lee Home in Seward, Alaska, 1200 miles from Nome, starting in 1965.  (RT 7714-17.)  The children at the center often had parents that were unable to care for them.  (Id.) Broughton stated that all 35 children were native children, ages 6 to 17, and that she was in charge of the younger boys.  (RT 7744-48.)  Broughton was there six months, did not specifically recall Petitioner, but recognized the admission form bearing Petitioner's name as from the Jesse Lee Home.  (RT 7750.)  Broughton acknowledged that there was discrimination towards native people at that time, and Seward was a predominantly white community.  (RT 7751.)  On cross-examination, Broughton denied that the children were usually discipline problems, stating that she did not encounter big problems during her time there.  (RT 7752.)  Broughton acknowledged that she did not know why Petitioner was placed there, and she was not there at the same time he resided there.  (RT 7752-53.)  Anyone with more than one quarter Eskimo blood was considered native, and Broughton stated that Petitioner appeared native to her.  (RT 7753-55.)  Those in the Seward area referred to the home as one for "unwanted children."  (RT 7755-56.)

Thomas Finegan, a counselor at the McLaughlin Youth Center, stated that he met Petitioner at the youth center and knew him during two different periods.  (RT 7758.) The first period was in 1969, when Petitioner was about 14 or 15, and recalled Petitioner as withdrawn and shy.  (RT 7758-61.)  Petitioner's initial stay at the center was short, about 30 days, then he returned a year or two later.  (RT 7762.)  Finegan only recalled Petitioner because his wife's roommate asked to arrange visitation, otherwise he would have no recollection, as he does not recall any incidents involving Petitioner or anything else that would make him stand out.  (RT 7768-69.)

On cross-examination, after reviewing records provided by the prosecution, Finegan acknowledged those records indicated that Petitioner came to the center after

being at a place called the Alcanta Youth Camp, at which he was placed after committing a residential burglary where he pointed a pistol at someone, and that he had run away from the camp several times. (RT 7771.) The same records showed Petitioner was released from the center in 1970, to his parents' custody, committed a residential burglary, and was then placed in a foster home. (RT 7772.) Petitioner was then arrested for joyriding, breaking and entering and assault and battery, after which he returned to the McLaughlin center before again being released to his parents in 1972. (RT 7772-73.) Finegan agreed that McLaughlin was a secure facility with infrequent escapes, while the Alcantra camp was open. (RT 7774-75.)

A. Bertram Matsumoto, a probation officer who worked at the McLaughlin facility, recalled seeing Petitioner at McLaughlin in 1969. (RT 7779-80.) Matsumoto recalled Petitioner being one of the youngest persons on the unit, very shy, not a management problem, and recalled him associating more with the Native children. (RT 7781-82.) Matsumoto came into contact with Petitioner again in 1978 at the Eagle River Correctional Center near Anchorage, an adult facility, where Petitioner was sent after a burglary conviction. (RT 7784-85.) Petitioner became involved in videotaping and video production while at the facility, and was furloughed to assist in video work at the University of Alaska. (RT 7785-87.) After Petitioner's parole, he went to work for the Alaska court system and television station in Anchorage. (RT 7788.)

On cross-examination, Matsumoto reviewed and discussed Petitioner's juvenile records, which he had not previously reviewed. (RT 7793-98.) Matsumoto, who had been Petitioner's case worker at Eagle River, only had access to the adult records in that capacity, and therefore knew about the burglary convictions in Oregon and Alaska, and his parole in 1979, after which he did not have further contact with Petitioner. (RT 7807-13.) Nothing in the records indicated to Matsumoto that Petitioner suffered from mental disturbance or disease. (RT 7813-14.)

PattyLynn Drewery, who works for the University of Alaska and previously worked for Channel 2 news, first met Petitioner in 1978 when he was still incarcerated,

when she went to do a story on him and his video work at the facility. (RT 7847-49.) Upon his release, he worked for Channel 2 under her supervision and was a very good worker. (RT 7851-52.) They did general news reporting and other projects, and Petitioner did not only shoot film, but often worked with lighting, editing, and other work. (RT 7852-54.) Petitioner was an excellent cameraman, and reporters, including Drewery, would request to work with him. (RT 7854.) Drewery recalled seeing Petitioner around the time of his marriage and found that he appeared to be a loving father. (RT 7857.) On cross-examination, Drewery stated that Petitioner was a good cameraman who was able to make a living at it. (RT 7858-60.) Petitioner's part Eskimo heritage was not a deterrent to hiring him. (RT 7861.) After working together, she and Petitioner only spoke infrequently, but they had spoken since the crimes, and she did not notice a mental defect. (RT 7861-63.)

Mary Alexander Wondsell first met Petitioner in 1979 or 1980 when he was looking for employment. (RT 7867-71.) Wondsell did not have funding to hire him, and he persisted, returning with a proposal, which convinced her to find a funding source with which to hire him. (RT 7872.) Petitioner worked as a newsletter editor, writer, and video person. (Id.) Petitioner did video work at an Elder's conferences in Nome and Wondsell found his work was often requested. (RT 7872-82.) She found Petitioner to be consistently happy, outgoing, neat, and clean. (RT 7882-85.) Wondsell acknowledged that most groups experienced discrimination, but that Eskimos bore the brunt of such behavior. (RT 7883.)

Stanley Reed, who met Petitioner in his capacity as an educator at the Eagle River Correctional Institution, stated that Petitioner assisted in producing videos for the institution. (RT 7947-50.) Reed had tried interesting others in the work, but Petitioner was the only one who followed up with it and continued the work. (RT 7951.) Reed found Petitioner to be courteous and did not get himself into trouble. (RT 7953.) On cross-examination, Reed stated that Petitioner informed him that he had been incarcerated for burglary. (RT 7956.)

William Green, a former correctional administrator, stated that when he was appointed to a commission to investigate how the correctional system handled minorities, Petitioner accompanied them on their travels as a cameraman. (RT 7959-60.) Green and Petitioner roomed together. (Id.) Green cannot recall if Petitioner was incarcerated at the time or under any sort of restraint. (RT 7961.) Green found Petitioner to be enthusiastic about his job. (RT 7963.) On cross-examination, Green recalled previously doing some volunteer work in the system, and coming into contact with Petitioner at an institution where he was incarcerated. (RT 7964-65.)

Mark Olson, a video producer in Alaska, knew Petitioner through his work as a cameraman at Channel 2, and again in Nome in 1981, when he obtained Petitioner's assistance in covering the Iditarod race. (RT 7965-70.) Olson also saw Petitioner's wife and children at that time. (RT 7971.) On cross-examination, Olson stated that he saw Petitioner's family on more than one occasion, and at a later time, Petitioner was spending more time away from his family. (RT 7974.) Olson had spoken with Petitioner since his April 1984 arrest, but they did not discuss the charges, and Olson did not notice a mental defect. (RT 7974-75.)

Ed Coll, a community college instructor in Hawaii, met Petitioner when he worked at the University of Alaska in 1978 when they worked together on some public service announcements (PSA's) at Eagle River. (RT 7978-79.) Petitioner assisted Coll in making the PSA's, and ran into him after his release, but they did not directly work together after that. (RT 7981-83.) Coll saw Petitioner professionally and socially until about a year prior to his 1983 move to Hawaii. (RT 7985.) After the move, Petitioner came to visit Coll in Hawaii in December 1983, staying about a month. (RT 7986.) Coll noted that Petitioner had been enthusiastic about his work in the past, but in late 1983, he was not motivated at all in his work. (RT 7987.) Coll received a phone call from Petitioner a few months after the visit, where Petitioner mentioned sailing to Rio, and did not sound okay. (RT 7992-93.) Coll maintained irregular contact with Petitioner mostly via phone and letter throughout their acquaintance. (RT 7993-94.)

They did not discuss the charged crimes. (RT 7994.)

Carol Bain, Ed Coll's wife, first met Petitioner in 1979, knew he had been incarcerated in the past, and saw him socially during the time he was employed at Channel 2. (RT 7996-99.) Bain was invited to, and attended, Petitioner's wedding reception, and visited their home in Nome on several occasions. (RT 8000.) Bain recounted an incident where they were having coffee one winter morning when they noticed a neighboring building on fire, to which Petitioner ran outside without a coat in order to attempt to alert the building's inhabitants. (RT 8001-03.) Bain also babysat Petitioner's children on occasion. (RT 8007.) On cross, Bain stated that she was aware Petitioner's conviction and incarceration was for burglary, but was not aware of any details. (RT 8008.) The wedding was in Anchorage, the reception was at Petitioner's mother's home, and Bain met his mother and sister. (RT 8008-09.) During Petitioner's December 1983 visit, Bain and her husband attempted to assist Petitioner in getting a job, but he was unmotivated to do so. (RT 8010-11.) Petitioner was not drinking excessively or using drugs at that time, to her knowledge, but appeared depressed. (RT 8011-12.) Bain had communicated with Petitioner since his arrest, but they had not discussed the crimes. (RT 8013.)

Richard Taylor, a television producer, first met Petitioner in the early 1980's through his work and later hired him to work at the University of Alaska. (RT 8019-21.) Taylor was Petitioner's immediate supervisor and they worked together fairly closely on a series of educational films about cold water survival. (RT 8021-26.) Taylor described Petitioner's camera work as good, and noted that Petitioner was a flexible and qualified cameraman. (RT 8026-31.) On cross-examination, Taylor noted that he worked with Petitioner on the project for a six month period, that Petitioner was cooperative, got along with other people, and did not appear to suffer from mental problems or be abusing alcohol or drugs. (RT 8043-46.) Taylor stated that he had not had contact with Petitioner since his arrest but that based on his work, would have given him a positive recommendation. (RT 8046-47.) Taylor characterized Petitioner as

introverted and withdrawn. (RT 8049.)

Robert Jenkins, a photographer and producer on the cold water survival video series, worked with Petitioner on that project and others over a period of several years. (RT 8050-55.) Jenkins knew Petitioner at the end of his marriage. (RT 8056.) Petitioner became less reliable, well-kept, and dependable during this time. (RT 8059.) Jenkins became aware that Petitioner developed a severe alcohol problem, observed Petitioner using illegal drugs, which escalated when Petitioner's marriage was breaking up. (RT 8059-61.) Jenkins maintained contact with Petitioner over the years and had phone conversations with him in early 1984, and recalled that Petitioner sounded quite fearful and paranoid, which was of concern, as Jenkins himself had suffered with an addiction. (RT 8062.) Jenkins and Petitioner discussed the possibility of meeting up in Philadelphia, but that never occurred, as Petitioner was arrested. (RT 8062-63.) On cross examination, Jenkins stated that Petitioner used cocaine, and that he and Petitioner drank quite a bit together. (RT 8065.) Jenkins met Petitioner's mother, and visited Nome with him, but did not feel Petitioner was very fond of the area. (RT 8066-67.) Jenkins also visited Petitioner in Seattle and again had concerns about Petitioner's drinking at that time, as Petitioner had a minor car accident. (RT 8068-70.) Jenkins also spoke with Petitioner after his arrest, and saw him in jail the previous weekend, but they did not discuss the case or charges at that time. (RT 8073-74.) On prior occasions, Jenkins had asked about the crimes, to which Petitioner stated he was innocent and had been framed. (RT 8074.)

Rob Stapleton, a photojournalist and friend of Petitioner's who he first met in 1979, stated that he was familiar with Petitioner's work and had on occasion loaned out his camera equipment to Petitioner. (RT 8079-84.) The quality of Petitioner's camera work improved over the years he knew him, and they, along with Andrew Holtz, worked together on the same stories at times. (RT 8085-87.) Stapleton last saw Petitioner in late 1983 in Alaska after his divorce, at which time Petitioner appeared depressed, dejected and quiet. (RT 8088.) Stapleton had been the best man and

photographer at Petitioner's wedding, Petitioner had participated in Stapleton's wedding, and the families had spent time together.  (RT 8089.)  When Petitioner's marriage was breaking up, Stapleton recalled him sleeping in his car and appearing upset and rattled. (RT 8090-91.)  Stapleton did not recall providing Petitioner with his brother Vince's address or contact information or discussing Petitioner visiting Vince in Ventura. (RT 8096.)  Petitioner contacted Stapleton when he was staying in Seattle in mid 1983, and Stapleton saw him at Christmas time in 1983 in Alaska.  (RT 8096-97.)  Stapleton was also contacted by Ventura County authorities regarding the last time he saw Petitioner, and acknowledged having several phone conversations with Petitioner in late March 1984. (RT 8098-8100.)  At that time, Petitioner told Stapleton he was visiting Stapleton's brother Vince, sounded upbeat, and stated that he was meeting people and having a good time.  (RT 8100-01.)  Petitioner had contacted him a few times since his arrest, but they spoke mostly about jail conditions, and Petitioner did not reply when Stapleton asked him about the charges or crimes.  (RT 8102.)

Melissa Wells Glick worked as an anchorperson at Channel 2 in Anchorage for about six months, was new to the field at that time, and Petitioner helped her a great deal by teaching her about editing and other technical things.  (RT 8104-09.)  Glick socialized with Petitioner on occasion, met his wife, and stated that the quality of his work was good. (RT 8110-11.)  Glick worked more with the other cameraman, because Andrew Holtz "monopolized" and "handpicked" Petitioner, as Holtz had more seniority.  (RT 8112-13.)  On cross-examination, Glick stated that she had some communication with Petitioner since his arrest, but that they did not discuss the charges, and she has not looked into the case, but as she did not see things with her own eyes, she could not say for sure if Petitioner was guilty or not.  (RT 8113-16.)

Lennart Bourin, a news producer and former cameraman who now works for ABC news, did not know Petitioner, but had reviewed several dozen tapes of his work, as well as a resume tape. (RT 8154a-61.)  It was clear some of the beginning work was done using poor equipment and the later work with better equipment.  (RT 8169-71.)

Bourin stated it appeared Petitioner was largely self-taught based on composition and framing in early work, and the improvement shown in later work. (RT 8175-76.) On cross-examination, Bourin agreed that he did not have direct knowledge of Petitioner's involvement in the work he reviewed, and that the pieces he reviewed were edited and did not include raw footage. (RT 8179-81.)

Deputy McFarland was recalled to testify about the location where the shank was found at the Central Jail, stating that Petitioner was located in module 5A cell 3 in the weekly records for three weeks prior to February 3, 1991, but that no records were kept of changes within the modules. (RT 8537-38.) On cross-examination, McFarland stated that on February 4, the day the shank was found, Petitioner was in cell 2. (RT 8538.) Petitioner was in cell 2 four weeks prior to the date the shank was found, and added that the purpose of the records was not to reflect the cell in which each inmate resided, but the module location of each inmate. (RT 8539-40.) McFarland also acknowledged occasional problems with the ways the cells are counted, as cell 2, as counted from left to right, would be listed as cell 3 if counted from right to left. (RT 8541-42.) The inmates were away from the module when the shank was found, but McFarland testified that he later verified the shank was found in Petitioner's cell. (RT 8544-45.)

The defense concluded its presentation by playing a video compilation of some of Petitioner's camera work for the jury. (RT 8546.)

## III. <u>PETITIONER'S CLAIMS</u>

In order to provide a structure for the Court's discussion of Petitioner's habeas claims, set forth below is a list of the claims contained in the federal Petition along with a parenthetical noting whether the claim was previously raised in state proceedings, which include the direct appeal, as well as the first (California Supreme Court Case No. S096874), second (Case No. S153780), and/or third (Case No. 180336) state habeas petitions. The claims are as follows:

Claim 1 - Trial Court Error and Ineffective Assistance of Trial Counsel in Voir Dire;

Incidents of Juror Misconduct (portions of the claim were raised as Claim XV on direct appeal and as Claims One and Seventeen of the second state habeas petition, allegations of juror misconduct was raised as the only claim in the third state habeas petition)

Claim 2 - Ineffective Assistance of Trial Counsel - Guilt Phase (previously raised as Claim II in the first state habeas petition and Claim Two in the second state habeas petition)

Claim 3 - Ineffective Assistance of Trial Counsel - Penalty Phase (previously raised as Claim II in the first state habeas petition and Claim Three in the second state habeas petition)

Claim 4 - Violation of Right to Competent Psychiatric Assistance (previously raised as Claim III in first state habeas petition and Claim Four in second state habeas petition)

Claim 5 - Incompetence to be Executed (previously raised as Claim Five in the second state habeas petition)

Claim 6 - Prosecutorial Misconduct (previously raised as Claim XVIII on direct appeal, Claim I in the first state habeas petition, and Claim Six in the second state habeas petition)

Claim 7 - Brady Violation (previously raised as Claim VIII in the first state habeas petition and Claim Seven in the second state habeas petition)

Claim 8 - Admission of Unreliable, Unconstitutional and Improper Evidence in Aggravation (previously raised as Claim V in the first state habeas petition and Claim Eight in the second state habeas petition)

Claim 9 - Police Failure to Preserve "Wood Chips" Evidence Admitted at Trial (previously raised as Claim VI on direct appeal, Claim VII in first state habeas petition and Claim Nine in second state habeas petition)

Claim 10 - Trial Court Errors at Guilt and Penalty Phases (portions of the claim were raised as Claims I, IV, V XIII, XIV, and XVII on direct appeal and Claim

IV in the first state habeas petition; the entire claim was raised as Claim Ten in the second state habeas petition)

Claim 11 - Trial Court Judge Was Not Impartial (previously raised as Claim II on direct appeal and Claim Eleven in the second state habeas petition)

Claim 12 - Insufficient Evidence to Sustain Convictions (previously raised as Claim X on direct appeal and as Claim Twelve in the second state habeas petition)

Claim 13 - Cumulative Effect of Constitutional Violations (previously raised as Claim XX on direct appeal, Claim IX in the first state habeas petition, and Claim Thirteen in the second state habeas petition)

Claim 14 - Errors in Jury Instructions (previously raised as Claim XIX on direct appeal and Claim Fourteen in the second state habeas petition)

Claim 15 - Denial of Full and Fair Suppression Hearing (previously raised as Claim III on direct appeal, Claim VI in the first state habeas petition and Claim Fifteen in the second state habeas petition)

Claim 16 - Systemic Death Penalty Claims (portions of this claim were previously raised as Claims XII, XXII, and XXIII on direct appeal and Claim XI and XII in the first state habeas petition; the entire claim was raised as Claim Sixteen in the second state habeas petition)

## IV. PROCEDURAL DEFENSES

Respondent asserts that this Court is prevented from reviewing the merits of several claims in the Second Amended Petition due to procedural default. Specifically, Respondent contends that portions of Claims 1, 2, 6, 7, 8, and 10 were rejected by the California Supreme Court on the basis of adequate and independent state procedural bars. Respondent also generally contends that relief on any claim contained in the federal Petition would require the creation of a new rule of criminal procedure, which is foreclosed under the Supreme Court's decision in Teague v. Lane, 489 U.S. 288 (1989).

**A. Procedural Default**

Generally, when a state court's rejection of a federal claim is based on a violation of a state procedural rule that is adequate to support the judgment and independent of federal law, a habeas petitioner has procedurally defaulted his claim. Coleman v. Thompson, 501 U.S. 722, 729-30 (1991). A state procedural rule is adequate if it has been "firmly established and regularly followed" by the state court. Ford v. Georgia, 498 U.S. 411, 424 (1991). The procedural rule is independent if it is not "interwoven with the federal law." Michigan v. Long, 463 U.S. 1032, 1040-41 (1983). If a state procedural ground is an adequate and independent ground for dismissal, a federal court will not consider the merits of the claims unless a petitioner can show sufficient cause for the default and resulting prejudice, or show that a failure to consider the claims would result in a fundamental miscarriage of justice. See Coleman, 501 U.S. at 750.

In the instant case, Respondent contends that Petitioner has procedurally defaulted all or parts of Claims 1, 2, 6, 7, 8 and 10, as the California Supreme Court's rejection of those contentions rest on the existence of one or more adequate and independent state procedural bars. (Ans. at 72.) Respondent asserts that Claim 1, "insofar as it alleges ineffective assistance of counsel during jury selection, was untimely as it was presented for the first time in 2007 in Carter's second state habeas petition." (Id., citing Supp. Lodgment No. 1.) Respondent asserts that Claim 2, "insofar as it alleges that trial counsel was ineffective for failing to investigate third party culpability defense (except as it relates to defense witness Ronald Tulio's alibi"), was untimely as it was presented for the first time in 2007 in Carter's second state habeas petition." (Id.) Respondent further asserts that Claims 6 and 10, the latter claim "insofar as it alleges that the trial court improperly admitted the testimony of prosecution witness Polly Haisha," were both waived for failure to object in the trial court. (Id. at 72-73.) With respect to Claims 6 ("insofar as this claim relates to the prosecution's alleged misrepresentation of a valid warrant to search the stolen vehicle in which Carter was arrested"), 7 and 8, Respondent asserts that these claims were

barred by the state supreme court pursuant to In re Dixon, 41 Cal.2d 756, 759 (1953). (Ans. at 72-73.)

**1. Timeliness bar (In re Robbins/In re Clark)**

On February 23, 2011, the Supreme Court issued an opinion in Walker v. Martin, 562 U.S. ___, 131 S. Ct. 1120 (2011), which held that California's timeliness requirement is an independent state ground adequate to bar federal habeas corpus relief. As a result of this decision, portions of Claims 1 and 2 appear to be procedurally defaulted pursuant to an adequate and independent state procedural bar and cannot be considered on the merits unless Petitioner is able to demonstrate cause and prejudice for the default, or that a fundamental miscarriage of justice would occur if these claims were not considered on the merits.

Petitioner asserts that he can demonstrate cause and prejudice for the default, as he has alleged ineffective assistance of both trial and appellate counsel for failing to raise these issues previously. (See Traverse at 40.) A claim of ineffective assistance of counsel for failure to raise the claims in the prior state appeal and state habeas petitions could conceivably constitute cause and prejudice sufficient to excuse a procedural default if the claims are found to have merit. See Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000). Indeed, Petitioner specifically notes that he "was represented on both direct appeal and state habeas by the same court-appointed counsel," and asserts that "[s]tate habeas counsel therefore operated under a conflict of interest, as it was not within his interest to allege his own ineffectiveness in failing to bring certain claims on direct appeal." (Traverse at 40.) However, a determination on whether cause and prejudice exists would require the Court to engage in a detailed analysis of each claim.

Alternately, established precedent in this Circuit dictates that a court's decision on the issue of procedural default is to be informed by furthering "the interests of comity, federalism, and judicial efficiency." Boyd v. Thompson, 147 F.3d 1124, 1127 (9th Cir. 1998). Where it is clear that deciding the merits of a claim will prove to be less complicated and time-consuming than adjudicating the issue of procedural default,

                        

a court may exercise discretion in its management of the case to reject the claims on their merits and decline to engage in a lengthy and involved cause and prejudice analysis. See Batchelor v. Cupp, 693 F.2d 859, 863-64 (9th Cir. 1982); see also Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same."), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997).

Thus, with regards to the noted portions of Claims 1 and 2, the Court will exercise discretion in its management of the case to reject those contentions on the merits and will decline to engage in a lengthy and complicated cause and prejudice analysis.

**2. Pretermitted (In re Dixon)**

The California Supreme Court stated "[t]he general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction." In re Dixon, 41 Cal. 2d at 759.

///

**a. Independence**

As noted above, a state procedural rule is "independent" if it is not interwoven with federal law. See LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001). In 1998, the California Supreme Court announced that it would thereafter decline to consider federal law in applying state procedural default rules. See In re Robbins, 18 Cal. 4th 770, 811-12 (1998).

Petitioner contends that the Ninth Circuit has held the Dixon rule is not an independent state procedural bar, citing to Washington v. Cambra, 208 F.3d 832, 834 (9th Cir. 2000) and Park v. California, 202 F.3d 1146, 1152-53 (9th Cir. 2000), in support of his position. (Traverse at 31 n.5.) However, the Ninth Circuit has clearly

indicated that the independence of a procedural rule is examined at the time it is applied. See Park, 202 F.3d at 1151-53. The Ninth Circuit's decisions in Washington and Park each involved a state habeas petition filed *prior* to the California Supreme Court's decision in Robbins, and concerned only the independence of the Dixon rule prior to the Robbins decision. See Washington, 208 F.3d at 833 (state habeas petition denied in 1997); Park, 202 F.3d at 1149 (state habeas petition denied in 1996). In contrast, Petitioner's first state habeas petition was filed in 2001 and denied in 2006, over eight years after the California Supreme Court expressed its intention to cease consideration of federal law in the application of state procedural bars.

While the Ninth Circuit has not yet ruled on the independence of a post-Robbins application of the Dixon rule, Petitioner concedes that this district has found such an application to be independent of federal law. See Protsman v. Pliler, 318 F. Supp. 2d 1004, 1007-08 (S.D. Cal. 2004). This Court agrees with that conclusion, and holds accordingly that the California Supreme Court's 2006 decision applying Dixon to Petitioner's first state habeas petition was independent of federal law.

**b. Adequacy**

A state procedural rule is "adequate" if it is "clear, consistently applied, and well-established at the time of the petitioner's purported default." Wells v. Maass, 28 F.3d 1005, 1010 (9th Cir. 1994), citing Ford, 498 U.S. at 424. In Bennett v. Mueller, 322 F.3d 573 (9th Cir. 2003), the Ninth Circuit announced a test to determine the adequacy of a challenged state procedural bar, holding:

> [T]he ultimate burden of proving the adequacy of the California state bar is upon the State of California . . . Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule. Once having done so, however, the ultimate burden is the state's.
>
> Accordingly, because it is the State who seeks dismissal based on the procedural bar, it is the State who must bear the burden of demonstrating that the bar is applicable-in this case that the state procedural rule has been regularly and consistently applied in state habeas actions.

Bennett, 322 F.3d at 585-86.

Here, the state must first "adequately ple[a]d the existence of an independent and adequate state procedural ground as an affirmative defense." Id. at 586. In the Answer, Respondent explicitly asserted that Claims 6, 7, and 8 were procedurally defaulted under Dixon, and asserted that the procedural rule in question was independent and adequate. (Ans. at 71-73.) As such, Respondent has satisfied the initial burden of pleading the Dixon procedural bar as an affirmative defense, and shifts the burden to the Petitioner. See Bennett, 322 F.3d at 586.

Once the state has met the initial burden, the burden shifts to the Petitioner to place the defense at issue, who "may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." Bennett, 322 F.3d at 586. The Ninth Circuit has indicated that the adequacy of a state procedural rule is determined at the time of a petitioner's default. See Fields v. Calderon, 125 F.3d 757, 760-61 (9th Cir. 1997). "Because the Dixon rule precludes collateral review of a claim that could have been brought on direct appeal, the procedural default, though announced by the California Supreme Court when the habeas petition is denied, technically occurs at the moment the direct appeal did not include those claims that should have been included for review." Id. at 761. In this case, Petitioner's default with respect to the Dixon rule occurred on July 2, 1999, the date on which Petitioner filed his opening brief on direct appeal.

In the Traverse, Petitioner refers the Court to several cases in which California district courts have found the Dixon rule inadequate. (See Traverse at 33 n. 7.) Among these cases is Dennis v. Brown, 361 F. Supp. 2d 1121 (N.D. Cal. 2005), in which the petitioner cited to 200 capital habeas cases decided between 1980 and 2003 in order to demonstrate inconsistent application of the untimeliness, successiveness and pretermitted (Dixon) state procedural bars, and the district court held that the petitioner had met the interim burden of placing the procedural bars at issue. Id. at 1130-31.

Petitioner also cites to several cases in which California district courts have found the Dixon rule adequate, noting that those courts found the rule adequate "[o]nly when there has been a technical failure on the part of the petitioner to present any evidence at all have the courts ruled on behalf of the respondent and found the rule adequate." (Traverse at 33.)

As a related matter, the Court takes judicial notice of a capital habeas case from this district in which the Dixon bar was found inadequate. See Ayala v. Ayers, 2008 WL 1787317 (S.D. Cal. April 16, 2008) (finding Dixon rule inadequate at the time of the petitioner's direct appeal in 1997). Based on Petitioner's allegations and case citations, as well as the prior decision from this district finding the state court's application of the Dixon rule inadequate during the relevant time period, the Court is persuaded that Petitioner has met the interim burden under Bennett in this case.

The Ninth Circuit has repeatedly stated that the government bears the "ultimate burden" of proving the adequacy of a state procedural bar. Bennett, 322 F.3d at 585-86; see also King v. Lamarque, 464 F.3d 963, 967 (9th Cir. 2006). In the instant case, Respondent has failed to demonstrate that the Dixon bar is consistently applied, and has not met the "ultimate burden" of proving the adequacy of this state procedural bar. Accordingly, the Court cannot conclude that the California Supreme Court's reliance on Dixon is sufficient to bar this Court from considering Claims 6, 7, and 8 on the merits.

**3. Contemporaneous Objection**

Respondent contends that portions[4] of "Claim 6, regarding prosecutorial misconduct, was waived for failing to object in the trial court" and that "Claim 10, insofar as it alleges that the trial court improperly admitted the testimony of prosecution

---

[4] In the Answer, Respondent has specifically alleged the application of the contemporaneous objection rule for failure to object at trial with respect to Petitioner's allegations of error in sections (B)(reference to defense seating arrangements during voir dire), (C)(1) (alleged misstatements and deceptive practices regarding the Barbara S. key, search warrant, and testimony of Polly Haisha), (C)(2) (comments disparaging of defense counsel, and (C)(3) (arguments on Petitioner's propensity to commit charged crimes) of the federal Petition. (See Ans. at 149-50, 152, 154-57, 163.)

witness Polly Haisha, was waived for failure to object in the trial court." (Ans. at 71-72.) On direct appeal, the California Supreme Court rejected certain voir dire and guilt phase allegations in Claim 6, stating in relevant part:

> Here, defendant failed to request an assignment of misconduct or an admonition with regard to any of the conduct he now challenges as improper. Accordingly, he has not preserved his claims on appeal.

Carter, 36 Cal. 4th at 1264.  With respect to the identified portion of Claim 10, the California Supreme Court also rejected that claim, stating in relevant part:

> Preliminarily, we observe that defendant did not object at trial based upon Evidence Code section 352 or 1101–a point acknowledged by defendant but apparently overlooked by the People–and therefore has not preserved this claim for our review. (See, e.g., People v. Boyette (2002) 29 Cal.4th 381, 424, 127 Cal.Rptr.2d 544, 58 P.3d 391.)

Carter, 36 Cal. 4th at 1256.

Respondent asserts that Claims 6 and 10 are procedurally defaulted, and notes that California's contemporaneous objection rule "has previously been found by the Ninth Circuit to be independent and adequate."  (Ans. at 72-73, citing e.g. Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004); Rich v. Calderon, 187 F.3d 1064, 1069-70 (9th Cir. 1999); Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999).) As noted above, with this assertion, Respondent has satisfied the initial burden of pleading the contemporaneous objection rule as an affirmative defense, and shifts the burden to the Petitioner.  See Bennett, 322 F.3d at 586.

Petitioner contends that "the contemporaneous objection rule is not adequate, and was not clear, consistently applied, or well established at the time of Petitioner's trial because there was a 'capital case exception' to the rule."  (Traverse at 34, citing People v. Bob, 29 Cal.2d 321 (1946).)  In Bob, the California Supreme Court reasoned that "it would seem appropriate for this court to take a liberal view of the technical rules applicable to criminal cases generally."  (Traverse at 34, citing Bob, 29 Cal. 2d at 328.)

While Bob involved a case in which the state supreme court reviewed a trial record and found a statement to be inadmissible hearsay despite trial counsel's erroneous objection on best evidence grounds, rather than on applicable hearsay

grounds, Petitioner asserts that the California Supreme Court later applied the capital case exception to situations in which counsel failed to raise any objection at all.  (See Traverse at 35, citing People v. Easley, 34 Cal.3d 858 (1983) and People v. Frank 38 Cal. 3d 711 (1985).)  However, in Carpenter v. Ayers, 548 F. Supp. 2d 736, 746-48 (N.D. Cal. 2008), another California district court previously conducted a detailed analysis of this very contention, and found that "Bob, Easley and Frank do not create an ambiguity in California's contemporaneous objection rule."  Id. at 748.  This Court agrees with that conclusion, and accordingly rejects Petitioner's contention that the contemporaneous objection rule is inadequate due to a "capital case exception" to the rule.

Petitioner alternatively attempts to demonstrate the California Supreme Court's inconsistent application of this procedural rule by citing to dozens of cases in which he asserts the state supreme court has often noted or admonished a petitioner for failure to preserve the claim but have nonetheless addressed the claim on the merits.  (Traverse at 36-37.)  However, the Supreme Court has clearly and specifically stated that an alternative ruling on the merits does not impact the independence or adequacy of a state procedural rule.  See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.") Yet, Petitioner also cites to numerous decisions in which the "state court address[ed] claims on their merits without any mention of whether the defendant properly objected or requested an admonition," "ambiguous cases which appear to mix merits and procedural default review," cases "which expressly apply exceptions to the general rule of waiver to excuse the defendant's failure to object or request admonition," and cases in which the California Supreme Court's actions are "internally inconsistent, applying the bar to some claims which were not preserved, but not applying them to others."  (Traverse at 37-39.)

Based on these cases, the Court concludes that Petitioner has met his interim burden under Bennett of demonstrating inconsistent application of the contemporaneous objection rule.

Meanwhile, Respondent has not offered any response to these citations or made any attempt to meet its "ultimate burden" of proving the adequacy of this state procedural bar. Bennett, 322 F.3d at 585-86; see also King, 464 F.3d at 967. As such, the Court cannot conclude that the California Supreme Court's application of the contemporaneous objection rule is sufficient to bar this Court from considering Claims 6 and 10 on the merits.

Ultimately, even were the Court to conclude that Petitioner failed to meet the interim burden under Bennett and hold the contemporaneous objection rule to be an adequate and independent state procedural bar, Petitioner contends that he is able to demonstrate cause and prejudice sufficient to excuse any procedural default. (Traverse at 39.)

In any event, as set forth below, the Court need not reach a decision on this procedural bar, as Claims 6 and 10 fail on the merits. See Franklin, 290 F.3d at 1232, citing Lambrix, 520 U.S. at 525.

**B. Teague v. Lane**

The United States Supreme Court, addressing perceived inconsistencies in its prior retroactivity jurisprudence, held that "new" constitutional rules of criminal procedure will not be applied retroactively to cases on collateral review unless they fall within two narrow exceptions. Teague v. Lane, 489 U.S. 288 (1989). A new rule is one that "breaks new ground or imposes a new obligation on the States or the Federal Government" or one whose "result was not dictated by precedent existing at the time defendant's conviction became final." Id. at 301. The two exceptions to the Teague rule are: (1) rules placing certain kinds of private individual conduct beyond the power of the criminal law to prohibit; and (2) procedures implicit in the concept of ordered liberty without which the likelihood of an accurate conviction is seriously diminished.

Penry v. Lynaugh, 492 U.S. 302, 305 (1989); Graham v. Collins, 506 U.S. 461, 478 (1993).

When the state properly argues that a "defendant seeks the benefit of a new rule of constitutional law, the court must apply Teague v. Lane before considering the merits of the claim." Caspari v. Bohlen, 510 U.S. 383, 389 (1994). Under Teague, habeas relief is generally unavailable if based "on a rule announced after [a petitioner's] conviction and sentence became final." Id. The first step in a Teague analysis, therefore, is to determine whether a petitioner is seeking the benefit of a constitutional rule announced after his or her conviction became final. See id. at 389-90.

However, in the instant case, with respect to the bulk of the claims in the Petition, the state only makes a brief and generalized mention of Teague in the Answer to the Petition, asserting that "[s]ince the state court's rejection of Carter's claims was not contrary to, or an unreasonable application of, clearly established and controlling United States Supreme Court precedent, relief on any claim in the Petition would require the creation of a new rule of criminal procedure. Relief predicated on retroactive application of a new rule of criminal procedure is foreclosed on collateral review. See Teague v. Lane, 489 U.S. 288, 299-301, 109 S. Ct 1060, 103 L. Ed. 2d 334 (1989)." (Ans. at 74-75.)

The Ninth Circuit has expressed its view on the duties placed on the state to properly raise and plead a claim made under Teague, holding that:

> If a state seriously wishes to press Teague upon us, at a minimum Teague should be identified as an issue (indeed the first issue) on appeal, the new rule of constitutional law that falls within its proscription should be articulated, the reasons why such a rule would not have been compelled by existing precedent should be explained with particular reference to the appropriate universe of precedent, and an argument should be made why the rule contended for is not within one of Teague's exceptions.

Arredondo v. Ortiz, 365 F.3d 778, 781-782 (9th Cir. 2004).

Respondent only mentions Teague in the Affirmative Defenses section of the Answer to the Petition, but failed to develop the argument in the Answer or later

pleadings, except with respect to portions of Claim 1 and 10. The Ninth Circuit places the burden on the state to articulate and present this argument and Respondent's burden to raise a Teague bar is not satisfied with a generalized reference to non-retroactivity and Teague at the outset of the Answer.[5] Accordingly, the Court will not conduct an analysis of whether Claims 2-9 and 11-16 are barred under Teague.

For purposes of the Teague analysis with respect to Claims 1 and 10, the Court notes that the California Supreme Court denied Petitioner's direct appeal on August 15, 2005, and denied rehearing on October 26, 2005. The Supreme Court denied certiorari on April 24, 2006, at which time Petitioner's conviction became final.

**1. Claim 1**

In Claim 1, Petitioner asserts in part that because "the trial court conducted voir dire in an improper and prejudicial manner," specifically, voir dire was conducted in open court rather than by sequestration, such error resulted in a violation of Petitioner's constitutional rights. (SAP at 68-69.) Respondent maintains that "[a]s there is no clearly-established rule of criminal procedure requiring individual voir dire in capital cases, to the extent Carter claims such procedure is constitutionally required, his claim is barred under Teague v. Lane, 489 U.S. 288." (Ans. at 82.)

Petitioner contends that the trial court's insistence in "conducting the voir dire in open court severely limited counsel's ability to get fair and accurate responses and properly determine bias from the prospective jurors." (SAP at 69.) In support, Petitioner cites to Witherspoon v. Illinois, 391 U.S. 501 (1968) and Mu'min v. Virginia, 500 U.S. 415 (1991). However, neither case articulates or compels imposition of the rule Petitioner advocates. In fact, in Mu'min, the Supreme Court declined to find a due process violation arising from a trial court's refusal to conduct individual voir dire using

[5] The Court acknowledges that Respondent briefly refers to Teague with respect to Claim 16 H, but notes that Respondent fails to offer any substantive argument in support of that citation. (See Ans. at 247) ("Given the long-standing Supreme Court authority on the issue, Carter's claim fails under AEDPA and under Teague v. Lane, 489 U.S. 288.") As such, Respondent fails to meet the burden of properly raising and pleading a Teague bar for that claim.

the petitioner's proposed questions in order to question prospective jurors on news accounts to which they may have been exposed, acknowledging that "[t]here is no single way to voir dire a juror, and I would not limit the trial judge's wide discretion to determine the appropriate form and content of voir dire questioning." Mu'min, 500 U.S. at 451 (Kennedy, J., dissenting.)

Accordingly, the Court has not been presented with case law indicating that sequestered voir dire is compelled by existing Supreme Court precedent. As such, Petitioner's proposed rule indeed "breaks new ground or imposes a new obligation on the State or the Federal Government," and therefore the Court's remaining inquiry is whether either exception to Teague applies to this "new" rule. Id. at 301. A rule disallowing open court voir dire in a capital trial does not either place private individual conduct beyond the power of the criminal law to prohibit, nor can such a rule be considered of a "watershed" nature. Id. at 311; see also Penry, 492 U.S. at 305; Graham, 506 U.S. at 478. Granting relief on this aspect of Claim 1 would result in the creation of a new rule of criminal procedure which would be barred under Teague. Moreover, even were this portion of Claim 1 not barred under Teague, it is without merit for the reasons set forth in the discussion below.

**2.   Claim 10**

In Claim 10, Petitioner asserts in part that the trial court erred in denying his request for allocution, which, in combination with other trial court errors, violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (SAP at 237.) Respondent contends that Petitioner "has pointed to no United States Supreme Court authority indicating that the right of allocution is constitutionally required," and argues that such a rule "would impose a new procedural requirements on California courts that was not dictated by precedent." (Ans. at 211.) Respondent also contends that because the proposed rule "falls within neither exception" to Teague, it is therefore barred. (Id.)

Petitioner generally notes that "a plea for mercy, or allocution, which, even though not recognized in California . . . has long been recognized as 'of utmost

importance' to a sentencing court." (SAP at 237, citing Green v. United States, 365 U.S. 301, 304 (1961).) However, the Supreme Court specifically left open the issue of whether allocution is a right of constitutional magnitude. In Hill v. United States, 368 U.S. 424 (1962), the Supreme Court held that a federal sentencing judge acted in violation of the Federal Rules of Criminal Procedure in failing to inquire whether a criminal defendant had anything to say on his own behalf, yet explicitly noted that "[w]hether [habeas] relief would be available if a violation of Rule 32(a) occurred in the context of other aggravating circumstances is a question we therefore do not consider." Id. at 429.

In contrast, the Ninth Circuit has concluded that "allocution is a right guaranteed by the due process clause of the Constitution." Boardman v. Estelle, 957 F.2d 1523, 1530 (9th Cir. 1992). Yet, even the Boardman Court conceded that such a rule does not appear to be dictated by existing Supreme Court precedent. See id. at 1527 (in which the Ninth Circuit acknowledges that the Supreme Court in "Hill therefore left open the question of whether a defendant who asks the court to speak has a Constitutionally guaranteed right to do so.") Ultimately, Petitioner fails to articulate how the result he advocates is "dictated by precedent" when the Supreme Court has specifically declined to announce such a rule. Accordingly, Petitioner appears to seek relief that would require the creation of a new rule of criminal procedure that is not compelled by existing United States Supreme Court precedent.

It is clear that the first exception to Teague is not implicated in this instance, as a proposed rule guaranteeing a right to allocution would "neither decriminalize a class of conduct nor prohibit the imposition of capital punishment on a particular class of persons." Saffle v. Parks, 494 U.S. 484, 495 (1990). However, the Court finds superficial applicability of the second Teague exception, in that it appears arguable that denying a capital defendant a chance for allocution could "seriously diminish the likelihood of obtaining an accurate determination" at his sentencing proceeding. Butler v. McKellar, 494 U.S. 107, 116 (1990). Yet, the Supreme Court has clearly indicated

that the second exception is of a limited scope and reserved for "watershed rules of criminal procedure," such the right to counsel in a criminal trial under Gideon v. Wainwright, 372 U.S. 335 (1963). See Saffle, 494 U.S. at 495, quoting Teague, 489 U.S. at 311. The Court is not persuaded that a rule guaranteeing the right to allocution at a capital sentencing proceeding is of comparable import. In any event, it is ultimately unnecessary for this Court to arrive at a conclusive determination as to whether or not Petitioner's proposed rule is barred under Teague, as Claim 10 is also without merit for the reasons outlined below. Accordingly, regardless of the Court's conclusion as to the applicability of the second Teague exception, Petitioner does not warrant habeas relief on Claim 10.

## V. STANDARDS OF REVIEW

### A. Standard of Merits Review under AEDPA

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in *violation of the Constitution or laws or treaties of the United States.*

28 U.S.C. § 2254(a) (emphasis added).

In Lindh v. Murphy, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the new provisions of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") "generally apply only to cases filed after the Act became effective." In capital habeas actions, cases are typically commenced by the filing of requests for appointment of counsel and stays of execution of the petitioners' death sentences. Petitioner filed his request for appointment of counsel and stay of execution on February 15, 2008 and filed his petition with this Court on January 13, 2009. AEDPA became effective on April 24, 1996, when the President signed it into law. See id. Accordingly, AEDPA applies to this case.

Relevant to this case are the changes AEDPA rendered to 28 U.S.C. § 2254(d),

which now reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. See Williams v. Taylor, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id.; Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004).

On habeas review, the federal court "look[s] to the last reasoned decision of the state court as the basis of the state court's judgment." Franklin, 290 F.3d at 1233 n.3. "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Merolillo v. Yates, 663 F.3d 444, 453 (9th Cir. 2011), quoting Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). In the instant case, portions of Claim 1 and Claim 16, as well as the entirety of Claims 6 and 9-15 were first raised on direct appeal and rejected in a reasoned decision prior to their subsequent summary denials on state habeas review. Accordingly, the Court must "look through" the later summary denials on habeas review to the reasoned opinion issued on direct appeal. Id. at 806; accord Johnson v. Williams, ___ U.S. ___, 133 S.Ct. 1088, 1094 (2013).

Even when the federal court undertakes an independent review of the record in the absence of a reasoned state court decision, the federal court must "still defer to the

state court's ultimate decision." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). If the state court decision does not furnish any analytical foundation, the review must focus on Supreme Court cases to determine "whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2001). Federal courts also look to Ninth Circuit law for persuasive authority in applying Supreme Court law, and to determine whether a particular state court decision is an "unreasonable application" of Supreme Court precedent. Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, ___ U.S. ___, 131 S.Ct. 770, 786 (2011), quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Portions of federal Claims 1 (raised as Claim 1 in the second state petition in case number S153780 and as the entirety of third state petition in case number S180336) and 16 (raised as Claim XII in the first state petition in case number S096874 and Claim 16 in the second state petition), as well as the entirety of Claims 2-5 (Claims 2-4 were raised as Claims II.A, II.B, and III in the first state petition, respectively and Claims 2-5 were raised as Claims 2, 3, 4, and 5 in the second state petition) and Claims 7-8 (raised as Claims VIII and V in the first state petition, respectively, and Claims 7 and 8 in the second state petition) were summarily denied by the California Supreme Court.

In an Order dated September 13, 2006, amending in its entirety a prior order dated June 28, 2000, the California Supreme Court held:

> The petition for a writ of habeas corpus, filed April 16, 2001, is denied, as follows.
>
> Claim I is denied on the merits. To the extent this claim reasserts issues raised and rejected on appeal, it is procedurally barred under *In re Waltreus* (1965) 62 Cal.2d 218, 225. To the extent the claim is based upon the record and was not raised on appeal, it could and should have been raised on appeal and hence is barred under *In re Dixon* (1953) 41 Cal.2d 756, 759.
>
> Claims II and III are denied on the merits.
>
> Claims IV is denied on the merits. To the extent this claim reasserts issues raised and rejected on appeal, it is procedurally barred under *In re Waltreus*, *supra*, 62 Cal.2d 218, 225.

Claim V is denied on the merits. To the extent this claim reasserts issues raised and rejected on appeal, it is procedurally barred under *In re Waltreus*, *supra*, 62 Cal.2d 218, 225. To the extent this claim is based upon the record and was not raised on appeal, it could and should have been raised on appeal and hence is barred under *In re Dixon, supra*, 41 Cal.2d 756, 759.

Claim VI is denied on the merits. To the extent this claim reasserts issues raised and rejected on appeal, it is procedurally barred under *In re Waltreus, supra*, 62 Cal.2d 218, 225. To the extent this claim is based upon the record and was not raised on appeal, it could and should have been raised on appeal and hence is barred under *In re Dixon, supra*, 41 Cal.2d 756, 759. To the extent this claim asserts a violation of petitioner's rights under the Fourth Amendment, it is not cognizable on habeas corpus. (*In re Harris* (1993) 5 Cal.4th 813, 830; see also *In re Clark* (1993) 5 Cal.4th 750, 767 (*Clark*); *In re Sterling* (1965) 63 Cal.2d 486, 487-488; *In re Lessard* (1965) 62 Cal.2d 497, 503.)

Claim VII is denied on the merits. To the extent this claim reasserts issues raised and rejected on appeal, it is procedurally barred under *In re Waltreus, supra*, 62 Cal.2d 218, 225. To the extent this claim asserts a violation of petitioner's rights under the Fourth Amendment, it is not cognizable on habeas corpus. (*In re Harris*, *supra*, 5 Cal.4th at p. 830; see also *Clark, supra*, 5 Cal.4th at p. 767; *Sterling*, *supra*, 63 Cal.2d at pp. 487-488; *Lessard*, *supra*, 62 Cal.2d at p. 503.)

Claim VIII is denied on the merits. To the extent this claim reasserts issues raised and rejected on appeal, it is procedurally barred under *In re Waltreus, supra*, 62 Cal.2d 218, 225. To the extent this claim is based upon the record and was not raised on appeal, it could and should have been raised on appeal and hence is barred under *In re Dixon, supra*, 41 Cal.2d 756, 759.

Claims IX, X, XI, XII, and XIII are denied on the merits.

(Carter, California Supreme Court Case No. S096874.)

In an Order dated June 17, 2010, denying the second state habeas petition, the state supreme court stated in full:

> The petition for a writ of habeas corpus, filed June 22, 2007, is denied as follows. All claims, except claims 5 and 16 (subclaim C), are denied on the merits. All claims are denied as untimely with the exception of claims 1 (subclaim D (with respect to Jurors Cigainero and Ridge)), 2 (subclaims C (with respect to the allegations concerning Fetal Alcohol Syndrome) and D (with respect to allegations concerning Tulio's alibi)), 3 (subclaims B, C, D, and E (insofar as they relate to allegations concerning child abuse and Fetal Alcohol Syndrome)), 5, 8 (insofar as it relates to allegations concerning Fetal Alcohol Syndrome), 13, 16, and 17. (*In re Robbins* (1998) 18 Cal.4th 770, 799, fn. 21; *In re Clark* (1993) 5 Cal.4th 750, 782-787.) Except insofar as they allege ineffective assistance of counsel, claims 1 (subclaims A and B), 6 (subclaims C.1-C.3, and D), 9, 10 (subclaims A-H), 11, 12 (subclaims B-C), 14, and 15 are denied on the ground that these claims were raised and rejected on appeal. (*In re Harris* (1993) 5 Cal.4th 813, 829-841; *In re Waltreus* (1965) 62 Cal.2d 218, 225.) Except insofar as they allege evidence of child abuse and Fetal Alcohol Syndrome, claims 2 (subclaims B, C, E, F, and G), 3 (subclaims B, C, D, E, and F), 4, 6 (subclaims B, C.1, C.2, C.3, and D), 7 (subclaims B and C),

> 8, 9, 10 (subclaim F), 14 (insofar as it alleges the trial court should have instructed the jury not to consider the other crimes against Kim, Knoll, Mills, Guthrie, and Jennifer S. as evidence during the penalty phase), and 15 (insofar as it alleges petitioner was denied a full hearing on his motion to suppress) are denied on the ground that these claims were raised and rejected in petitioner's prior petition for writ of habeas corpus (S096874). (*In re Clark*, *supra*, 5 Cal.4th at p. 767; *In re Miller* (1941) 17 Cal.2d 734, 735.) Except insofar as they allege evidence of child abuse and Fetal Alcohol Syndrome or that prior postconviction counsel was ineffective for failing to raise them, claims 1 (subclaims A, B, C, and D (insofar as it alleges Juror McAlpine improperly met with the other jurors after his dismissal)), 2 (subclaim D (insofar as it relates to third party culpability concerning the murder of Tok Kim), 10 (subclaims A, B, C, D, E, G, and H), 11, 12 (subclaims B and C), 14 (insofar as it alleges that several standard guilt phase instructions were erroneous), and 15 (insofar as it alleges that trial counsel provided ineffective assistance) are denied on the ground that they are successive, as they could have been raised in petitioner's prior petition for writ of habeas corpus (S096874) but were not. (*In re Robbins, supra*, 18 Cal.4th at p. 788, fn. 9; *In re Clark, supra*, 5 Cal.4th at pp. 767-768; *In re Horowitz* (1949) 33 Cal.2d 534, 546-547.) Except insofar as they allege evidence of child abuse and Fetal Alcohol Syndrome or ineffective assistance of counsel, claims 1 (subclaim D (insofar as it alleges Juror McAlpine improperly met with the other jurors after his dismissal)), 6 (subclaim B), 7 (subclaim B), and 8 are denied on the ground that they could have been raised on appeal but were not. (*In re Harris, supra*, 5 Cal.4th at pp. 825 & fn. 3, 826-829; *In re Dixon* (1953) 41 Cal.2d 756, 759.) Claims 5 and 16 (subclaim C) are denied as premature without prejudice to renewal after an execution date is set. (*People v. Abilez* (2007) 41 Cal.4th 472, 536; *People v. Lawley* (2002) 27 Cal.4th 102, 169, fn. 25.) To the extent claim 12 (subclaims B and C) alleges insufficiency of the evidence, it is not cognizable on habeas corpus. (*In re Lindley* (1947) 29 Cal.2d 709, 723.) To the extent claim 15 alleges a violation of the Fourth Amendment, it is not cognizable on habeas corpus. (*In re Sterling* (1965) 63 Cal.2d 486, 487.)

(Supp. Lodgment No. 4.)

In an Order dated June 17, 2010, denying the third state habeas petition, the state supreme court stated in full: "The petition for writ of habeas corpus, filed on February 16, 2010, is denied." (Supp. Lodgment No. 8.)

Because these claims were denied without a statement of reasoning, the Court will conduct an independent review of the record with respect to Claims 1-5, 7-8, and 16[6] in order "to determine whether the state court clearly erred in its application of

---

[6] As noted, aspects of Claims 1 and 16 were originally raised on direct appeal and Petitioner raised additional contentions in later state habeas petitions. Therefore, to the extent that the California Supreme Court issued a reasoned opinion on certain contentions at issue in Claims 1 and 16, the Court will review the state supreme court's direct appeal opinion in order to determine, pursuant to section 2254(d), whether its adjudication was contrary to, or an unreasonable application of, clearly established

Supreme Court Law." See Pirtle, 313 F.3d at 1167; see also Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (in the absence of a reasoned decision by the state court, "[o]nly by [an independent review of the record] may we determine whether the state court's decision was objectively unreasonable"); see also Richter, 131 S.Ct. at 784 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.")

**B. Standard for Evidentiary Hearing**

AEDPA also limited the circumstances under which district courts may grant an evidentiary hearing. Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing unless the applicant shows that–
>
> (A) the claim relies on--
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Under AEDPA, when determining whether to grant an evidentiary hearing, the district court must first ascertain whether the petitioner has failed to develop the factual basis of a claim in state court. Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir. 2005). As explained by the Supreme Court:

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met.

---

federal law, or was based on an unreasonable determination of the facts. See Williams, 529 U.S. at 413.

Williams v. Taylor, 529 U.S. 420, 437 (2000).

If the petitioner has not failed to develop the facts in state court, an evidentiary hearing is required if; (1) the petitioner establishes a colorable claim for relief – i.e., petitioner alleges facts that, if proven, would entitle him to habeas relief; and (2) the petitioner did not receive a full and fair opportunity to develop those facts.  Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005).  The second requirement is met by a showing that:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled on other grounds by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

Moreover, the United States Supreme Court recently held that, for claims previously decided on the merits by a state court, a federal habeas court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 131 S.Ct. at 1398.  The Supreme Court also noted that "[a]lthough state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." Id. at 1401.  Thus, pursuant to Pinholster, it does not serve the interests of judicial economy to hold an evidentiary hearing prior to conducting a review under section 2254(d).  In the instant order, the Court will therefore conduct a section 2254(d) review along with the evaluation of whether Petitioner's federal habeas claims warrant an evidentiary hearing.

## VI.  DISCUSSION

In his merits brief and reply, Petitioner mounts a lengthy argument asserting that he is able to satisfy § 2254(d) with respect to each of his claims because "the state court

process and analysis were unreasonable in light of California's own special procedures for resolving habeas petitions." (Pet. Merits Brief at 45.) Petitioner separately alleges that "with respect to his extra-record claims, the California Supreme Court made unreasonable credibility determinations on his supporting evidence." (Id.) Petitioner asserts that the state court's failure to issue an order to show cause ["OSC"] on each of his claims constituted an unreasonable application of clearly established federal law, because Petitioner had made out a prima facie case for relief with respect to each claim presented in the state petition and now contained in the federal Petition.  Pursuant to California law, the "[i]ssuance of an OSC signifies the court's preliminary determination that the petitioner has pleaded sufficient facts that, if true, would entitle him to relief."  People v. Duvall, 9 Cal. 4th 464, 475 (1995).  To sustain these arguments, Petitioner relies primarily on the Ninth Circuit's decision in Nunes v. Mueller, 350 F.3d 1045 (9th Cir. 2003).  (Id. at 45-51, 80-82; Reply at 30-34.)

In Nunes, the state appellate court made credibility determinations without affording the petitioner an evidentiary hearing, in contravention of the state court's own policy to evaluate a petition for sufficiency by a determination of whether the petitioner made out a prima facie case for relief.  See Nunes, 350 F.3d at 1050.  Under California law, this involves a determination of "whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief."  See Duvall, 9 Cal. 4th at 474-75.  With respect to § 2254(d)(1), the Nunes Court found that the state court's decision involved an unreasonable application of clearly established federal law "because Nunes clearly made out a prima facie case of ineffective assistance of counsel under Strickland [v. Washington, 466 U.S. 668, 687 (1984).]"  Id. at 1054.  The Ninth Circuit reasoned that "[w]ith the state court having purported to evaluate Nunes' claim for sufficiency alone, it should not have required Nunes to prove his claim without affording him an evidentiary hearing- and it surely should not have required Nunes to prove his claim with absolute certainty."  Id.  With respect to § 2254(d)(2), the Ninth Circuit noted that the state court's "assessment of the evidence went well beyond its

self-assigned task of assessing Nunes' allegations for sufficiency to determine whether Nunes would be entitled to relief." Id. at 1055. The Ninth Circuit was careful to note, however, that "we do not hold (or even hint) that the state court erred because it evaluated the facts differently than we did or because it arrived at a different result. Instead the state court's decision was objectively unreasonable because that court made factual findings (that is, it drew inferences against Nunes where equally valid inferences could have been made in his favor, and it made credibility determinations) when it rather claimed to be determining prima facie sufficiency." Id. at 1056. Nunes is readily distinguishable from Petitioner's case, as in Nunes, the state court made explicit factual findings and credibility determinations, while in Petitioner's case, the California Supreme Court denied Petitioner's 2001, 2007, and 2010 state habeas petitions on the merits without a statement of reasoning. Moreover, a more recent Ninth Circuit case appears to be of greater relevance to the situation at hand.

In Lambert v. Blodgett, 393 F.3d 943 (9th Cir. 2004), the Ninth Circuit found that the district court had erred in concluding that the state court's factual findings and conclusions of law were not entitled to deference because the state court had declined to grant the petitioner an evidentiary hearing. Id. at 948. The Ninth Circuit concluded that the district court failed to accord proper deference to the state court's determination under 28 U.S.C. § 2254(d), stating that "[w]e decline to hold that AEDPA's reference to 'adjudicated on the merits' authorizes us to review the form or sufficiency of the proceedings conducted by the state court. Thus, we will not read into 'adjudicated on the merits' a requirement that the state have conducted an evidentiary hearing, or indeed, any particular kind of hearing." Id. at 965-66.

The Lambert Court specifically noted that Nunes did not conflict with its decision, because in Nunes, the Court held that the "state court had put Nunes in a double bind, that Nunes had clearly stated a sufficient claim and that, '[w]ith the state court having purported to evaluate Nunes' claim for sufficiency alone, it should not have required Nunes to prove his claim without affording him an evidentiary hearing.'"

Lambert, 393 F.3d at 968 n.14, citing Nunes, 350 F.3d at 1054. The Ninth Circuit then stated that "[e]ven as we concluded that, under the circumstances, the state court should have granted Nunes an evidentiary hearing, we treated the state court's decision as one adjudicated on the merits and subject to AEDPA's deferential review." Id.

Petitioner contends that "[e]ach claim in Carter's petitions set forth adequate allegations, well supported by unchallenged evidence, which, under state law, entitled him to an order to show cause." (Pet. Merits Brief at 47.) Petitioner then states that "[t]he California Supreme Court, however, summarily denied his 2007 and 2010 State Petitions, signaling its determination that he failed to make out a prima facie case for each of his claims raised therein," and contends that these summary denials were therefore based on an objectively unreasonable application of federal law. (Id.) However, the fact remains that in Petitioner's case, it is clear that each claim was adjudicated on the merits by the California Supreme Court, whether or not the state court issued an OSC or ordered an evidentiary hearing on Petitioner's claims. (See section V.A., supra., detailing California Supreme Court denial of 2001, 2007 and 2010 state habeas petitions); see also Lambert, 393 F.3d at 969 ("[W]e hold that a state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits.") Moreover, the Supreme Court has clearly directed that "[s]ection 2254(d) applies even where there has been a summary denial." Pinholster, 131 S.Ct. at 1402, citing Richter, 131 S.Ct. at 786. Accordingly, the Court will accord AEDPA deference to the state court's decision rejecting Petitioner's claims on the merits. See Lambert, 939 F.3d at 965-66, 968 n.14, citing Nunes, 350 F.3d at 1054. However, in evaluating Petitioner's claims, the Court will necessarily examine whether the California Supreme Court's decision to deny Petitioner's claims without the issuance of an OSC or further factual development constituted an objectively unreasonable application of clearly established

federal law.

Petitioner separately contends that "[i]f the state court based its denial of Carter's extra-record based claims on credibility determinations, its decision was also an unreasonable determination of the facts under § 2254(d)(2)." (Pet. Merits Brief at 81.) Again, unlike in Nunes, where the state court made explicit credibility determinations and factual findings, the California Supreme Court denied Petitioner's 2001, 2007, and 2010 state habeas petitions on the merits without a statement of reasoning, and Petitioner therefore has no evidence that the state supreme court made any explicit credibility determinations or invalid adverse inferences with respect to the factual allegations presented in those petitions. Petitioner argues only that "[a]t least at face value, the evidence introduced by Carter in support of his claims - which included declarations from other defense team members and well-respected experts - was credible. Accordingly, to the extent the state court rested its decision on unsustainable credibility determinations, its decision is objectively unreasonable." (Id. at 83.) On the evidence presented, the Court is unpersuaded that the state court's summary denials on state habeas review involved an unreasonable determination of the facts.

With respect to evidence not previously presented to the state court, the Court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011). Accordingly, any evidence that was not previously presented to the California Supreme Court will not be considered by this Court

in the evaluation of each claim under 2254(d). Based on the Court's review of the record, this includes material from trial counsel's files, currently under seal, and the deposition of second chair trial counsel, submitted by Respondent in conjunction with record expansion proceedings, labeled Ex. 1-14. (See Doc. Nos. 141-43, 148.) This also includes Petitioner's exhibits filed in support of the Motion for Evidentiary Hearing, including materials from trial counsel's files, witness interviews, memos, and expert reports, labeled Ex. A through Ex. AA. (See Doc. No. 113.)

If Petitioner is able to satisfy §2254(d) with respect to any of the claims in the federal Petition, the Court will then consider this additional evidence in determining whether relief is warranted on the claim or claims at issue.

**A. <u>Claim 1- Ineffective Assistance of Trial Counsel- Jury Selection; Juror Misconduct</u>**

For Claim One, Petitioner appears to raise as a single claim an agglomeration of several sub-claims for habeas relief.[7] He claims that the combination of claimed errors made during the jury selection process, together with claimed jury misconduct, denied him the Constitutional right to a fair and impartial jury. In particular, the Second Amended Petition describes Claim One like this: "Mr. Carter's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution . . . because of the errors that occurred during jury selection and due to jury misconduct." (SAP at 66.) In his reply brief, Petitioner criticizes Respondent's "piecemeal attack" on Claim One. (Reply at 35.) Petitioner likewise criticizes the California Supreme Court for failing "to assess the totality of the circumstances" of his jury selection process. <u>Id.</u> Petitioner says, "the state court conducted a limited assessment of each individual error." <u>Id.</u> However, the combination of sub-claims as a single agglomerated claim has never been presented to the state courts. Therefore, it is an unexhausted claim and is denied. 28 U.S.C. § 2254(b)(1)(A).

The component sub-claims, on the other hand, have been individually presented to the California Supreme Court (either on direct appeal or in one of three state habeas corpus petitions) and each has been denied on the merits. Having reviewed the claims, this Court determines that the arguments and theories that supported or could have

[7] Carter's claims make generous use of one-sided characterizations and then build conclusions upon their characterizations. For example, Carter might describe a ripe, Golden Delicious apple, as an almost rotten, seedy, colorless fruit lacking essential protein, the regular consumption of which may lead to a deprivation of medical care. The repeating of Carter's characterizations does not mean this Court agrees that the characterizations are accurate.

supported the California Supreme Court's decisions are consistent with the holdings of prior decisions of the United States Supreme Court. The California Supreme Court decisions on each issue were neither contrary to nor an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States. 28 U.S.C. §2254(d)(1); Pinholster, 131 S.Ct. 1388.

**1. The Trial Judge Conducted Voir Dire Improperly**

**a. Voir Dire Conducted in Open Court**

Petitioner claims that the manner in which voir dire was conducted denied him a fair and impartial jury. He claims that conducting the voir dire in open court (rather than sequestering) violated his constitutional rights under Witherspoon v. Illinois, 391 U.S. 510 (1968). The California Supreme Court denied this claim on direct appeal. Carter, 36 Cal. 4th at 1247-48. Witherspoon says nothing about the constitutionality of voir dire conducted in open court. Instead, the Supreme Court has said that, "[n]o hard-and-fast formula dictates the necessary depth or breadth of voir dire." Skilling v. United States, 130 S. Ct. 2896, 2917 (2010), citing United States v. Wood, 299 U.S. 123, 145-146 (1936) ("Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."). On this claim, the California Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established Federal law.

**b. Voir Dire Time Limits**

Petitioner also claims that the trial court set arbitrary time limits for counsel to conduct voir dire which violated his right to a fair trial under Rosales-Lopez v. United States, 451 U.S. 182 (1981). As a matter of fact, the time limits were not arbitrary. They were decided and announced ahead of time after hearing arguments from counsel and these limits were applied evenly to both Petitioner's defense and the government. Moreover, the jury selection process was careful and methodical and lasted some eight days.

Petitioner cites the case of one juror to demonstrate that the trial court failed to adequately voir dire. Petitioner asserts that prospective juror Cigainero indicated on his pre-trial juror questionnaire that he would automatically refuse to vote for life imprisonment. During voir dire, the trial judge asked him to clarify his view. Cigainero first said that he had not understood the written question. Cigainero then explained that he would automatically refuse to vote for the death penalty. He then agreed that he would consider mitigating and aggravating circumstances first. The judge and counsel left Cigainero on the panel. The California Supreme Court denied this claim on direct appeal. Carter, 36 Cal. 4th at 1248-52.

In Rosales-Lopez, the United States Supreme Court says nothing about the amount of time that must be spent on voir dire, only that in a federal trial voir dire must be "adequate," and that "the adequacy of voir dire is not easily subject to review." 451 U.S. at 188. Beyond that, Rosales-Lopez addresses only a non-constitutional standard for the federal courts. Id. at 190. On this record, the California Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established Federal law.

**c. Voir Dire Courtroom Conditions**

Petitioner also claims that conditions in the courtroom during jury selection were so crowded and uncomfortable that it was impossible to fairly and effectively conduct voir dire. While the courtroom was crowded and warm at the outset of voir dire, the uncomfortable conditions in the courtroom were not unrelenting, but improved as the jury pool was reduced through challenges for cause. For this claim, Petitioner cites no decisions of the Supreme Court (and no case has been found) addressing a constitutionally required comfort level during jury selection. The California Supreme Court denied this claim on appeal observing that a defendant, "is entitled to an impartial jury, not a contented one." Carter, 36 Cal. 4th at 1252-53. With no federal law clearly established, the California Supreme Court's decision cannot be said to be contrary to or an unreasonable application of clearly established Federal law.

**d. Trial Judge Conduct of Voir Dire**

Petitioner next claims that the trial judge improperly stated the law during voir dire, failed to uncover and excuse unsuitable jurors, and improperly excused jurors for cause, rendering his conviction unconstitutional under Witherspoon, 391 U.S. 510, Wainwright v. Witt, 469 U.S. 412 (1985), and Morgan v. Illinois, 504 U.S. 719 (1992). The California Supreme Court denied this claim on direct appeal. Carter, 36 Cal. 4th at 1253-54. The California Supreme Court again denied the claim on the merits in Petitioner's second state habeas petition presented as claim 1(A) and (B). (Supp. Lodgment No. 4.)

As to the claim about improper excusals for cause, Petitioner has not identified a juror that was erroneously removed for cause. Without identifying a juror, Petitioner is simply speculating and has not carried his habeas burden. The California Supreme Court made the same observation in denying Petitioner's direct appeal. Carter, 36 Cal. 4th at 1254. In denying the claim, the California Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established Federal law.

As to the claim the trial judge improperly stated the law during jury selection, the California Supreme Court found that some statements "lacked precision," were "overly simplistic," and "contained technical misstatements," but were not formal instructions. Instead, the court found that the statements were made to familiarize the prospective jurors with the tasks ahead and in order to assist the parties. Neither Witherspoon, nor Wainwright, nor Morgan require the strict precision Petitioner now claims was lacking. Witherspoon only requires a court to not produce a jury "uncommonly willing to condemn a man to die." 391 U.S. at 521. Petitioner also cites Wainwright, but Wainwright does not require technically precise voir dire questions. 469 U.S. at 433-434 ("Relevant voir dire questions addressed to this issue need not be framed exclusively in the language of the controlling appellate opinion; the opinion is, after all, an opinion and not an intricate devise in a will."). Likewise, Morgan does not impose strict accuracy requirements on trial courts during voir dire questioning. Morgan holds

that a defendant is entitled, upon his request, to ask questions of prospective "jurors who, [] prior to the State's case in chief, ha[ve] predetermined the terminating issue of his trial, that being whether to impose the death penalty." 504 U.S. at 736. But Petitioner does not assert that this happened during his trial. He does not point to a time where he was denied a follow-up question of a juror who expressed a predetermination to impose the death penalty. He only alleges undefined prejudice and a "curtailment" of his right to challenge jurors for cause. Without the guidance of clearly established federal law, the California Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established Federal law.

**2. Effective Assistance of Counsel During Voir Dire**

Petitioner next claims that he was denied the effective assistance of counsel during the jury selection process. Part of this claim was raised for the first time in Carter's second state habeas petition as claim I(C), and part of this claim (relating to juror Cigainero) was raised for the first time in his reply brief in support of claim 1(C). This ground for federal habeas relief amounts to Petitioner second-guessing his trial counsel's strategic decisions during jury selection. The claim was denied on the merits without a reasoned opinion by the California Supreme Court. (Supp. Lodgment No. 4.)

In order to prevail on an ineffective assistance of counsel claim, a habeas petitioner must show both that counsel's performance was deficient and that counsel's errors were so serious as to deprive the defendant/petitioner of a fair trial. See Strickland, 466 U.S. at 687. An ineffective assistance of counsel claim in a federal habeas review of a state conviction imposes a greater degree of difficulty. "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. ___, 130 S.Ct. 1473, 1485 (2010). "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Richter, 131 S. Ct. at 788, citing Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (internal quotation marks and citations omitted).

"A federal habeas court must therefore determine that the likelihood of a different result is substantial, not just conceivable." Richter, 131 S.Ct. at 792.

According the requisite double deference standard for ineffective assistance claims, Petitioner's claim lacks merit under both the performance prong and the prejudice prong. On the performance prong, picking a jury is an inherently subjective, imperfect process. By necessity, counsel make decisions on instinct and feel rather than by absolute certainty. Assessing jurors during voir dire requires an evaluation of demeanor and credibility. Having reviewed the trial transcript in this case, it is fairly arguable that counsel made reasonable tactical decisions during voir dire. In fact, there is a legal presumption that the challenged actions are sound strategy. Id. at 689. Under Strickland, a federal habeas court's review of such tactical decisions "must be highly deferential" and accorded "a strong presumption of validity, regardless of whether we agree with it." United States v. Quintero-Barraza, 78 F.3d 1344, 1349 (9th Cir. 1995). Courts applying Strickland recognize there are distorting effects of hindsight when looking back to review a prospective juror's statements and trial counsel's decisions about whether or not to leave a person on a jury. On the thin showing in this petition, and given the high level of deference accorded to counsel's strategic decisions in assessing prospective jurors in jury selection, Petitioner has not demonstrated that his trial counsel performed in a constitutionally deficient manner.

On the prejudice prong, Petitioner has to make the required showing of prejudice under Strickland, by showing that a "juror who harbored an actual bias was seated on the jury as a result of counsel's failure to voir dire on the insanity defense." Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011). Petitioner points to one juror as evidence of his counsel's ineffectiveness: juror Cigainero. Cigainero was interviewed in 2009 and his name first mentioned in the reply brief in support of claim 1(C) of Petitioner's second state habeas petition.

Petitioner argues that Cigainero twice admitted that he was biased in favor of the death penalty. Because of that he argues that counsel should have struck Cigainero

from the panel. Petitioner argues that Cigainero first admitted his bias in his juror questionnaire. Petitioner then argues that Cigainero again admitted his pro-death penalty bias in open court during voir dire. The evidence, however, is not nearly so clear as Petitioner claims. The questionnaire itself posed a long, grammatically complex question which called for a yes-or-no answer. During voir dire, the trial judge asked about the questionnaire answer, and Cigainero agreed that he did not understand the written question. (RT 1464-65.) More importantly, during voir dire the trial judge posed the question to Cigainero, again. And again, Cigainero said he did not understand the complicated question. This was the exchange Petitioner's counsel was evaluating,

> The Court: Okay. On the questionnaire, one of the questions we asked, and I'm going to read the whole thing to you,
>
> "Assume for the sake of this question only that the jury has found the defendant guilty of first degree murder and has found one or more special circumstances true and that you are in the penalty phase. Would you, because of any views you may have concerning capital punishment, automatically refuse to vote in favor of the penalty of life imprisonment without the possibility of parole, and automatically vote for a penalty of death without considering the evidence, or any of the aggravating and mitigating factors to which you will be instructed regarding the facts of the crime and the background and character of the defendant?"
>
> How would you answer that now, or do you understand?
>
> Prospective Juror: I don't understand the whole question.

(RT 1464.) The trial judge then asked a question in a shorter, simpler form. Cigainero's answer was that he would automatically *refuse* to vote for the death penalty.

> The Court: Okay. Do you think you would have a tendency to automatically refuse to vote for the death penalty where there was special circumstance[s] found – first degree murder found?
>
> Prospective Juror: Yes.

(<u>Id.</u>) In other words, based upon the voir dire, it would have appeared to counsel that

juror Cigainero was actually biased *against* the death penalty and that it would have been ineffective assistance for his counsel to strike Cigainero from the jury. Further court questioning indicated that Cigainero was open minded about punishment and ready to consider aggravating and mitigating factors before deciding any punishment. (RT 1463-1464.)

In judging ineffective assistance of counsel claims, "hindsight cannot suffice for relief when counsel's choices were reasonable and legitimate based on predictions of how the trial would proceed." Premo v. Moore, 131 S. Ct. 733, 745 (2011). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Burger v. Kemp, 483 U.S. 776, 789 (1987), quoting Strickland, 466 U.S. at 689.

Applying these standards, Petitioner's first two examples of Cigainero's alleged death penalty bias do not suggest such bias at all. The trial record demonstrates the opposite. From counsel's point of view during jury selection, and without the benefit of hindsight, Cigainero appeared to be biased *against* the death penalty and ensuring he stayed on the jury was a reasonable decision (and the preferable decision) for his attorney to make. Counsel's decision is entitled to double deference by this Court. In denying Petitioner's claim, the state court likely reached the correct result under Strickland. It is at the very least a reasonable decision. Under § 2254(d), that the California Supreme Court "reached a reasonable [decision] is sufficient." Premo, 131 S. Ct. at 743.

In one of his more interesting arguments, Petitioner relies on hindsight to argue that he was constitutionally prejudiced by his counsel's performance. He points back to the interview of Cigainero conducted some 18 years after the trial.

There are problems with this approach. *First*, the trial record demonstrates that his counsel performed competently. Thus, Petitioner's claim fails the performance prong of the Strickland test. Without a failure of counsel's performance, prejudice is

irrelevant. *Second*, post-verdict evidence about a juror's mental processes is inadmissible under both the Federal Rules of Evidence and decisions of the Supreme Court. *Third*, habeas courts are to correct for the distorting effects of hindsight. *Fourth*, even in hindsight, the evidence is ambiguous.

Petitioner's counsel interviewed Cigainero in 2009 about his own deliberative process while on the jury. Petitioner claims that the interview answers demonstrate that Cigainero *automatically* decided on the death penalty for Petitioner before hearing aggravating or mitigating evidence during the penalty phase. According to Petitioner, this interview evidence shows that Cigainero was biased in favor of the death penalty during the trial and that his trial attorney should have elected to strike Cigainero from his jury. Thus, the prejudice from his counsel's allegedly deficient performance.

Unfortunately for Petitioner, the post-verdict interview answers may not be considered. Federal Rule of Evidence 606 bars a federal court from considering a juror's testimony about his deliberations. Rule 606(b) states: "During an inquiry into the validity of a verdict . . . a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." The Ninth Circuit follows this rule. Jurors "may not be questioned about the deliberative process or subjective effects of extraneous information, nor can such information be considered by the trial or appellate courts." United States v. Bagnariol, 665 F.2d 877, 884-85 (9th Cir. 1981). More recently, the Ninth Circuit explained that juror deliberations are to be, and remain, secret. "Indeed, no one, including the judge, is even supposed to be aware of the views of individual jurors during deliberations, because a jury's independence is best guaranteed by secret deliberations, such that jurors may return a verdict freely according to their conscience and their conduct in the jury room may be untrammeled by the fear of embarrassing publicity." Williams v. Cavazos, 646 F.3d 626, 643-644 (9th Cir. 2011), quoting Clark v. United States, 289 U.S. 1, 16 (1933) (internal quotations omitted); see also Rushen v. Spain, 464 U.S. 114,

121 n.5 (1983) ("But a juror generally cannot testify about the mental process by which the verdict was arrived."); McDonald v. Pless, 238 U.S. 264, 267-68 (1915) ("But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding."); Mattox v. United States, 146 U.S. 140, 149 (1892) ("Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because being personal it is not accessible to other testimony; it gives to the secret thought of one the power to disturb the expressed conclusions of twelve; its tendency is to produce bad faith on the part of a minority, to induce an apparent acquiescence with the purpose of subsequent dissent; to induce tampering with individual jurors subsequent to the verdict.").

Williams continues, "[a]s Justice Cardozo wrote, 'Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world.'" Id. at 644; see also Fields v. Brown, 503 F.3d 755, 778 (9th Cir. 2007) (en banc), cert. denied sub nom., Fields v. Ayers, 552 U.S. 1314 (2008) (post-verdict juror testimony about a juror's, or the jury's, deliberative process may not be considered by a reviewing habeas court). Consequently, it would have been a reasonable application of federal law for the California Supreme Court to disregard the post-verdict juror interview. Likewise, the evidence may not be considered here and the federal claim fails as a result.

Even if the interview evidence were to be considered, however, the interview evidence is ambiguous. Asked years later about his decision in favor of imposing the death penalty and when he made it, Juror Cigainero said,

> [It was] at the point when I was convinced that [Carter] was responsible for the murders because I believed in the death penalty. And once I saw in my mind I felt he committed these murders and the way he did it and everything else that went along with it, I just felt he was a candidate for it. Nobody had to convince me that I had to change my vote over to a death penalty. I was always in favor of that.

(Lodgment No. 5, Ex. 4 at 71.)  Petitioner reads this answer as demonstrating that Cigainero automatically voted for the death penalty.  Part of his answer can be read that way.  However, other parts of his answer suggest he engaged in a proper deliberative process.  For example, he said he felt that Petitioner was a *candidate* for the death penalty.  Cigainero's use of the word "candidate" implies one among two or more still in the running for a final determination.  In other words, a mind not yet made up.  He also said that once he felt Petitioner committed the murders "and the way he did it and everything else that went along with it," *then* he felt Petitioner was a candidate for the death penalty.  This part of the statement, "and everything else that went with it," implies that Cigainero considered aggravation and mitigation matters beyond the guilt phase and from the penalty phase before deciding upon Petitioner's penalty.  That would be consistent with his memory (from the same interview) of how the others jurors deliberated:

> Question:    Did any of the jurors appear to you to reach a verdict before the deliberations either on the built or the penalty?
>
> Cigainero:   Not that they ever voiced.

(Id. at 73.)  Juror Ridge was also interviewed and had the same answer.

> Question:    Do you think that any of the jurors – just from your own recollection or thought process, do you remember any of the jurors reaching a verdict on guilt or penalty before the deliberations process begun [sic]?
>
> Ridge:       No.

(Id. at 45.)  The ambiguity of Cigainero's answer, combined with the long passage of time between trial and post-verdict interview, do little to shed light on whether this juror was unconstitutionally biased in favor of the death penalty.  When the distorting effects of hindsight are eliminated, the Cigainero interview answer does not demonstrate Strickland-type prejudice from counsel's jury selection performance.  It is certainly insufficient to overcome the double deference owed to the California Supreme Court's decision denying Petitioner's claim of ineffective assistance of counsel during jury

selection. Ybarra, 656 F.3d at 1001.

**3. Misconduct by Jurors (McAlpine, Cigainero, and Ridge)**

Petitioner also claims that he was deprived of a fair and unbiased verdict due to four alleged instances of juror misconduct. *First*, Petitioner points to a luncheon that the jurors had with Mr. McAlpine. McAlpine had been on the jury during the guilt phase, but had difficulty staying awake. He was removed before the jury was instructed on the guilt phase. McAlpine later met with the jury at the jurors' invitation, prior to the penalty deliberations. *Second*, Petitioner again points to Mr. Cigainero's post-verdict interview as evidence that he prematurely decided the penalty question and categorizes it as juror misconduct. *Third*, Petitioner claims that the jury already knew he was under a death sentence from the Los Angeles case. *Fourth*, Petitioner argues that the jury engaged in misconduct by viewing what he characterizes as "extrinsic evidence," when during deliberations a juror, Mr. Ridge, found a rope or stocking within Petitioner's jacket – a jacket that had been admitted into evidence.

**a. Former Juror McAlpine's Luncheon**

Former juror McAlpine met with the other jury members at a luncheon after the guilt phase, but prior to the penalty deliberations. Petitioner claims this was jury misconduct because the trial was probably discussed. The claim was presented in Petitioner's second state habeas petition as claim 1(D) and denied without a reasoned opinion by the California Supreme Court. (Supp Lodgment No. 4.)

This claim has little evidentiary support and is based primarily on speculation and conjecture. Certainly, the luncheon did actually take place. The trial transcript reflects that the lunch plans were brought to the attention of the trial judge and defense counsel. The defense consented to the luncheon. (RT 8035.) The trial judge specifically, and soundly admonished McAlpine and the other jurors to refrain from discussing the case. (RT 8035-36.) Yet, Petitioner has produced no evidence that the any aspect of the case was actually discussed or that any such discussion, if it had occurred, had any effect on the outcome of the case. Jurors are presumed to follow a judge's instructions.

Petitioner speculates that McAlpine likely failed to follow the judge's instructions, because, during the trial, McAlpine failed to follow the judge's instructions to stay awake. With nothing more than speculation as a basis for the claimed misconduct, the California Supreme Court's denial of this claim cannot be said to be an erroneous or unreasonable application of federal law.

**b. Juror Cigainero's Decision-Making**

For this claim, Petitioner again points to Cigainero's post-verdict interview and alleges that he failed to follow the jury instructions because he prematurely made up his mind about the penalty phase. Petitioner claims that amounts to juror misconduct. The claim was presented in the reply brief in support of Petitioner's second state habeas petition as claim 1(D) and denied without a reasoned opinion by the California Supreme Court. (Supp. Lodgment No. 4.)

As discussed earlier, post-verdict evidence of a juror's mental processes during deliberations is not evidence that is entertained in a habeas review. Moreover, the passage of 18 years undermines the supposed accuracy of the juror's memory and the answer given is, itself, ambiguous. The California Supreme Court's denial of this claim cannot be said to be an erroneous or unreasonable application of federal law.

**c. Awareness of Prior Death Sentence**

For this claim, Petitioner argues that the deliberating jury was aware of his death sentence in the Los Angeles case. That alleged awareness necessarily reduced the jury's sense of responsibility and amounts to misconduct. The claim was presented in Petitioner's second state habeas petition as claim 17 and denied on the merits without a reasoned opinion by the California Supreme Court. (Supp. Lodgment No. 4.) Relying again on the problematic post-verdict juror interviews, Petitioner claims, as a fact, that the jury knew that he had already been sentenced to death in the Los Angeles case and that they knew that this case would be appealed. Petitioner claims that this "extrinsic evidence" poisoned the jury and led them to shirk their responsibility.

There are three problems with this claim. The first two problems are with the

juror interview evidence. As noted earlier, these interviews were conducted some 18 years after the trial concluded. In that time, memories grew dim and sequences of events may be confused. The larger problem is that the juror interviewed, Mr. Ridge, did not remember actually being informed of the other death sentence during deliberations. Consistent with that, Ridge said that "it wasn't known during the deliberations." (Lodgment No. 5, Ex. 4 at 50.) At most, he said that "we kind of thought that we knew," but that it was not until after the trial that he saw news articles that confirmed his musings. Ridge explained, "I know at some point afterwards that there were articles in the newspaper about [the L.A. sentence], and I think that confirmed everything that we kind of thought we knew, but we didn't discuss it." (Id.) In other words, Ridge's memory is that he guessed that there was another death sentence, but that the jury did not discuss it, and that he did not know with certainty until after he and the other jurors rendered their verdict.

While Petitioner argues that this is enough to be considered prejudicial jury misconduct, the Supreme Court has not gone nearly that far. On the contrary, in Romano v. Oklahoma, 512 U.S. 1 (1994), the Court affirmed a conviction in a more drastic case. The state had introduced into evidence, and before the jury, a copy of the judgment of death for the defendant from another case. The Romano court reasoned, "it is impossible to know how this evidence might have affected the jury. It seems equally plausible that the evidence could have made the jurors more inclined to impose a death sentence, or it could have made them less inclined to do so. Either conclusion necessarily rests upon one's intuition." Romano, 512 U.S. at 14. In view of Romano, the California Supreme Court's denial of this claim cannot be said to be an erroneous or unreasonable application of federal law.

**d. Jury Viewing of Petitioner's Jacket**

The jacket in the jury room was the sole subject of Petitioner's third state habeas petition and the third habeas petition was the first time Petitioner presented the issue to the state courts. That petition was denied by the California Supreme Court on the

merits in a summary denial. (See Supp. Lodgment No. 8.) ("The petition for writ of habeas corpus, filed on Feb 16, 2010, is denied.").

In this claim, again based upon post-verdict interviews, Petitioner asserts that the jury engaged in prejudicial misconduct by examining "extrinsic evidence." He points to interviews in 2008-2009 of two jurors: Mr. Ridge and Mr. Hughes.[8] Ridge and Hughes both said they recalled another juror examining Petitioner's jacket during deliberations. Significantly, his black leather jacket had been introduced into evidence in open court during the trial. Ridge said the juror pulled a nylon stocking out of a tear in the jacket's lining. Hughes said the juror pulled a rope out of the tear. Juror Cigainero was also asked about the jacket, but he did not recall seeing either item. (See Lodgment No. 5.)

If the jury was exposed to extrinsic evidence, it would remain to be determined whether the exposure was prejudicial. Not all extrinsic evidence is *per se* prejudicial. See Xiong v. Felker, 681 F.3d 1067, 1076 (9th Cir. 2012). Some exposure may have a *de minimis* effect and not a prejudicial effect. Id. "The presumption of prejudice that arises from juror misconduct, although strong, is not conclusive." Id. The interview answers suggest that finding the stocking or the rope (or whatever it was) did not prejudice the jury. For example, Hughes explained, "[m]y memory would be that [the rope] wasn't so much discussed as, oh look, and then just put it back in [the jacket]." (Lodgment No. 5, Ex. 6 at 156.) Ridge answered in a similar way about the stocking he remembered. "[W]e didn't think it unusual because the stocking had been brought

[8] The post-verdict juror interview evidence may be parsed into statements about extrinsic evidence and statements about the jurors' mental processes. The Ninth Circuit has observed, "[a] long line of precedent distinguishes between juror testimony about the consideration of extrinsic evidence, which may be considered by a reviewing court, and juror testimony about the subjective effect of evidence on the particular juror, which may not." Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (citations omitted). "Jurors may testify regarding extraneous prejudicial information or improper outside influences. They may not be questioned about the deliberative process or subjective effects of extraneous information, nor can such information be considered by the trial or appellate courts." Bagnariol, 665 F.2d at 884-85. "Therefore, although we may consider testimony concerning whether the improper evidence was considered, we may not consider the jurors' testimony about the subjective impact of the improperly admitted evidence." Sassounian, 230 F.3d at 1109.

up as part of the evidence, and we were looking at the items and here is the stocking. So I don't think at the time anybody thought that it was different than what had already been introduced because we didn't discuss it." (Id. at 160.) Thus, it would be reasonable for the California Supreme Court to conclude that the presence of the stocking or the rope (whatever it was) had a *de minimis* effect on the jury deliberations.

It would also be reasonable to conclude that there was no juror misconduct because there was no "extrinsic evidence." There are only a handful of Supreme Court decisions concerning extrinsic evidence in jury deliberations. These cases involved bailiffs' remarks about a defendant's guilt, newspaper articles discussing the evidence as strong, and a person attempting to financially influence a jury foreman's decision. See Xiong, 681 F.3d at 1076-77 (describing Supreme Court cases on extrinsic evidence). The guiding principle was announced half a century ago. "[E]vidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." Turner v. Louisiana, 379 U.S. 466, 473 (1964). In Petitioner's case, his jacket came before the jury in exactly this way – in open court with the full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.

That something may have been found within the admitted-into-evidence jacket, does not mean the thing found is to be treated as extrinsic evidence. There are no Supreme Court decisions or Ninth Circuit decisions to that effect. The only decision concerning material submitted to the jury through attachment to properly admitted evidence was decided by the Fifth Circuit. See Farese v. United States, 428 F.2d 178, 180 (5th Cir. 1970) (deeming "extrinsic" money found inside the pocket of a laundered shirt found within an admitted-into-evidence attache case). Of course, federal habeas relief is only available for erroneous or unreasonable applications of clearly established Federal law as determined by the United States Supreme Court. See Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) ("circuit precedent does not constitute 'clearly

established Federal law, as determined by the Supreme Court'"). To borrow a phrase from Xiong, "critical factual distinctions exist between the Supreme Court jurisprudence regarding juror misconduct and the misconduct at issue in this case." Id., 681 F.3d at 1076. Xiong's conclusion is equally appropriate here. Because the Supreme Court cases on extrinsic evidence "all involved much more significant, and in some cases, deliberate interference with the deliberation process, the nature of the misconduct here is factually distinguishable from clearly established Sixth Amendment Supreme Court precedent." Id.

There are several arguments and theories that could have supported the California Supreme Court decision to deny the "extrinsic evidence" claim. It could have found that the evidence of extrinsic evidence was unconvincing in view of: (a) Juror Cigainero's statement that he did not recall anything being discovered in Carter's jacket during deliberations; and (b) the 18-years passage of time and its distorting effect on the memories of Ridge and Hughes. It could have decided that there is no clearly established federal law classifying objects found within objects admitted in evidence as "extrinsic evidence." It could have decided that even if the stocking or rope (or whatever it was) was properly characterized as extrinsic evidence, that the prejudice was *de minimis* in view of Hughes' and Ridge's statements that the jury did not discuss the items.

Having determined the theories or arguments that could have supported the California Supreme Court's decision, a federal habeas court must then ask "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Richter, 131 S. Ct. at 786. In answer to this question, it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holdings of the Supreme Court. Thus, the California Supreme Court's denial of this claim cannot be said to be an erroneous or unreasonable application of federal law, and evidentiary development is not warranted.

**B. Claim 2- Ineffective Assistance of Trial Counsel- Guilt Phase**

**1. Sub-Part Claims**

For Claim Two, Petitioner puts forward several examples of his counsel's shortcomings. First, he argues a failure to investigate viable defenses. Second, he argues a failure to investigate his mental impairments. Third, he argues a failure to investigate a third-party culpability defense. Fourth, he argues a failure to make proper objections to jury instructions and prosecutorial misconduct. Fifth, he argues a failure to make meaningful opening and closing arguments. Sixth, he argues his lead counsel was sick and exhausted during trial.

This claim and its sub-claims were first presented to the California Supreme Court in Petitioner's first state habeas petition presented as claim 2(A) subsections (1) through (6) and was denied on the merits without a reasoned opinion. (Lodgment No. 113.) The exception is the claim of failure to investigate a third-party culpability defense. That claim was not raised until the second habeas petition. The failure to investigate a third-party culpability defense was raised while at the same time re-raising the other sub-claims as Claim 2, sub-claims (A) through (G). These were again denied by the California Supreme Court on the merits without a reasoned opinion. (See Supp. Lodgment No. 4.) Where the state court decision is unaccompanied by reasons, a federal habeas court "must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Richter, 131 S. Ct. 770, 786 (2011). In Petitioner's case, applying Strickland to his ineffective assistance claims could easily have supported the California Supreme Court's decision to deny the claim.

To reiterate, in order to prevail on an ineffective assistance of counsel claim, a habeas petitioner must show both that counsel's performance was deficient and that counsel's errors were so serious as to deprive the defendant of a fair trial. Strickland,

466 U.S. at 687. In order to prevail on an ineffective assistance of counsel claim in a federal petition for a writ of habeas corpus from a state conviction, a petitioner faces a greater degree of difficulty. "The standards created by Strickland and § 2254(d) are both highly deferential . . . and when the two apply in tandem, review is doubly so." Richter, 131 S. Ct. at 788 (internal quotation marks and citations omitted). "A federal habeas court must therefore determine that the likelihood of a different result is substantial, not just conceivable." Id. at 792. A state court's reasonableness in applying Strickland, is not the same as the reasonableness a federal court looks for under § 2254(d). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 788.

Having reviewed the trial transcript in this case, it is fairly arguable that counsel made reasonable tactical decisions during the guilt phase. Under Strickland, a federal habeas court's review of such tactical decisions "must be highly deferential" and accorded "a strong presumption of validity, regardless of whether we agree with it." United States v. Quintero-Barraza, 78 F.3d 1344, 1349 (9th Cir. 1995). On this showing, and given the high level of deference accorded to counsel's strategic decisions, and the added deference accorded the California Supreme Court's application of Strickland to those decisions, Petitioner has not demonstrated a right to federal habeas relief.

**2. Failure to Investigate and Confront – Trial Tactics**

For this sub-claim, Petitioner takes issue with the strategy his counsel chose. Petitioner asserts that if counsel had spent more time and effort challenging the uncharged "other crimes" evidence and challenging the sexual assault evidence in the charged crimes, he may have succeeded in creating reasonable doubt about his involvement in the five murders. He identifies a long list of ways his counsel could have presented the defense differently.

The examples are classic tactical choices deserving of deference. Petitioner

suggests one approach to making a defense. But counsel could have reasonably decided that additional time and questioning spent would have had a negative effect on the jury. Attempting to undercut the "other crimes" evidence could have backfired by drawing more attention to the string of senseless murders and more attention to Petitioner's involvement. Rather than making a compelling case that Petitioner was unconnected with the Los Angeles murders, the approach urged as competent today, could well have highlighted the atrocity and tragedy attributed to Petitioner and convinced the jury that the San Diego murders were more likely to have been committed by Petitioner. Or, it could have had the effect of annoying the jury by convincing the jury that defense counsel was wasting its time unnecessarily. All in all, while Petitioner characterizes the prosecution's case against him as one built on circumstantial evidence, the circumstantial evidence was fairly extensive and convincing. In review, defense counsel made reasonable tactical choices entitled to deference in trying to mount a defense. To sum up, there is a reasonable argument that counsel satisfied Strickland's deferential standard. Richter, 131 S. Ct. at 788. Given the added deference accorded the California Supreme Court's application of Strickland to those decisions, Petitioner has not demonstrated a right to habeas relief.

**3. Failure to Investigate Mental Impairments**

In this sub-claim, Petitioner argues that his counsel should have done more to investigate his mental impairments as a defense to the murders. Specifically, Petitioner claims that he suffered from diffuse and organic brain damage. He argues that competent counsel would have argued to the jury that his impairments prevented him from being guilty of first degree murder or the special circumstances alleged.

But defense counsel did investigate Petitioner's mental impairments and presumably decided as a tactical choice to not attempt an incompetency defense in the guilt phase. As the thrust of the guilt phase defense was to focus on reasonable doubt, to simultaneously mount a diminished mental capacity defense as an alternative, could well have been seen as undercutting the main defense. See United States v. Stern, 519

F. 2d 521, 524-25 (9th Cir. 1975) ("While a defendant may plead inconsistent defenses, here it appears that competent counsel might well have concluded that it would not have been in defendant's best interest to do so.") Perhaps it would have been successful in the guilt phase. It is clear, however, that it did not succeed in the penalty phase, and that suggests it would not have fared well in the guilt phase. Petitioner's counsel made reasonable tactical choices trying to mount a reasonable doubt defense, rather than a diminished capacity defense. On this sub-claim, there is a reasonable argument that counsel satisfied Strickland's deferential standard. Richter, 131 S. Ct. at 788. Given the added deference accorded the California Supreme Court's application of Strickland to those decisions, Petitioner has not demonstrated a right to federal habeas relief.

///

**4. Failure to Investigate Third Party Culpability of Tulio and Blevins**

For this sub-claim, Petitioner asserts that his counsel should have done more to investigate and present evidence of *possible* third-party culpability for two of the "other crimes"[9] murders. Specifically, Petitioner argues that blame for the death of Tok Kim could have been laid on an ex-boyfriend, Ray Blevins. In the same way, he argues that blame for the murder of Susan Knoll could have been placed on an ex-boyfriend of Knoll, Ronald Tulio.

Here, it is necessary to emphasize that the murders of Kim and Knoll were not the murders for which Petitioner was being tried in San Diego. The San Diego conviction is the proceeding attacked in this federal habeas petition. The murder of Ms. Knoll, along with the murders of Ms. Mills and Ms. Guthrie, were tried first, in Los Angeles County, and their murders were introduced as evidence of "other crimes" offered under California Evidence Code § 1101(b). The death of Tok Kim, which

[9] Kim's car was found in Los Angeles County, parked in front of the apartment where the bodies of Susan Knoll and Jillette Mills were stacked inside a bedroom closet. Knoll's car was found one block away. Mills' car, on the other hand, was being driven by Carter through Arizona when police made a traffic stop. Inside the car, police found several personal items linking Carter to each of the murdered women. See Carter, 36 Cal. 4th at 1222-23.

occurred in Alameda County, was introduced as "other crimes" evidence in both the Los Angeles and San Diego proceedings. Petitioner faults his attorneys in the San Diego case for not spending more resources investigating and presenting evidence that would tend to cast the blame on others for the Kim and Knoll murders, since an attorney has a duty to make a reasonable investigation or a reasonable decision that makes a particular investigation unnecessary. Duncan v. Ornoski, 528 F.3d 1222, 1234 (9th Cir. 2008). At bottom, Petitioner takes issue with counsel's decision.

As the California Supreme Court observed, between the Los Angeles case and the San Diego case, Petitioner was "clearly linked to the deaths of five women, four of whom died by strangulation within days of each other, as well as to the near fatality by strangulation of a sixth woman." Carter, 36 Cal. 4th at 1193. His San Diego counsel had to strategically determine how much defense resources to allocate to investigating and discrediting the "other crimes" evidence, while trying to mount a viable defense to the San Diego murder charges. While he chose not to try to blame Blevins for Kim's murder, he did present evidence suggesting Tulio, rather than Carter, was guilty of Knoll's murder. See Carter, 36 Cal. 4th at 1234-35 (summarizing defense evidence presented about the Knoll murder at the San Diego trial).

It is certainly arguable that a trial strategy designed to spend more efforts on telling the jury that Petitioner was not involved in the murders of Kim and Knoll would backfire and leave the jury more convinced of Petitioner's bad character and guilt in the San Diego case. Further weakening his claim, there is no Supreme Court standard setting forth how much investigation is required or trial time must be spent by defense counsel to challenge "other crimes" evidence during a trial. Such a scenario is replete with dilemmas and tactical choices and trying cases is not a science, it is an art. On this sub-claim, there is a reasonable argument that counsel satisfied Strickland's deferential standard. Richter, 131 S. Ct. at 788. Given the added deference accorded the California Supreme Court's application of Strickland to those decisions, Petitioner has not demonstrated a right to federal habeas relief.

**5. <u>Failure to Make Objections</u>**

For this sub-claim, Petitioner argues that his attorneys should have objected to the introduction of Las Vegas gambling coupons found in the car he was driving, should have objected to various jury instructions, and should have objected to guilt phase prosecutorial arguments as misconduct.

There is a reasonable argument, however, that these instances were not defense counsel performance failures. The California Supreme Court described the gambling coupon evidence as "trivial." Deciding to raise no objection to trivial evidence is certainly a reasonable decision. The California Supreme Court considered each instance asserted to be prosecutorial misconduct and found the assertions meritless. <u>See</u> <u>Carter</u>, 36 Cal. 4th at 1263-68. Deciding to raise no objection to prosecutorial remarks that may not fall to the level of misconduct is also a reasonable decision. The guilt phase jury instructions Petitioner characterizes in this federal habeas petition as constitutionally defective (<u>see</u> claim 14), have not been found to be constitutionally defective. Deciding to make no objection to proper jury instructions is, once again, a reasonable decision. On this sub-claim, there is a reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard. <u>Richter</u>, 131 S. Ct. at 788. Given the added deference accorded the California Supreme Court's application of <u>Strickland</u> to those decisions, Petitioner has not demonstrated a right to federal habeas relief.

**6. <u>Failure to Provide Meaningful Opening and Closing Statements</u>**

For this sub-claim, Petitioner describes his attorney's opening statement as "tragically inept" and the closing statement at "equally pathetic." (Pet. Merits Brief at 135.) He claims, "the actions and omissions of trial counsel in failing to provide a synthesized, theme-driven, organized, and purposeful argument" fell below the standard of competence. (SAP at 121.)

But Petitioner's counsel did make an opening and closing argument. The transcript record reflects counsel arguments were on point, relevant and understandable. They were good enough. The standard for constitutionally sufficient assistance of

counsel is neither perfection nor brilliance. And the purpose of federal habeas corpus is "to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems." Greene v. Fisher, 132 S. Ct. 38, 43 (2011) (internal quotations omitted). While there are arguments that could have been made, and evidence that could have been emphasized, opening and closing arguments are fundamentally the product of tactical decisions and legal artistry. That those choices may be criticized in hindsight, does not demonstrate deficient performance of counsel. There was no extreme failure in this case. On this sub-claim, there is a reasonable argument that counsel satisfied Strickland's deferential standard. Richter, 131 S. Ct. at 788. Given the added deference accorded the California Supreme Court's application of Strickland to those decisions, Petitioner has not demonstrated a right to federal habeas relief.

**7. Lead Counsel's Illness**

For the last sub-claim, Petitioner describes his lead defense counsel, Charles Bumer, as ill and exhausted throughout the trial. The record indicates only that Bumer felt dizzy and nauseated on one day during the hearing on *in limine* motions. On that day, the record also reflects that Bumer continued on to argue cogently and forcefully those motions. The vast remainder of the trial transcript does not record Bumer complaining of illness or exhaustion, nor does it reflect observations of the trial judge to that effect.

That counsel felt ill on three days during a multi-week trial, and that Petitioner continued to be represented by co-counsel during that time, is neither out of the ordinary, nor evidence that he received ineffective assistance of counsel. That Bumer was 68-years old at the time, that he had finished a lengthy trial right before Petitioner's trial, or that he passed away five years later, does not indicate (as Petitioner suggests) that Bumer was too ill to perform competently. If those facts suggest anything, they suggests that Bumer was likely at the apex of his experienced career – not that he was too ill and exhausted to perform competently. On this final sub-claim, there is a

reasonable argument that counsel satisfied Strickland's deferential standard. Richter, 131 S. Ct. at 788. And given the added deference accorded the California Supreme Court's application of Strickland to those decisions, Petitioner has not demonstrated a right to federal habeas relief.

**8. Prejudice**

In this broad, summary attack, Petitioner claims a reasonable possibility that the jury would have acquitted on at least some of the charges, had counsel assisted effectively. For proof, Carter points to the post-verdict juror interviews conducted some 18 years after the trial. He speculates that the interviews show that the jury took several votes with various jurors voting against guilt prior to arriving at a unanimous verdict. He proposes that this evidence proves the case was tenuous.

Once again, post-verdict evidence is not properly considered or admitted to reveal how the jury deliberated. Williams, 646 F.3d at 643-644, quoting Clark, 289 U.S. at 16; F.R.E. 606(b). Nevertheless, even if such evidence were to be considered, it demonstrates no more than the deliberations of a serious, conscientious jury that took its time evaluating the sobering task at hand, and in so deliberating, did not rush to judgment. If the post-verdict interviews in this case prove Strickland prejudice, then prejudice could be proven in almost every case, every time a jury conscientiously deliberates.

As to this claim of prejudice, there is a reasonable argument that counsel satisfied Strickland's deferential standard. Richter, 131 S. Ct. at 788. Given the added deference accorded the California Supreme Court's application of Strickland to those decisions, Petitioner has not demonstrated a right to federal habeas relief. Evidentiary development of the claim is not warranted.

**C. Claim 3- Ineffective Assistance of Trial Counsel- Penalty Phase**

In Claim 3, Petitioner alleges that his "attorneys failed to provide reasonably competent assistance at the penalty phase of his trial" in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments, and if not for "counsel's

unprofessional actions and omissions, the result of the proceeding would have been different." (SAP at 124.) Specifically, Petitioner asserts that trial counsel: (1) failed to adequately investigate the mitigating and aggravating evidence; (2) unreasonably proceeded with the same penalty phase presentation as in the Los Angeles trial, which had led to a death verdict against Petitioner; (3) was ineffective in developing and presenting Petitioner's background to the jury; (4) failed to develop and present evidence of Petitioner's mental impairments; and (5) was deficient in penalty phase closing arguments to the jury. (Id. at 124-67.)

In the Answer, Respondent acknowledged that while the state supreme court had denied the second state petition based in part on procedural grounds as well as on the merits, Petitioner had timely raised several ineffective assistance of counsel claims in the first state petition, which were denied solely on the merits, and Respondent therefore did not assert a defense of procedural bar to Claim 3. (See Ans. at 71.) However, in the response to Petitioner's Merits Brief, Respondent cited to the California Supreme Court's denial of the second state exhaustion petition, and argued that "[t]his claim is procedurally barred and should be denied on that basis." (Merits Resp. at 75 n. 8.) As Petitioner points out, Respondent's failure to assert the existence of this procedural bar in the Answer (and in fact, Respondent's concession that the claim had been timely raised in a prior state petition), waives this affirmative defense as applied to the instant claim. (See Merits Reply at 22-24); see also Rule 5 of Rules Governing Section 2254 Cases; Gray v. Netherland, 518 U.S. 152, 166 (1996). As such, the Court will consider Claim 3 on the merits.

**1. Information Relating to Petitioner's Background- Presented at Trial**

Marion Pasas, a San Diego investigator who worked on Petitioner's defense team, stated that:

> In addition to information about Dean's tragic childhood, the San Diego trial team put on a significant amount of information about Dean's work as a cameraman. They tried to highlight the idea that Dean, because of his camera skills, could still be of some value to the community.

(Ex. 74 at 3-4.)  Pasas heard rumors of abuse during her investigation, as well as stories of alcoholism, but stated that the trial defense "did not present even a fraction of the child abuse I suspected from my investigation in Nome."  (Id.)  Pasas also stated that "[p]rior to and during trial I was not aware of mercury and arsenic contamination in Nome from gold-mining operations, the nature and extent of Dean Carter's exposure to neurotoxins, and I did not interview Lela Oman or any other person about those issues."  (Id. at 62.)

Petitioner's mother Esther states that prior to her marriage to Jim Carter, she did not have problems with her sons, but afterwards her son Dean "began to act up and he ran away constantly."  (Ex. 77 at 2.)  When Petitioner misbehaved, Esther states that her husband administered the discipline, using methods she did not approve of, but did not object to, including using a belt and that Jim "chained him [Petitioner] to the bed."  (Id.)  When Petitioner was sent away to the Jesse Lee Home, Jim Carter made all the arrangements, and did not provide Esther with her son's contact information.  (Id. at 3.) Esther states that her drinking escalated after their marriage because Jim was a heavy drinker, and they fought often, as he was a jealous man.  (Id. at 4.)  When Esther was interviewed before trial, she felt that the defense team "were judgemental [sic] of me and critical of my son Dean," and it appeared they were "against my son instead of trying to help him."  (Id. at 5.)  Esther states that "[h]ad I been approached differently and had I believed that I could help my son, I probably would have testified about the facts contained in this declaration.  And would have also talked to them and answered all of their questions."  (Id.)  Esther Carter did not testify at trial.

In merits briefing submitted in connection with the instant Petition, Petitioner acknowledges that he was evaluated by a number of medical and mental health experts prior to his trials, including, but not necessarily limited to, Drs. Berg, Kowell, Stoddart, MacSpeiden, Adler, and Friedman.  (See Pet. Merits Brief at 163 n. 53.)  Moreover, Dr.

Connor's post-conviction declaration[10] references a 1987 psychological evaluation performed by a Dr. Maloney, a 1989 psychological evaluation performed by Dr. Berg, and neurological consultation, evaluation and assessment by Dr. Kowell.[11] Dr. Connor indicated that Dr. Kowell performed an MRI and EEG on Petitioner in 1989, stated that "the tests indicated no intracerebral abnormalities" but noted that "it was unlikely that a neuroradiologist at that time would have looked for neuroimaging signs that are consistent with FASD." (Ex. 103 at 8.)

The state record confirms that San Diego trial counsel retained expert assistance in preparation for Petitioner's trial. The record reflects that on January 4, 1988, upon defense application, psychologist Paul S.D. Berg was authorized to enter the San Diego County Jail "on a continuing basis until further order of the Court, to confer with defendant." (CT 196.) The record also reflects that on January 11, 1987, upon defense application, psychiatrist James E. Stoddart, M.D., was authorized to enter the San Diego County jail "on a continuing basis to interview Defendant." (CT 201.) On March 30, 1988, lead counsel Bumer applied, and received permission, for Dr. Stoddart, "employed by the defense in the above entitled case, be admitted to the Los Angeles County Jail for the purpose of private interview with the defendant, and that private facilities in the medical section of the jail be made available for such interview." (CT 212.) A similar order is dated May 17, 1989, and also allowed Dr. Stoddart admission to the LA County jail for an interview with Petitioner. (CT 217.)

Petitioner has also submitted several school records, military records, mental

[10] Dr. Connor's declaration, while signed in 2009, was submitted to the California Supreme Court as Exhibit 94 in support of Petitioner's informal reply with respect to his second state habeas petition. Accordingly, that declaration was part of the state record at the time the California Supreme Court considered and adjudicated Claim 3. See Pinholster, 131 S.Ct. at 1398.

[11] Petitioner submitted the Kowell and Berg reports to this Court as Exs. Z and AA in support of the Motion for Evidentiary Hearing, but these documents do not appear to be part of the exhibits and pleadings filed in the California Supreme Court in either the Los Angeles or San Diego post-conviction proceedings. As such, these exhibits will not be considered in the Court's evaluation of Petitioner's claims under § 2254, as they were not part of the state record at the time of the California Supreme Court's adjudication of Claim 3. See Pinholster, 131 S.Ct. at 1398.

health evaluations, pre-sentence reports, correctional records, and other documents gathered during trial preparation.  For instance, a 1971 psychiatric evaluation by Marriane Hagen, Ph.D. noted that Petitioner "appears to have the basic ability and academic skills necessary to function in high school.  His primary difficulties center around his difficulties with relationships, a tendency to over-react, and a high anxiety level."  (Ex. 14.)

A 1973 evaluation by Dr. Kennoyer, Ph.D., performed at the request of Petitioner's probation officer, recommended that Petitioner, age 17, be treated as a juvenile, rather than adult offender.  (Ex. 18.)  Dr. Kennoyer stated that, "I found the boy quite likeable and although our interview lasted only 45 minutes, I would venture to say that he appears to be a fairly classical sociopathic personality."  (Id. at 2.)  While Dr. Kennoyer recommended that treatment as a juvenile would allow a greater potential for treatment, the expert opined that "I do not feel the prognosis for the boy is exceptionally good..."  (Id.)

A 1973 report by Petitioner's Alaska probation officer Barton Penny concurred, with Penny stating that "Dean continues to display a personality such that without further professional efforts at reintegration he will continue to engage in delinquent or criminal behavior and have little chance at ever making an acceptable social adjustment."  (Ex. 9 at 6.)  J. Rennebohm, a psychiatrist with the Oregon State Correctional Institution, saw Petitioner periodically in 1975, prescribed Sinequan for depression, and stated that "[b]y [Petitioner's] own admission, his irritability and destructively aggressive conduct that emanates from it, are willful, the result of personal choice, and represent matters over which he could exercise control if he chose to do so."  (Ex. 12, Ex. 21 at 4.)

A 1977 psychological evaluation performed by Dr. Robert McManmon concluded that Petitioner's "thought processes do not show disruption."  (Ex. 23.)  He found no evidence of hallucinations or delusions, stated that Petitioner admitted some depression due to the prospect of incarceration, and found that Petitioner "tended to see

things in a rather concrete way with little insight." (Id. at 1.)   Dr. McManmon concluded that "[i]ncarceration would limit this man's rehabilitation, and lead to hardening of criminal patterns.   Since this man is a long-term Alaskan, adequate supervision should protect society." (Id. at 2.) Paul Tannenbaum's 1977 pre-sentence report, prepared in connection with Petitioner's Alaska burglary conviction, found that Petitioner's "behavior appears to be best explained focusing upon his immaturity and lack of consideration of consequences." (Ex. 7 at 4.)

Correctional counselor Kathi Smith performed a 1978 psychological testing and evaluation on Petitioner. (Ex. 24.)  Smith noted that Petitioner, who at that point was serving his second felony incarceration and has reported spending 7 years in correctional settings, largely as a juvenile, "is described as somewhat depressed, restless, and having difficulty controlling impulses.  His behavior is self-punitive in that he feels guilt over misbehavior, but is not deterred by this guilt." (Id.) Smith noted that "[t]he MMPI raises the question of psychiatric problems, but discussion with Mr. Carter does not indicate, to me, a need for psychiatric intervention at this time." (Id.)

Medical records reflect an April 15, 1962 entry stating that Petitioner, age 6, was seen after being "struck by [a] car." (Ex. 8.)  Petitioner sustained "contusion and bruising over left biceps only," and indicated that an "x-ray [was] neg [sic]." (Id.) Hospital records also detailed injuries Petitioner sustained in a 1977 car accident, including a potential concussion, contusions, and sprains, and noted that Petitioner had a "history of concussions." (Ex. 26.) The report indicated that "[m]ultiple x-rays of the cranium, neck, lumbar spine, chest, right elbow, left femur, and left knee showed no significant abnormalities." (Id.)

**2.    Information Relating to Petitioner's Background- Not Presented At Trial and Submitted During Post-Conviction Proceedings**[12]

---

[12] As discussed at the outset of the Merits discussion in the instant Order, because Petitioner's Exs. A-AA in support of the Motion for Evidentiary Hearing were not previously submitted to the state court, those exhibits will not be considered in the Court's evaluation of Petitioner's claims under § 2254, as they were not part of the

Petitioner has submitted a number of declarations from neighbors and friends in Nome, Alaska, who knew Petitioner as a child or knew his family. He alleges that many of these individuals were not contacted or interviewed at the time of trial, and those that were contacted had relevant information that they are only now providing. These declarations largely outline, in greater detail than presented at trial, the mistreatment that Petitioner suffered during his childhood and adolescence at the hands of his mother and step-father and the alcoholism of his parents.

Several individuals offered declarations providing general knowledge of the Carters' drinking and mistreatment of Petitioner. For example, Lilly Rose was friends with Esther Carter and had gone out drinking with Esther on weekends. (Ex. 86 at 1.) While Rose did not know who the fathers of Esther's sons were, she stated "I can only suppose they are military men since Esther went out with many of them." (Id.) Rose added that "I do know that Esther continued to drink throughout her pregnancy with Dean," and asserted that Esther favored her son Jerry over Dean. (Id. at 2.) Catherine Dickson, a Nome resident, also suspected that Petitioner's father is "one of the military guys" Esther dated. (Ex. 78 at 1-2.) Dickson also knew James Carter, who she found "antisocial" and noted that Carter "was different from the Nome residents and had the tendency to be condescending towards Natives." (Id. at 2.) Dickson stated that "the word in town was that James was abusive towards Dean and Jerry," and recalled speaking to others in town who actually witnessed mistreatment. (Id.) Robbie Fagerstrom, another Nome citizen, states it was "common knowledge" that the Carters were "big drinkers" and was also "well known that they locked up their kids." (Ex. 79 at 1.) Nancy Green, whose family rented a home near the Carter family for a few winters in the 1960's, states that "Esther and Jerry both picked on Dean and mistreated him." (Ex. 81 at 1.) Michael Ahmasuk, who lived next door to the Carter family and

---

record at the time of the state court's adjudication of Claim 3. See Pinholster, 131 S.Ct. at 1398. Also, as noted above, in evaluating this claim under § 2254(d), the Court will similarly refrain from considering the exhibits that were submitted by Respondent in record expansion proceedings. (Doc. No. 144, 147.)

attended school with Petitioner, states that "Dean told his friends that Jim Carter used to lock him in a closet," and added that "[w]henever we did not see Dean for a few hours, we assumed Jim Carter had locked him in the closet." (Ex. 81 at 1.)

Chuck Reader, who knew Esther Carter from when he was bartending and "would regularly go out drinking with Esther and Jim Carter," attended a family picnic where he witnessed "Dean hopping around the cabin while chained at both ankles." (Ex. 85 at 1-2.) When Reader inquired as to the reasons for the chaining, Jim Carter acted as if it were "routine" and said "[c]an't let him loose." (Id. at 2.) Reader states that Jerry Carter was favored, and that when Reader later had a dispute with the Carter family over his belief that Jerry had stolen his daughter's motorcycle, the Carters assumed Dean had committed the theft. (Id. at 3.) Vaughn Johnson, whose family lived in a summer camp near the Carters, stated that he once "went around to the back of their camp house and saw Dean Carter handcuffed and chained to the house outside." (Ex. 83 at 1.) Dean "told him Jim Carter had chained him," and they returned later to unchain him. (Id.) Johnson added that Dean "used to disappear for days at a time" and Esther didn't answer when asked where he was. (Id.) Johnson also noted that the Carters were "heavy drinkers," and when Johnson went to their home "Jim and Esther were often drinking." (Id.)

Beverly Gelzer, whose family also had a summer camp near the Carters, recalled an incident when she heard Petitioner yelling loudly, and stated that "[l]ater, another neighborhood kid told me that Jim Carter had been beating Dean with a two-by-four." (Ex. 80 at 1-2.) She stated that Petitioner "had no attention span and seemed a little slow" and noted that something was "off about him," stating that he "had a hard time relating to the other kids." (Id.) Gelzer knew that Petitioner tried to run away at least twice and remembers he got on a plane, but did not offer a indication as to the basis of this knowledge. (Id.) Gelzer stated that Jerry Carter was "not an angel" and that he once tried to sexually assault her. (Id. at 2-3.) Gelzer noted that "[i]n June of 1989, I

met with an investigator named Marion Pasas and told him[13] much of what I have stated here." (Id. at 3.)

Roscoe Wilke stated that Esther's mother Vera was their housekeeper and often asked to "borrow an 'advance' from us on her pay to buy alcohol." (Ex. 88 at 1.) Wilke noted that both Esther and James Carter "drank a hell of a lot of alcohol." (Id.) Separately, Wilke stated that Petitioner "was not the sharpest kid around" and questioned whether that was the reason that "Esther and Jim picked on him so much." (Id.) Wilke also described an incident where he and his wife once found Petitioner, at age 12 or 13, crying on the school steps at 11:30 at night. (Id.) When questioned about it, Petitioner stated that "his father wouldn't let him in the house," so the Wilkes drove Petitioner home. (Id.)

Cecil Johnson, an Alaska state trooper working in Nome, knew James Carter and police chief Minnix through their police work. (Ex. 82 at 1.) Johnson "knew that James and Esther Carter were drinkers," and while he did not socialize with them, he noted that Minnix's wife drank with Esther Carter. (Id.) Johnson stated that "Chief Minnix told me many times that Esther and James Carter chained the boys (Jerry and Dean) to the bed when the went out drinking and when they went to work," and stated that Minnix is a "righteous man and therefore I knew he was telling me the truth about the Carter boys." (Id. at 1-2.) Johnson stated that "I only saw Dean Carter a few times but I always thought there was something wrong with the boy; he was different." (Id.)

Guy Martin, who worked as an officer on the Nome police force in the 1960's alongside James Carter, stated that Carter "was known to be a drinker and had all the characteristics of a heavy drinker." (Ex. 84 at 2.) Martin stated that he once responded to a daytime off-duty call from Sophie Swanson regarding noise from the Carter home next door to her, as Ms. Swanson suspected abuse. (Id.) Martin states that he knocked at the residence, and receiving no response, entered and found, "Dean and Jerry chained

---

[13] It is unclear whether the reference to Ms. Gelzer's prior meeting with a defense investigator includes merely a typographical error or whether Ms. Gelzer met with an investigator other than Pasas, as Ms. Pasas is female.

to the floor, like the Count of Monte Cristo.  Next to the boys, I found a bowl with water."  (Id. at 2-3.)  Martin stated that they "had been crying" and Dean was more upset than Jerry; Martin then went to the police department to confront James Carter, who told him to "mind my own business or else."  (Id. at 3.)  Ms. Swanson informed Martin that the chaining had gone on a long time, and suspected that it also happened when the Carters went out drinking.  (Id.)  Before Martin left the police department he told Carter "that he better take care of it or I would," but never reported the incident, which he now regrets.  (Id. at 3-4.)  Martin added that when defense team members came to Nome to investigate Petitioner's case, "Esther Carter asked me not to say anything to them and specifically asked me not to tell them about the abuse" and he "respected her wishes."  (Id. at 4.)

Cheryl Stavish, a friend of Petitioner's sister Pollyanne, stated that on one visit to the Carter house, she discovered a "hidden" room accessible from Polly and Goldie's room.  (Ex. 87 at 1.)  Stavish stated that "[t]he room was the size of a small jail cell" and contained "only an army-type bed" and one window "which was small, had bars on it."  (Id. at 2.)  She stated, "I had a feeling this is where Dean was kept," and when she asked about it, Polly said, "[w]e are not supposed to look in there."  (Id.)  Stavish also described an incident that occurred one summer when she spent time at the Johnsons' family cabin, stating that it was raining, and "I saw Dean handcuffed and shackled by the ankles to the outside stilts of the Carter cabin.  Dean was wet, cold, and hungry. From the look of him, Dean must have been chained to the cabin for hours and hours." (Id. at 3.)  When she and Mr. Johnson went to check on Petitioner, "Dean told Mr. Johnson that Jim Carter had chained Dean to the cabin."  (Id. at 3.)  Stavish indicated that days would go by when she did not see Petitioner, and when she asked about him, the Carter children replied, "Dean was a bad boy."  (Id. at 4.)  Stavish stated that it was "common knowledge" that Petitioner ran away from home often, and believed, but did not have proof, that Jim Carter beat Esther, as she saw "bruises, a black eye, and broken glasses" on Esther.  (Id. at 4.)  She opined that Jim Carter favored Jerry and referred to

Petitioner as "that bastard," and also stated that Pollyanne Carter informed her that "although she did not see anything, she used to hear Jim beating/whipping Dean through the thin walls separating their rooms." (Id. at 4-5.) She explained that "I met with investigator Casey Cohen in May of 1987. I told him about the incident in which Dean was chained to the summer cabin, how Dean was kept in a room that looked like a jail cell, and that everyone in Nome knew about Dean's abuse at the hands of Jim Carter." (Id. at 5.)

Kenneth Brown, who authored a 1971 juvenile probation report on Petitioner stemming from a 1970 burglary charge, wrote that Petitioner's mother and stepfather felt that he was "born a bad egg." (Ex. 6 at 1.) Brown concluded that Petitioner's home situation was "obviously very poor," as he "never received the attention and affection that a young boy should" and that James Carter "evidently resented the boy to some extent because he was illegitimate." (Id.) Brown noted that the Carters would "leave him chained to a bed post so they could go out socializing," and that Petitioner's mother "feels that Dean is a failure and prefers to give her attentions to Jerry." (Id.) Brown recommended that Petitioner be removed from the home and placed in foster care, a situation to which Petitioner was "amenable." (Id.)

Petitioner has also submitted an EPA report which discussed elevated levels of toxic chemicals found at Steadman Field in Petitioner's hometown of Nome, Alaska, an area where the town's children played. The Weston Report, issued in 1987, discusses high concentrations of arsenic and mercury, which presented an "increased lifetime cancer risk" and "an elevated risk of toxicity" to children who played in the field. (Ex. 38 at 85-86.) Additionally, the report added that "acute and chronic exposure to elevated concentrations of arsenic may lead to a variety of health problems including gastrointestinal tract damage, tremors, other nervous system disorders, gangrene of the extremities (blackfoot disease), psychosis and teratogenesis (birth disorders)." (Id. at 86.) The report noted while that mining of gold deposits had taken place in the area since 1899 and mining operations had been consolidated in the 1920's,

the EPA first conducted preliminary investigations in 1981. (Id. at 2-4.) Lela Oman, a Nome resident who took in a teenaged Esther Carter for a brief time, stated that at the time of Petitioner's birth and early childhood, Esther Carter and her family lived within one-quarter mile of Steadman Field, and the area children would play on that field. (Ex. 52 at 2-3.)

Petitioner has also submitted a number of reports and evaluations conducted post-conviction in addition to declarations offering limited information about trial counsel's penalty phase preparations. Psychologist Dr. Mindy Rosenberg, Ph.D. was retained by post-conviction counsel to identify factors impacting Petitioner's childhood development and to render an opinion as to potential mitigation themes that could have been developed at trial. After interviewing Petitioner and reviewing case materials including the penalty phase proceedings, declarations, Petitioner's social history records and mental health evaluations, Dr. Rosenberg concluded as follows:

> Dean Carter suffered pervasive child maltreatment beginning in early childhood and continuing through adolescence. This maltreatment included neglect, physical abuse, and psychological maltreatment in the forms of terrorizing, spurning, isolating, and corrupting. Exposure to these sustained and repetitive traumas in combination with other risk factors, such as prenatal alcohol exposure, a unique cultural and environmental background, ethnic discrimination and rejection, community and institutional failures, including multiple out-of-home placements without treatment, and substance abuse, contributed to serious impairments in psychological functioning, including problems with behavior and emotional regulation, interpersonal relationships, problem solving, and issues of self worth. These factors formed the psychological context from which to view Dean's adult functioning and behavior.
>
> Inclusion of the mitigation themes described above, and all the information that was gathered from Dean's family and background, would have presented a complete and integrated picture of his life to the jury. The jury would have then been able to understand what occurred to Dean throughout his early and later childhood and adolescence, and how he was shaped by a multitude of factors.

(Ex. 73 at 57-58.)

Paralegal Kathleen Gilberd, who assisted lead counsel Bumer in arranging a PET scan of Petitioner in May and June 1991 and helped to locate Dr. Buchsbaum to interpret the results of the scan, states that "[t]o the best of my memory, I did not

provide Dr. Buchsbaum with any documentation regarding petitioner's social or medical history, and to the best of my knowledge no such documentation or information was provided to Dr. Buchsbaum." (Ex. 61 at 3.) Ms. Gilberd opines that had the tests been conducted earlier, and had the defense team been aware of Petitioner's exposure to neurotoxins, she believes they would have conducted additional investigation and testing, and states that "we would have seriously considered how to utilize the information in both the guilt and penalty phases." (Id.)

Dr. Adrian Raine, who was associated with Dr. Buchsbaum, acknowledges that Petitioner was one of the subjects included in an experimental PET brain scan study conducted in 1990's. (Ex. 57.) Dr. Raine reviewed Petitioner's PET scan and raw data, Dr. Buchsbaum's testimony, as well as other test results and life history documents provided by habeas counsel, and opined that Petitioner's PET scan "depicts significantly abnormal brain functioning," showing reduced functioning in certain areas and increased functioning in others. (Id. at 8.) Based on the scan and other reviewed materials, Dr. Raine concluded that:

> [P]etitioner's ability to think, reason, problem solve, control his emotions and impulses, would be significantly compromised by these brain dysfunctions. When risk factors, such as prenatal and birth complications, childhood abuse and neglect, head traumas, exposure to neurotoxins, such as mercury, are additionally present, these combined factors may particularly contribute to brain dysfunction and abnormalities consistent with those depicted in the petitioner's PET scan.

(Id. at 9.)

Clinical psychologist Dr. Myla Young, Ph.D met with and conducted tests on Petitioner in 1998 and 1999, and found that Petitioner's "overall intellectual functioning is in the *High Average-Superior Range*," stating that "[t]his means Dean has the biological capacity for intellectual accomplishment." (Ex. 59 at 6.) (emphasis in original). As for his neuropsychological performance, Dr. Young found that Petitioner "demonstrates impaired 1) attention, 2) verbal memory, 3) arithmetic, and 4) complex psychomotor functioning." (Id. at 7.) After reviewing provided information regarding Petitioner's social history, PET scans and prior evaluations, Dr. Young concluded as

follows:

> In summary, and based upon the foregoing, it is my opinion that it is probable Dean Carter has had long-term neurological deficits and diffuse brain dysfunction, and it is also probable that he suffers impaired functioning of anterior brain regions and experiences frontal lobe impairment.  Precise etiology of this impairment, at this time, is not known.  Information that I have gained from the previously described documents, however, suggests that some combination of prenatal exposure to neurotoxins, childhood/adolescent exposure to neurotoxins, drug abuse, multiple head traumas, and persistent childhood rejection and abuse combine to explain Dean's brain impairment.

(Id. at 10.)

Physician Dr. David Foster, M.D., who has a specialty in neuropsychiatry, performed an evaluation and reviewed records pertaining to Petitioner's medical, developmental, and social history, as well as the PET scan and prior evaluations, concluding that Petitioner "has brain damage to those parts of his brain needed for the executive functions of insight, judgment and impulse control in actual situations." (Ex. 70 at 37.)  Dr. Foster states that such individuals, particularly under stress or under the influence of drugs or alcohol, "are more like sleep walkers reacting to unconscious or emotionally triggered impulses and not guided by conscious and rational decision making processes."  (Id.)  Dr. Foster states that Petitioner "has been intermittently delusional" and that such psychotic thinking "would further compromise his decision making."  (Id. at 38.)  Dr. Foster concludes that "[i]t can be stated with medical certainty that Mr. Carter's neurological and psychiatric problems are long standing and were present during the time frame of the crimes for which he is convicted and sentenced to death."  (Id.)

Dr. Natalie Novick Brown, Ph.D., who specializes in the evaluation and treatment of individuals with fetal alcohol impairment, premised her opinion by explaining that the diagnostic criteria for Fetal Alcohol Syndrome ["FAS" or "FASD"] included: "1) pre- and/or post-natal growth deficiency, 2) a characteristic set of facial abnormalities (referred to as "facial dysmorphology"), and 3) a central nervous system (CNS) dysfunction." (Ex. 72 at 3.) Dr. Brown explained that this "triad of criteria must be met

for a diagnosis of FAS," while a fourth criterion, prenatal alcohol exposure, was not necessary to confirm that diagnosis if the other three criteria had been satisfied. (Id. at 5.) Dr. Brown stated that the original diagnostic criteria was developed in 1973 and by the time of Petitioner's San Diego trial in 1991, "the condition was definitely not a new or novel concept in medicine or psychology." (Id. at 7.)

In Petitioner's case, Brown explains that there is evidence of prenatal alcohol exposure, through statements made by Lilly Rose, who witnessed Petitioner's mother consuming alcohol while pregnant. (Id. at 15-16.) With respect to the first prong, "growth deficiency," Brown explained that in Petitioner's case, "none of the records I reviewed included his height or weight. Confirmation of growth deficiency falls within the diagnostic domain of a medical doctor if such records can be located." (Id. at 17.) With respect to the second prong, "facial dysmorphology," Brown states that "childhood photos indicate the possibility of FAS facial abnormalities," but notes that "confirmation of facial dysmorphology is the domain of a medical doctor trained in this area." (Id. at 16.) With respect to the third prong, central nervous system dysfunction, Brown states that numerous records and tests indicate that Petitioner suffers from brain abnormalities, had developmental difficulties as a child, including ADHD and social skill deficits, executive function deficits, motor skill deficits, and other deficits that indicate the presence of such dysfunction. (Id. at 18-25.)

Dr. Brown concluded that, "[t]o a reasonable degree of psychological certainty, data support a strong conclusion that Dean Phillip Carter meets criteria for FASD. Confirmed prenatal alcohol exposure in combination with structural, neurological, and functional CNS deficits consistent with FASD would have qualified him for a specific diagnosis of Fetal Alcohol Effects ["FAE"] in 1989 and 1991." (Id. at 25.) Dr. Brown further stated that, in her opinion, "antisocial personality disorder is ruled out as an explanatory factor in Mr. Carter's offense conduct for two reasons: the diagnosis addresses only an isolated segment of his behavior that was uncharacteristic of his functioning in his adult years, and it does not account for his lifelong functional

deficits."  (Id. at 28.)  Brown also notes that such a diagnosis is inapplicable to Petitioner because the DSM-IV indicates that when an underlying medical condition exists, other diagnoses should be excluded unless it can be proven that the condition was present without the existence of the medical condition.  (Id. at 30.)  Dr. Brown explains that "[a]s FASD is the lifelong result of the toxic effects of alcohol, it is the underlying medical condition.  An FASD condition accounts for all of Mr. Carter's behavioral history: from infancy to the present, from innocuous but odd non-criminal behaviors to significant antisocial events, and whether he was intoxicated on substances or not."  (Id. at 30.)

Brown opines that:

> [T]he research suggests that for Dean Phillip Carter's brutal aggression to have been prevented, he needed appropriate identification and intervention in childhood.  While he might have been identified as a child at risk and referred for evaluation had he been born in the 1990's, unfortunately he was born too early to be detected in routine screening by medical or school personnel and referred for medical evaluation.  Thus, it was the timing of his birth that prevented him from being diagnosed and treated as a child for FASD.  Had he received appropriate treatment for his primary disabilities in childhood, it is highly likely that his secondary disability would have been more manageable and less extreme, if they had developed at all.

(Id. at 35-36.)

Dr. Richard Adler, a psychiatrist, conducted an interview and exam on Petitioner in 2009, and reviewed the declarations of Dr. Novick-Brown, Dr. Connor, Petitioner's childhood photos, declarations from Nome individuals including Esther Carter, and the penalty phase testimony of Bertha Adsuna, Jerry Carter and Polly Carter.  (Ex. 102.)  Dr. Adler states that "As explained in detail in my report, it is my professional opinion that Mr. Carter suffers from Partial Fetal Alcohol Syndrome ["PFAS"].  If asked in 1989 to 1991 to conduct a similar evaluation, I would have made the equivalent diagnosis that I am making now."  (Id. at 1.)  Dr. Adler reviewed the criteria for the PFAS diagnosis, noting that the declaration of Lilly Rose confirmed maternal alcohol exposure, that his review of childhood photos confirmed evidence of facial abnormalities, and that Petitioner "abundantly" met the criteria for cognitive

abnormalities.  (Id. at 15-16.)  Dr. Adler explained that a diagnosis of PFAS (also
preivously known as Fetal Alcohol Effects) did not include growth deficits as a criteria.
(Id. at 17.)  Dr. Adler also stated that he diagnosed Petitioner with PFAS as opposed to
FAS because Petitioner "has two, but not all three of the facial stigmata of FAS."  (Id.
at 17.)  However, Dr. Adler noted that "it should be emphasized that the diagnosis of
FAS versus the diagnosis of Partial FAS appears to be 'a distinction without a
difference' when it comes to the level of functional impairment and life outcomes for
the affected individual."  (Id. at 17.)

Dr. Paul Connor, a clinical psychologist who specializes in fetal alcohol research,
reviewed Petitioner's past psychiatric evaluations, medical and school records and other
reports.  (Ex. 103.)  Based on his own evaluation of Petitioner and review of records,
Dr. Connor states,"it is my opinion, to which I hold to a reasonable degree of medical
certainty, that Mr. Carter evidences a complex pattern or behavior of cognitive
abnormalities that are inconsistent with developmental level and cannot be explained
by familial background or environment *alone*."  (Id. at 4) (emphasis in original).  Dr.
Connor opines that "a diagnosis on the fetal alcohol spectrum disorder is warranted in
Mr. Carter's case," and explained that "research on the neuropsychological effects of
Fetal Alcohol Syndrome was still being undertaken in the late 1980s [sic] and 1990s
[sic] and was focused primarily in children, so information would have needed to be
extrapolated to adults at that time.  Despite this, with information about prenatal alcohol
exposure, demonstration of physical anomalies related to FAS, and neuropsychological
deficits, this diagnosis could have been made during Mr. Carter's prior trials."  (Id. at
24-25.)

Petitioner has also submitted two declarations, from Los Angeles and San Diego
second chair trial counsel, alleging that the *Los Angeles* lead counsel's trial preparation
and presentation, particularly with respect to the penalty phase proceedings, was
deficient.  (See Ex. 75- Declaration of Marcia Morrissey; Ex. 107- Declaration of
Josephine Dedina.)  Los Angeles lead counsel Howard Gillingham also submitted a

declaration, in which he concedes his failure to investigate and present several avenues of penalty phase evidence with respect to the Los Angeles proceedings. (See Ex. 90.)

**3. Legal Standard**

To prevail on a claim alleging ineffective assistance of counsel, a petitioner must demonstrate (1) that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that "the deficient performance prejudiced the defense." Campbell v. Wood, 18 F.3d 662, 673 (9th Cir. 1995), quoting Strickland, 466 U.S. at 687.

To establish deficient performance, the petitioner must demonstrate that the representation he received "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Moreover, due to the difficulties inherent in evaluating the contested behavior from counsel's perspective at the time, there exists a strong presumption that counsel's conduct "falls within the wide range of reasonable professional assistance." Id. at 689. Thus, a petitioner must overcome the presumption that the challenged action might be considered sound trial strategy. Id. at 689.

To establish prejudice, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In addition, individual deficiencies that may not by themselves meet the Strickland prejudice standard may, when considered cumulatively, constitute sufficient prejudice to justify granting the writ. Harris v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995).

The process of determining penalty phase prejudice requires courts to "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation." Williams (Terry) v. Taylor, 529 U.S. 362, 397-98 (2000). A court "must carefully weigh the mitigating evidence (both that which was introduced and that which was omitted or understated) against the aggravating evidence," and then determine

whether there is a reasonable probability that the sentencer "would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Mayfield v. Woodford, 270 F.3d 915, 928 (9th Cir. 2001), quoting Strickland, 466 U.S. at 695.

In evaluating a claim of ineffective assistance of counsel on federal habeas,"[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Richter, 131 S. Ct. at 785. Additionally, "[f]ederal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 788.

///

///

**4. Merits- Counsel's Performance**

As stated above, a reviewing court's scrutiny of trial counsels' performance is highly deferential, as "[t]he Court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

**a. Failure to Investigate Evidence in Aggravation and Mitigation**

In the Second Amended Petition, Petitioner generally alleges that trial counsel failed to investigate evidence in mitigation, but specific allegations concerning counsel's alleged failure to prepare and present Petitioner's background, social history, and evidence of mental impairments are detailed in later sections of the Petition and other pleadings. In accordance, the Court will address these specific allegations below. (See section C.3.d. and C.3.e., infra.)

Petitioner also generally contends that trial counsel failed to adequately investigate the State's case in aggravation. (SAP at 131.) Petitioner specifically faults the performance of counsel, who referred to Petitioner's past criminal record but

"provided no expert testimony or cogent explanation of the impact of this institutionalization on Mr. Carter." (Id.) However, a review of the trial record reveals that trial counsel procured, and attempted to introduce, the testimony of James W. L. Park regarding prison conditions and Petitioner's anticipated adjustment to incarceration. (See Claim 10, infra.) In light of the trial court's ruling regarding the permissible cross-examination of Mr. Park, Petitioner fails to even allege, much less attempt to demonstrate, that counsel's decision not to present Park's testimony constituted ineffective assistance. Petitioner's unsupported allegations in this regard do not merit relief. See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.")

///

///

**b. San Diego and Los Angeles Defense Teams and Trial Presentations**

Petitioner was charged with, and tried for, capital murder in both Los Angeles and San Diego Counties, and the Los Angeles and San Diego defense teams worked on his cases during overlapping time frames. While the charges differed in each jurisdiction, the Los Angeles crimes were admitted as other crimes evidence at the San Diego trial (and the San Diego crimes were similarly admitted at the Los Angeles trial), so each trial team was ostensibly investigating similar matters, particularly with respect to potential penalty phase proceedings. Petitioner alleges that "[r]ather than benefitting from the appointment of four attorneys and multiple investigators, competition and distrust between the San Diego and Los Angeles lawyers directly interfered with the ability of either team to investigate Mr. Carter's case." (SAP at 128.)

Declarations from members of Petitioner's San Diego trial defense indicate that there was friction between the Los Angeles and San Diego defense teams. For instance, Kathleen Gilberd, a paralegal to lead counsel Ted Bumer (who is deceased), states that

she attended joint meetings with San Diego and Los Angeles counsel and personnel, and opined that "relations between the Los Angeles and San Diego attorneys and support staffs were tense, rather than collaborative or collegial. I believe these relations were detrimental to petitioner's interests." (Ex. 108 at 2-3.)[14] Second chair counsel Josephine Dedina similarly recalls "strained relations" between the Los Angeles and San Diego defense teams, especially between Los Angeles lead counsel Gillingham and San Diego lead counsel Bumer. (Ex. 107 at p. 2.)[15] Ms. Dedina characterized the relationship between the two defense teams as "competitive and suspicious, rather than trustworthy." (Id.)

San Diego defense investigator Marion Pasas "often observed tension and strain between the Los Angeles and San Diego defense attorneys," and stated that the Los Angeles team created a "competitive atmosphere, as opposed to a collaborative effort, and they were suspicious rather than trustworthy." (Ex. 74 at 1.) Pasas asserts that this atmosphere hampered penalty phase preparation. For example, Pasas states that because San Diego counsel Bumer disagreed with Los Angeles counsel Gillingham's

---

[14] Exhibit 108 appears to have been submitted in support of Petitioner's first state habeas action regarding his Los Angeles convictions, rather than his San Diego case, but in filing his second state habeas petition on his San Diego convictions, Petitioner stated that the claims in that petition were based on all prior records and appeal, and specifically requested that the California Supreme Court take judicial notice of the "entire record" from both the prior Los Angeles and San Diego direct appeal and state habeas actions. (See Supp. Lodgment No. 1 at 34.) Moreover, as the California Supreme Court appears to have considered and adjudicated the San Diego and Los Angeles cases together at all stages of the post-conviction proceedings (the Los Angeles and San Diego direct appeal opinions were both issued on August 15, 2005, each first state habeas petition was adjudicated on June 28, 2006, and later, the second state habeas petitions, as well as the third state habeas petition on the San Diego convictions, were each adjudicated on June 17, 2010), it is apparent that exhibits in this posture were before the state court at the time the claim was adjudicated, and may be considered by this Court in evaluating this claim under § 2254(d). See Pinholster, 131 S.Ct. at 1398 (A habeas court's review pursuant to § 2254(d) "is limited to the record that was before the state court.")

[15] Exhibit 107 appears to have been submitted in support of Petitioner's first state habeas action regarding his Los Angeles convictions. Accordingly, as discussed in footnote 5, it is apparent that this exhibit was part of the record before the state court at the time the claim was adjudicated, and may be considered by this Court in evaluating this claim under § 2254(d). See Pinholster, 131 S.Ct. at 1398 (A habeas court's review pursuant to § 2254(d) "is limited to the record that was before the state court.")

decision not to put on a guilt phase defense and distrusted the quality of Gillingham's mitigation investigation, Bumer sent Ms. Pasas to Alaska ahead of the Los Angeles team.  Pasas notes that at the time of the Alaska trip she had only been on the case a short time and knew little of the case, that Petitioner had not yet begun to trust her, and as a result was not properly prepared.  Pasas states that "[d]ue to my lack of preparation, my meeting with Esther Carter was unsuccessful" and "[a]s a result of my inability to successfully interview Esther Carter, the rest of my Nome investigation was thwarted.  Certain witnesses told me that they would not speak with me regarding the Carter family without Esther's permission, which, after our disastrous initial encounter, I could not get."  (Ex. 74 at 3.)

As stated above, Esther Carter was interviewed before trial, but felt that the defense team "were judgemental [sic] of me and critical of my son Dean," and it appeared they were "against my son instead of trying to help him," and did not cooperate with their efforts.  (Ex. 77 at 5.)  Esther states that "[h]ad I been approached differently and had I believed that I could help my son, I probably would have testified about the facts contained in this declaration.  And would have also talked to them and answered all of their questions."  (Id.)  Yet, a review of her declaration reveals only that she presently describes incidents of abuse similar to that which was presented at the penalty phase proceedings through the testimony of Jerry Carter and Pollyanne (Carter) Reasner.   Moreover, Ms. Carter at best indicates that had she been approached "differently," she "probably" would have cooperated with Petitioner's defense team and testified on his behalf.  Given that counsel made attempts to interview Ms. Carter by sending an investigator to Alaska, it is difficult to conclude that their actions constituted deficient performance simply because they may have acted slightly in haste.  Additionally, while Ms. Pasas states that "certain witnesses" would not speak to her without Mrs. Carter's permission, the record fails to support her assertion that the Nome investigation was "thwarted" due to the unsuccessful interview of Esther Carter.  In particular, it is clear that the defense's penalty phase presentation included testimony

from at least six former or current (at the time of trial) residents of Nome, including Petitioner's brother, sister, Eskimo elder Bertha Adsuna, missionary Harriet Brown, former classmate Ruth Butts, and classmate Beth Farley, who was friends with Esther Carter.

As such, even were the Court to agree that counsel's performance was deficient in conducting the interview of Esther Carter in an allegedly hurried fashion, Petitioner fails to offer persuasive evidence of prejudice, as discussed below. See Strickland, 466 U.S. at 697 (A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.")

Petitioner also contends that San Diego trial counsel "failed to reevaluate its approach in light of the Los Angeles loss" at trial, and specifically argues that "[t]rial counsels' decision to proceed with the same witnesses presented in Los Angeles was objectively unreasonable," particularly the decision to call Petitioner's brother Jerry Carter, who gave "misleading testimony" and "minimize[d]" the abuse Petitioner suffered.[16] (SAP at 132-33.)

A review of the trial record reveals that Jerry Carter provided penalty phase testimony regarding his mother and step-father's frequent drinking and violent arguments, excessive discipline towards the children, and that Petitioner ran away from home on several occasions to escape the situation. (RT 7436-45.) Jerry Carter related an incident where Petitioner attempted to stop their mother from going to the bar by holding onto the bumper of the car and receiving cuts and abrasions on his feet, yet failing to deter her from leaving that evening. (RT 7449-51.) Jerry also testified that his parents once chained Petitioner for a day or two to keep him from running away.

---

[16] In support of this contention, Petitioner also cites the deposition of Josephine Dedina (Ex. A to Motion for Evidentiary Hearing) and two 1990 memos by San Diego trial counsel analyzing the trial approach in Los Angeles and discussing things learned from conducting interviews of the Los Angeles jury members (Exs. Q and R). As discussed above, because these exhibits were not previously submitted to the California Supreme Court, they may not be considered by this Court in evaluating Petitioner's claim under § 2254. See Pinholster, 131 S.Ct. at 1398.

(RT 7452.)

While several of the submitted declarations appear to indicate that Petitioner was chained on multiple occasions and that Jerry Carter's testimony could have been expanded, this Court's review is deferential, both to the determination of the state supreme court and to the discretion of trial counsel. The Supreme Court directs that "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Richter, 131 S. Ct. at 785. Here, clearly, the state court's application of Strickland was in fact reasonable.

Under Strickland, a reviewing court must indulge the strong presumption that counsel's conduct "falls within the wide range of reasonable professional assistance." Id., 466 U.S. at 689. It is clear from the declaration of trial investigator Marion Pasas that San Diego counsel undertook an investigation into Petitioner's background, sending Ms. Pasas to Alaska to interview Petitioner's friends and family members. (See Ex. 74.) "It is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable." Strickland, 466 U.S. at 689. In particular, Jerry Carter, whose testimony Petitioner now criticizes, was, as Petitioner's older brother, in the best position to provide testimony about their childhood and upbringing, and counsel's decision to call him to testify was reasonable. "There are countless ways to provide effective assistance in any given case." Strickland, 466 U.S. at 689. Here, despite the fact that the Los Angeles penalty phase strategy proved unsuccessful, Petitioner fails to demonstrate that trial counsel's decision to call many of the same witnesses at the San Diego proceedings, which included Petitioner's siblings, friends, co-workers, and former employers, fell outside the range of reasonable professional assistance. In any event, even if counsel's performance was deficient in one or more respects, as discussed below, Petitioner did not suffer prejudice.

**c. Preparation and Presentation of Petitioner's Background**

Petitioner contends that trial counsel was ineffective for failing to "present the full-extent of Mr. Carter's childhood abuse," and for failing to present "expert testimony synthesizing the lay witness testimony or explaining its impact on Mr. Carter." (SAP at 134.) Petitioner contends that due to counsel's failings, "[t]he final penalty phase presentation was no more than a partial and inaccurate glimpse of Mr. Carter's early childhood and adolescence." (Id.) Specifically, Petitioner asserts that trial counsel's penalty phase presentation failed to:  (1) accurately represent the childhood abuse and mistreatment suffered; (2) present evidence of Petitioner's developmental issues; (3) inform the jury of the community's failure to help Petitioner; (4) explain the impact of institutionalization on Petitioner; (5) accurately portray the socio-economic environment in which Petitioner was raised; (6) explain the family history of alcoholism and mental illness; (7) explain Petitioner's substance abuse in the context of his brain dysfunction and mental illness; and (8) properly represent Petitioner's brief period of success in context.  (SAP at 134-47.)

As noted above, Petitioner has submitted a number of declarations obtained after trial that offer greater detail about Petitioner's troubled childhood, including the abuse and mistreatment he suffered at the hands of his alcoholic parents, the harsh and discriminatory environment of Nome, Alaska, as well as observations about his developmental difficulties.  A review of the trial record reflects that several of these subjects were addressed at trial.  Petitioner concedes this fact, claiming not that counsel failed to present this information entirely, instead asserting that counsel's presentation of the potentially mitigating factors was incomplete.  However, "the relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." Siripongs v. Calderon, 133 F.3d 732, 736 (9th Cir. 1998).  Given the state court's silent denial of this claim, AEDPA demands that this Court "determine what arguments or theories supported or, as here, could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are

inconsistent with the holding in a prior decision of this Court." Richter, 131 S. Ct. at 786.

The trial record reflects that defense counsel presented testimony from over twenty separate witnesses at the penalty phase. Among these witnesses were brother Jerry Carter and sister Pollyanne Reasner, who provided details about Petitioner's childhood and upbringing in Nome, Alaska, which included alcoholic parents and domestic violence. Jerry Carter described the physical abuse he and Petitioner suffered at the hands of their parents, including beatings with a razor strap, belt, or branch. Jerry added that Petitioner had run away from home a number of times, and that their parents had on one occasion chained Petitioner to a bed in order to prevent him from running away. Long-time residents of Nome, including Bertha Adsuna and Harriet Brown, observed Petitioner's unfavorable treatment by his parents in comparison to his siblings, including his shabby dress and loneliness. Several other individuals testified about the prejudicial attitudes existing in Alaska with respect to mixed race individuals such as Petitioner, and the extreme alcoholism rampant in the Nome area.

A number of individuals who came into contact with Petitioner through both the youth and adult correctional system testified that Petitioner was not a management problem, and noted his later interest in video work. Former employers, associates, and co-workers testified about Petitioner's video production and camera work, his skill and dedication to that largely self-taught craft, and one spoke of him having saved the lives of several individuals from a house fire. Petitioner's friends, relatives and acquaintances explained that the 1982-83 proceedings regarding his divorce, child support and custody, and subsequent separation from his children rendered Petitioner depressed and escalated his use of alcohol and drugs in the months before the crimes. Petitioner's friend and former co-worker Robert Jenkins, in particular, observed that Petitioner's life appeared to be "controlled" by drugs after his divorce and just before the time of the crimes, and that Petitioner sounded "paranoid" and "fearful" during several late night phone conversations. (RT 8050-63.)

In closing, defense counsel emphasized Petitioner's childhood, that Petitioner had been chained by his parents as a child, suffered beatings, and witnessed alcohol use, abuse, and violence between his mother and step-father.  Counsel argued that "[t]he fact that Dean Carter had a bad childhood; that he had alcoholic parents; that he was abused; that he was neglected; he came from what is now called a disfunctional [sic] family, may help to explain why these things happen had [sic]."  (RT 8665.)  Counsel agreed that Petitioner had been treated, and turned out, differently than his sibling Jerry, who escaped their home life into sports, or Polly, who escaped into the church and marriage to a pastor.  (RT 8669; 8684.)  Instead, Petitioner attempted, unsuccessfully, to run away at a young age, and later encountered legal troubles.  (Id.)  Counsel closed with a plea for the jury to "[r]emember the little boy in Nome abused, neglected, alcoholic parents.  The little boy who was crying out for warmth and affection."  (Id.)

Petitioner's contention that defense counsel's penalty phase investigation "underdeveloped and misrepresented" his background appears to be largely predicated on the number of witnesses that have now been procured by post-conviction counsel to offer additional information or observations regarding Petitioner's childhood, background, and upbringing.  "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'"  Wiggins v. Smith, 539 U.S. 510, 523 (2003), quoting Strickland, 466 U.S. at 688-89 (internal citation omitted).

It is clear that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."  Boyde v. California, 494 U.S. 370, 380 (1990).  In this case, an examination of the proffered witness statements, and the information contained in those statements, reveals

that much of the background and character testimony is largely cumulative to evidence that was introduced during the San Diego penalty phase proceedings.  See Wong v. Belmontes, 558 U.S. 15, __, 130 S.Ct. 383, 388 (2009) (trial counsel is not required to present cumulative mitigating evidence).

As an ancillary matter, several statements are largely hearsay, and those witnesses could not have properly been called to testify on those subjects.  For instance, the declaration of Robbie Fagerstrom includes his statement that it was "common knowledge" that the Carters were drinkers and "well known that they locked up their kids." (Ex. 79.)  Catherine Dickson relates that "the word in town" was that Mr. Carter was abusive towards Petitioner and Jerry Carter.  (Ex. 78.)  Cecil Johnson states that Nome Police Chief Larry Minnix "told me many times" that the Carters chained the boys when they went out drinking.  (Ex. 82.)  Polly Carter's friend Cheryl Stavish stated that Ms. Carter told her about hearing Petitioner being beaten, and Stavish evidently found a closet in the Carter home, of which she "had a feeling" that was where Petitioner was kept.  (Ex. 87.)  Petitioner presents such evidence as an "offer of proof" as to evidence he could introduce after investigation and discovery.  (SAP at 61.)  In any event, even these hearsay statements appear to concern subjects that were already introduced at the penalty phase proceedings.  Witnesses testified about the drinking habits of Petitioner's parents, that Petitioner had been chained, and that Carter children were neglected.  As such, Petitioner fails to demonstrate that counsel's failure to procure these witnesses constituted deficient performance.

Petitioner also contends that counsel's failure to introduce evidence of his developmental difficulties, including his head injuries, mental slowness, and the extent of his mother's alcoholism, constituted prejudicially deficient performance.  As discussed above, his mother's use, and abuse, of alcohol was introduced at the penalty phase proceedings.  What was not introduced was evidence that his mother ingested alcohol while pregnant with Petitioner.

The state record does not clearly show that trial counsel was aware that

Petitioner's mother drank alcohol when pregnant.  Lilly Rose stated that Esther Carter consumed alcohol when pregnant with Petitioner, yet Ms. Rose indicated that"I have never been interviewed by anyone regarding Dean Carter in the past."  (Ex. 86 at 3.)  Esther Carter, who also submitted a declaration in support of the federal Petition, does not admit to drinking when pregnant with Petitioner.  It is clear from the record that trial counsel was aware of, and presented at trial, evidence indicating Esther Carter had a drinking problem when Petitioner was young.  As such, even without Ms. Rose's declaration, Petitioner's point is well-taken that it may have been fruitful for trial counsel to have investigated the extent of his mother's drinking, and whether it included her pregnancy.  On the other hand, this Court's inquiry is necessarily deferential and limited, and must "address not what is prudent or appropriate, but only what is constitutionally compelled."  United States v. Cronic, 466 U.S. 648, 665 n. 38 (1984).  Here, there is a "reasonable argument that counsel satisfied Strickland's deferential standard" by investigating and presenting a penalty phase narrative including evidence of Petitioner's childhood abuse, his parents' alcoholism and violence, and his own descent into drug and alcohol abuse after his divorce.  Richter, 131 S.Ct. at 788.  Alternately, even were the Court to conclude that counsel's performance was deficient in failing to investigate these areas, Petitioner must demonstrate that the state court's rejection of his ineffective assistance claim was objectively unreasonable, and that he can demonstrate both deficient performance and prejudice.  As explained below in the prejudice discussion, Petitioner has not done so.

Petitioner also contends that counsel should have investigated his family history of alcoholism and mental illness, alleging that Petitioner's maternal grandmother suffered from alcoholism and "unspecified mental problems," and that James Carter, Petitioner's step-father, was "condescending towards native[]" Alaskans, was a heavy drinker, and was abusive towards his wife and children.  (SAP at 143-44.)  With respect to Mr. Carter, both Jerry Carter and Polly Reasner testified about their parents' drinking habits, violent altercations, and incidents of abuse.  With respect to Petitioner's

extended family history, while this information may have proven useful, again, the Court's deferential review of counsel's performance does not compel a conclusion that the failure to investigate or present this information at trial constituted deficient performance.  See Bobby v. Van Hook, 558 U.S. 4, 19 (2009) ("[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties.")  Counsel's decision to present the information they had already discovered, and to cease searching for additional, more distant information, falls "well within the range of reasonably professional judgments."  Strickland, 466 U.S. at 699.

Defense counsel began the penalty phase investigation years before trial, and sought information, albeit not always successfully, from Petitioner's family members, friends, co-workers, correctional counselors, and townspeople in Nome, including his Sunday School teacher, an Eskimo elder, and Petitioner's childhood schoolmates.  (See e.g. Ex. 74- Investigator Marion Pasas, who was retained in June 1986 to assist in investigating and preparing Petitioner's San Diego case, stated that "shortly after I was hired" she was tasked with travel to Alaska "to interview potential penalty phase witnesses," and that she worked on the case through the 1991 trial).  Moreover, in contrast to cases in which defense counsel's performance was found to be deficient, Petitioner's trial counsel called numerous individuals to testify at the penalty phase. See e.g. Porter v. McCollum, 558 U.S. 30, __, 130 S.Ct. 447, 449 (2009) (Despite available evidence concerning the defendant's mental health, military service, and that he suffered abuse as a child, "[t]he defense put on only one witness, Porter's ex-wife, and read an excerpt from a deposition.  The sum total of the mitigating evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son."); see also Wiggins, 539 U.S. at 515 (counsel introduced evidence that someone other than the defendant committed the murder and talked of introducing information on the petitioner's background during opening statements to the jury, but provided "no evidence of Wiggins' life history" at

the penalty phase).

Petitioner also contends that trial counsel was deficient for failing to present evidence concerning the Nome community's knowledge of, and failure to help, Petitioner in the face of the abuse. The only conceivable mitigating factor such evidence could arguably pertain to is factor (k), which reads: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Cal. Penal Code § 190.3(k). In this case, even assuming such evidence would have been relevant and admissible in mitigation, the Court remains unpersuaded that the failure to present such evidence resulted from deficient performance. While evidence about the Nome community's failure to help Petitioner was not presented, counsel did present evidence about the general dysfunctional nature of that community, including the rampant alcoholism, high rate of depression and suicide, and pervasive prejudice against people of mixed race. In any event, as discussed below, Petitioner fails to demonstrate prejudice resulting from the asserted deficiency.

With respect to Petitioner's contention that trial counsel performed deficiently in failing to call an expert witness to provide explanation and context regarding Petitioner's history of institutionalization, the record refutes Petitioner's contention. As discussed in greater detail in Claim 10, see infra, the trial transcripts show that defense counsel retained and attempted to call James W.L. Park to testify about Petitioner's anticipated adjustment to prison and anticipated lack of future dangerousness. (RT 8183-8202.) While the trial court held that Petitioner's status as a death row inmate would not be revealed, the judge ruled that Park, a correctional counselor and licensed clinical psychologist, could be cross-examined regarding his knowledge of Petitioner's history of violence and criminal behavior, including past psychological records and reports that Park may have reviewed in preparing for his testimony. (RT 8238-47.) Based on this ruling, defense counsel declined to call Park to testify.

Accordingly, it is evident that trial counsel did prepare and attempt to call a

witness to offer context and explanation regarding Petitioner's correctional history. Given the trial court's ruling on the allowable scope of cross-examination, this Court cannot say that counsel's ultimate decision not to call Park constituted deficient performance.  Indeed, the discussion that occurred between the parties and the trial court support a conclusion that counsel's decision not to call Park was strategic in nature.  (See RT 8241-46.)  Petitioner now disagrees with that choice, arguing that "counsel should have still presented Mr. Park's testimony, even if it left Mr. Park open to cross-examination.  Without any testimony on this point, Mr. Carter's childhood institutionalization was left unexplained."  (SAP at 142.)  "A disagreement with counsel's tactical decisions does not provide the basis for declaring that the representation was constitutionally deficient."  Raley v. Ylst, 470 F.3d 792, 799 (9th Cir. 2006).

A review of the record plainly shows that the defense called a correctional official to testify that Petitioner did not present a behavioral or discipline problem when incarcerated.  (See RT 7779-91, Testimony of A. Bertram Matsumoto.)  The defense also presented witnesses who had worked with Petitioner in a professional capacity during his incarceration, utilizing Petitioner's cameraman skills.  (See RT 7846-59, Testimony of Patty Lynn Drewery; RT 7958-65, Testimony of William Green.)

In the Motion for Evidentiary Hearing, Petitioner alleged that "[d]efense counsel planned to call Mr. Park to testify about how Mr. Carter would have adjusted to life in prison.  In contrast to the testimony Mr. Park would have provided, the testimony discussed here is testimony relating to how institutionalization had already affected Mr. Carter's development, not how Mr. Carter would be affected by institutionalization," while in the merit briefs, Petitioner cited to the declaration of Mindy Rosenberg and asserted that "counsel utterly failed to explain the actual circumstances which lead to those years of institutionalization, let alone the impact of that institutionalization on his emotional and mental health."  (Compare Mot. at 86 n. 37 with Pet. Merits Brief at 149.)  In the federal Petition, Petitioner alleged that trial counsel should have called Mr.

Park to testify despite the trial court's ruling, and contended that the failure to do so constituted ineffective assistance.  (See SAP at 142.)  Regardless of how the argument is framed, the Court remains unpersuaded that trial counsel's actions constituted deficient performance, or that the California Supreme Court's rejection of this contention was objectively unreasonable.

Similarly, the record refutes Petitioner's allegation that trial counsel failed to properly present Petitioner's socio-economic background.  First, it is clear that the defense called a number of penalty phase witnesses who testified about the harsh environment of Nome, including the remoteness of the town to other populated areas, the prejudice suffered by those who were of partial Eskimo heritage, and that alcoholism was a pervasive and detrimental issue in the area.  As detailed in the discussion of Claim 10, infra, no less than a half a dozen penalty phase witnesses, including Jerry Carter, Polly Reasner, Bertha Adsuna, Harriet Brown, Beth Farley, and Ruth Butts, each offered testimony about growing up and living in Nome, and the unique challenges and difficulties such an existence imposed.  (See Claim 10.6.b.)

Second, as also noted in the discussion of Claim 10, the trial court excluded counsel's retained expert, cultural anthropologist Dr. Ellanna, from testifying in part because her proposed testimony was "not just duplicative but cumulative" of other penalty phase testimony on the subject. (RT 7925.)  In fact, testimony about the Nome environment that had already been introduced at the penalty phase was extensive enough to provoke a sidebar discussion on whether additional testimony on the subject was "redundant."  (See RT 7687-88.)  A review of the record indicates that counsel investigated and presented substantial information about Petitioner's socio-economic background to the penalty phase jury, and procured and attempted to introduce Dr. Ellanna's testimony.  Petitioner fails to demonstrate that counsel performed deficiently in this respect, particularly given the strong presumption that counsel's conduct "falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.

Petitioner also contends that trial counsel failed to provide context and misrepresented his life history.  Petitioner specifically alleges that counsel should have connected Petitioner's use of alcohol, marijuana, and cocaine to his "lifelong history of abuse, mental impairments, exposure to neurotoxins, pre-natal abuse, and mental illness," rather than how it was presented, which was as a depressive reaction to the dissolution of his marriage and separation from his children that spiraled out of control. (SAP at 145-46.)  Separately, Petitioner contends that instead of investigating and presenting evidence of abuse, neglect, and brain damage due to fetal alcohol syndrome, "trial counsel inexplicably focused his penalty-phase presentation on a fairly narrow window of time- approximately four years during which Carter experienced a brief period of apparent success and normalcy."  (Pet. Merits Brief at 144.)

In short, Petitioner takes issue with what appears to have been the strategic decisions of trial counsel in preparing and presenting the penalty phase case.  As discussed above, "the relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."  Siripongs, 133 F.3d at 736.  It is evident that trial counsel's investigation began several years before the penalty phase proceedings and that counsel sought information from both lay and expert witnesses, including Petitioner's family members, friends, co-workers, correctional counselors, and townspeople in Nome, as well as Mr. Park and Dr. Ellanna, among others.  Given the deference with which this Court must view trial counsel's decisions, the Court cannot conclude that trial counsel's decision was unreasonable.  Strickland, 466 U.S. at 690 ("Strategic choices made after thorough investigation of the law and facts are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.")  As "the state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself," the Court cannot conclude that the state supreme court's adjudication was objectively unreasonable.  See Richter,

131 S.Ct. at 785 ("The pivotal question is whether the state court's application of the Strickland standard was unreasonable.")

**d. Development and Presentation of Mental Impairment Evidence**

Petitioner contends that trial counsel "knew that Mr. Carter had significant, identifiable mental impairments, but completely failed to present evidence of Mr. Carter's mental diseases or defects to the jury. The penalty phase did not include the testimony of a single mental health expert or a social historian. " (SAP at 148.) Specifically, Petitioner contends that trial counsel failed to develop and present evidence concerning his abnormal PET scan, failed to investigate and present expert evidence regarding fetal alcohol syndrome, failed to investigate and present readily available evidence concerning his childhood head injuries, exposure to neurotoxins, as well as failed to call an expert to testify about the impact of his abusive history and substance abuse on his later behavior.

Again, as stated above, persuasive authority instructs that "the relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." Siripongs, 133 F.3d at 736. Under AEDPA, this Court must "determine what arguments or theories supported or, as here, could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Richter, 131 S. Ct. at 786.

The Ninth Circuit has indicated that a counsel's duty to investigate a defendant's mental condition differs between the guilt and penalty phases, because "[e]vidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense to conviction in the guilt phase." Hendricks v. Calderon, 70 F.3d 1032, 1044 (9th Cir. 1995). This divergent standard appears to apply to counsel's duty to provide information to expert witnesses. See Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999), citing Caro v. Calderon, 165

F.3d 1223, 1226 (9th Cir. 1999) ("Although the lawyer's failure to develop and relay medical evidence did not constitute ineffective assistance at the guilt phase, we concluded that sentencing-where mitigation evidence may well be the key to avoiding the death penalty-is different.")

It is important to emphasize that Petitioner does not allege that counsel failed to consult any experts when preparing his case for trial, instead arguing that counsel's investigation in this respect was inadequate.  Petitioner asserts that the retained experts "were provided with insufficient information to adequately diagnose Mr. Carter's mental illness and brain damage," and contends that "[a]dequately prepared consultants would have offered the opinions set forth" by the experts retained in post-conviction proceedings. (SAP at 149.) However, with the exception of Dr. Buchsbaum, Petitioner fails to provide the Court with any details concerning the experts trial counsel did consult in preparation for the penalty phase proceedings, fails to indicate what materials trial counsel did or did not provide those experts, and fails to disclose what those experts actually concluded about Petitioner's mental and physical condition. Accordingly, with the exception of the allegations concerning Dr. Buchsbaum, the Court is left with Petitioner's conclusory allegations that trial counsel's investigation into mental impairment issues was inadequate, based only on the evaluations conducted well after trial.

First, with respect to Dr. Buchsbaum, Petitioner contends that trial counsel: (1) failed to provide him with a "clinical, medical or social history," which would have allowed him to render an adequate and competent opinion and (2) "inexplicably failed to develop and offer testimony" from Dr. Buchsbaum at the penalty phase.  (SAP at 149-151.)   Petitioner contends that the "so-called 'tactical' decision not to call Dr. Buchsbaum in the penalty phase was based on an inadequate investigation." (SAP at 151.) Petitioner asserts that Dr. Raine, who was consulted in post-conviction proceedings, was given proper background materials and concluded, based on a review of those materials and the PET scan results, that Petitioner's "ability to think, reason,

problem solve, control his emotions and impulses, would be significantly compromised by these brain dysfunctions."  (Ex. 57 at 9.)

The record indicates that a Dr. Lottenberg performed a PET scan on Petitioner on May 30, 1991, approximately a week before commencement of the penalty phase portion of trial on June 5, 1991.  (See Ex. 101; CT 2673.)  Petitioner states that the results were faxed to defense counsel on June 3, 1991, and states that "[o]ver the next week, counsel contacted a handful of experts with regard to reviewing the PET scan," but several declined for various reasons, and like Dr. Lottenberg, recommended Dr. Buchsbaum.  (SAP at 149.)  On June 13, 1991, after faxing the PET scan and related reports, the trial judge and both parties held an in-chambers telephonic conference with Dr. Buchsbaum, who was attending a conference in Italy.  (See RT 8314.)

During the conversation, Dr. Buchsbaum confirmed that Petitioner's scan results were "abnormal," but stated that "I cannot really relate this to any aspect of the medical or psychiatric history without more information."  (RT 8315.)  Dr. Buchsbaum spoke generally about the areas of Petitioner's brain that contained abnormalities, such as areas associated with "memory, and especially verbal memory" as well as "regulation of emotion," but noted that "without more detail about the clinical history, history of head injury, history of neurological disease, brain infections, injury at birth, it would be hard to give a more detailed story."  (RT 8316.)  He did state that Petitioner was part of the 1 person in 20 or 40 that have a significant number of abnormalities, as Petitioner had about 17 or 18 "abnormal areas" and that a normal individual had "about three" such areas.  (RT 8316-17.)  Dr. Buchsbaum stressed the limited nature of his opinion, stating that "I would have a much more detailed and substantive opinion if I had additional information about the patient."  (RT 8322.)

The trial judge then took a recess of the proceedings and provided defense counsel with an opportunity to speak with Dr. Buchsbaum alone and off the record. (RT 8327.)  Upon the trial court's inquiry as to whether the defense would be pursuing the PET scan information, Mr. Bumer stated, "[m]y decision is, it is a tactical decision

that we are not," and noted that he had discussed that decision with Petitioner. (RT 8368.) Mr. Bumer noted that "[i]t is purely a tactical decision on my part based on a careful consideration of a number of things, including Kelly/Frye, and a number of others." (RT 8368-69.) The trial judge noted that "[b]ased upon the discussion that we had with the doctor, it is apparent that it would most likely open the door to more than just the testimony of this particular doctor and other issues, so I don't disagree with the tactical end of it," to which Mr. Bumer agreed, "That was one of the factors, among a number of others, that I had in mind." (RT 8369.) Mr. Bumer also noted that he was unaware of any disagreement by Petitioner with the decision. (Id.)

Again, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. This deference is particularly appropriate given that Mr. Bumer clearly stated the decision not to pursue the PET scan evidence was tactical, and that the decision was made after consulting with Dr. Buchsbaum outside the presence of the other parties, and after discussion with Petitioner. (RT 8327, 8368); see Strickland, 466 U.S. at 689 ("The defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'") Dr. Raine's report, on its own, does not prove that Dr. Buchsbaum was inadequately prepared, nor does it prove that, were Dr. Buchsbaum provided additional materials, the two experts' conclusions would have been similar.[17] In short, the record clearly indicates that counsel conducted a PET scan, contacted and conferred with an appropriate expert, and made a strategic decision not to further pursue and present the evidence at trial. Counsel's performance was not deficient.

With respect to mental health experts other than Dr. Buchsbaum, as noted above, the state record indicates that San Diego trial counsel, at a minimum, retained psychologist Dr. Paul S.D. Berg and psychiatrist Dr. James E. Stoddart, M.D., who,

[17] The Court is not privy to the contents of the discussion between defense counsel and Dr. Buchsbaum, as it was not preserved in the state record, but it appears logical to surmise that such conversation was substantive in nature. In any event, is clear that after the conversation, and subsequent discussion with Petitioner, defense counsel made an explicitly tactical decision not to pursue the PET scan evidence.

upon the request of defense counsel as early as 1988 and 1987, respectively, were authorized to enter the county jail to interview Petitioner. (See CT 196, 201, 212, 217.) From a review of Dr. Connor's post-conviction report, the record also reflects that Los Angeles and/or San Diego defense counsel commissioned a 1987 psychological evaluation by Dr. Malone, a 1989 evaluation by Dr. Berg, and a neurological consultation, evaluation, and assessment by Dr. Kowell. (See Ex. 101.) These evaluations and/or reports are not contained in the state record. Instead, without providing the Court with any information as to what materials trial counsel provided these experts, or what diagnoses or conclusions the retained experts reached, Petitioner nevertheless argues that trial counsel provided their experts with "insufficient information" and that "[a]dequately prepared experts would have offered the opinions set forth in the attached expert declarations and in the paragraphs below." (SAP at 148-49.) Given the contents, or lack thereof, of the state record, Petitioner's assertions are unpersuasive.

To reiterate, this is not a case in which trial counsel failed to conduct any mental health investigation. Instead, Petitioner asserts that the investigation counsel conducted was inadequate based on the additional mitigation evidence discovered after trial. Contrast Lambright v. Stewart, 241 F.3d 1201, 1207 (9th Cir. 2001) (trial counsel ineffective for "failure to obtain a psychiatric evaluation of Lambright, despite knowing of his wartime experience and extensive drug use" and failing to present any psychiatric evidence or argument at sentencing hearing).

Petitioner also contends that trial counsel was ineffective for failing to investigate and present evidence of fetal alcohol syndrome ["FAS"] and its impact on Petitioner's mental and physical health and abilities. (SAP at 154.) Again, the state record does not contain direct evidence that trial counsel was aware that Esther Carter drank while pregnant with Petitioner, as the Lilly Rose declaration was obtained well after trial. (See Ex. 86 at 3.) Petitioner alleges that counsel knew of the prenatal alcohol exposure, citing to pre-trial interviews of Jerry Carter and Bertha Adsuna, yet neither of those

statements include any mention of Esther Carter consuming alcohol while pregnant with Petitioner. (See Pet. Merits Brief at 154, citing Exs. 67 and 63.) In any event, it is arguable that evidence of Mrs. Carter's alcohol use when Petitioner was a child, which counsel knew of and presented at the penalty phase, should have aroused a suspicion that Esther Carter's alcohol use started much earlier. Petitioner also contends, without citation to factual support, that "[i]n September 1988, counsel discussed the possible sources of neurological damage their client experienced, *including* fetal alcohol abuse syndrome. Counsel, however, never investigated or presented this evidence at trial." (SAP at 154) (emphasis in original).

Respondent contends that counsel could not be ineffective for "failing to present evidence of which experts were still uncertain" as FAS factors and criteria were still developing at the time of Petitioner's trial. (Ans. at 128.) Dr. Paul Connor concedes that the diagnostic criteria was not fully developed at the time of Petitioner's trial in 1990-91, but asserts that it was still possible to render a FAS diagnosis, explaining that "information would have needed to be extrapolated to adults at that time. Despite this, with information about prenatal alcohol exposure, demonstration of physical anomalies related to FAS, and neuropsychological deficits, this diagnosis could have been made during Mr. Carter's prior trials." (Ex. 103 at 25.) Again, in contrast to cases in which counsel's performance was deficient, there is no evidence in the state record[18] that Petitioner's trial counsel was, or should have been, aware of information indicating a need for further investigation into his mother's alcohol use. See Rompilla v. Beard, 545 U.S. 374, 390 (counsel unreasonably failed to look at file of defendant's prior conviction, which contained "red flags" indicating a need to investigate further).

Moreover, the Court's examination of counsel's performance is limited to whether counsel was deficient in failing to investigate and present such evidence, not

[18] Evidence that trial counsel was aware of, and expressed the need to, investigate FAS is contained in trial counsel's memos and notes. (See Ex. E at 1.) However, these materials were not submitted to the state court at the time the claim was adjudicated on the merits, and cannot be considered by the Court in its evaluation of Claim 3 under section 2254(d). See Pinholster, 131 S.Ct. at 1398.

merely whether it was "possible" to render a diagnosis of FAS, an area of research that was admittedly new, underdeveloped, and had not yet been applied to adults, at the time of trial. Here, even if the facts alleged were sufficient to state a prima facie case of deficient performance, Petitioner must also demonstrate that counsel's deficient performance was prejudicial, and that the California Supreme Court's rejection of this claim was an objectively unreasonable application of Strickland. See Richter, 131 S.Ct. at 785. As discussed below, Petitioner fails to demonstrate prejudice.

Nor does Petitioner persuasively demonstrate that counsel was ineffective for failing to investigate and present evidence that Petitioner "was subjected to in-utero toxins" as well as toxins in and around Nome during his childhood, that he suffered "numerous head traumas," or that he had a "history of drug abuse," each of which contributed to his neurological impairment. (SAP at 159-60.) First, with respect to the asserted "in-utero" exposure to neurotoxins, Petitioner relies upon the declaration of Lela Oman,[19] who observed Petitioner a few days after his birth and noted abnormalities in his head that caused her concern, after which she prompted Esther Carter to seek medical advice. (Ex. 52.) Ms. Oman also stated that at the time of Petitioner's birth and childhood, Esther resided in an area near a gold mining operation which contained a field often used as a neighborhood playground. (Id.) Again, it does not appear that Ms. Oman was interviewed at the time of trial or that counsel was, or should have been, aware of the information she now provides. Vaughn Johnson states that several of his friends, including Petitioner, played in the "gold dredges" in Nome as children, but again, there is no indication that trial counsel was aware of this information. (See Ex.

---

[19] Petitioner notes that "At the time of his birth, a practical nurse, Lela Oman, observed Mr. Carter's cranial abnormalities and expressed grave concern over Dean's birth condition." (SAP at 159.) While Ms. Oman indicates that she had been trained in nursing and had worked as a nurse's aid, the declaration also appears to indicate that Ms. Oman's observations were not made in a clinical capacity, as she states that "[w]ithin a few days of Dean's birth, Esther brought her newborn son to *The Glue Pot* to show me her baby," and Ms. Oman then advised Esther Carter to "seek the advice of her doctor, Fred M. Langsam, M.D." (Ex. 52.) The Glue Pot was a local restaurant. (See Ex. 64.) Ms. Oman states that "[t]o the best of my knowledge, she followed my advice and returned to Maynard McDougal Memorial Hospital." (Ex. 52.)

83.)  Accordingly, in light of the record presented, Petitioner fails to demonstrate that counsel possessed, or failed to take reasonable action to pursue, evidence indicating that Petitioner had been exposed to neurotoxins.  See Caro v. Calderon, 280 F.3d 1247, 1255 (9th Cir. 2002) (counsel, who was aware of the defendant's "extraordinary history" of exposure to toxic chemicals, was found ineffective for failing to investigate and present that evidence, as well as for failing to provide examining experts with the information he possessed.)  Without any "red flag" or other indication that he had been exposed to toxins as a child, Petitioner fails to demonstrate that counsel had a reasonable duty to seek out evidence of this nature, such as the 1987 EPA report.  See Bobby, 558 U.S. at 19 ("This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face . . ., or would have been apparent from documents any reasonable attorney would have obtained.") (internal citations omitted).

Petitioner also contend that counsel failed to present evidence of his history of head injuries and its impact on his neurological functioning.  (SAP at 160.)  As noted above, medical records indicated that Petitioner, age 6, was examined at a Nome area hospital on April 15, 1962 after being "struck by [a] car."  (Ex. 8.)  Those records also appear to indicate that the accident itself, and the injuries Petitioner sustained, were minor.  While Petitioner emphasizes that after the incident he was observed to be "in some sort of convulsion," (see SAP at 160, citing Exs. 8, 63, 73), the medical records noted that Petitioner merely sustained a "contusion and bruising over left biceps only," and indicated that an "x-ray [was] neg [sic]."  (Id.)  Moreover, Edna Buffas, the cab driver, states that she "was going extremely slowly down Front Street, barely moving" due to a town celebration that had crowded the street when Petitioner "ran out into the street and into the left side of her taxi cab."  (Ex. 64.)  In light of the record, the Court cannot find fault with counsel's decision not to attempt to portray this accident as evidence of brain impairment.

Petitioner also cites to hospital records which detailed injuries Petitioner

sustained in a 1977 car accident, including a potential concussion, contusions, and sprains, and noted that Petitioner reported a "history of concussions." (Ex. 26.) That report indicated that "[m]ultiple x-rays of the cranium, neck, lumbar spine, chest, right elbow, left femur, and left knee showed no significant abnormalities." (Id.) Again, a review of the state record shows that counsel commissioned a PET scan and consulted with an expert, which appears to be a reasonable course of events given that Petitioner appeared to have had a history of concussions. Petitioner fails to demonstrate that counsel rendered deficient performance in failing to present this evidence, as counsel clearly and explicitly made a tactical decision not to pursue the PET scan evidence and related potential testimony of Dr. Buchsbaum. (See RT 8327, 8368.)

Petitioner also asserts that trial counsel should have investigated and presented Petitioner's history of drug use as a potential source of impairment. (SAP at 160.) Again, the state record demonstrates that Petitioner's drug and alcohol use was presented at the penalty phase, and that counsel called witnesses who detailed Petitioner's escalating substance abuse after his divorce and in the weeks and months preceding the crimes. Petitioner fails to demonstrate that counsel's decision to present his drug use in this manner was not a tactical decision entitled to deference. See Strickland, 466 U.S. at 689.

Trial counsel has "an obligation to conduct a thorough investigation of the defendant's background." Williams, 529 U.S. at 396. The state record indicates that San Diego trial counsel[20] consulted a number of mental health and medical experts in preparing Petitioner's case for trial. Yet, with respect to the bulk of Petitioner's allegations concerning trial counsel's failure to adequately pursue and present mental health evidence, Petitioner only offers what post-conviction experts have concluded

---

[20] The record also indicates, and Petitioner appears to concede, that Los Angeles trial counsel consulted a number of experts distinct from those consulted by San Diego trial counsel, as the San Diego record indicates that Drs. Berg and Stoddart were admitted to the San Diego jail to confer with Petitioner, yet Petitioner concedes that Petitioner was also evaluated by experts including Drs. Kowell, MacSpeiden, Adler, and Friedman. (See Pet. Merits Brief at 163 n. 53.)

about Petitioner's mental health. It is troubling that Petitioner fails to provide information relating to the experts consulted during penalty phase preparation, including any testing performed, evaluations conducted, or reports issued, which do not appear to have been made a part of the state record.[21] Petitioner is essentially asking the Court to conclude that trial counsel's investigation and presentation was unreasonable based solely on the evidence post-conviction counsel was able to obtain after trial, without providing the Court with the tools to evaluate trial counsel's actual penalty phase investigation. The Court declines to do so.

Trial counsel began investigating Petitioner's case, contacting and retaining a number of mental health and medical experts to examine Petitioner nearly four years before the commencement of the San Diego penalty phase proceedings. (See CT 196, 201.) Counsel called over twenty penalty phase witnesses to testify on Petitioner's behalf, who spoke of the neglect and abuse Petitioner's suffered as a child, the cold and desolate environment of Nome, Alaska, and the racial prejudice and alcoholism that plagued the community. Witnesses testified that Petitioner attempted to run away, and was later sent away as a child, first to an orphanage, then later to various correctional facilities, which continued in adulthood. Counsel presented evidence that Petitioner sought to better himself in prison, teaching himself camera work, gaining employment after his release, marrying and starting a family, and saving people from a fire on one occasion. Counsel presented testimony that Petitioner descended into depression and substance abuse after his divorce, in the months before the crimes. It is clear from the Court's review that counsel's decisions on which evidence to pursue and present was strategic, was based on an investigation of Petitioner's social history and his mental and physical health, and counsel's decisions are entitled to deference. See Strickland, 466

---

[21] As stated earlier, the bulk of exhibits submitted in support of the motion for evidentiary hearing, in addition to documents submitted in the course of record expansion proceedings, were not a part of the state record at the time the California Supreme Court adjudicated this claim on the merits. This includes Exs. Z and AA, reports issued in 1989 by Dr. Kowell and Dr. Berg, respectively. Accordingly, the Court has not considered these exhibits in adjudicating this claim under section 2254(d).

U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). Ultimately, there is a "reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 131 S.Ct. at 788. Petitioner fails to demonstrate that counsel's performance was deficient.

**e. Counsel's Penalty Phase Argument**

Petitioner contends that counsel was ineffective in his arguments to the jury because he posed a question about the cause of Petitioner's violence that he failed to answer. Counsel's opening statement included the question, "Why. Why at the age of 29 does this man suddenly erupt into this chain of violence?" (RT 7419.) In closing, counsel repeated the query, stating "What happened? What caused this? Well, we will probably never know. Probably never have an answer to that question." (RT 8677.) Petitioner also charges that counsel failed to offer the jury a reasonable basis for a verdict of life in prison, and "did not articulate a mitigation theme or offer any explanation beyond Mr. Carter's unidentified 'great mental problems.'" (SAP at 164.)

A review of the record reveals that counsel's closing argument spanned twenty-five pages, and that he spent significant time emphasizing to the jury that their decision was a "grave" and "awesome" responsibility, but no matter the decision they reached in considering "these two dreadful punishments," Petitioner would die in prison. Counsel also spent time reminding the jury about Petitioner's upbringing and environment- that he was raised in cold, isolated Nome, Alaska and that because he "had a bad childhood; that he had alcoholic parents; that he was neglected; he came from what is now called a dysfunctional family, may help to explain why these thing happen had [sic]." (RT 8665.) Counsel reiterated that aside from his parents' drinking and fighting, Petitioner was treated differently than his siblings- that "there was something wrong in that family and he bore the brunt of it." (RT 8671.) He repeatedly referenced that Petitioner made several childhood attempts to run away from his home and family, and once he left, he married and had children. Counsel noted that Petitioner

had saved several people from a fire and taught himself video work in prison to better himself. Addressing the convictions and other crimes evidence, counsel asserted that "[n]obody with any sense, who was not having great problems of some kind, great mental problems of some kind, could conceivably behave in this way." (RT 8682.)

Again, the Court must indulge a "strong presumption" that the conduct in question was reasonable. Strickland, 466 U.S. at 689. Counsel articulated in his arguments to the jury that Petitioner's dysfunctional childhood and upbringing "may help to explain" the crimes of March and April 1984. Whether counsel could have provided a more thorough explanation is not for this Court to determine, as "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... The purpose is simply to ensure that criminal defendants receive a fair trial." Id. Ultimately, the Court is not persuaded that counsel's performance was deficient, and cannot conclude that the state supreme court's rejection of this contention was objectively unreasonable.

**5. Merits - Prejudice**

As discussed above, Petitioner contends that counsel's penalty phase performance was deficient in failing to adequately investigate and present mitigating evidence about his mental impairments, mental illnesses, the extent of childhood abuse suffered, failing to work effectively with the Los Angeles defense team, and presenting a similar penalty phase defense as in the Los Angeles trial. However, based upon the Court's review of the state record, even if trial counsel's actions constituted deficient performance in one or more of the respects alleged, the claim fails because Petitioner is unable to demonstrate that he suffered actual prejudice from counsel's alleged errors. See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.")

As there is no reasoned state opinion in this case, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have

supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Richter 131 S.Ct. at 786. With respect to Petitioner's argument that the California Supreme Court's failure to issue an OSC or order an evidentiary hearing on this claim was objectively unreasonable, the contention is without merit. Under California law, in order to warrant evidentiary development, a petitioner must "plead[] sufficient facts that, if true, would entitle him to relief." People v. Duvall, 9 Cal. 4th 464, 475 (1995). To demonstrate a prima facie case of relief on a claim of ineffective assistance of counsel, this necessarily includes a showing of both deficient performance and prejudice. See Strickland, 466 U.S. at 687. In this case, it is evident that the state supreme court could have reasonably concluded, as this Court does, that taking the facts alleged as true, even if Petitioner demonstrated a prima facie case of deficient performance, he did not suffer prejudice.

Petitioner offers a number of declarations from friends and acquaintances of Petitioner and his family and asserts that had trial counsel presented this information, it would have shown the true picture of Petitioner's harsh, abusive childhood and upbringing. Petitioner also alleges that counsel failed to adequately prepare the experts that were retained and failed to properly investigate and present Petitioner's FASD, mental health issues and brain abnormalities.

Dr. Rosenberg asserts that Petitioner's history of maltreatment, psychological factors, prenatal alcohol exposure, culture and environment "contributed to serious impairments in psychological functioning, including problems with behavior and emotional regulation, interpersonal relationships, problem solving, and issues of self worth." (Ex. 73.) Dr. Foster concluded that Petitioner "has brain damage to those parts of his brain needed for the executive functions of insight, judgment and impulse control in actual situations," and that "[i]t can be stated with medical certainty that Mr. Carter's neurological and psychiatric problems are long standing and were present during the time frame of the crimes for which he is convicted and sentenced to death." (Ex. 70.)

While Dr. Foster concludes that Petitioner had brain damage, other post-conviction experts appear equivocal about the existence and extent of brain impairment, and whether any damage bears a connection to Petitioner's history.  Dr. Young stated that it was "probable" that Petitioner had neurological deficits and dysfunction, and notes only that the information provided "suggests that some combination" of the elements present in Petitioner's social, psychological and medical history led to brain impairment. (Ex. 59.) Dr. Raine opined that the factors outlined in Petitioner's history "may particularly contribute" to the observed abnormalities in Petitioner's PET scan. (Ex. 57.)

Meanwhile, a review of the available record indicates that a 1973 psychological evaluation found Petitioner "to be a fairly classical sociopathic personality." (Ex. 18 at 2.)  A 1973 probation report indicated that Petitioner "continues to display a personality such that without further professional efforts at reintegration he will continue to engage in delinquent or criminal behavior and have little chance at ever making an acceptable social adjustment."  (Ex. 9 at 6.)  Similarly, a 1975 Oregon psychiatrist evaluation found that "[b]y [Petitioner's] own admission, his irritability and destructively aggressive conduct that emanates from it, are willful, the result of personal choice, and represent matters over which he could exercise control if he chose to do so." (Ex. 12, Ex. 21 at 4.)  A 1977 psychological evaluation found that Petitioner "tended to see things in a rather concrete way with little insight."  (Ex. 23 at 1.)  Similarly, a 1977 Alaska pre-sentence report opined that Petitioner's "behavior appears to be best explained focusing upon his immaturity and lack of consideration of consequences." (Ex. 7 at 4.)  Finally, a 1978 evaluation found that while tests raised some indication of psychiatric problems, there was no need for mental health assistance at that time, and Petitioner was found to be "somewhat depressed, restless, and having difficulty controlling impulses.   His behavior is self-punitive in that he feels guilt over misbehavior, but is not deterred by this guilt."  (Ex. 24.)

Thus, it appears that favorable expert mental state testimony could have been

countered and outweighed by these psychological reports clearly indicating that Petitioner was a "fairly classical sociopathic personality" and was an individual who "feels guilt over misbehavior, but is not deterred by this guilt." See e.g. Daniels v. Woodford, 428 F.3d 1181, 1204 (9th Cir. 2005) (finding counsel ineffective when presentation of mental health testimony allowed for possibility that defendant was a sociopath). Such evidence would have devastated defense efforts to garner sympathy for Petitioner.

In any event, even after reweighing the evidence now offered in mitigation against the existing evidence in aggravating, the Court is not persuaded that the result of the proceeding would have been different. See Wiggins, 539 U.S. at 537 (a petitioner can establish prejudice by showing that, had all the available mitigation been offered at the trial, "there is a reasonable probability that at least one juror would have struck a different balance" between life and death.); see also Rompilla, 545 U.S. at 393 ("although we suppose it is possible that [the sentencer] could have heard it all and still have decided on the death penalty, that is not the test.") The Supreme Court instructs that "[t]he likelihood of a different result must be substantial, not just conceivable." Richter, 131 S.Ct. at 792.

In mitigation, the state record reflects that trial counsel presented the jury with substantial evidence concerning Petitioner's upbringing in a harsh, desolate Alaskan town whose populace, including Petitioner's mother and step-father, was plagued by alcoholism and where prejudice towards those of mixed race, like Petitioner, was well-known. There was physical abuse and violence in Petitioner's childhood, he had been placed in foster care at a young age, and in prison, Petitioner pursued and taught himself video work as a trade skill. Upon release, Petitioner gained employment in that field and started a family, and counsel presented evidence that connected the dissolution of his marriage to his increased substance use and abuse and descent into violent acts. The additional social history evidence appears largely cumulative to that presented at trial, but may have added greater color and depth to the information about Petitioner's

childhood.  The FASD and brain impairment evidence would have been mitigating, but the state record also contains early psychological reports indicating anti-social personality disorder, which would have undoubtedly tempered or even negated such evidence.

In aggravation, the prosecutor relied on the circumstances of the sexual assault and robbery/murder convictions, four other murders and a separate sexual assault, two prior convictions, and Petitioner's possession of a weapon in jail.  Petitioner had been convicted of the March 1984 brutal, knife-point sexual assault and robbery of Barbara S., the roommate of a woman he had been dating.  He had also been convicted of robbery, burglary and murder in the mid-April strangulation death of Janette Cullins, another female acquaintance whose body was found concealed in her apartment closet; he was observed using her ATM card to obtain money from her account.  Other crimes evidence had been previously introduced regarding a late March 1984 Ventura County rape and robbery of Jennifer S., another female acquaintance, also by knife-point.  The prosecution also presented evidence of the early April 1984 Alameda County death of Tok Kim, who was seen in the company of Petitioner on several occasions in early April; Ms. Kim's body was found, badly decomposed, in her apartment.  Evidence was also introduced regarding the mid- April 1984 murders of Jillette Mills, Susan Knoll and Bonnie Guthrie, with the first two women found in the closet of their shared apartment, both had been strangled and sustained other injuries, Mills' body exhibited evidence of sexual assault, Petitioner's palm print was found in the apartment, and Mills' car was missing.  Ms. Kim's previously missing car was located parked near the Knoll/Mills apartment.  Additionally, Bonnie Guthrie, a friend of Ms. Knoll and Ms. Mills, was discovered strangled on the floor of her apartment in mid-April 1984, having also suffered abrasions and other injuries consistent with forced sexual activity.  Items belonging to each victim were found on Petitioner's person or in Ms. Mills' missing car, which Petitioner was driving at the time of his arrest.  Finally, the prosecutor introduced aggravating evidence that Petitioner had suffered two prior convictions and that a

weapon had been found in his jail cell.  In evaluating prejudice, the Court must consider this aggravating evidence along with the additional evidence now presented in mitigation.  See Belmontes, 130 S.Ct. at 386 (When evaluating prejudice, "it is necessary to consider all the relevant evidence that the jury would have had.")

Petitioner argues that, despite the substantial evidence in aggravation, additional testimony regarding his abusive upbringing and evidence of FASD and brain impairments "might well have" affected the jury's verdict.  (See Pet. Merits Brief at 158-60.)  The Court emphatically disagrees.  While the Ninth Circuit has admittedly found prejudice in cases where substantial evidence had been offered in aggravation, the cases Petitioner relies upon are distinguishable.  While Petitioner now identifies areas of additional mitigation counsel could have presented, the state record reflects that trial counsel conducted an adequate investigation into Petitioner's background and history and presented it in an effective manner.

The jury was well apprised of Petitioner's upbringing by alcoholic, violent parents who physically abused and mistreated him, including chaining him.  The jury was made aware of the circumstances of the harsh Nome environment, that Petitioner was later sent away to a home for unwanted children, that he was exposed to prejudicial attitudes, and institutionalized as a juvenile.  The trial judge acknowledged that Petitioner's "alcoholic family background, the child abuse type of situation, and his childhood living conditions, the discrimination that he received" would be given weight, "the fact that he pulled himself up by the straps when he was incarcerated and established a trade for himself" as well as "the fact that he is a father, a parent, and considering the substance abuse factors which I mentioned earlier, I am considering the relatively short time period involved as far as the series of events."  (RT 8872.)  The trial judge also noted that given Petitioner's childhood and circumstances, "the Court feels sympathy and compassion for the defendant, and I believe the jurors do too."  (Id.)  Petitioner's trial judge acknowledged the wealth of background information the defense presented on his behalf, and its impact, in nevertheless concluding, "I think the death

penalty is well warranted in this particular case, despite the sympathy, despite his background." (RT 8874.); contrast Wiggins, 539 U.S. at 525, 537 (the "sentencing jury heard only one significant mitigating factor- that Wiggins had no prior convictions," and due to counsel's failings, never heard the available "powerful mitigating narrative," including that the defendant had an alcoholic mother, foster home placements, maltreatment including neglect, was left by his mother without food, had frequent absences from school, emotional problems, and suffered sexual abuse in foster placements.)

Petitioner's reliance on Williams v. Taylor is also misplaced. Unlike in Williams, Petitioner's trial counsel presented a substantial amount of mitigating evidence, calling twenty witnesses who traced Petitioner's upbringing in Nome, his foster home and juvenile institutional placements, later incarcerations, and his marriage, children, and divorce, providing the jury with a picture of Petitioner's background and circumstances. See Williams, 529 U.S. at 369 (Williams' defense only presented a total of four penalty phase witnesses- "three witnesses briefly described Williams as a 'nice boy' and not a violent person" and a testifying psychiatrist "did little more than relate Williams' statement during an examination that in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone.") Petitioner's trial counsel presented evidence of his neglect and abuse at the hands of his parents, including beatings and chainings, and that he attempted to run away to escape his home. See id. (Williams' counsel failed to investigate and uncover extensive records of neglect, abuse, and evidence of inadequate schooling and that Williams was borderline intellectually disabled.)

Here, "[d]espite all the mitigating evidence the defense did present . . . [Petitioner] fault[s] his counsel for failing to find more." Bobby, 558 U.S. at 19. Yet the state record clearly demonstrates that trial counsel investigated and presented a substantial amount of mitigation evidence, including obtaining Petitioner's records, contacting and presenting evidence from Petitioner's family members, friends,

acquaintances, correctional counselors, and contacting mental health and medical experts to examine Petitioner. Contrast Stankewitz v. Woodford, 365 F.3d 706, 719-20 (9th Cir. 2004) (the record did not reflect that trial counsel ever hired an investigator, procured a mental health examination, or spoke to anyone who spent time with the defendant during his childhood; counsel also failed to obtain school, medical, and correctional records.) In light of the entire record of evidence in mitigation and aggravation, the additional evidence Petitioner now presents is insufficient to persuade the Court that "there is a reasonable probability that at least one juror would have struck a different balance" between life and death. Wiggins, 539 U.S. at 537.

With respect to Petitioner's other allegations of ineffective assistance, including, but not limited to, the competitive behavior between the Los Angeles and San Diego trial defense teams, the similarity of witness lineups, failure to present evidence about the Nome community's knowledge and inaction, and counsel's closing arguments, not only has Petitioner failed to demonstrate that counsel's performance was deficient, he fails to demonstrate prejudice. Given the abundance of evidence in aggravation, as outlined above, Petitioner fails to demonstrate that counsel's actions or decisions in these respects resulted in "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

**6. Conclusion**

With respect to the Strickland performance prong, the available record clearly shows that counsel began the mitigation investigation early, several years before the San Diego trial, and obtained Petitioner's school, medical, and correctional records. It is also evident that counsel at least contacted a number of mental health and medical experts and obtained permission for them to consult with Petitioner at the San Diego jail, although any reports generated have not been included in the state record. It is also clear that counsel contacted a significant number of Petitioner's family members, friends, co-workers, employers, and correctional counselors, and that nearly twenty

witnesses testified on Petitioner's behalf at penalty phase proceedings.  The record also reflects that counsel had Petitioner undergo a PET scan and contacted a number of experts in attempts to interpret the scan results, ultimately deciding not to pursue or present the evidence at trial.

It is also clear that Petitioner's trial counsel conducted an extensive penalty phase investigation, which stands in contrast to cases in which counsel's performance was found prejudicially deficient.  See Hamilton v. Ayers, 583 F.3d 1100, 1114-15, 1130-31 (9th Cir. 2009) (first-time capital counsel did not retain learned co-counsel to assist on case, did not retain mitigation or mental health expert, appeared to have only interviewed five individuals, and presented only one witness- the defendant's mother- in a penalty phase presentation that lasted 40 transcript pages, despite available evidence that the defendant grew up in an physically and sexually abusive environment, was placed in a succession of foster homes, and had ongoing mental health problems); see also Hendricks, 70 F.3d at 1043-44 (counsel failed to pursue and present evidence regarding the defendant's hard childhood, drug problems, and mental impairments, and called three penalty phase witnesses who "did little to aid in Hendricks' fight for his life."); Wallace, 184 F.3d at 1116-17 (counsel failed to explore defendant's mental state or conduct any investigation into his dysfunctional family background, failed to provide such information to retained experts, and failed to even contact the defendant's immediate family members to obtain background information that was "easily within his reach."); see also Porter, 130 S.Ct. at 453 (counsel presented testimony from only one witness and read from a deposition despite available evidence of an abusive background, mental impairments, and military service, decorations, and post-service PTSD).

Moreover, it is not at all clear that counsel acted unreasonably in deciding not to present expert mental health or medical testimony about brain impairments.  "[W]hile the Constitution requires that a criminal defendant receive effective assistance of counsel, the presentation of expert testimony is not necessarily an essential ingredient

of a reasonably competent defense." Bonin v. Calderon, 59 F.3d 815, 834 (9th Cir. 1995) (trial counsel acted reasonably in refraining from presenting expert testimony in mitigation, when such testimony would have opened door to repeated discussion on the defendant's brutal crimes and whether they fit the asserted diagnosis). In this case, it appears that opening the door to psychological or other medical testimony would have undoubtedly led to a prolonged discussion and examination of the multiple murders and sexual assaults, equivocation among the post-conviction experts, and prior mental health reports indicating that Petitioner suffered from anti-social personality disorder.

In any event, with respect to Claim 3 as a whole, even if Petitioner's allegations in this case were sufficient to state a prima facie case of deficient performance, in order to demonstrate that the state court's decision was unreasonable or contrary to their established procedures, Petitioner must also demonstrate that the California Supreme Court could not have reasonably concluded that he did not state a prima facie case with respect to the Strickland prejudice prong. That is, the California Supreme Court must have been objectively unreasonable in concluding that Petitioner failed to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., 466 U.S. at 694. As discussed above, Petitioner has not shown "a reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Simply put, this is not a case where the "state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S.Ct. at 786-787. Therefore, based on an independent review of the record, the Court cannot conclude that the California Supreme Court's rejection of this claim was objectively unreasonable.[22]

---

[22] As noted earlier, there exists a quantum of evidence that cannot be considered by this Court, namely Exs. A-AA and exhibits submitted in connection with record expansion proceedings, because that evidence was never submitted to the California Supreme Court for consideration in its adjudication of this claim on the merits. See

Evidentiary development of the claim is not warranted.

**D. Claim 4- Psychiatric Assistance at Trial**

In Claim 4, Petitioner asserts that his conviction and death sentence were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments because "he was deprived of his right to the competent assistance of a psychiatric expert," and argues that "[c]ounsel had an obligation to properly prepare the experts who evaluated [Petitioner], and to the extent they failed to do so, they were ineffective." (SAP at 167-68.) Specifically, Petitioner states that his court-appointed experts "provided incomplete and unreliable evaluations of [Petitioner] because they lacked the necessary foundation to make reliable conclusions" regarding Petitioner's mental state. (SAP at 168.)

Petitioner raised this claim as Claim III in the first state habeas petition. (Lodgment No. 104.) The California Supreme Court denied the claim on the merits. (Lodgment No. 113.) Petitioner also raised this claim as Claim Four in the second state habeas petition. (Supp. Lodgment No. 1.) The California Supreme Court rejected this claim on the merits, denied it as untimely, and "[e]xcept insofar as [it] allege[d] evidence of child abuse and Fetal Alcohol Syndrome," denied it because it had already been "raised and rejected in petitioner's prior petition for writ of habeas corpus (S096874)." (Supp. Lodgment No. 4.) Respondent acknowledges that this claim was timely raised in the first state habeas petition, does not contend that the claim is

---

Pinholster, 131 S.Ct. at 1388. In this case, even were Petitioner able to satisfy section 2254(d), which would allow the Court to consider this claim de novo, it is the opinion of this Court that this additional evidence is fatal to Petitioner's allegations of prejudicially ineffective assistance of trial counsel. For instance, this evidence includes Ex. AA, in which Dr. Berg clearly indicates that: (1) trial counsel provided the expert with an expansive amount of background material to assist in his evaluation and (2) that the psychological tests performed indicated "that [Petitioner] did not fall within the category normally associated with organic brain syndrome," and (3) concluded that in Petitioner's case "the diagnosis would be of a Personality Disorder NOS, with antisocial, paranoid, and borderline features." (Ex. AA.) Reports by Dr. MacSpeiden and Dr. Coburn, submitted in conjunction with record expansion proceedings, similarly concluded that Petitioner suffers from anti-social personality disorder; these reports also confirm that trial counsel provided the experts with extensive background material on Petitioner. (See Doc. No. 142, Ex. 5.)

procedurally defaulted, instead asserting that the state supreme court's silent denial on the merits in the first state habeas petition is entitled to deference under AEDPA. (Ans. at 139.) Accordingly, the Court will consider this claim on the merits.

Petitioner asserts that "[t]o the extent that [Petitioner's] trial counsel engaged court-appointed psychologists, psychiatrists, and other mental health professionals, they were inadequate, as demonstrated by those that have been conducted in these post-conviction proceedings" and maintains that "[h]ad proper evaluations been conducted, they would have revealed significant mental impairments, dysfunction, organic brain damage, FASD, and compelling evidence of mental health defenses and mitigation of punishment." (SAP at 170.) Here, Petitioner appears to claim a violation of two rights, including: (1) the right to competent expert assistance; and (2) the right to the effective assistance of counsel.

To the extent Petitioner asserts that he was prejudiced due to trial counsel's deficient acts in failing to provide materials to and adequately prepare the retained experts, it is a repetition of allegations previously advanced in support of Claim Three of this Petition. (See SAP at 148-49, in which Petitioner contends that "trial counsels' failures and omissions to prepare and provide expert testimony" constituted ineffective assistance of counsel and argues that "[t]he mental health professionals that were retained by counsel were provided with insufficient information to adequately diagnose [Petitioner's] mental illness and brain damage."); (see also SAP at 151, in which Petitioner alleges that "trial counsel failed to provide Dr. Buchsbaum with a clinical, medical, or social history in order to allow the doctor an adequate opportunity to render a medically competent opinion on the PET scan and how it related to [Petitioner].") As these contentions are thoroughly discussed in the adjudication of that claim (see Claim 3, supra), and the Court will not reiterate that analysis here.

To the extent Petitioner alleged that he was deprived of competent expert assistance due to the appointed experts' failings, he fails to cite any clearly established federal law supporting his assertion of constitutional error in this respect. In Ake v.

Oklahoma, 470 U.S. 68 (1985), the Supreme Court instructed that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Id. at 83.  However, the Ninth Circuit has elaborated that "Ake does not guarantee access to a psychiatrist 'who will reach only biased or favorable conclusions.'" Harris v. Vasquez, 949 F.2d 1497, 1516 (9th Cir. 1990), quoting Granviel v. Lynaugh, 881 F.2d 185, 192 (5th Cir.1989).

Petitioner fails to cite to any Supreme Court authority holding that Ake guarantees a due process right to effective expert assistance.  In fact, this argument appears to have been considered and rejected by the Ninth Circuit.  See Harris, 949 F.2d at 1518 (rejecting Petitioner's proposed "constitutional rule that would require federal courts to conduct a 'psychiatric medical malpractice review' in a federal habeas proceeding to determine whether a state prisoner's psychiatrists 'competently' assisted the defense."); but see Wallace, 184 F.3d at1118 n.7 (in which the Ninth Circuit suggested in dicta that "[t]he failure of a psychologist retained on [a defendant's] behalf to make a proper inquiry as to [defendant's] background may also constitute a failure to provide competent psychiatric advice in violation of Ake.") (citation omitted.)

Moreover, even were the Court inclined to indulge the Wallace Court's suggestion that a psychologist's failure to make a proper inquiry could constitute an Ake violation, Petitioner fails to allege such a claim in this instance.  Instead, Petitioner himself places the blame for any inadequacies in the mental health evaluations squarely at the feet of trial counsel, contending that "[b]ecause of counsel's failure to obtain a social history that met industry standards, as well as a thorough assessment of Carter's brain development, the mental health expert evaluations in this case rested on faulty, incomplete, and, by extension, misleading foundations."  (Pet. Merits Brief at 169.) Petitioner fails to explain how *trial counsel's* alleged failure to conduct an adequate social and medical history and provide that information to their experts "resulted in the

*State* failing to provide Carter with an appropriate mental health evaluation." (Id.) (emphasis added). Ake, as currently understood, stands for the proposition that the state may not deny an indigent defendant *access* to psychiatric assistance. Here, it is evident that the state did not deny Petitioner access to such assistance, as the record clearly demonstrates that the defense consulted with neuropsychiatrist Dr. Buchsbaum about Petitioner's mental state. (See RT 8313-28.) Moreover, Petitioner concedes that he was evaluated by multiple mental health experts at the time of his trial, "including Paul Berg, Arthur Kowell, James Stoddart, Thomas MacSpeiden, Allan Adler, and Meredith Friedman." (Pet. Merits Brief at 163 n. 53.)

As the state record clearly reflects Petitioner was provided with psychiatric assistance, Claim 4 is without merit. See Harris, 949 F.2d at 1516. Based on an independent review of the record, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. Neither habeas relief nor evidentiary development is warranted on Claim 4. See Baja v. Ducharme, 187 F.3d 1075, 1087 (9th Cir. 1999); see also Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.") (emphasis omitted.) Evidentiary development of the claim is not warranted.

**E.   Claim 5- Petitioner's Competence to Be Executed**

In Claim 5, Petitioner asserts that he is entitled to an evidentiary hearing on his claim that he is incompetent to be executed, contending that the application of the death penalty to him constitutes cruel and unusual punishment in violation of the Eighth Amendment. (SAP at 171.) Specifically, Petitioner states that because he "suffers from profound mental defects, disorders and illnesses from childhood and into adulthood, including organic brain damage, FASD, PTSD, and deficiencies caused by both pre- and post-natal abuse...[his] profound and ongoing mental illness prevents him from being executed." (SAP at 172.)  Respondent notes that the California Supreme Court

rejected the claim as premature,[23] maintains that Petitioner has "failed to establish that he is mentally incompetent to be executed," and asserts that, even if this Court were to consider the claim on the merits, Petitioner fails to merit habeas relief. (Ans. at 144-46.)

"[T]he Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." Ford v. Wainwright, 477 U.S. 399 (1986). Petitioner concedes that the claim is unripe for review because his execution date has not been set, but presents the claim in order to preserve his right to present it when ripe, pursuant to Stewart v. Martinez-Villareal, 523 U.S. 637 (1998). Respondent does not dispute that the claim is unripe for review. (See Ans at 144-45; Opp. to Mot. at 38.)

The Court agrees with the conclusion of the California Supreme Court that this claim is premature, as an execution date has not been set in this case. See Herrera v. Collins, 506 U.S. 390, 406 (1993) ("[U]nlike the question of guilt or innocence, which becomes more uncertain with time for evidentiary reasons, the issue of sanity is properly considered in proximity to the execution.") Accordingly, Claim 5 is denied without prejudice as premature. An evidentiary hearing is not warranted on this claim at the present time.

**F. Claim 6- Prosecutorial Misconduct**

With respect to voir dire and the guilt phase of trial, Petitioner alleges that the prosecutors' misconduct included "misrepresentation of law and fact to the trial court in order to obtain advantages in court rulings," "misstatements of law and fact to jurors," "improper shifting of the burden of proof," "adverse comments upon Mr. Carter's right against self-incrimination," "unethical aspersions on defense counsel's integrity and ethics," and "exhorting jurors to anger, prejudice and community sentiment." (SAP at 176.) With respect to the penalty phase, Petitioner contends that

---

[23] Claim 5, also raised as Claim 5 in Petitioner's second state habeas exhaustion petition, was denied in relevant part as follows: "Claims 5 and 16 (subclaim C) are denied as premature without prejudice to renewal after an execution date is set. (*People v. Abilez* (2007) 41 Cal.4th 472, 536; *People v. Lawley* (2002) 27 Cal.4th 102, 169, fn. 25.)" (Supp. Lodgment No. 4; case no. S153780.)

the prosecutor committed misconduct through "bad faith" questions to witnesses as well as arguments "designed to improperly invoke non-statutory aggravation evidence," in violation of both California Penal Code § 190.3 and Petitioner's constitutional rights. (SAP at 184.)

With respect to the guilt phase contentions, the California Supreme Court first stated that "defendant failed to request an assignment of misconduct or an admonition with regard to any of the conduct he now challenges as improper. Accordingly, he has not preserved his claims on appeal," but nonetheless reasoned that "[e]ven assuming defendant's claims properly were before us, we would reject them on the merits, as follows." Carter, 36 Cal 4th at 1264. The state court proceeded to outline Petitioner's guilt phase contentions and conclude as follows:

> 1. Alleged Misstatements of Fact and Deceptive Practices
>
> Defendant contends that prior to trial, the prosecution misled the trial court into believing that a key found in defendant's possession was a key to Barbara S.'s business office. Defendant implies the prosecution acted in bad faith in light of its subsequent disclosure that the key could not be located. No misconduct appears.
>
> Defendant faults the prosecution for declining to stipulate to certain facts supporting defendant's motion to suppress evidence seized from the Datsun 280 ZX. Defendant contends the prosecution's position was characterized by "obfuscation and gamesmanship." The prosecution's reluctance to accept a stipulation was not improper. (See *People v. Garceau* (1993) 6 Cal.4th 140, 182, 24 Cal.Rptr.2d 664, 862 P.2d 664.)
>
> Defendant contends the prosecution misrepresented the significance of the testimony of witness Polly Haisha. Defendant argues that the prosecution on the first day of trial deceptively suggested that Haisha was a potential witness who was unlikely to be called unless the defense denied ownership of the address book that included her name. Defendant also complains that Haisha, a law student, was permitted to remain in the courtroom during a portion of the opening statements, until the defense objected that her presence violated the court's order excluding witnesses from observing the proceedings.
>
> At trial, defendant objected to Haisha's testimony on relevancy grounds, which the trial court properly overruled, as we previously have explained. (See, *ante*, 32 Cal.Rptr.3d pp. 871-874, 117 P.3d pp. 571-575.) Defendant did not object to Haisha's testimony on the ground that the prosecution had violated discovery rules or had engaged in misconduct. Therefore, he has waived any such claim on appeal. (*People v. Ochoa*, *supra*, 19 Cal.4th at p. 427, 79 Cal.Rptr.2d 408, 966 P.2d 442.) Even if we assume prosecutorial misconduct, it is not reasonably probable that a result more favorable to defendant would have occurred in the absence of Haisha's

testimony. (*People v. Haskett* (1982) 30 Cal.3d 841, 866, 180 Cal.Rptr. 640, 640 P.2d 776.) As we previously have noted, Haisha was a minor witness whose testimony was peripheral to the central events underlying defendant's crime spree. Neither her presence during a portion of the prosecutor's opening statement, in violation of the court's order excluding witnesses, nor her eventual testimony at trial, could have made any possible difference in the outcome of the trial, in view of the compelling evidence that linked defendant to the charged offenses.

2. The Prosecutor's Comments Regarding Defense Counsel

Defendant contends the prosecution made disparaging comments regarding defense counsel. Again, defendant did not object to the comments of which he now complains, and thereby has waived his claim. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215, 40 Cal.Rptr.2d 456, 892 P.2d 1199.) Even if defendant's contention properly were before us, we would reject it. With one exception, the comments were not made in the presence of the jury, and defendant fails to demonstrate how these comments outside the jury's presence, which were of the sort one might expect to encounter during a vigorously contested capital trial, prejudiced the proceedings below. With regard to the one comment made before the jury-at the commencement of the prosecution's guilt phase rebuttal argument-we note that it was fleeting, imprecisely attributed to a member of the United States Supreme Court, and not remotely similar in degree of impropriety to the comments we have held to constitute prejudicial misconduct. (See, e.g., *People v. Hill* (1998) 17 Cal.4th 800, 72 Cal.Rptr.2d 656, 952 P.2d 673.) [FN33]

    FN33. The prosecutor argued on rebuttal as follows:

    "Good morning. [Defense counsel] suggested that the prosecution, or law enforcement developed a theory about Dean Carter's guilt and then suggested that perhaps the witnesses changed their testimony to fit that theory. Suggested perhaps that by the way we ask questions and the way we presented evidence, that we were somehow trying to manipulate the evidence to fit a theory about his guilt.

    "I suggest to you that would be improper for the prosecution to do.

    "[Defense counsel] likes to talk about age[-]old traditions in our system, he likes to talk about the Constitution, and he likes to talk about the rules, so I'm going to do that for a minute.

    "I'm going to tell you what a United States Supreme Court [justice]-he likes to do that on occasion, to, quote the United States Supreme Court-said about the relative duties between prosecutors and defense attorneys.

    " 'Law enforcement officers have an obligation to convict the guilty and to make sure they do not convict the innocent.'

    "It would be improper for the prosecution to try to manipulate a case to convict somebody who wasn't guilty.

And if we tried to do that, he wouldn't stand still for it, and the court wouldn't stand still for it.

"That hasn't happened.

*" That same United States Supreme Court Justice says, 'Defense counsel have no comparable obligation to ascertain or present the truth.'*

*" They don't have to tell you what's true. We do."* (Italics added.)

The prosecutor's comments, of which defendant now complains, are derived from *United States v. Wade* (1967) 388 U.S. 218, 256-257, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (conc. & dis. opn. of White, J.).

3. Other Alleged Prosecutorial Misconduct

Immediately after making the comment noted in the margin (fn. 33, *ante*), the prosecutor commented upon the failure of the defense to present evidence as to "why defendant was in that car with all that property. They could do that if they wanted to." [FN34] Defendant interposed an objection that the prosecutor improperly was "suggesting that the defendant should have testified, and [is] drawing attention to the fact that he did not." (See *Griffin v. California* (1965) 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (*Griffin* )). In view of the arguable ambiguity inherent in the prosecutor's comments, the trial court declined to rule as to their propriety, and instead acceded to defendant's request to reinstruct the jury at that time pursuant to CALJIC Nos. 2.60, and 2.61, which recognized defendant's constitutional right not to testify and his option to rely on the state of the evidence.

FN34. The prosecutor argued as follows:

"Defense counsel talked a lot about the presumption of innocence. He says you carry that with you into the jury room. I don't want to play a word game. The instruction says, 'The defendant in a criminal action is presumed to be innocent until the contrary is proved.'

"That happened some time ago. The contrary was proved. His innocence was disproved a long time ago in this case. It doesn't exist anymore. The evidence took that away from him.

"The rules are that the defense doesn't have to present any evidence in a case. They can if they want to. No one prevents them from presenting any evidence to you. No one prevents them from telling you what happened. No one prevents them from bringing forth witnesses to explain why the defendant was in that car with all of that property. They could do that if they wanted to."

On appeal, defendant contends that the prosecutor's comments constituted *Griffin* error. (*People v. Sanders* (1995) 11 Cal.4th 475, 527-529, 46 Cal.Rptr.2d 751, 905 P.2d 420.)

"'Pursuant to *Griffin*, it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf.' (*People v. Hughes* (2002) 27 Cal.4th 287, 371 [116 Cal.Rptr.2d 401,39 P.3d 432].) We also have said 'it is error for the prosecution to refer to the absence of evidence that only the defendant's testimony could provide.' (*Id.* at p. 372, 116 Cal.Rptr.2d 401, 39 P.3d 432, citing *People v. Murtishaw* (1981) 29 Cal.3d 733, 757 & fn. 19 [175 Cal.Rptr. 738, 631 P.2d 446].) *Griffin*'s prohibition against "'direct or indirect comment upon the failure of the defendant to take the witness stand,"' however, "'does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses.'" (*People v. Hovey* 1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776], quoting *People v. Jackson* (1980) 28 Cal.3d 264, 304 [168 Cal.Rptr. 603, 618 P.2d 149].)" (*People v. Harrison* (2005) 35 Cal.4th 208, 257, 25 Cal.Rptr.3d 224, 106 P.3d 895; see also *People v. Stewart* (2004) 33 Cal.4th 425, 505-506, 15 Cal.Rptr.3d 656, 93 P.3d 271; *People v. Brown* (2003) 31 Cal.4th 518, 554, 3 Cal.Rptr.3d 145, 73 P.3d 1137; *People v. Bradford* (1997) 15 Cal.4th 1229, 1339, 65 Cal.Rptr.2d 145, 939 P.2d 259.)

In this case, we need not decide whether the prosecutor's comments constituted error under *Griffin*, because even if we assume (without deciding) that error occurred, in view of the indirect nature of the prosecutor's comment, the court's timely reinstruction of the jury, and the strength of the evidence against defendant, it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" (*United States v. Hasting* (1983) 461 U.S. 499, 511, 103 S.Ct. 1974, 76 L.Ed.2d 96) even if the prosecutor had not made the comment at issue. Accordingly, no prejudicial error occurred.

Defendant also characterizes as improper argument certain additional remarks made by the prosecutor during summation: "There are people among us who murder other people because they like to murder other people. [¶] There are evil people among us. [¶] ... [¶] [Defense counsel] stresses that you are the conscience of the community, and you are. People in the community have emotions. It's ... improper for you to have your verdict influenced by emotion. But it is proper for you to express through a verdict how you feel about this case, to tell the defendant Dean Carter, what you did, you murdered Janette Cullins, was evil, was senseless, it was vicious, it was unforgivable, and it was first degree murder." Elsewhere during his summation, the prosecutor argued similarly.

Defendant did not interpose an objection, and thus waived his claim. But even if the issue properly had been preserved, we would reject defendant's claim of error. The prosecutor's comments were not, as defendant asserts, references to "improper[ ] character propensity," but instead came "within the range of permissible comment regarding egregious conduct on defendant's part. [Citation.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 537, 7 Cal.Rptr.2d 199, 828 P.2d 101 [rejecting a challenge to the prosecutor's characterization of the defendant as a "'mass murderer, rapist,'" "'a perverted murderous cancer,'" and a "'walking depraved cancer'"]; see also *People v. Hawkins* (1995) 10 Cal.4th 920, 961, 42 Cal.Rptr.2d 636, 897 P.2d 574 [upholding prosecutor's characterization of the defendant as "'coiled like a snake'" and a "'rabid dog'"].) Moreover, in view of the overwhelming evidence that connected defendant to the charged crimes,

> the prosecutor's remarks "could not have carried such an emotional impact as to make it likely the jury's decision was rooted in passion rather than evidence." (*People v. Thomas*, *supra*, 2 Cal.4th at p. 537, 7 Cal.Rptr.2d 199, 828 P.2d 101.)

Carter, 36 Cal. 4th at 1264-68.

With respect to the voir dire and penalty phase contentions, the California Supreme Court also rejected these claims of error, reasoning as follows:

> Defendant contends the prosecution committed misconduct at the penalty phase by "propound[ing] questions to witnesses in bad faith," interposing objections on the ground of hearsay, propounding "arguments ... designed to improperly invoke non-statutory aggravation evidence in violation of [s]ection 190.3 and [defendant's] constitutional rights," and by improperly commenting upon defendant's failure to testify in violation of *Griffin v. California*, *supra*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. Defendant further contends the prosecution improperly "used every means available to curtail testimony regarding [defendant's] childhood-or other-socio-medico information and history that were legitimately proffered for a sentence less than death."
>
> Our review of the record leads us to conclude that defendant greatly overstates his position. Although a prosecutor is not permitted to comment, "either directly or indirectly, on the defendant's failure to testify in his defense," the prosecutor may comment "'on the state of the evidence, or on the failure of the defense to introduce material evidence or call logical witnesses....'" (*People v. Turner* (2004) 34 Cal.4th 406, 419, 20 Cal.Rptr.3d 182, 99 P.3d 505; quoting *People v. Medina* (1995) 11 Cal.4th 694, 755, 47 Cal.Rptr.2d 165, 906 P.2d 2.) For the most part, the prosecution's handling of its penalty phase responsibilities fell within the range of appropriate behavior. The prosecution was vigorous in its cross-examination and summation, and in interposing objections (most of which clearly were well-founded). Even were we to assume that the isolated incidents of which defendant now complains constituted misconduct, they were trivial in the context of defendant's trial and did not resemble or even approach the sort of misconduct that we have held to be prejudicial. (See, e.g., *People v. Hill*, *supra*, 17 Cal.4th 800, 72 Cal.Rptr.2d 656, 952 P.2d 673.) We therefore reject defendant's claim of prejudicial error.[FN41]
>
> > FN41. We also reject as meritless defendant's assertions of prosecutorial misconduct to the extent that they relate to alleged instances of misconduct during voir dire, which defendant addresses in connection with his penalty phase argument.

Carter, 36 Cal. 4th at 1277.

As discussed above in section IV, the Court will address this claim on the merits irrespective of the state court's imposition of procedural bars.

To succeed on a prosecutorial misconduct claim, a petitioner must demonstrate

that the misconduct was "so egregious that it infects the trial with such unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 193 (1986). Inappropriate statements by a prosecutor, particularly during closing arguments, may present a claim of constitutional magnitude if the comments were so prejudicial that they rendered the trial fundamentally unfair. Donnelly v. DeChristoforo, 416 U.S. 637 (1974). This is because the "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982), citing Brady v. Maryland, 373 U.S. 83 (1963).

**1. Voir Dire**

Petitioner contends that "[t]he prosecutor's effort to create an atmosphere of prejudice against Mr. Carter can be traced to jury selection," which included improper appeals to sympathy for the victim, derogatory references to Petitioner, and irrelevant and improper comments about the history of capital punishment in California. (SAP at 177-78.)

***Introducing Mr. Cullins to the Jury Venire***

The trial record reflects that the prosecutor introduced Mr. Cullins, who was sitting in the courtroom as a spectator, to the panel of prospective jurors by directing their attention to the man he identified as "Mr. George Cullins" and describing him as "another man I'd like for you all to see to avoid contact with him because he's a potential witness." (RT 1539-40.) Defense counsel objected and moved for a mistrial at sidebar. (RT 1540-41.) The trial court acknowledged counsel's concerns, but denied the motion, stating that she would "probably have preferred" to have introduced Mr. Cullins herself, but noted that while Mr. Cullins had been introduced by name, he had not been identified to the venire as the victim's father. (RT 1541.)

Contrary to Petitioner's assertion that this incident was part of the prosecution's continued efforts to influence and prejudice the jury, the Court cannot conclude that prejudicial error arose from the prosecutor warning potential jurors not to speak with

a prospective witness. Moreover, while the inference may have been clear that Mr. Cullins was a relation of Ms. Cullins, the prosecutor refrained from identifying him as her father. The Court agrees that better practice would have been for the trial judge to have introduced Mr. Cullins as a potential witness, but upon review of the record, the Court finds the actions did not constitute misconduct.

***Highlighting Defense Seating Arrangements***

Petitioner also contends that the prosecutor referred to the defense's seating arrangements in a "derogatory manner," by repeatedly pointing out to potential jurors that Petitioner was "sitting between two ladies" at the defense table. (RT 1982, 1999.) Respondent maintains that Petitioner forfeited this contention by failing to object to the comments as prosecutorial misconduct at trial, when instead trial counsel merely characterized the comment as a "cheap shot." (Ans. at 150.) However, as noted above in the discussion of procedural default, the Court will consider this claim on the merits irrespective of the state court's imposition of procedural bars. Respondent alternately contends that the prosecutor's comment was simply made in response to defense counsels' tactical decision regarding the seating arrangements, and was not misconduct.

At a sidebar, second chair trial counsel stated that the prosecutor's comment was a "cheap shot" and the seating arrangements were due to a "logistics problem." (RT 2029.) However, the trial judge noted that the two women Petitioner was seated between were second chair counsel and the female investigator, the latter of whom was "at counsel's table basically with permission of the court," as "she doesn't need to be at counsel table." (RT 2029-30.) The trial judge stated that while she would not direct counsel to change their seating arrangements, they "had to be aware that that was subject to comment if it was perceived as a tactical decision," and that "[t]here are other combinations of positioning that perhaps you could come up with if you were concerned about the comment." (RT 2029.) The trial judge concluded by informing the defense, "I'm not going to take any - - I'm not going to tell the People not to [sic] it and I'm not going to tell you to change your position. I frankly think it is all tactical."

(RT 2030.)

Again, upon review of the trial record, the state court's rejection of this contention was reasonable. There is no indication in the record that the prosecutor's comments were improper; indeed, the trial court noted that the defense's chosen seating arrangements, which also appeared tactical to the trial judge, were properly "subject to comment" by the prosecutor. (RT 2029.) The Court finds no misconduct.

***Comments on Capital Punishment in California***

Petitioner additionally asserts that the prosecutor also committed misconduct during voir dire by making political comments about the state of capital punishment in California. (SAP at 178.) While questioning a prospective juror about his questionnaire responses regarding the criminal justice system, the following exchange took place:

> Mr. Pippin: Who do you think they are? Who makes the laws?
>
> Prospective Juror: The people in each state - -
>
> Mr. Pippin: Do you know how the death penalty came into effect in California when it was reinstated after they - -
>
> Prospective Juror: No, I don't.
>
> Mr. Pippin: - - the Bird Court kicked it out?
>
> Prospective Juror: No, I don't.

(RT 2680.) Defense counsel objected to the comment as incorrect, improper, and "a disparagement of the judicial system." (RT 2681.) The trial court disagreed, stating that "although I don't consider the comment was perhaps in the best of taste, I don't consider it an affront to the judiciary." The judge reasoned that if any prospective jurors were offended by the remark, they "are not going to particularly like Mr. Pippin as a result of it, so he's made his own bed and he can lie in it." (Id.) Petitioner then raised a concern that the comment could dispose prospective jurors against Petitioner or the defense, but the trial judge dismissed that possibility, stating, "I don't interpret it that way. I think that's stretching the comment a bit." (Id.)

Petitioner fails to explain how the prosecutor's comment about past actions of the California Supreme Court under Chief Justice Rose Bird could have reasonably resulted in any prejudice to Petitioner.   To the extent the prosecutor's comment was a misstatement of law, the trial judge's preliminary instructions to the prospective jurors explicitly directed that, "I will be giving you the law, and whether you would approve or disapprove of the Court's ruling or instructions, it would be your duty to accept as correct the statements of law which I give you. [] You're not allowed to substitute your own idea of what you think the law is, or what the law ought to be." (RT 407; see also RT 431.)

Moreover, once the jury was empaneled, the trial judge not only reiterated that it was the court's duty to instruct the jury as to the law, but also cautioned the jury that the statements of the attorneys were not evidence and that they "must not consider as evidence any statement of any attorney made during the trial." (RT 3215-16.) A jury is presumed to understand and follow the trial court's instructions. Weeks v. Angelone, 528 U.S. 225, 233 (2000); Richardson v. Marsh, 481 U.S. 200, 211 (1989).   In the absence of any indication to the contrary, the Court must presume that the jurors followed the trial court's admonition that the statements of counsel were not evidence and that the trial court would instruct them on the law.   In any event, even had the comments about the California Supreme Court constituted misconduct, Petitioner fails to demonstrate any prejudice.

In sum, this claim of prosecutorial misconduct during voir dire fails because Petitioner is unable to demonstrate that any of the highlighted comments actually constituted misconduct.   Moreover, even were the Court to construe the above comments as misconduct, Petitioner fails to show that the prosecutor's purported efforts to influence the jury during voir dire amounted to conduct "so egregious" that it infected Petitioner's trial with such unfairness as to result in a denial of due process. Darden, 477 U.S. at 193.  The California Supreme Court's rejection of this claim was reasonable, and Petitioner is not entitled to habeas relief on this aspect of Claim 6.

**2. Guilt Phase**

With respect to the guilt phase of trial, Petitioner contends that the prosecutors "purposefully misrepresented facts to the trial court on more than one occasion in order to persuade the trial court to rule in their favor on issues of law that were not otherwise supported by evidence or law," that they made comments disparaging of defense counsel, and that they committed misconduct in comments and misstatements of law during opening and closing arguments in rebuttal. (SAP at 178, 181-82.)

**a. Misstatements of Fact and Deceptive Practices**

***Barbara S.'s Key***

Petitioner first alleges that the prosecution committed misconduct when they "misled" the trial court into believing that a key belonging to Barbara S.'s business was found among Petitioner's possessions at the time of his arrest and that they were consulting with expert witnesses about the key, which Petitioner instead insists were "disingenuous efforts to secure a joint trial" of the Barbara S. case with the Cullins homicide case. (SAP at 178.)

A review of the trial record reveals no misconduct. On March 11, 1991, the prosecution explained that a key found in Petitioner's possession "appeared to be virtually identical" to one fitting Barbara S.'s business. (RT 740.) However, the detective who attempted to confirm the key's provenance "was unable to get that key to work in the actual door of the business, but they otherwise appeared to be identical keys." (Id.) At that time, the prosecution stated that they intended to have an expert take a look at the keys. (RT 740-41.) On April 8, 1991, the prosecution stated that they could not locate the key, that they believed it may have been disposed of or lost, and that it was most recently in the possession of a retired detective. (RT 3103-04.) There is no evidence that the prosecution acted improperly in this regard.

Moreover, Petitioner fails to show that the prosecutor's representations about the key rendered Petitioner's trial unfair. He asserts that the "trial court relied upon the prosecutors' misrepresentations in denying Mr. Carter's severance motion and

permitting joinder of the otherwise unrelated [Barbara S.] case with the Cullins capital murder case." (SAP at 178.) Yet, the state record clearly reflects that the key was merely one of multiple commonalities between the two cases that the trial court relied upon in denying the severance motion. For instance, aside from the key, the trial court noted that both victims had missing credit or ATM cards, that Petitioner had previously associated with both victims, and that the time span between the crimes was a matter of weeks. (RT 2963-65.) The trial court also noted that there was evidence that both crimes involved the use of a knife, that a similar knife had been found in Petitioner's possession, and that Petitioner had been found in the possession of "rather worthless items" from each victim. (Id.)

As such, this Court finds no evidence that the prosecution's alleged misrepresentations about the Barbara S. key had a prejudicial effect on the outcome of his trial proceedings. The state court's rejection of this contention was objectively reasonable.

***Existence of a Warrant***

Petitioner alleges that "[t]he prosecutors claimed in pretrial proceedings that a lawful warrant had issued to search Carter, which justified his illegal stop, detention and arrest on April 17, 1984," and that "the prosecutors' false representation was used in an attempt to dissuade the trial court" from proceeding with a suppression hearing related to the search. (SAP at 179, citing CT 126-37.)

As an initial matter, the Court's review of the record fails to substantiate Petitioner's claim of misconduct, as the cited portion fails to include any prosecutorial assertion or representation that the April 17, 1984 search of Petitioner was conducted pursuant to a warrant. Instead, the prosecution primarily argued that the defense motion to suppress was inadequate because the defendant failed to demonstrate standing to challenge the search and because he failed to provide proper notice sufficient for a hearing. (CT 131-36.) The prosecutor alternately argued that the stop, detention and arrest was lawful, arguing not that a warrant had issued, but that the officer had

reasonable cause for the stop and arrest. (CT 136-37.) The prosecution asserted that "the car was not searched until after the Arizona Highway Patrol officer learned that the vehicle was wanted in connection with a crime in Culver City," adding that "[w]hen police officers have probable cause to believe that an automobile contains contraband or evidence of a crime or is itself an instrumentality of a crime, they may search the vehicle for such contraband or evidence even without a search warrant." (CT 137.)

Petitioner fails to specifically indicate how the cited passages support his contention that the prosecutor made false representations about the existence of a warrant. In any event, despite any alleged misrepresentations, the court proceeded to convene the parties for a suppression hearing. At the suppression hearing, the prosecutor explicitly conceded, consistent with the argument in the moving papers, that "we are unable to prove there was a search warrant. We shouldn't have to because we don't need a search warrant to search something that he doesn't have a right to complain about for the search." (I-14 RT 32.)

Ultimately, the Court did not rule on the propriety of the search because the parties were unable to reach an agreement as to Petitioner's standing to contest the search, and defense counsel declined the offered opportunity to demonstrate standing. (See Claim 15, infra.) As the prosecution's alleged arguments did not prevent the trial court from attempting to hold a suppression hearing, Petitioner fails to demonstrate that the alleged misconduct had a prejudicial effect on the outcome of his trial proceedings. The state court's rejection of this contention was objectively reasonable.

***Failure to Provide Petitioner with Kim Case Discovery***

Petitioner alleges that evidence of Tok Kim's death was erroneously admitted as other crimes evidence, "when in fact the prosecution failed to provide Mr. Carter's trial counsel with discovery that eliminated him as a source of semen on Ms. Kim's bedspread." (SAP at 179.)

However, a review of the state record clearly indicates that the forensic report in question was turned over to defense counsel well in advance of the San Diego trial. The

California Supreme Court noted that the report was provided to Los Angeles defense counsel on or before June 15, 1989, in response to a February 19, 1988 discovery motion.  See Carter, 36 Cal. 4th at 1160.  Meanwhile, Petitioner's San Diego trial commenced in 1991, as pre-trial motions were filed and argued between January and March 1991, jury selection took place between March 1 and March 28, 1991, and opening statements took place on April 10, 1991.  (See CT 2569-73, 2580-81; 2575-2601; 2608.)  Petitioner fails to demonstrate any misconduct when he was provided with the report in question over eighteen months before pre-trial proceedings commenced in his case.

Not only does Petitioner fail to show that the alleged delay in providing the report constituted misconduct, but he additionally fails to explain how any such misconduct had a prejudicial effect on his defense.  First, the prosecutor repeatedly reminded the jury that the evidence about Ms. Kim's death was admissible for limited purposes, and that the jury's verdicts would involve only the crimes against Ms. Cullins and Barbara S.  (See RT 6655-56, 6689-96, 6698-99.)

Additionally, the report eliminating Petitioner as a source of semen found on Ms. Kim's bed was of limited relevance to his defense against the sexual assault of Barbara S. or the murder of Ms. Cullins, as Petitioner was not charged with crimes against Ms. Kim in the San Diego proceedings, and the San Diego prosecution conceded during closing arguments that there was no physical evidence of sexual assault with respect to Ms. Kim.  (See RT 6738- "We know the defendant was probably having at least a consentual [sic] sexual relationship with Ms. Kim at first based on the fact that when he was scene [sic] at the Shell Station on April 2nd he had a hickey on his neck.  He was a [sic] sheepish about his relationship with Ms. Kim to the gas station attendant. [¶]  Her body was obviously too decayed for there to be any signs of whether she was sexually assaulted or not.")  Earlier in his closing argument, the prosecutor had offered a list of the victims who had been sexually assaulted, and did not mention Ms. Kim, arguing "Jillette Mills was raped, Bonnie Guthrie was raped, and there is at least

evidence that Susan Knoll was sexually assaulted. Those women were all sexually assaulted. Rose S.[] and, of course, Barbara S.[] were raped." (RT 6685.)

Petitioner has not shown that the failure to provide the 1986 lab report regarding the Kim forensic evidence until 1988 constituted misconduct that resulted in prejudice to his defense as to the Barbara S. and Cullins crimes. The California Supreme Court's rejection of this claim was reasonable.

***Testimony of Polly Haisha***

Petitioner alleges that "[t]he prosecutors misrepresented that Polly Haisha, a law clerk in the San Diego District Attorney's Office, was a minor witness who would only be called if Carter denied ownership of an address book found in his possession and that included her name in it" and did not reveal Ms. Haisha as a potential witness until the first day of trial, which allowed her to remain in the courtroom for a portion of opening statements (Pet. Brief at 173.) Petitioner also states[24] that "[a]lthough ownership of the address book was never contested, Haisha was called to testify to wholly irrelevant and highly inflammatory matters beyond simply identifying her name and telephone number to the jury, or the dates of calls from Carter." (Id.)

However, the Court cannot conclude that the prosecution misrepresented Ms. Haisha's testimony based only on the fact that, when called as a witness, she testified to additional matters than originally anticipated surrounding her contact with Petitioner. It is clear that, on April 10, 1991, the prosecutor informed defense counsel and the trial court that they had found Ms. Haisha's name in Petitioner's address book, asked her about it, and discovered that she "had met Dean Carter at a party and he had put her

---

[24] Petitioner also alleges that he warrants relief because the state court's decision involved an unreasonable determination of fact. On direct appeal, the California Supreme Court noted that defense failed to object to misconduct or discovery violations. See Carter, 36 Cal. 4th at 1264. Yet, the state record indicates that defense counsel raised an objection to the prosecutor's failure to turn over Ms. Haisha's phone number. (RT 4203.) However, this instance was only cited in the imposition of the procedural bar, and as such, does not go "to a material factual issue that is central to petitioner's claim." Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir. 2004). The procedural bar was not the sole ground for the disposition of Petitioner's claim on direct appeal, as the state court separately considered and rejected the claim on the merits.

name in his phone book." (RT 3327.) The defense was therefore aware that Ms. Haisha and Petitioner had met on a prior occasion and that Petitioner had been in possession of her contact information. The prosecutor's statements about their intent in calling Ms. Haisha did not prevent defense counsel from determining whether Petitioner and Haisha had additional contacts and the contents of such exchanges, either by contacting Ms. Haisha or by talking with Petitioner, their client, prior to her testimony on April 18, 1991. In short, the prosecutor properly identified Ms. Haisha as a potential witness and Petitioner fails to point to any clearly established authority supporting his position that the prosecution's actions in this regard constituted misconduct.

Even were the Court to consider the prosecutor's representations about Ms. Haisha as misconduct, Petitioner fails to demonstrate prejudice. As the state court reasonably concluded, "Haisha was a minor witness whose testimony was peripheral to the central events underlying defendant's crime spree." Carter, 36 Cal. 4th at 1265.

Moreover, the record reflect that several other witnesses were in the courtroom during opening statements, including Jennifer S., Sandra Pender, and Richard Hass. (RT 3330-31.) Once apprised of this fact, the trial judge directed those witnesses to vacate the courtroom, stating:

> Everybody except Mr. Cullins, there has been an order to exclude witnesses. That was not specifically initially stated to include opening statement, but I would include opening statement when asked about it, so all witnesses must wait outside.

(RT 3330-31.) The judge also noted for the record that "the three people that raised their hand have now left. And I believe the law student witness left before that." (RT 3331.) In this direction, and in the sidebar conference immediately beforehand, the judge explicitly acknowledged that the initial instructions had been unclear about whether witnesses would be excluded from the courtroom during opening statements. (See RT 3324-26 - in which the trial judge conceded that "I don't think the order was sufficiently specific initially. I'm going to now include the opening statements in case there is any misunderstanding.") As such, Petitioner has not shown that Ms. Haisha's

presence in the courtroom during that portion of opening statements was misconduct, as it was not against any specific direction of the court, much less that it resulted in any prejudice to the outcome of Petitioner's case. The state court's rejection of this contention was objectively reasonable.

**b. Comments Disparaging Defense Counsel**

As noted above in the state court's opinion on direct appeal, the prosecutor's argument in rebuttal argument began with the following remarks:

> Good morning. Mr. Bumer [lead defense counsel] suggested that the prosecution, or law enforcement developed a theory about Dean Carter's guilt and then suggested that perhaps the witnesses changed their testimony to fit that theory. Suggested perhaps that by the way we ask questions and the way we presented evidence, that we were somehow trying to manipulate the evidence to fit a theory about his guilt.
>
> I suggest to you that would be improper for the prosecution to do.
>
> Mr. Bumer [lead defense counsel] likes to talk about age old traditions in our system, he likes to talk about the Constitution, and he likes to talk about the rules, so I'm going to do that for a minute.
>
> I'm going to tell you what a United States Supreme Court - - he likes to do that on occasion, too, quote the United States Supreme Court - - said about the relative duties between prosecutors and defense attorneys.
>
> "Law enforcement officers have an obligation to convict the guilty and to make sure they do not convict the innocent."
>
> It would be improper for the prosecution to try to manipulate a case to convict somebody who wasn't guilty. And if we tried to do that, he wouldn't stand still for it, and the Court wouldn't stand still for it.
>
> That hasn't happened.
>
> That same United States Supreme Court Justice says, "Defense counsel have no comparable obligation to ascertain or present the truth."
>
> They don't have to tell you what's true. We do.

(RT 6858.) Petitioner contends that the trial prosecutor's argument was a misstatement of law and "was clearly intended to disparage [Petitioner's] trial counsel's ethics and integrity before the jury, improperly infusing prosecutors with judicial imprimatur," violating Petitioner's constitutional rights. (SAP at 181.) As discussed above, despite the fact that trial counsel did not raise any specific objection to these remarks, the Court

will consider Petitioner's contentions on the merits irrespective of the state supreme court's imposition of a procedural bar.

"[A]bsent specific evidence in the record, no particular defense counsel can be maligned." Bruno v. Rushen, 721 F.2d 1193, 1995 (9th Cir. 1983). As there is no record indication that the prosecutor had evidence supporting this attack, the argument appears to be inappropriate on its face. However, in this instance, the Court must also consider whether these remarks can be considered an "invited response" to defense counsel's comments. See United States v. Young, 470 U.S. 1, 12-13 (1985) (improper prosecutorial remarks on rebuttal did not rise "to the level of 'plain error' when he responded to defense counsel" by expressing his belief in the defendant's guilt, as defense counsel's closing argument asserted "that the Government did not believe in its own case.")

A review of the state record shows that defense counsel's closing argument, made immediately prior to the prosecutor's rebuttal, repeatedly argued that the prosecution witnesses may have altered their testimony to fit the prosecution's "theory" of the crime. For instance, defense counsel Bumer discussed the testimony of Barbara S. and argued that despite Barbara's inability to identify Petitioner as her assailant in 1984, "She is absolutely determined now in 1991, that Dean Carter is the man who raped her. So this is a good example of how testimony - - witnesses' memories or at least witnesses' stories change over time to fit the theory that Dean Carter is guilty." (RT 6835.) Defense counsel's closing argument repeatedly offered examples of witness testimony, such as that of Mr. Elson (who testified about a jacket Petitioner wore in Oakland), Mr. Jeffries (a maintenance worker at the Kim complex in Oakland who testified that he saw Petitioner in the vicinity), and Ms. Johnson (who testified about her sexual encounters with Petitioner in Ventura in March 1984) that fit "this theme of a theory, and stories changing to fit the theory." (RT 6836-40.) Defense counsel repeatedly cited such witness testimony in arguing that "[t]he theory develops that Dean Carter is guilty, and the stories and the testimony change to fit the theory." (RT 6843.)

It appears that the beginning of the prosecutor's remarks in rebuttal were aimed at countering the defense's allegations that the evidence and witness testimony had been shaped to fit the prosecution's theory of the crime. The Supreme Court instructs that if such remarks were arguably invited, a reviewing court must examine the alleged misconduct in light of both counsel's arguments; that is, "if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." Young, 470 U.S. at 12-13. However, reviewing both counsel's arguments, the comments at issue continued beyond what could be interpreted as an "invited response," and contained an uninvited attack on defense counsel's truthfulness. Meanwhile, defense counsel, even after arguing that the witnesses may have shaped their testimony to fit the theory of the crime, had explicitly affirmed the desire of all counsel to make accurate and truthful arguments. In fact, Mr. Bumer specifically noted that because attorneys make arguments by memory, the jury was encouraged to "checkup" on them via transcripts of the proceedings, avowing that "there is no possibility that people like Mr. Pippin and Mr. Eichler [trial prosecutors], or myself and Ms. Dedina [defense counsel], we're going to get up here and deliberately misstate evidence." (RT 6840.) As such, this does not appear to be a situation where, like in Young, "any potential harm from this remark was mitigated by the jury's understanding that the prosecutor was countering defense counsel's repeated attacks on the prosecution's integrity and defense counsel's argument that the evidence established no crime." Young, 470 U.S. at 17-18.

In any event, even considering that these remarks may have risen to the level of misconduct, "the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." Id. at 12. Unlike the reversible error found in Bruno, where the prosecutor repeatedly intimated that "the fact that the accused hired counsel was in some way probative of his guilt" and suggested that "defense counsel had agreed for the sake of profit to aid in fabricating a defense," there is no evidence that Mr. Pippin's remarks were "calculated to wrongly impute guilt

to the defendant." Bruno, 721 F.2d at 1195. In this case, Mr. Pippin's comments about defense counsel were brief, comprising only a few lines of a rebuttal argument which spanned nearly thirty-four transcript pages, and were not repeated. As the California Supreme Court reasonably noted, the contested remark "was fleeting, imprecisely attributed to a member of the United States Supreme Court, and not remotely similar in degree of impropriety to the comments we have held to constitute prejudicial misconduct." Carter, 36 Cal. 4th at 1265.

The Court finds no reversible error arising from the alleged misconduct. The state supreme court's rejection of this contention on appeal was not objectively unreasonable.

**c. Argument During Opening and Rebuttal**

***Griffin Error***

Immediately following the comment addressed above, the prosecutor offered argument and comments on the presumption of innocence, stating:

> Mr. Bumer talked a lot about the presumption of innocence. He says you carry that with you into the jury room. I don't want to play a word game. The instruction says, a defendant in a criminal action is presumed to be innocent until the contrary is proven.
>
> That happened sometime [sic] ago. The contrary was proved. His innocence was disproved a long time ago in this case. It doesn't exist anymore. The evidence took that away from him.
>
> The rules are that the defense doesn't have to present any evidence in a case. They can if they want to. No one prevents them from presenting any evidence to you. No one prevents them from telling you what happened. No one prevents them from bringing forth witnesses to explain why the defendant was in that car with all of that property. They could do that if they wanted to.

(RT 6858-59.) Defense counsel objected, arguing that the prosecutor was "suggesting that the defendant should have testified," and asked for a cautionary instruction. (RT 6861.) The trial court declined to rule on whether the prosecutor actually commented on the defendant's constitutional right not to testify, stating that while the comment was "reasonably related to evidence other than the defendant testifying," but agreed that "the implication is also a carryover to the defendant testifying." (RT 6861.) The trial judge

re-instructed the jury with CALJIC 2.60 and 2.61, the instructions relating to the defendant's right to rest on the state of the evidence and his constitutional right not to testify. (See RT 6862-63.) Petitioner also complains that, even after the curative instruction, the prosecutor continued to make improper comments about the evidence, stating that he won a "bet" or "wager" with himself that defense counsel would not address or explain certain evidence introduced at trial. (See RT 6874, 75.)

Petitioner contends that these comments violated his constitutional privilege against self-incrimination under Griffin v. California, 380 U.S. 609 (1965). Yet, a review of the record clearly indicates that the prosecutor's comments were directed at defense counsel's presentation of the case and their alleged failure to "bring[] forth witnesses" on their behalf, rather than at the defendant's decision not to testify. "While a prosecutor may not draw attention to a defendant's silence, prosecutors are entitled to call attention to the defendant's failure to present exculpatory evidence more generally." United States v. Mayans, 17 F.3d 1174, 1885 (9th Cir. 1994), citing United States v. Lopez, 803 F.2d 969, 973 (9th Cir. 1986). Accordingly, the Court finds no Griffin error.

Also, as a related matter, the Court must presume the jury understood and followed the trial court's instructions. Weeks, 528 U.S. at 233. Here, the jury was specifically re-instructed that the defendant had the right not to testify and to rest on the state of the evidence, and Petitioner fails to offer any evidence that the jury failed to comprehend or comply with these instructions.

Thus, in light of the indirect nature of the comments and the trial court's prompt curative instruction, Petitioner fails to demonstrate that the prosecutor's comments were so prejudicial that they rendered his trial "so fundamentally unfair as to deny him due process." Donnelly, 416 U.S. at 645. The state court's rejection of this contention was not an objectively unreasonable application of clearly established federal law.

***Arguments About Propensity and Community***

Petitioner argues that the prosecution also "improperly stated the law and urged

the jury to rely upon other-crimes evidence to prove that such evidence demonstrated Mr. Carter's predisposition to commit the charged crimes" and made improper character attacks to the same end.  (SAP at 183.)  He also contends that the prosecution improperly "urged the jury to base their verdict on inflamed passions," stating that the charged crimes should make them angry, and that when such crimes are committed by "evil" people, the community has an obligation to convict.  (Id.)

In closing, prosecutor Eichler argued to the jury, stating that "When he [sic] ask yourself if Dean Carter is the type of person then that has this intent to commit a murder in the manner that he committed the murder against Jan Cullins, you can look at the victims who lived."  (RT 6730.)  Mr. Eichler then referred to the sexual assault of Jennifer S. and the victim's fear and survival, arguing, "That's the same person that had that intent when he broke into Jan Cullins' apartment.  [¶]  So, Dean Carter then is not just somebody that's capable of rape, he's capable of murder."  (Id.)  In rebuttal, prosecutor Pippin referred to this argument, stating:

> The truth is- - I think this was a point Mr. Eichler made well yesterday - - There are people among us who murder other people because they like to murder other people. [¶] There are evil people among us. [¶] We have a system to deal with them.  It's slow, it's cumbersome, but it works. [¶] And when you find these evil people and you see them and you know they are evil, when you know they have done evil deeds, and they're charged with that, we, as a community, have an obligation to convict them of it, to tell them and everybody else we will not tolerate that activity.  [¶] This activity ought to make you angry, but you shouldn't convict him because you're angry.  [¶] You convict him because he did these crimes, and the evidence proves he did these crimes.

(RT 6880-81.)

Mr. Pippin also argued that:

> As I indicated, we asked you to perform your task and make your decision being uninfluenced by emotion. [¶]  Mr. Bumer stresses that you are the conscience of the community, and you are.  People in the community have emotions.  It's proper for you - - it's improper for you to have your verdict influenced by emotion.  But it is proper for you to express through a verdict how you feel about this case, to tell the defendant, Dean Carter, what you did, you murdered Janette Cullins, was evil, it was senseless, it was vicious, it was unforgivable, and it was first degree murder.

(RT 6890.)

With respect to Petitioner's contention that the prosecutor improperly made arguments about what was in the best interest of the community (see SAP at 184), a review of the state record shows that defense counsel had earlier argued in closing that:

> We have a jury to stand between the government and its witnesses and the person who is accused.  [¶] A jury is the conscience of the community.  You listen to the evidence, you determine the credibility, the believability, or acceptability of the evidence.  You decide the case based on the evidence under the law as the Judge tells you the law."
>
> ...
>
> "You take the evidence that you have seen and heard, you take the law that Judge Lasater has told you the law, and you take your own common sense because you are the conscience of the community.  [¶]  You are the product of hundreds of years of history and experience which tells us that you must be here.

(RT 6824.)

It therefore appears that the prosecutor's contested remarks about community were aimed at the defense's own exhortation about the jury's responsibility as the "conscience of the community."   In this instance, it is clear that because "the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,'" reversal of the conviction is not warranted.  Young, 470 U.S. at 12-13.

In addition, Petitioner fails to demonstrate that referring to him as "evil" and the "type" of person capable of committing these crimes rendered his trial fundamentally unfair.  In Furman v. Wood, 190 F.3d 1002 (9th Cir. 1999), the Ninth Circuit failed to find prejudicial misconduct where the trial prosecutor made reference to a defendant's "twisted, and ugly, and vicious" conduct and also referred to defendant as a "con artist."  Id. at 1005-06.  In concluding that the prosecutor's comments had not deprived the petitioner of due process, the reviewing court found it "appropriate to consider whether the jury was instructed to decide solely on the basis of the evidence rather than counsel's arguments, and whether the state's case was strong."  Id. at 1006, citing Darden, 477 U.S. at 182.

Here too, the trial judge instructed the jury that their verdict was to be based only

on the evidence presented and the law as stated by the judge, and that they "must not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." (See CALJIC 1.00, CT 2253-54.) The trial court also specifically instructed that jurors "must not consider as evidence any statement of any attorney made during the trial." (RT 3215-16.) Additionally, as detailed in the discussion of Petitioner's claim of insufficient evidence to support his convictions (see Claim 12, infra), the prosecution's case against Petitioner was strong.

Accordingly, this Court cannot conclude that the state court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. Habeas relief is not warranted on this contention.

**3. Penalty Phase**

With respect to the penalty phase of trial, Petitioner contends that the prosecutor "propounded questions to witnesses in bad faith, and arguments mounted were designed to improperly invoke non-statutory aggravation evidence." (SAP at 184.) Petitioner specifically contends that the prosecutor:

(1) objected to the mitigation testimony of cultural anthropologist Linda Ellanna, Ph.D. and then emphasized defense counsel's failure to present such evidence in mitigation; (2) asked improper questions of witness Jerry Carter implying that Petitioner abused his children; (3) attempted to introduce Petitioner's juvenile record and made improper comments about defense counsel; (4) improperly questioned other witnesses; and (5) made numerous improper statements in closing arguments. (SAP at 184-192.)

***Dr. Ellanna***

In penalty phase closing arguments, the prosecutor argued that extreme emotional disturbance was not a mitigating factor in the instant case, stating in part:

> In fact, it seemed to be, by the way the defense was presenting their evidence, the kind of case where the defense could find some mental health expert to come in here and tell you that this defendant was suffering under some mental or emotional disturbance so that you could factor that in, in deciding whether you were going to give him life in prison or not.
>
> You think they could find somebody who could come in and talk

> about the kinds of things he put evidence on before you; that he was part Eskimo; that he grew up in Nome; that his parents drank too much; that [sic] parents liked his brother better than they liked him; that he continued to run away.

(RT 8611.) Defense counsel objected, stating at a side bar that their chosen expert had been excluded from testifying, to which the trial court noted that Dr. Ellanna was "not qualified in that area," and overruled the objection. (RT 8612.)

Petitioner contends that because the trial court had granted the prosecution's improper motion to exclude the testimony of cultural anthropologist Dr. Linda Ellanna, the prosecutor committed misconduct in highlighting the defense's lack of expert testimony on this subject. (SAP at 185.) The Tenth Circuit's decision in Paxton v. Ward, 199 F.3d 1197, 1216-18 (10th Cir. 1999), which Petitioner cites in support of his position, is distinguishable. In that case, charges that the defendant had murdered his wife had been previously been dismissed pursuant to stipulation because the defendant had passed a polygraph. Id. at 1216. However, when the defendant was later tried for that same crime, the jury was not informed of the reasons underlying the prior dismissal. Id. At the defendant's penalty phase proceedings, the prosecutor improperly and dishonestly argued to the jury that the defendant failed to offer evidence supporting his innocence, asserted that the reasons for the dismissal were unknown, and implied that the reason for the prior dismissal was that the defendant's daughter previously declined to testify against her father. Id. There, the misconduct at issue, combined with the erroneous admission of improper and prejudicial testimony, was found to have violated the petitioner's constitutional rights. Id. at 1217-18.

Here, Petitioner fails to demonstrate that Dr. Ellanna, despite her training as a cultural anthropologist, was to be called as an expert witness or that she would have offered expert testimony on the subject areas mentioned by the prosecutor. The prosecutor criticized the defense's failure to call a mental health expert, and Petitioner fails to demonstrate that a cultural anthropologist can be considered such an expert.

Additionally, the proposed testimony included Dr. Ellanna's direct knowledge of the general Nome environment, including alcoholism and prejudice towards Eskimo

or part-Eskimo individuals, and her interactions with Petitioner's step-father Jim Carter and observations of his attitudes towards and prejudices against native Eskimo children. She had only come into brief and largely indirect contact with Petitioner on two occasions when he was a child, had not observed Mr. Carter's interactions with Petitioner, and did not claim the ability to capably testify about the impact of Petitioner's environment and upbringing on his mental state. The prosecutor's comments that the defense had failed to present evidence of extreme emotional disturbance from a mental health expert could not have reasonably referred to her excluded testimony.

In this case, the prosecutor was entitled to comment on what he perceived to be an absence of relevant, qualified testimony that Petitioner's crimes were mitigated by extreme emotional disturbance. See Menendez v. Terhune, 422 F.3d 1012, 1037 (9th Cir. 2005); see also Ceja v. Stewart, 97 F.3d 1246, 1253-54 (9th Cir. 1996) ("Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom.") The Court finds no misconduct in this instance. The California Supreme Court's rejection of this contention was not objectively unreasonable.

***Examination of Jerry Carter***

During cross-examination of Petitioner's brother Jerry Carter, the prosecutor inquired about Petitioner's attitude with respect to his divorce, child support, and child custody situations as follows:

Q: And at the time you saw him, did he say anything about a $800 a month child support payment that he had to make that was ordered in September of '83?

A: He didn't say how much or anything. He just said child support.

Q: Was he - - what was his attitude towards making that?

Mr. Bumer: I'm going to object Your Honor, to relevance.

The Court: Overruled. You may answer that question.

A: Not too happy because of the fact that he did state that he was

unable to see his boys.

By Mr. Pippin:

Q: Did he tell you why?

A: And he really wasn't happy with it.

Q: Did he tell you why?

A: No, he didn't.

Q: Didn't say anything about beating them?

A: No, he didn't.

(RT 7480.)

At side bar, the prosecutor argued that he had a good faith basis for asking the question, as he had "reports from interviews with his wife that not only did he mistreat the boys, he molested the daughter that was his stepdaughter." (RT 7481.) The trial judge held that, based on the prosecutor's statements, that he had a good faith basis for asking the question, and that it had been answered in the negative. (Id.) A later review of the divorce records revealed that Petitioner's ex-wife had alleged that she had been abused, but never contended that Petitioner had abused their twin boys. (RT 7931-40.) Defense counsel moved for a mistrial. (Id.) The trial judge stated, "I don't think this was intentional misconduct, based upon what I have before me. My preference is that the question hadn't been asked." (RT 7941-42.) The trial court noted that "[t]here isn't a sufficient basis that I would allow the question to be asked again, but I can see why it was asked," based on the records provided. (RT 7943.) The trial judge declined to order a mistrial, and gave defense counsel the option of a curative instruction. (RT 7943-45.) At the conclusion of the penalty phase presentations, the trial judge read the jury the following instruction:

> Okay. Ladies and Gentlemen, you were instructed earlier that a question in and of itself is not evidence, and may be considered by you only as it supplies meaning to the answer. [¶] This is true for all questions, but also for the question asked of Jerry Carter concerning physical abuse by the defendant, Dean Carter, on his twin sons. [¶] There is no evidence of physical abuse of the boys.

(RT 8548.)  As stated previously, the Court must presume the jury understood and followed the trial court's instructions.  Weeks, 528 U.S. at 233.  Petitioner fails to offer any evidence that the jury failed to comprehend or comply with her explicit instruction.

Petitioner contends that the prosecutor "exploited" this earlier misconduct by arguing in closing that "[t]he inability to visit your children could be an extenuating factor and something that could cause you to feel sorry for someone if you were wrongly prevented from seeing your children.  But if your conduct in some way caused you to forfeit your right to see your children, then it is not a factor that should cause you sympathy, and you don't have any evidence."  (RT 8642.)  Yet, Petitioner fails to demonstrate that these remarks relate to the earlier question about child abuse; instead, a review of the record indicates that the argument appeared to be directed toward the defense's attempts to appeal to the sympathies of the jury.  Indeed, the prosecutor followed the contested remarks by arguing that "the defense presents part of it, and says, it wants you to speculate, please feel sorry for my client, because he had twin boys and there came a time when he couldn't see them anymore, and that depressed him, so give him a break for killing Janette Cullins in San Diego."  (Id.)  The Court finds no error in this regard.

In any event, even if the prosecutor's comments can be construed as improper, Petitioner fails to show that the conduct was "so egregious that it infects the trial with such unfairness as to make the resulting conviction a denial of due process."  Darden, 477 U.S. at 193.  Accordingly, the California Supreme Court's rejection of this contention was not objectively unreasonable.

***Juvenile Conduct and Convictions***

Petitioner contends that the prosecutor "was admonished by the court that evidence of Carter's allegedly violent conduct as a juvenile was not admissible," yet the prosecutor "ignored the court's directive" in closing arguments.  (Pet. Merits Brief at 177, citing RT 7798-7806.)

During the examination of Petitioner's adult probation officer, the prosecutor

posed several questions about the witness' knowledge of Petitioner's juvenile convictions, based on documents the witness had not previously reviewed.  At sidebar, the trial judge noted that "My concern about these records is that they're not felony convictions, and they're not crimes of violence.  [¶] You said juvenile records, juvenile records would not indicate a conviction under the case law that I have reviewed before we started this phase."  (RT 7802.)   The trial court allowed questions about what records the witness had reviewed, including juvenile and adult records.

In closing, the prosecutor argued that Petitioner, as a juvenile, had committed a "burglary where he pointed a .357 Magnum at someone." (RT 8631.)  After objection and a review of the transcripts, the trial court admonished the jury that "there was at this point no evidence I could find to a .357 Magnum.  It was a reference to a pistol."  (RT 8634.)  The prosecutor admitted that while "I thought the evidence indicated the kind of pistol that was used in the burglary that sent him to McLaughlin.  Apparently the testimony is that a pistol was used, and that's something you can consider." (RT 8634.)

The prosecutor noted that the defense had initially presented the information about Petitioner's time in youth camp as a result of the juvenile convictions, stating "[t]hose are the things that caused him to be confined when he was a juvenile presented to you presumably as mitigating factors."  (RT 8634.)  The prosecutor also conceded that "In presenting evidence to you of aggravating factors, the prosecution can only put on felony convictions for crimes that involved acts of violence," conceding that "[j]uvenile findings aren't felony convictions so we won't present that evidence to you."  (RT 8634-35.)

Based on a review of the entire record, Petitioner fails to demonstrate that the erroneous reference to a make and model of gun, rather than accurately noting that the reference was to a pistol having been used in the burglary, constituted misconduct.  Particularly in light of the trial court's admonishment, the prosecutor's admission of error, and the prosecutor's explicit acknowledgment that juvenile findings were not admissible as aggravation, the Court is not persuaded that this reference resulted in

prejudice to Petitioner. The state court's rejection of this contention was reasonable.

***Comments About Defense Counsel***

In closing, the prosecutor argued that the defense failed to provide Petitioner's probation officer or youth camp counselor with juvenile records because "he tried to blow it by you that oh, here poor Dean Carter was locked up for some unjustifiable reason when he was a juvenile. [] That's what he was trying to do. The law let's [sic] defense attorneys manipulate the evidence like that." (RT 8636.)

"[A]bsent specific evidence in the record, no particular defense counsel can be maligned." Bruno v. Rushen, 721 F.2d 1193, 1995 (9th Cir. 1983); but see United States v. Del Toro-Barboza, 673 F.3d 1136, 1151 (9th Cir. 2012) (prosecutorial comment that defense counsel "tried to slip in some stuff" did not constitute reversible error, as "defense counsel was equally accusatory during its closing" and the comments were distinguishable from those at issue in Bruno.) Here, as there is no record indication that the prosecutor had evidence supporting this attack, or that the remarks were invited, the argument appears to be inappropriate. However, as with the guilt phase arguments, there is no evidence that these remarks were "calculated to wrongly impute guilt to the defendant." Bruno, 721 F.2d at 1195. The comments about defense counsel were brief, comprising only a few lines of a closing argument which spanned seventy transcript pages, and the Court cannot conclude that the remarks rendered the trial unfair. Ultimately, Petitioner fails to demonstrate that the comment constituted error that violated his right to due process. Darden, 477 U.S. at 181. The state court's rejection of this contention was not objectively unreasonable.

***Examination of Other Defense Witnesses***

Petitioner also contends that the prosecutor "repeatedly asked improper questions of defense penalty phase witnesses to inflame the passions of the jury." (Pet. Brief at 178.) Of defense witness Robert Jenkins, who, liked Petitioner suffered from drug and alcohol problems, the prosecutor asked "You didn't strangle any girls, rape any women?" (RT 8078.) The defense objected to the question as argumentative and the

trial court promptly sustained the objection. (Id.)

The prosecutor then asked witness Beth Farley two contested questions, the first being, “There are other mass murderers from Nome, Alaska?” (RT 7676.) Again, the defense immediately objected, the trial judge asked the prosecutor to rephrase the question, and the prosecutor withdrew the question. (Id.) Ms. Farley stated that she had spoken to Petitioner since his arrest, and the prosecutor inquired as follows: “Did you ask him why he would kill somebody else’s children?” (RT 7680.) The defense objected, did not state the grounds for the objection, and the prosecutor rephrased the question as “Did you ask him about the crime?” without a ruling by the trial judge. (Id.)

Based upon the Court’s review of the record, it is clear while that these identified instances reflect the argumentative nature of the prosecutor’s questions, they do not constitute misconduct. First, the jury was repeatedly instructed that statements of counsel were not evidence. (See e.g. RT 3215-16; CT 2256, CALJIC 1.02.) Again, prior to the penalty phase opening statements, the trial court reiterated that “As I’ve told you before, what the lawyers say is not evidence.” (RT 7278). See Greer v. Miller, 483 U.S. 756, 766 n.8 (“We normally presume a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it...”) Moreover, given that the trial court sustained one objection, asked the prosecutor to rephrase a second question before it was withdrawn, and that the prosecutor rephrased the third question before the trial court ruled on that objection, Petitioner fails to demonstrate that the mere fact that these questions were initially posed “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Donnelly, 416 U.S. at 643.

The state court’s rejection of this contention was not objectively unreasonable.

///

///

***Arguments to the Jury***

Petitioner contends the prosecutor also committed misconduct in arguing to the jury that the death penalty was “the morally right thing to do, and your community will

applaud you for doing it," as well as by offering his personal opinion about the propriety of the death penalty in Petitioner's case. (Pet. Brief at 178, citing RT 8652, 8588, 8591-92.)

With respect to the latter contention, the prosecutor asserted in closing that "Over seven years ago now, when I examined the evidence in this case, the conclusion reached then was that death was the appropriate thing, the appropriate sentence for the person responsible for this. Nothing has come to light since then, no evidence has been presented to change that decision as of today." (RT 8588.) Upon objection, the trial judge agreed that "[t]he prosecution cannot state their own opinions, but I think that the way it's phrased gets around it enough." (RT 8589-90.) The trial court opined that "I don't think this is prosecutorial misconduct by any stretch of the imagination," and declined to take further action. (Id.) The record reflects that, prior to closing penalty phase arguments, the trial judge repeated the earlier instruction that "[s]tatements made by the attorneys during trial are not evidence." (RT 8558.)

With respect to the prosecutor's comments about community, immediately after the prosecutor concluded his arguments, the trial court reminded jurors of an earlier instruction, stating that "You must neither be influenced by bias, nor prejudice against the defendant, or swayed by public opinion or public feelings." (RT 8658.) The trial judge had previously given this instruction just before closing arguments, (see RT 8550-51), in addition to an instruction which stated "the law does forbid you from being governed by mere conjecture, prejudice, passion or public opinion." (RT 8553.)

Even assuming the contested comments were in error, given the explicit instructions of the trial court and the lack of any evidence that the jury did not understand or follow their instructions, Petitioner fails to demonstrate that the comments constituted error that violated his right to due process. See Darden, 477 U.S. at 181.

Accordingly, this Court cannot conclude that the state court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.

Habeas relief is not warranted on this contention.

**4. Cumulative Analysis**

As stated above, the "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith, 455 U.S. at 219, citing Brady, 373 U.S. 83 (1963). As such, these identified instances of misconduct must be considered in light of the trial record as a whole. See Donnelly, 416 U.S. at 647-48; Sassounian, 230 F.3d at 1106-07. In this case, the alleged misconduct occurred during the course of proceedings that spanned over 50 court days.[25] Given the length and complexity of the trial, the responsiveness of the trial judge in issuing curative instructions when requested, the latitude provided to counsel in arguments to the jury, and Petitioner's failure to demonstrate that several alleged errors actually involved prosecutorial misconduct (see e.g., Introduction of Mr. Cullins to Jury Venire, Barbara S. Key, Alleged Misrepresentation of Warrant, Kim Report, Defense Seating Arrangements), this Court cannot conclude that the cumulative impact of the alleged misconduct identified above "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643.

**G. Claim 7- Failure to Disclose Exculpatory Evidence**

For claim seven, Carter asserts that the state failed to disclose material, exculpatory evidence in violation of Brady, 373 U.S. 83. This claim was first presented to the California Supreme Court in Carter's first state habeas petition as claim 8 and was denied on the merits without a reasoned opinion. (Lodgment No. 113.)

This is one of Petitioner's weaker claims. In language that suggests the claim was torn wholesale from his habeas petition for the Los Angeles case, Petitioner says

[25] Jury voir dire spanned 15 court days. (CT 2575-2602.) Starting with opening statements and instructions, the guilt phase included 26 court days of testimony, argument by counsel, conferences between counsel and the trial court, and jury deliberations. (CT 2608-54.) Starting with opening statements and instructions, the penalty phase included 9 days of testimony, argument by counsel, conferences between counsel and the trial court, and jury deliberations. (CT 2673-91.)

that prosecutors disclosed evidence on the eve of trial. While that was true for the Los Angeles trial in 1989, his San Diego trial did not take place until 1991. In other words, the Brady evidence was disclosed, and it was disclosed more than a year prior to trial. That alone suggests that the California Supreme Court had a reasonable basis for denying the claim, *i.e.*, that there was no Brady violation.

Moreover, the evidence which Carter describes as Brady material concerned the rape of Tok Kim, not the murder of Tok Kim. The Kim murder was introduced as "other crimes" evidence at both the Los Angeles and the San Diego trials. Petitioner has identified no Supreme Court decisions where evidence that *was* produced, regarding an *un*charged crime, in *another* murder case, made out a Brady violation. Without addressing the "prejudice" element of a claimed Brady violation, the California Supreme Court could have reasonably decided that Petitioner failed to meet these two prongs of a Brady violation: the non-disclosure of favorable evidence. Strickler v. Greene, 527 U.S. 263, 281-82 (1999). It is certainly possible that fairminded jurists could disagree that this theory is inconsistent with the holding of prior decisions of the Supreme Court. Wetzel v. Lambert, 132 S. Ct. 1195, 1198 (2012). Therefore, the decision of the California Supreme Court denying this claim was reasonable and Petitioner has not demonstrated a right to federal habeas relief or evidentiary development.

**H. Claim 8- Admission and Use of Unconstitutional, Unreliable, and Improper Aggravation Evidence**

Petitioner asserts that the prosecution used "constitutionally infirm convictions to obtain a death verdict," in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (SAP at 200.) Specifically, Petitioner contends that his 1978 burglary conviction in Alaska and 1974 burglary conviction in Oregon were "defective" because "the Alaska conviction was based on a guilty plea which was neither knowingly nor intelligently made," and that "the elements of both out of state convictions (Alaska and Oregon) did not meet certain requirements under California

law." (Id. at 200-01.)  Petitioner contends that at the time of both convictions, he was not competent to stand trial or to assist counsel in his own defense.  (Id. at 201.)

Petitioner presented this claim to the state court as claim V of the first state habeas petition and claim 8 of the second state habeas petition.  In adjudicating the first state petition, the California Supreme Court denied this claim, stating "Claim V is denied on the merits.  To the extent this claim reasserts issues raised and rejected on appeal, it is procedurally barred under In re Waltreus, supra, 62 Cal.2d 218, 225.  To the extent this claim is based upon the record and was not raised on appeal, it could and should have been raised on appeal and hence is barred under In re Dixon, supra, 41 Cal.2d 756, 759."  (Lodgment No. 113.)  In adjudicating the second state habeas petition, the state court again rejected the claim both on the merits and based on state procedural bars, except to the extent the claim related to Petitioner's allegations about fetal alcohol syndrome or child abuse.  (See Supp. Lodgment No. 4.)  Respondent maintains that "[t]o the extent the state court decisions rest on a state procedural bar that is independent of federal law and adequate, Carter is precluded from raising the claim in his federal habeas petition," but alternately maintains that the California Supreme Court's denial of this claim on the merits is entitled to deference under AEDPA.  (Ans. at 184.)  As discussed above in section IV, the Court will address this claim on the merits irrespective of the state court's imposition of procedural bars.

Petitioner asserts that during the time of those prior crimes and convictions, November and December 1974 for the Oregon conviction, and December and January 1978 for the Alaska conviction, he "was not competent to stand trial or waive any of his statutory or constitutional rights" and that his guilty plea "was not the product of knowing, intelligent and voluntary waivers."  (SAP at 201.)

Respondent contends that, pursuant to Lackawanna County District Attorney v. Coss, 532 U.S. 394 (2001), Petitioner is precluded from challenging the validity of those prior convictions.  (Ans. at 184.)  Indeed, the Supreme Court specifically held that:

> [O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid . . . If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained.

Coss, 532 U.S. at 403-04 (internal citation omitted).

The Court has recognized scant exceptions to this rule, most notably when there was a failure to appoint counsel in the prior case in violation of the Sixth Amendment. See id. at 404, citing Gideon v. Wainright, 372 U.S. 335 (1963). However, Petitioner has not alleged that there was a failure to appoint counsel with respect to either his 1974 Oregon conviction or his 1978 Alaska conviction, and the state court record fails to offer any indication that either conviction suffered from such a defect. In fact, Petitioner appears to concede that he was represented by counsel in both prior cases. With respect to the Oregon conviction, Petitioner contends that he was incompetent to "waive any of his statutory or constitutional rights, including ... his right to rationally assist counsel in the conduct of a defense." (SAP at 201.) With respect to the Alaska guilty plea and conviction, Petitioner contends that the "guilty plea was not the product of knowing, intelligent and voluntary waivers. At the time of trial counsel's representation, Mr. Carter was incapable of making a rational choice." (Id.) Petitioner also contends in a footnote to the federal petition that "[t]o the extent these concerns were not raised in either the Alaska or the Oregon proceedings, it was a direct result of defense counsel's constitutionally defective representation." (SAP at 202 n. 31.)

Moreover, Petitioner fails to demonstrate that he falls within either of the other potential exceptions to the rule discussed in Coss, that is, Petitioner has not offered any evidence that the state court "refuse[d] to rule on a constitutional claim that had been properly presented to it," nor has he presented "compelling evidence that he is actually innocent of the crime for which he was convicted, and which he could not have uncovered in a timely manner." Coss, 532 U.S. at 405. Instead, Petitioner asserts that his prior convictions are invalid because he was suffering from a variety of mental and

neurological impairments which rendered his guilty plea in those cases constitutionally defective. (SAP at 193-95.) As this argument fails to fall under any recognized or potential exception to the rule, this type of challenge to a prior conviction used to enhance a sentence appears precluded under Coss.

Petitioner cites Johnson v. Mississippi, 486 U.S. 578 (1988), which is distinguishable from the instant case. In Johnson, the Supreme Court reversed a Mississippi death sentence where a jury considered in aggravation a prior New York state conviction which had been set aside in a separate appellate proceeding in New York. Id. at 584-86. In that situation, the defendant had been convicted in 1963 of assault in New York state partially due to a coerced incriminating statement he made to police, and was never informed of his right to appeal the conviction. Id. at 582. Meanwhile, in 1981, the New York conviction was used as an aggravating circumstance in sentencing the defendant to death for a murder of a policeman in Mississippi. Id. at 580-81. In 1987, after the defendant was later allowed to appeal the prior assault conviction, the New York state appellate court reversed the conviction. Id. Then, in light of the fact that the assault conviction had factored into the imposition of the death sentence, the Supreme Court reversed the Mississippi death sentence and remanded it for re-examination, stating that "it would be perverse to treat the imposition of punishment pursuant to an invalid conviction as an aggravating circumstance." Id. at 586.

In this case, Petitioner fails to demonstrate that Johnson is applicable to his case-he does not allege that either the Oregon or the Alaska conviction has been found invalid or has been set aside in any separate or prior appellate proceeding. Instead, Petitioner is attempting to mount a *direct* challenge to the validity of the prior Oregon and Alaska convictions in the instant habeas proceedings; proceedings which are necessarily limited to challenging his San Diego County, California convictions, sentence and confinement. The situations are inapposite. Petitioner's claim is governed by Coss, and he may not use these federal habeas proceedings to directly challenge the

validity of the prior out-of-state convictions. Id. at 403-04.

Farrow v. United States, 580 F.2d 1339 (9th Cir. 1978), upon which Petitioner also relies, involves a sentence erroneously enhanced by a prior conviction rendered invalid due to a Sixth Amendment violation under Gideon, and is similarly distinguishable on that basis. As noted above, because Petitioner does not allege that he was deprived of counsel in either his 1974 Oregon case or his 1978 Alaska case, and the record offers no indication that either conviction suffers from such an infirmity, Farrow offers no support for Petitioner's claim of error.

Ultimately, based on an independent review of the record, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Williams, 529 U.S. at 412-13. Habeas relief is not warranted on Claim 8.

**I. Claim 9- Admission of "Wood Chips" Evidence at Trial- Failure to Preserve Evidence**

For claim nine, Petitioner asserts that the police failed to preserve wood chips evidence of his forced entry into Janette Cullins' apartment. This claim was first presented to the California Supreme Court and denied on direct appeal with an opinion. Carter, 36 Cal. 4th at 1246-47. This claim was again presented to the California Supreme Court in his first state habeas petition as claim 7 and was denied on the merits without a reasoned opinion. (See Lodgment No. 113.) The claim was again presented to the California Supreme Court in the second state habeas petition as claim 9 and denied without a reasoned opinion. (See Supp. Lodgment No. 4.)

The jury found Petitioner murdered Cullins. A witness, Cheri Hofer, left Cullins' apartment on the evening of April 12th and observed that the area around the front door was freshly vacuumed. When Hofer returned to the apartment on April 14th, Cullins' body was discovered. Also evident were wood chips on the carpet beneath the door latch on the front door. Police detectives took photographs of the door, door jamb, and

the wood chips on the carpet.  The police detective also had a portion of the door jamb cut out, to preserve to the presence of pry marks on the door jamb.  Although photographs of the wood chips on the floor were taken, preserved, and introduced at trial, the actual wood chips were never gathered or preserved by the police.  Petitioner claims it was error of constitutional dimension for the police to have failed to collect and preserve the actual wood chips found on the floor.  He relies on California v. Trombetta, 467 U.S. 479 (1984) and Arizona v. Youngblood, 488 U.S. 51 (1988).

In Trombetta the Court held that the government's duty to preserve is limited to evidence where the exculpatory value of the evidence is apparent.

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Trombetta, 467 U.S. at 488-489 (citations omitted).  In Youngblood, the Court held that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."  Id., 488 U.S. at 58; see also Illinois v. Fisher, 540 U.S. 544, 545 (2004) (per curiam) (same); United States v. Romo-Chavez, 681 F.3d 955, 961 (9th Cir. 2012) (applying Youngblood rule requiring showing of police bad faith).

The California Supreme Court considered Petitioner's claim under the correct standards of Trombetta and Youngblood.  The California Supreme Court found that Petitioner failed to show any bad faith on the part of the police.  Carter, 36 Cal. 4th at 1246.  Similarly, he has offered no evidence of bad faith in this federal habeas petition.  The California Supreme Court also found that the wood chips did not possess an exculpatory value that was apparent prior to their loss.  Id.  Petitioner asserts that if the wood chips had been preserved, he could have argued that the chips came from the police work of cutting out the door jamb – not from his prying open the door.  The argument would have been of limited value as it did not explain the more significant

evidence of the pry marks on the door jamb.  That the door had been pried open was important.  That door jamb wood was, or was not, damaged in the process would not have played a significant role in the defense.  For a duty to preserve to arise, the evidence to be preserved must be recognized as significant to the defense.  Trombetta, 467 U.S. at 488-489 ("duty . . . limited to evidence that might be expected to play a significant role in the suspect's defense").

That California Supreme Court finding that the wood chips were not exculpatory was reasonable, but unnecessary to deny Petitioner's claim since there was no concomitant showing of bad faith by the police.  Youngblood, 488 U.S. at 58.  It is certainly possible that fairminded jurists could disagree that this theory is inconsistent with the holding of prior decisions of the Supreme Court.  Lambert, 132 S. Ct. at 1198.  Therefore, the decision of the California Supreme Court denying this claim was reasonable and Petitioner has not demonstrated a right to federal habeas relief.

**J.     Claim 10- Allegations of Trial Court Error at the Guilt and Penalty Phases**

In Claim 10, Petitioner asserts that numerous trial court errors at both the guilt and penalty phases of trial deprived him of a fundamentally fair trial and due process in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  (SAP at 208.) Respondent contends that, except where procedurally defaulted, the California Supreme Court's rejection of this claim on the merits is reasonable and entitled to deference.  (Ans. at 190.)  As discussed above in section IV, the Court will address this claim on the merits irrespective of the state court's imposition of procedural bars.

Petitioner presented this claim as claim XVII on direct appeal, claim IV in the first state habeas petition and Claim Ten in the second state habeas petition.  The state court's decision with respect to each contention contained in the instant claim will be discussed in their respective sections below.

As a general matter pertinent to the allegations raised in this claim, state evidentiary rulings are not cognizable on a federal habeas proceeding, unless the admission of evidence violated a petitioner's due process right to a fair trial.  See Estelle

v. McGuire, 502 U.S. 62, 70 (1991); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990). In order to show a due process violation, a petitioner must demonstrate that the trial court's ruling was so prejudicial that it rendered his trial fundamentally unfair. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

**1. Refusal to Exclude Evidence of Crimes Against Knoll, Mills, Guthrie, Kim, and Steward**

Petitioner alleges that the trial court erred in allowing the prosecution to present the "other crimes" evidence from Los Angeles, Alameda and Ventura Counties at his San Diego trial proceedings. (SAP at 208.) Petitioner contends that: (1) the trial court ignored significant differences between the charged crimes and other crimes in allowing the admission of the other crimes on the issues of intent and identity and (2) the improper admission of that evidence allowed the jury to "use that evidence to draw inferences of criminal disposition and propensity." (Id. at 211-15.)

The California Supreme Court considered this claim in the appeal of the San Diego conviction and death sentence, as follows:

> Defendant raises a number of contentions that are either virtually identical or substantially similar to certain claims raised on appeal from the Los Angeles County death judgment rendered against him for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie-contentions that we have rejected in the companion appeal in *People v. Carter*, *supra*, 36 Cal.4th 1114, 32 Cal.Rptr.3d 759, 117 P.3d 476, 2005 WL 1939712. These contentions are as follows: 1) defendant's motion to suppress the evidence seized from his person and from the stolen Datsun 280 ZX improperly was denied; 2) defendant's motion to exclude other-crimes evidence involving the death of Tok Kim, the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie, and the rape of Jennifer S., improperly was denied ...
>
> For the reasons we have set forth more extensively in the companion matter, *People v. Carter*, *supra*, 36 Cal.4th 1114, 32 Cal.Rptr.3d 759, 117 P.3d 476, 2005 WL 1939712, we reject defendant's contentions. Insofar as defendant's claims do not precisely mirror those set forth in the companion appeal, neither defendant's additional arguments nor the variants in their phrasing persuade us that the trial court committed an error or abuse of discretion prejudicial to defendant's case. Indeed, these claims are not deserving of additional discussion. (*People v. Laursen* (1972) 8 Cal.3d 192, 205, 104 Cal.Rptr. 425, 501 P.2d 1145.)

Carter, 36 Cal. 4th at 1269-70.

In the above-referenced Los Angeles opinion, the California Supreme Court reasoned that:

> Viewing the evidence in the light most favorable to the trial court's ruling, certain of the charged and uncharged offenses displayed common features that revealed a highly distinctive pattern. As noted in our summary of the evidence, Jillette Mills and Susan Knoll each was fatally strangled and their bodies found in a closed bedroom closet; in the uncharged offense involving Janette Cullins, the victim's body also was found strangled in her closed bedroom closet. Although defendant notes certain differences in the circumstances surrounding the victims' deaths, the combination of fatal strangulation and placement of a young woman's body in a closed bedroom closet is both highly distinctive and suggestive that the same person perpetrated the crimes involving Knoll, Mills, and Cullins.
>
> To be highly distinctive, the charged and uncharged crimes need not be mirror images of each other. Thus, although there were certain differences in the crimes committed against Knoll and Mills, and those against Cullins, such distinctions went to the weight of the evidence and did not preclude the prosecution from introducing the evidence regarding Cullins's murder.
>
> Although the evidence of Kim's death did not share the distinctive features of the murders charged in the present case, it clearly was relevant on the issues of intent and a common plan.[FN14] The vehicle owned by Tok Kim was missing at the time her body was found but later was discovered near the residence of Knoll and Mills. Subsequently, a white Datsun 280 ZX matching the description of Mills's vehicle, missing since the time Mills's body was found, was observed in the vicinity of Cullins's apartment near the time of Cullins's murder. When arrested, defendant had on his person or in the Datsun an eclectic array of objects identified as having belonged to (1) each of the three victims in the murders charged in the present case, (2) Janette Cullins, and (3) Tok Kim.
>
> > FN14. Although no cause of death was established as to Kim, as noted a curtain tie was found beneath her neck. In his briefing, defendant characterizes Kim's death as an "uncharged homicide.""
>
> The shared characteristics of the killings, as well as the presence of evidence associated with a particular victim or victims at events related to the next murder, indicate that when defendant committed the crimes charged in the present case as well as the uncharged crimes, he acted pursuant to a common plan to kill and steal from his victims.

Carter, 36 Cal. 4th at 1148-49.  The state supreme court then discussed the applicable legal standards with respect to the degree of similarity required to establish relevance on the issues of common design or plan, as well as intent.  The court then weighed the probative value of the "other crimes" evidence against the potential prejudice, concluding as follows:

> We find no abuse of discretion. Evidence of the circumstances surrounding the death of Tok Kim was highly probative, as it helped to establish a link between her recent acquaintance with defendant and her sudden death, and the murders of Susan Knoll, Jillette Mills, Bonnie Guthrie, and Janette Cullins that shortly followed. Because the five women each died within a period of approximately four days, the proximity of these incidents to each other "further enhanced" the probative value of the other crimes evidence. (See *People v. Kipp*, *supra*, 18 Cal.4th 349, 371, 75 Cal.Rptr.2d 716, 956 P.2d 1169.) Kim's Honda was discovered shortly after her death, hundreds of miles from her residence, parked in front of the apartment in which the bodies of Knoll and Mills were discovered, and at approximately the same time that Mills's car disappeared. Evidence of the circumstances of Cullins's death was probative for the same reason. Mills's missing white Datsun 280 ZX matched the description of the vehicle that a neighbor observed rapidly driving away from the apartment building in which Cullins (who also had been acquainted with defendant) had resided. The cause of Cullins's death, and the location of her body in a bedroom closet, closely resembled both the manner of killing and the concealment utilized by the perpetrator at the Knoll/Mills crime scene. As noted, at the time of defendant's arrest items linking him to all five deceased women were discovered on his person or in Mills's vehicle.

Id. at 1149-50.

As stated above, a state evidentiary ruling is only cognizable on federal habeas review to the extent that the admission of evidence was in violation of a petitioner's due process rights. See Estelle, 502 U.S. 76-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state law questions.") Here, the state trial court admitted the evidence of the Mills, Knoll, Guthrie and Kim homicides as evidence of identity, motive, intent, or common plan with respect to the Cullins murder, and introduced the sexual assault of Jennifer S. with respect to the sexual assault of Barbara S.[26]

Petitioner contends that the state court erred by ignoring "significant differences" among the homicides in concluding that the crimes were sufficiently similar to warrant admission as other crimes evidence on the issues of identity and intent. Petitioner notes for instance that Kim's cause of death remained undetermined, that different methods

---

[26] Petitioner fails to advance any substantive argument with respect to the admission of the sexual assault of Jennifer S., and the Court will limit is adjudication to the propriety of admitting the Mills, Knoll, Guthrie, and Kim murders as other crimes evidence. See James, 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.")

of strangulation were employed in the other homicides, that a few of the victims showed signs of sexual activity when others did not, that three victims were found in closets and two lying on a floor, and that only some of the victims' cars had been stolen, while others were located adjacent to the victims' residences.  (SAP at 212-14.)   Petitioner also points out that there were no signs of forced entry in any case except for Cullins, and that while there was evidence that Cullins knew Petitioner, there was no evidence indicating whether or how Petitioner knew Knoll, Mills or Guthrie.  (SAP at 214-15.)

However, a review of the California Supreme Court's decision clearly shows that the state court acknowledged that these crimes were not "mirror images" of each other, nonetheless concluding that "the combination of fatal strangulation and placement of a young woman's body in a closed bedroom closet is both highly distinctive and suggestive that the same person perpetrated the crimes involving Knoll, Mills, and Cullins." Carter, 36 Cal. 4th at 1148.  Moreover, with respect to the death of Tok Kim, the state court reasonably concluded that while "evidence of Kim's death did not share the distinctive features of the murders charged in the present case, it clearly was relevant on the issues of intent and a common plan." Id.  The fact that different methods of strangulation were used, that the prosecution was not able to establish Petitioner's prior acquaintance with Knoll, Mills and Guthrie, and that only Kim's and Mills' car were stolen is insufficient to overcome the similarities between the crimes. Five women were found strangled in their homes in the span of several days, three found in a closet and two on the bedroom floor.  Petitioner was linked to two of the women, Ms. Kim and Ms. Cullins, through witness identification or common acquaintances, and Petitioner's palm print was found at the Mills/Knoll apartment.  Ms. Kim's car, previously located in Oakland, was found outside the Mills/Knoll apartment in Los Angeles, and Ms. Mills' car was seen in the area of Ms. Cullins' San Diego

apartment.[27] Moreover, Petitioner was arrested while driving Ms. Mills' car in Arizona, and possessions belonging to each of the victims were found either in that car or on Petitioner's person.

"A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005). Here, it is clear that the Mills, Knoll, Guthrie, and Kim evidence was relevant and admissible under California law. See Cal. Evid. Code 1101 (b) ("Nothing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such act.") The jury could reasonably have used the other crimes evidence to prove identity, intent, or common plan, and its admission did not violate due process. See Jammal, 926 F.3d at 920 ("Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.")

With respect to Petitioner's contention that the introduction of the other crimes evidence constituted improper propensity evidence, the Supreme Court has never held that the admission of such evidence violates due process. See Estelle, 502 U.S. at 75 n. 5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."); see Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008), citing Alberni v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006) (collecting cases and acknowledging that Supreme Court had expressly reserved ruling on whether the admission of propensity evidence could constitute a due process violation).

Moreover, a review of the state record in this case demonstrates that the jury was

---

[27] That Ms. Knoll's or Ms. Guthrie's cars in Los Angeles, or Ms. Cullins' car in San Diego were not also stolen appears of little relevance, as Petitioner was observed driving Mills' white Datsun, previously located in Los Angeles, by several San Diego witnesses both before and after the time of the Cullins murder; he was also driving that same car when arrested several days later in Arizona. (See RT 4922-25, 5242-50; 3956-63.)

generally instructed that the other crimes evidence "was admitted for a limited purpose" and that the jury "must not consider such evidence for any purpose except the limited purpose for which it was admitted." (CT 2262.) In particular, the jury was instructed that the evidence of the Knoll, Mills, Guthrie and Kim murders "may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes," and could only be considered for limited purposes including intent, identity, and motive.[28]

A jury is presumed to understand and follow the trial court's instructions. Weeks, 528 U.S. at 233-34; Marsh, 481 U.S. at 211. Therefore, even if the admission of such evidence could constitute a due process violation, Petitioner fails to demonstrate that the jury considered the other crimes evidence for an impermissible purpose despite the trial court's explicit direction to the contrary. See Jammal, 926 F.3d at 920. The California Supreme Court's rejection of this claim on appeal was not contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts. Williams, 529 U.S. at 412-13. Petitioner

---

[28] The jury was instructed with CALJIC 2.50 as follows:

> Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial.
>
> Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes.
>
> Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:
>
> The existence of the intent which is a necessary element of the crime charged;
>
> The identity of the person who committed the crime, if any, of which the defendant is accused;
>
> A motive for the commission of the crime charged;
>
> The defendant had knowledge of the nature of things found in his possession;
>
> The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged.
>
> For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.
>
> You are not permitted to consider such evidence for any other purpose.

(CT 2273-74.)

is not entitled to habeas relief on this contention.

**2. Denial of Motion to Sever Cullins Murder Charge from Barbara S. Rape Charge**

Petitioner contends that the trial court erred in refusing to sever the Cullins murder charge from the Barbara S. rape charges. (SAP at 215.) Petitioner specifically argues that the trial court, in reviewing the severance and other crimes issues, "improperly combined the two concepts," and contends that even assuming the evidence of the Knoll, Mills, Guthrie and Kim deaths were admissible in the Cullins case, they were not admissible in the Barbara S. rape case, and even assuming the Jennifer S. rape was admissible in the Barbara S. case, it was not admissible in the Cullins matter. (SAP at 217-18.) Petitioner also asserts that the "stronger" Cullins murder case was improperly joined with the "weaker" Barbara S. rape case and increased the prejudicial impact of the other crimes evidence. (SAP at 218-19.)

Petitioner raised this claim on direct appeal, and the California Supreme Court held that it was not an abuse of discretion for the charges stemming from both crimes to be tried together, reasoning:

> Defendant raises a number of contentions that are either virtually identical or substantially similar to certain claims raised on appeal from the Los Angeles County death judgment rendered against him for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie-contentions that we have rejected in the companion appeal in *People v. Carter*, *supra*, 36 Cal.4th 1114, 32 Cal.Rptr.3d 759, 117 P.3d 476, 2005 WL 1939712. These contentions are as follows: . . . and 5) defendant's motion to sever his trial for the murder of Janette Cullins from the charge of rape involving Barbara S. improperly was denied.[FN37]
>
> > FN37. With regard to defendant's contention that the trial court erroneously denied his motion to sever his trial for the murder of Janette Cullins from the charged rape of Barbara S., we rely upon the analysis of section 954 and our decisions interpreting that statute as set forth in *People v. Carter*, *supra*, 36 Cal.4th at pp. 1153-1154, 32 Cal.Rptr.3d at pp. 789-790, 117 P.3d at pp. 501-503, 2005 WL 1939712, and which need not be repeated here, except to observe that the distinctions between defendant's motion to sever the Susan Knoll and Jillette Mills murder charges from the Bonnie Guthrie murder charge in the Los Angeles proceedings (see *id.* at pp. 1152-1156, 32 Cal.Rptr.3d at pp. 788-792, 117 P.3d at pp. 501-505, 2005 WL 1939712), and defendant's motion

> to sever the Janette Cullins murder charge from the Barbara S. rape charge in the San Diego proceedings, do not persuade us that the trial court below abused its discretion. To the contrary, the court reviewed in exhaustive detail the basis for its conclusion that severance was improper, observing, among other things, that the rape and murder charges were of the same class under section 954, each crime involved a forced entry into a residence, each involved evidence that a knife had been used, each involved theft, and each victim previously had been acquainted with defendant. Strong evidence linked defendant independently to the death of Janette Cullins and to the rape of Barbara S. Accordingly, the likelihood that the jury might convict defendant of having committed one of the charged crimes based on the evidence that he committed the other was virtually nonexistent. No abuse of discretion in denying defendant's motion to sever appears. Nor has defendant demonstrated that prejudice actually resulted from the joinder of the murder and rape charges at trial. (See *People v. Bradford*, *supra*, 15 Cal.4th at p. 1318, 65 Cal.Rptr.2d 145, 939 P.2d 259.)

> For the reasons we have set forth more extensively in the companion matter, *People v. Carter*, *supra*, 36 Cal.4th 1114, 32 Cal.Rptr.3d 759, 117 P.3d 476, 2005 WL 1939712, we reject defendant's contentions. Insofar as defendant's claims do not precisely mirror those set forth in the companion appeal, neither defendant's additional arguments nor the variants in their phrasing persuade us that the trial court committed an error or abuse of discretion prejudicial to defendant's case. Indeed, these claims are not deserving of additional discussion. (*People v. Laursen* (1972) 8 Cal.3d 192, 205, 104 Cal.Rptr. 425, 501 P.2d 1145.)

Carter, 36 Cal. 4th at 1269-70.

"The propriety of consolidation rests with the sound discretion of the trial judge." Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991). "Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." United States v. Lane, 474 U.S. 438, 446 n.8 (1986). Such prejudice only occurs when the "impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000), citing Bean v. Calderon, 163 F.3d 1073, 1086 (9th Cir. 1998). "In evaluating prejudice, the Ninth Circuit focuses particularly on cross-admissibility of evidence and the danger of 'spillover' from one charge to another, especially where one charge or set of charges is weaker than another." Davis, 384 F.3d at 638, citing Sandoval, 241 F.3d at 772 and Bean, 163 F.3d at 1084.

First, Petitioner contends that the evidence of the Cullins murder and Barbara S. rape were not cross-admissible, as "[t]here were no allegations that Cullins had been raped, and [Barbara S.] was not murdered. (Pet. Merits Brief at 213.) He also asserts that the other crimes evidence was improperly introduced, as the Mills, Knoll, Guthrie and Kim murders were not cross-admissible with the Barbara S. case, and the Jennifer S. assault was not cross-admissible with the Cullins murder. (Id.)

The state trial judge concluded that "Under Penal Code section 954 these cases are of the same class. There's been no question about that. [] In addition, the Court specifically finds cross admissibility." (RT 2963.) As discussed previously with respect to Claim 6, the trial judge specifically noted numerous similarities between these two sets of crimes. For instance, both victims had missing credit or ATM cards, Petitioner had previously associated with both victims, and the time span between the crimes was a matter of weeks. (RT 2963-65.) The trial court also noted the existence of evidence that both crimes involved the use of a knife,[29] a similar knife had been found in Petitioner's possession, and Petitioner had been found in the possession of "rather worthless items" from each victim. (Id.) Moreover, evidence presented also suggests that shortly before each crime, Petitioner had been rejected by the victim (Janette Cullins) or someone close to her (Barbara S.'s roommate Susan Loyland).

Second, Petitioner asserts prejudice arising from the joinder of the Cullins homicide charges with the "considerably weaker" Barbara S. assault evidence. (Pet. Brief at 214.) Petitioner contends that the Barbara S. case "depended almost entirely"

[29] Petitioner contends that the state supreme court was incorrect in stating that the Cullins murder involved a knife because "the incision on Cullins was created after her heart stopped beating." (Pet. Reply at 85 n. 25, citing RT 4674.) Assuming the truth of this assertion, the fact that the wound appears after the victim's death does not establish that a knife was *not* used in the course of the murder, only that the knife was not the *cause of death*. It is entirely possible that a knife was brandished as a weapon during the course of the crime, was used to subdue the victim into compliance, or was used for some other purpose. The fact that Ms. Cullins sustained a cutting wound inflicted after her death does support the conclusion that a knife was employed at some point during the course of the burglary, robbery and murder, and is a reasonable point of similarity between the crimes against Ms. Cullins and those against Barbara S.

on the victim's "highly questionable" identification of Petitioner. (SAP at 219.)[30]  A review of the record does not support this contention. As detailed more thoroughly in the discussion of Claim 12 (see infra), substantial evidence was introduced at trial apart from the victim's description of the assault and identification of Petitioner. Susan Loyland, Barbara S.'s roommate who had been dating Petitioner, testified that Petitioner failed to meet her as planned on the day of the assault and that she never heard from him again after that day.  Loyland also noted that in the course of dating Petitioner, he had been to the residence she shared with Barbara S., had met the victim, and knew the location of Loyland's hidden money that went missing after the crime.   Janelle Barksdale, a neighbor, testified that she saw Petitioner in the area that evening, heading in the direction of Barbara S.'s residence.  In adjudicating Petitioner's motion to sever these two cases, the trial judge acknowledged the possibility of prejudice when a weaker evidentiary case was joined with a stronger one, but rejected that likelihood in the instant case, stating that "when the [Barbara S.] case and the Cullins cases are viewed by themselves, one is not dramatically stronger than the other."  (RT 2965.)

Moreover, the evidence presented in support of these crimes was separate and distinct, and Petitioner fails to demonstrate that evidence of the allegedly "stronger" Cullins burglary- robbery-murder charges tainted the jury's consideration of the separate Barbara S. burglary-robbery-rape-oral copulation charges.  See Comer v.

---

[30] Petitioner also asserts that the joinder of the cases "accomplished the prosecution purpose of bolstering both cases by aggregating the evidence, inflaming the jury in the capital case by [Barbara S.'s] medical condition, and thereby increasing the chance of conviction in each case."  (SAP at 219-20.) (footnote text omitted).  This appears to refer to the fact that Barbara S. had suffered an unrelated stroke prior to the time of trial, and testified by typing her answers on a typewriter, which were read aloud to the jury by an interpreter.   However, Petitioner fails to demonstrate that this testimony inflamed or prejudiced the jury, as the trial record clearly shows that the jury was initially instructed and later reminded that Barbara S.'s medical condition was unrelated to the rape. (See RT 3319 - the prosecutor noted in his opening statement that Barbara S.'s condition was due to strokes and unrelated to the charged assault; RT 3850-51 - prior to the victim's testimony, the trial court issued the jury a reminder that Barbara S.'s "physical condition is not related to the events of March 25th.") Accordingly, there is no evidence that Barbara S.'s physical condition, particularly given the cautionary instruction, increased the chance of conviction or resulted in any prejudice to Petitioner.

Schriro, 480 F.3d 960, 985 (9th Cir. 2007) ("[W]hen the joined offenses are different in nature, such as murder and kidnapping/sexual assault, and specific evidence is presented as to each crime, the risk of confusing or misleading the jury is reduced.")

Finally, Petitioner contends that the jury instructions failed to provide sufficient guidance and did not mitigate any prejudice that resulted from the improper joinder of the charges. (SAP at 213-14.) However, a review of the record clearly shows that the jury instructions in this case were specifically and separately directed to the consideration of the individual charged counts. (See CT 2291 - CALJIC 8.10 included specific reference to count one murder charge; CT 2315 - CALJIC 10.00 included specific reference to count four rape charge; CT 2318 - CALJIC 10.40.2 included specific reference to count five oral copulation charge; CT 2319, 2321 - instructions included specific reference to robbery charges in counts two and six; CT 2323 - CALJIC 14.50 included specific reference to count three burglary charge.) Contrast Bean, 163 F.3d at 1083-84 (finding prejudice where joined charges were not cross-admissible, evidence of one charge was substantially stronger than the other, and "the trial court delivered several instructions that could have applied only to [one set of crimes] without explaining which instruction applied to which set of offenses.") Moreover, the jury was also explicitly directed to consider each count separately, further limiting any potential prejudice from the alleged misjoinder. (See CT 2328 - The trial court instructed the jury pursuant to CALJIC 17.20 as follows; "Each count charges a distinct crime. You must decide each count separately. The defendant may be found guilty or not guilty of any or all of the crimes charged. Your finding as to each count must be stated in a separate verdict."); see also Lane, 474 U.S. at 450.

In sum, based on the evidence supporting the cross-admissibility of the Cullins and Barbara S. charges, the relative strength of each case against Petitioner, the distinct nature of the charges joined, and the jury instructions provided, Petitioner fails to show that the consolidation of these cases "had a substantial and injurious effect or influence in determining the jury's verdict." Sandoval, 241 F.3d at 772, citing Bean, 163 F.3d at

1086. The California Supreme Court's rejection of this claim on appeal was not objectively unreasonable. Petitioner does not merit habeas relief on this claim.

**3. Double Jeopardy- San Diego Trial on Cullins and Barbara S. Charges Occurred After Severance of Those Charges from Los Angeles Trial Proceedings**

Petitioner contends that his San Diego conviction and death sentences were obtained in error, as the trial court erroneously allowed the "duplicative prosecution and death sentence in San Diego following the prosecution of Mr. Carter for the Cullins homicide in both phases of the Los Angeles trial to secure guilt and death verdicts." (SAP at 220.)

The California Supreme Court considered and rejected this claim in Petitioner's direct appeal of his San Diego convictions and death sentence, as follows:

> The state and federal Constitutions declare that no person shall twice be placed in jeopardy for the same offense. (U.S. Const., 5th Amend.; Cal. Const., art. I, sect. 15.) In Los Angeles County, defendant was placed in jeopardy for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie. In those proceedings, he was neither charged with, nor convicted of, any crimes pertaining to the murder of Janette Cullins or the rape of Barbara S. Accordingly, jeopardy never attached to defendant in the Los Angeles County proceedings for the crimes committed in San Diego County. (See *People v. Carpenter*, *supra*, 21 Cal.4th at p. 1039, fn. 4, 90 Cal.Rptr.2d 607, 988 P.2d 531. [" ' " [T]he murder of two persons, even by the same act, constitutes two offenses, for each of which a separate prosecution will lie, and ... a conviction or acquittal in one case does not bar a prosecution in the other." ' [Citations.]"]; *People v. Medina* (1995) 11 Cal.4th 694, 765, 47 Cal.Rptr.2d 165, 906 P.2d 2 [rejecting the defendant's contention that double jeopardy principles should apply where the defendant already once had defended against the charges at the penalty phase of the earlier trial]; see also *United States v. Watts* (1997) 519 U.S. 148, 154-155, 117 S.Ct. 633, 136 L.Ed.2d 554.) Accordingly, defendant's double jeopardy argument must fail.

Carter, 36 Cal. 4th at 1239.

The Double Jeopardy clause of the Fifth Amendment offers three separate constitutional protections. "It protects against a second prosecution on the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717 (1969), overruled on other grounds by Alabama

v. Smith, 490 U.S. 794 (1989); Brown v. Ohio, 432 U.S. 161, 165 (1977).

Petitioner argues that his right to be free from double jeopardy was violated because "the prosecutors in San Diego proposed to prosecute Mr. Carter for the death of Janette Cullins even though those facts had already been fully litigated in Los Angeles and for which Mr. Carter had been sentenced to death. The San Diego prosecutors further proposed to relitigate Mr. Carter's criminal liability for the death of Ms. Mills, Ms. Knoll, and Ms. Guthrie, and to impose a sentence of death on him for those crimes, even though those same facts had been fully litigated in Los Angeles." (SAP at 221.)

While it is apparent from the state court record that *evidence* pertaining to Ms. Cullins murder were introduced at the Los Angeles trial, it is also clear that Petitioner *was not prosecuted for, or convicted of*, that murder in Los Angeles. The constitutional prohibition against double jeopardy exists to guarantee that "the State with all its resources and power should not be allowed to make repeated attempts to *convict* an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." Green v. United States, 355 U.S. 184, 187-88 (1957) (emphasis added). In the Los Angeles proceedings, Petitioner was in "jeopardy" for three murders- that of Jillette Mills, Susan Knoll, and Bonnie Guthrie. At those proceedings, evidence pertaining to the murder of Ms. Cullins was admitted at the guilt phase for a limited purpose, and at the penalty phase as a factor to be used in weighing punishment. The Los Angeles jury was not asked to determine whether Petitioner was guilty of that murder beyond a reasonable doubt, or to mete out a sentence of punishment for the alleged commission of that crime. In short, Petitioner was not in "jeopardy" in Los Angeles for the murder of Ms. Cullins.

For the same reasons, the admission of evidence pertaining to the Mills, Knoll, and Guthrie murders at the San Diego trial did not violate the double jeopardy clause.

In San Diego, Petitioner was on trial for one homicide, that of Ms. Cullins, and the jury was charged with determining whether Petitioner was guilty of that murder. At those proceedings, evidence pertaining to the murders of the Los Angeles victims were admitted at the guilt phase for a limited purpose, and at the penalty phase as a factor to be used in weighing punishment.

Simply put, Petitioner was not exposed to a second prosecution or a second punishment for the Mills, Knoll, and Guthrie homicides; those offenses were part of the evidence to be considered by the jury in weighing Petitioner's punishment for the murder of Ms. Cullins. The Supreme Court has noted that "sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction." United States v. Watts, 519 U.S. 148, 154 (1997), citing United States v. Witte, 515 U.S. 389, 402-403 (1995). The consideration of these "other crimes" did not violate the prohibition against double jeopardy, as "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted." Watts, 519 U.S. at 155, citing Witte, 5151 U.S. at 401.

Despite the similarity of evidence presented in the Los Angeles and San Diego trials, the fact remains that in Los Angeles, Petitioner was tried for the murders of Susan Knoll, Jillette Mills and Bonnie Guthrie, while in San Diego, Petitioner was tried for the murder of Janette Cullins. As such, Petitioner was not "twice placed in jeopardy for the same offense" in his San Diego trial. See U.S. Const. 5th Am. Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim on appeal was contrary to, or an unreasonable application of, clearly established federal law. The claim does not merit habeas relief.

**4. Failure to Exclude Polly Haisha Testimony**

Petitioner contends that the "trial court erroneously failed to exclude Polly Haisha's prejudicial and misleading testimony as irrelevant, incompetent, unduly

prejudicial improper character evidence, and, at the penalty phase, impermissible non-statutory aggravating evidence." (SAP at 224-25.) Respondent alternately maintains that this claim is procedurally barred, is not cognizable because it fails to state a federal question, and that the state supreme court's rejection of the claim on direct appeal is reasonable and entitled to deference. (Ans. at 198-99.)

The California Supreme Court commenced its consideration of this claim by summarizing Ms. Haisha's trial testimony, including the fact that Ms. Haisha, while a senior in high school, met Petitioner at a party in February 1984, accepted an invitation to go sailing with him and gave him her phone number. Ms. Haisha later became uncomfortable and cancelled the date, but through later phone conversations, rescheduled and repeatedly continued to cancel dates with Petitioner. Ms. Haisha identified an entry in Petitioner's address book as containing her name and phone number. She also related the contents of several conversations with Petitioner, including discussions about her plans for college, his invitation to sail to France with him, and his demeanor when speaking about his ex-wife. Ms. Haisha last spoke to Petitioner on March 24, 1984, when he called and told her he would be in San Diego the following day; when Ms. Haisha asked him not to call her again, he became "irritated" and "almost hostile," but did not contact her after that date. She also acknowledged that she worked as a law student intern in the San Diego District Attorney's Office the prior summer and planned to return to the office the next summer after taking the bar examination. The state court rejected Petitioner's claim, reasoning in part as follows:

> The prosecution met its burden of establishing that the testimony of Polly Haisha was relevant under Evidence Code section 210. Haisha's testimony corroborated the testimony of Susan Loyland that defendant intended to be in San Diego on March 25, 1984, the date on which Loyland's housemate, Barbara S., was raped in San Diego, and after which neither Haisha nor Loyland ever heard from defendant again. Haisha's testimony also bolstered the prosecution's theory of the case that defendant embarked upon his murderous crime spree in the immediate aftermath of being spurned by a number of women, including Haisha. (See *ante*, 32 Cal.Rptr.3d pp. 845-847, 117 P.3d pp. 549-552.) Implicit in the prosecution's theory is that these rejections comprised a "trigger" that, once pulled, propelled defendant to rape and murder women whom he

> recently had befriended. Accordingly, defendant's demeanor during his conversations with Haisha-including his frustration and anger when Haisha cancelled their scheduled dates-in the weeks leading up to the murders and other crimes appears relevant.
>
> The evidence was not unduly prejudicial. It merely described Haisha's initial encounter with defendant at a party and his subsequent fruitless efforts to meet her again, causing him to become irritated or angry. The testimony was not altogether uncomplimentary, as Haisha recalled that during their first telephone conversation, defendant "was really nice."
>
> The trial court did not abuse its discretion in denying defendant's motion to exclude Haisha's testimony. Further, viewed in the context of defendant's trial, in which the prosecution's evidence overwhelmingly established that defendant committed multiple brutal murders and vicious rapes, the testimony of Polly Haisha-a woman whom defendant did not physically attack, and who had only minimal personal contact with him-was not even remotely prejudicial.

Id. at 1256. The California Supreme Court also rejected Petitioner's contention that Ms. Haisha's testimony constituted improper character evidence that was considered as non-statutory evidence in aggravation, reasoning that "the prosecution did not offer Haisha's testimony to prove defendant's conduct on a specific occasion." Id. at 1257. The state court rejected Petitioner's assertion that the evidence had a prejudicial impact on the penalty phase, stating:

> [I]t is not reasonably possible that the evidence 'carried over' as an aggravating circumstance to the penalty phase, or that in the absence of the evidence defendant would have received a more favorable penalty verdict. As noted above, a massive amount of other, far more damaging evidence was introduced against defendant at the guilt and penalty phases of the trial.

Id. The state supreme court then concluded:

> Considered as guilt phase evidence, even if we were to determine under any theory that the trial court abused its discretion in admitting the testimony of Polly Haisha, such error would have been harmless under the applicable Watson standard, because it is not reasonably probable that the jury would have reached a different result in the absence of Haisha's testimony. (*People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243.)

Id. (footnote omitted.)

To the extent Petitioner claims the trial court's ruling involved an error of state law, it is not cognizable on federal habeas review unless the admission of this evidence violated his due process rights. See Estelle, 502 U.S. at 70; Gordon, 895 F.2d at 613.

Here, Petitioner fails to demonstrate that the admission of this testimony was so prejudicial as to render his trial fundamentally unfair.  See Jammal, 926 F.2d at 919. As the state court reasonably noted in its adjudication of Petitioner's claim of prosecutorial misconduct, "Haisha was a minor witness whose testimony was peripheral to the central events underlying defendant's crime spree."  Carter, 36 Cal. 4th at 1265.

Petitioner contends that the trial court acted unfairly in allowing Ms. Haisha to testify because the prosecutor failed to notify the defense of her testimony in a timely manner, and because the prosecutor failed to accurately describe her anticipated testimony.  (Pet. Merits Brief at 224.)  The record indicates that Ms. Haisha was mentioned as a potential prosecution witness on the first day of trial and was called as a witness eight days later.  (RT 3208, 4183.)  While Haisha's trial testimony was admittedly more extensive than the prosecutor's original representation on the first day of trial, it is clear that the prosecutor gave an accurate proffer on the morning of her anticipated testimony and that the defense was given an opportunity to interview the witness prior to her testimony and prepare for cross-examination.  (See RT 4288 - during the hearing on the defendant's relevancy objection to Haisha's testimony, trial prosecutor noted that "I might add that the defense counsel or investigator spent at least an hour talking to Polly Haisha during the pendency of this case.")

Petitioner separately faults the state supreme court for failing to explicitly address several facets of Ms. Haisha's testimony in its prejudice analysis, including her photo identification of Petitioner and several statements about Petitioner's relationship with his family, contending that the absence of these "critical aspects of Haisha's testimony" rendered the opinion "unreasonable under § 2254(d)(2)."  (Pet. Brief at 225.)

As an initial matter, the Court remains unconvinced that these alleged omissions constitute "critical aspects" of Haisha's testimony, or that they were omitted at all. During her testimony, Ms. Haisha identified Petitioner in court, and also identified several photos of Petitioner as he looked in 1984, noting that Petitioner's appearance had changed between 1984, when they met, and 1991, the time of trial.  Among the

photos was a snapshot taken from an ATM surveillance camera, as well as photos taken at the birthday party where Haisha and Petitioner met in February 1984.  The state court's opinion accurately noted that "Haisha identified defendant in court and in photographic exhibits." Carter, 36 Cal. 4th at 1254.  The fact that the state court did not address, in detail, the provenance of each photo exhibit does not render the state court opinion incomplete.  Petitioner also contends that the state court, in describing Haisha's testimony, failed to properly address "highly inflammatory statements about Carter's relationship with his family."  (Pet. Brief at 225.)  The only statement that appears relevant to this assertion is Haisha's testimony that, during one of their phone conversations, Petitioner called his ex-wife a "bitch."  (Id. at 223.)  Again, the California Supreme Court accurately recounted this portion of Ms. Haisha's testimony.  See Carter, 36 Cal. 4th at 1255.  As such, Petitioner fails to demonstrate that the state supreme court failed to consider these aspects of Haisha's testimony in adjudicating Petitioner's claim on appeal; the Court accordingly rejects Petitioner's assertion that the state court's opinion involved an unreasonable determination of the facts.

Petitioner separately contends that the photo identification was improper because Haisha "was not present at the ATM at the time the photograph was taken, had not been with him on or around the time the photograph was taken, and even though there were contemporaneous photographs of Mr. Carter that fairly and accurately represented his physical appearance at the time."  (SAP at 227; Pet. Brief at 223.)  The trial court reasonably rejected defense counsel's objection to this identification, stating that "it doesn't seem to me unduly prejudicial in the sense that there is a photograph of a person, and she's saying that was how Dean Carter looked that particular time."  (RT 4294.)  That there were other available photos with which to make an identification is of no import.  Moreover, several photos depicting Petitioner's appearance in 1984 were used as trial exhibits, and each were ostensibly available for the jury to review and compare.  (See RT 4292, 4299, 4317.)  The Court rejects the contention that Ms. Haisha's identification of Petitioner, a man she knew during the time period in question,

was prejudicial for the reasons suggested by Petitioner.

Ultimately, Petitioner fails to demonstrate that the trial court's admission of Ms. Haisha's testimony rendered his trial fundamentally unfair. See Ortiz-Sandoval, 81 F.3d at 897; Jammal, 926 F.2d at 919. The California Supreme Court's rejection of this claim was not contrary to, nor an unreasonable application of, clearly established federal law, nor did it involve an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on this claim.

**5. Exclusion of Evidence of Barbara S.'s Drinking on Night of Sexual Assault**

Petitioner also alleges that "the trial court erroneously excluded Ms. Loyland's relevant testimony regarding [Barbara S.'s] drinking the day of the attack, denying Mr. Carter his right to present a defense." (SAP at 228.) Respondent asserts that this claim fails to present a federal question cognizable on habeas review and that, in any event, the state court's rejection of the claim was reasonable and entitled to deference. (Ans. at 202-03.)

The California Supreme Court addressed the trial court's decision to exclude this evidence during their analysis of Petitioner's claim of insufficient evidence to support the convictions, as follows:

> He further asserts that the evidence supporting the convictions was undermined by the fact that the trial court excluded evidence indicating that Barbara S. suffered from alcoholism in the spring of 1984.[FN30]
>
> > FN30. Defendant assigns error to the trial court's ruling, made pursuant to Evidence Code section 352, excluding the proffered testimony of Susan Loyland that Barbara S. suffered from alcoholism.
> >
> > After conducting a foundational hearing at the People's request, outside the presence of the jury, in which Loyland described her own alcoholism and daily drug usage in the spring of 1984, the trial court explained at length its reasons for excluding Loyland's proffered testimony, stating that although the evidence "could be relevant," its admission "is going to take us in a circle of evidence that is ... going to be nonproductive and [cause] undue consumption of time." The court added: "I'm not precluding that subject of [Barbara. S.] being an alcoholic being raised by other witnesses if the foundation can be laid."

> The trial court's ruling conformed to the requirements of Evidence Code section 352. The proffered testimony regarding Barbara S.'s alleged alcoholism was marginally relevant and likely would have consumed an undue amount of court time. No abuse of discretion appears.
>
> Moreover, even were we to conclude that the trial court ruled incorrectly, any such error plainly would have been harmless in view of the overwhelming evidence that defendant broke into the residence shared by Barbara S. and Susan Loyland, stole money belonging to each, and sexually assaulted Barbara S.

Carter, 36 Cal. 4th at 1258-59.

To the extent Petitioner claims the trial court's ruling involved an error of state law, it is not cognizable on federal habeas review. See Estelle, 502 U.S. at 70; Gordon, 895 F.2d at 613; (See SAP at 229- Petitioner contends that the trial court's "ruling [excluding Loyland's testimony] was in error, however, because [Barbara S.'s] competency to perceive and recall were critically probative of her ability to identify her assailant, which the examination of Ms. Loyland was hardly a major detour.") However, Petitioner also contends that the exclusion of Ms. Loyland's testimony deprived him of the opportunity to present a defense. (See SAP at 229.) This contention does present a federal question. See Trombetta, 467 U.S. at 485 (constitutional guarantees of due process and fundamental fairness "require that criminal defendants be afforded a meaningful opportunity to present a complete defense.")

Petitioner specifically alleges that the trial court erred in excluding Ms. Loyland's proffered testimony that Barbara S. "was a 'bad alcoholic' who drank every night, all weekend, and occasionally at lunch," who "suffered from alcoholic blackouts" and that, "on the day of the attack, [Barbara S.] had started drinking early in the morning and by 10:00 a.m. or 11:00 a.m. was 'pretty drunk.'" (SAP at 228, citing RT 3912, 3926-49.) As an initial matter, the Court's review of the proffered testimony reveals that Ms. Loyland appeared to recant her prior statement about Barbara S.'s alcohol intake on the morning of the rape, as Mr. Loyland testified that she woke at 11 that morning, stated "I didn't see her drinking," and in fact, did not see Barbara S. at all prior to leaving the

residence.  (RT 3937-38.)  Loyland explained that her prior statement involved an assumption based on prior observed behavior, rather than any observations on the day in question.  (Id.)  Loyland added that Barbara S. was not drunk or under the effects of alcohol when they spoke at the hospital later that evening.  (RT 3938.)  Moreover, Loyland acknowledged that she too had been an alcoholic and habitual drug user during this time period, which affected her own ability to perceive and recall events.  (RT 3933-34.)

Moreover, this Court's review of the record does not bear out Petitioner's assertion that the trial court precluded this testimony as "non-productive and [an] undue consumption of time."  (SAP at 228.)  Instead, it is clear that the trial court also found Ms. Loyland's credibility lacking, found Loyland's ability to recall events hampered by her own alcoholism and drug use, and concluded that Loyland "bas[ed] her opinion that she, [Barbara S.] had something else - - had something to drink in the morning on her assumption, or her beliefs that she drank every morning."  (RT 3945-47.)  The trial court also specifically stated that testimony about Barbara S.'s alcoholism was not wholly precluded, only the testimony of Ms. Loyland at that time.  (RT 3947-48.)

The Ninth Circuit has instructed that in cases involving exclusion of defense evidence, a habeas court must "balance the importance of the evidence against the state interest in exclusion," taking into account factors including: (1) "its probative value on the central issue," (2) "its reliability," (3) "whether it is capable of evaluation by the finder of fact," (4) "whether it is the sole evidence on the issue or merely cumulative," and (5) "whether it constitutes a major part of the attempted defense."  Perry v. Rushen, 713 F.2d 1447, 1452-53 (9th Cir. 1983).  However, a court must also "give due to weight to the substantial state interest in preserving orderly trials, in judicial efficiency, [and] in excluding unreliable or prejudicial evidence."  Id. at 1453.

Evaluating Petitioner's claim under these factors, it is clear that the California Supreme Court's rejection of this claim on appeal was reasonable.  While Ms. Loyland's statements about Barbara S.'s habitual alcohol use may have been capable

of evaluation, they appear to have limited probative value with respect to Petitioner's stated use for the testimony- challenging the victim's ability to identify her assailant on the day of the crime. Given Ms. Loyland's own admission that her memory was often faulty due to drug and alcohol use, in addition to her 402 hearing testimony that she did not even actually see Barbara S. on the morning of the rape, but merely assumed the victim had been drinking as was her habit, her testimony was not reliable. Moreover, Ms. Loyland's testimony was not the sole evidence on this point, as Barbara S. acknowledged that she had consumed several alcoholic drinks on the evening of the attack. (See RT 3868-71.) Finally, even if this evidence constituted an important part of the intended defense, the trial court explicitly stated that it was not categorically disallowing all testimony about Barbara S.'s alcoholism, only the unreliable testimony of Ms. Loyland on the subject. (See RT 3947.)

Petitioner fails to demonstrate that the trial court's exclusion of Ms. Loyland's testimony regarding Barbara S.'s alcohol intake and alcoholism rendered his trial fundamentally unfair. See Ortiz-Sandoval, 81 F.3d at 897; Jammal, 926 F.2d at 919. The California Supreme Court's rejection of this claim was not contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on this claim.

///

///

**6. Exclusion of Mitigation Evidence and Denial of Motion for Allocution**

Petitioner asserts that the trial court's exclusion and restriction of mitigation evidence during the trial's penalty phase and the denial of Petitioner's motion for allocution violated his constitutional rights. (SAP at 229-30; Pet. Merits Brief at 228, citing Lockett v. Ohio, 438 U.S. 586 (1978).)

With respect to the consideration of mitigating evidence in a capital case, the Supreme Court has generally stated that:

> [T]he Eighth and Fourteenth Amendments require that the sentencer . . .

> not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.[FN12]
>
> > FN12. Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.

Lockett, 438 U.S. at 604-05; see also Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982) ("The sentencer, and the [appellate court] on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.")

**a. Jerry Carter**

Petitioner first contends that the trial court improperly sustained several prosecution objections to testimony given by Petitioner's brother Jerry Carter, which curtailed potential mitigation evidence. (SAP at 233.) On direct appeal, the California Supreme Court detailed and ultimately rejected Petitioner's claim of error, as follows:

> On direct examination, Jerry Carter testified regarding defendant's difficult childhood in a manner generally consistent with the testimony he gave at defendant's trial for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie. (See *People v. Carter*, *supra*, 36 Cal.4th at pp. 1136-1137, 32 Cal.Rptr.3d at pp. 775-777, 117 P.3d at pp. 489-492, 2005 WL 1939712.) In the course of presenting this testimony, however, defense counsel asked Jerry Carter several questions concerning subjects about which the witness lacked personal knowledge. These topics included where defendant would go as a child when he ran away; where defendant found food on those excursions; defendant's efforts as a child to stow away on airplanes; and information regarding where defendant went when he was sent away from Nome by his mother and his stepfather. The trial court sustained the prosecutor's objections to these lines of inquiry on foundational and hearsay grounds.
>
> On appeal, defendant contends that the trial court's rulings improperly foreclosed the defense from presenting certain aspects of the case in mitigation. We are unpersuaded. In view of Jerry Carter's lack of personal knowledge as to certain aspects of his proposed testimony, the trial court ruled correctly. Similarly, insofar as the witness attempted to testify as to statements made to him that were offered for the truth of the matter asserted, the proffered testimony was hearsay that was not subject to any recognized exception, and properly was excluded by the trial court. (Evid.Code, § 1200, subd. (a); *People v. Whitt* (1990) 51 Cal.3d 620, 642-643, 274 Cal.Rptr. 252, 798 P.2d 849.)
>
> Moreover, even if we were to agree with defendant that the trial court

> ruled improperly, we observe that the defense succeeded in introducing the gist of the incidents through other testimony of Jerry Carter and of other witnesses. In the context of that testimony, much of which graphically described the abuse defendant suffered as a child, as well as defendant's institutionalization, the excluded testimony was of marginal significance. Thus, there is not a reasonable possibility that the jury would have rendered a different verdict had the trial court not excluded the challenged testimony. (*People v. Brown* (1988) 46 Cal.3d 432, 447-448, 250 Cal.Rptr. 604, 758 P.2d 1135.)

Carter, 36 Cal. 4th at 1272-73.

As noted above, the Supreme Court has held that the exclusion of relevant mitigating evidence can violate a defendant's constitutional rights. See Lockett, 438 U.S. at 604-05. For instance, in Green v. Georgia, 442 U.S. 95 (1979), a state court was found to have erred in excluding evidence that Green's co-defendant confessed to a third party that he committed the murder. Despite the fact that the prosecutor found the confession sufficiently reliable to use at the co-defendant's trial, the trial court erred in rejecting that same evidence as hearsay during Green's penalty phase proceedings. The Supreme Court concluded that "[r]egardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial . . . and substantial reasons existed to assume its reliability." Green, 442 U.S. at 97, citing Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("[T]he hearsay rule may not be applied mechanistically to defeat the ends of justice.")

However, the Ninth Circuit has clarified that cases such as Green and Chambers "do not stand for the proposition that a defendant must be allowed to put on any evidence he chooses." LaGrand v. Stewart, 133 F.3d 1253, 1266 (9th Cir. 1998); see also Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("[W]e have never questioned the power of the States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability- even if the defendant would prefer to see the evidence admitted.")

Petitioner argues that because their stepfather Jim Carter was deceased and their

mother Esther refused to testify, that "[t]he trial court's rulings deprived Carter of an opportunity to present, through the most reliable source available, relevant and critical mitigating evidence." (Pet. Merits Brief at 231.) Yet, while Petitioner asserts that Jerry Carter could reliably testify about Petitioner's childhood attempts to run away from home and stow away on airplanes, a review of the state record does not support this conclusion. Jerry Carter's own words indicate that his testimony about these particular runaway attempts were related to him by other individuals including Petitioner, their parents, and townspeople. (RT 7442-43) ("It was all told to me again, but it was a lot more that the parents told me. The second time, being a small town, I had a lot of feed back on it," and "I talked with [Petitioner] when it was over with.") As such, it is not apparent that Jerry Carter had personal knowledge about the details concerning the airplane incidents, other than the fact that he was told about two of them. (See RT 7442.)

Moreover, despite Petitioner's contention that the trial court refused to allow the runaway incidents into evidence, the record indicates that the trial court allowed some testimony about these events, including that Petitioner made "numerous attempts" to run away as a reaction to his home life, that he ran away for days at a time, and that he had a friend that brought him food on several of these occasions. (RT 7440-41.) Jerry Carter also testified that he searched for Petitioner on a number of occasions and found him more than once in "the tool shed or tool box" blocks from their home. (Id.)

The record also belies Petitioner's contention that only certain evidence was the subject of testimony despite the "chronic" abuse he suffered as a child. (Pet. Merits Brief at 233.) Yet, Jerry Carter's testimony discussed the "lickin's" that he and Petitioner endured at the hands of their mother, stating that "[w]e would have to go pick a branch, or we had a belt, we had a razor strap." (RT 7438.) Carter also recounted that their mother and step-father often returned home from the bars at closing time, 5 a.m., and engaged in violent drunken arguments that involved throwing furniture and once, the family's Christmas tree. (RT 7438-39.) Carter also recounted that Petitioner, at the

age of five or six, tried to stop his mother from driving to the bar by "screaming and hollering, hanging on the back bumper, dragging his feet trying to stop the car." (RT 7451.) Carter explained that their mother cleaned Petitioner up and went back to the bar. (Id.) Carter also related incidents where their parents "chained" Petitioner to the bed for a few days "to keep him from running away" before scheduled testing that had been set up in Anchorage. (RT 7451-52.)

In this instance, it is clear that California's hearsay rule was not "applied mechanistically to defeat the ends of justice." Chambers, 410 U.S. at 302. Instead, the rule was applied reasonably, as Jerry Carter did not have personal knowledge of the information about the airplane running-away incidents; even Petitioner acknowledges that Jerry Carter did not have first-hand knowledge of those incidents, but had obtained the information "not just from various conversations he had with townspeople and his family, but from [Dean] Carter himself." (Pet. Merits Brief at 232.) The excluded testimony about the airplane incidents was neither "highly relevant to a critical issue" at the penalty phase, as the jury was already apprised of the violence and abuse in Petitioner's childhood home which led to his attempts to run away, nor did "substantial reasons exist[] to assume its reliability," as Jerry Carter's testimony regarding the airplane incidents was based on second-hand information. Green, 442 U.S. at 97. The state court's rejection of this claim was reasonable.

In sum, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim on appeal was contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to habeas relief on this claim.

**b. Dr. Linda Ellanna**

Second, Petitioner asserts that the trial court erred in excluding Dr. Linda Ellanna from testifying at the penalty phase of trial. (SAP at 233-34.) Petitioner contends that Dr. Ellanna would have provided "evidence about the rampant alcoholism and depression suffered by the Native Alaskan population, as well as the racial and ethnic discrimination directed towards them by the Caucasian minority." (Pet. Merits Brief

at 233.)   On direct appeal, after a detailed recounting of Dr. Ellana's prospective

testimony given outside the presence of the jury, the California Supreme Court

examined and rejected Petitioner's claim, stating as follows:

> On appeal, defendant contends the trial court erred in excluding the testimony in question. Although certain aspects of Dr. Ellana's testimony clearly fell outside the bounds of relevancy (for example, cultural attitudes and problems in Nome at the time of defendant's 1991 trial, seven years after he was incarcerated in California), and other aspects were cumulative (for example, the harsh living conditions experienced by residents of Nome), the question whether her testimony ought to have been excluded in its entirety is closer. Dr. Ellana did have firsthand knowledge of the rigid and prejudicial attitudes regarding "half-breeds" expressed by defendant's stepfather; as noted earlier, defendant is part Eskimo. Consistent with the principles set forth in Evidence Code sections 210 and 352, we believe that the trial court could have set certain limits as to the areas in which Dr. Ellana could testify.
>
> We need not decide whether the trial court's ruling to exclude Dr. Ellana's testimony in its entirety was erroneous, however, because even if we assume that error occurred, defendant suffered no prejudice. The jury heard a considerable amount of other testimony regarding Nome's harsh conditions and defendant's troubled childhood. Viewed in the context of the comprehensive case in mitigation presented by the defense, Dr. Ellana's testimony was of marginal significance and unlikely to have swayed the jury. Defendant fails to persuade us that it is reasonably possible a more favorable result would have been reached in the absence of the trial court's ruling excluding this testimony. (*People v. Brown*, *supra*, 46 Cal.3d 432, 447-448, 250 Cal.Rptr. 604, 758 P.2d 1135.)

Carter, 36 Cal. 4th at 1275.

As the state court accurately noted, Dr. Ellana's proposed testimony primarily

concerned her observations of the Nome environment and her interactions with and

knowledge of Petitioner's step-father Jim Carter.  Petitioner contends that the failure

to provide this cultural evidence prejudiced Petitioner, citing to two Ninth Circuit cases

which discuss error arising from the omission of cultural evidence.  In Mak v. Blodgett,

970 F.2d 614 (9th Cir. 1992), the Ninth Circuit concluded that trial counsel was

deficient, in part, for failing to present evidence of the defendant's Chinese immigrant

background, given that expert testimony could have explained the "serious assimilation

problems" experienced by such immigrants and that the defendant's "'stoic' demeanor

was consistent with the cultural expectations of Chinese males."  Id. at 620.   In

Siripongs v. Calderon, 35 F.3d 1308 (9th Cir. 1994), trial counsel was found ineffective

for failing to present evidence of the defendant's Thai upbringing that "might well have bridged a cultural gap between the jury and the accused." Id. at 1316.  Petitioner argues that because trial counsel was found ineffective in those two cases, "[i]t follows, then, that trial courts should not, indeed cannot, restrict the introduction of this mitigating evidence."  (Pet. Brief at 234.)

First, Petitioner fails to offer any clearly established federal law demonstrating that the exclusion of cultural evidence, by itself, amounts to error of constitutional dimension.  In Mak and Siripongs, the Ninth Circuit found trial counsel's performance deficient, but granted relief based on several factors, only one of which was the omission of cultural evidence.  Indeed, those Ninth Circuit cases concern trial counsel's performance in failing to present information that would have provided a cultural context for the jury, given those defendants' cultural background and unique circumstances.  Here, Petitioner fails to demonstrate that cultural evidence was similarly absent from his trial.  A number of defense witnesses testified about Nome and its harsh environment, as well as the alcoholism, depression, and prejudices prevalent in the community.  In fact, the trial court excluded Dr. Ellanna from testifying in part because it her proposed testimony was "not just duplicative but cumulative" of other penalty phase testimony on the subject.  (RT 7925.)

Petitioner's supplemental assertion that lay testimony about Nome's environment and conditions were "minimal and superficial" is not borne out by the Court's review of the record.   On the contrary, no less than a half dozen penalty phase witnesses discussed or described the living conditions and environment in Nome, Alaska, during Petitioner's childhood and adolescence.   For instance, Petitioner's brother Jerry described growing up in Nome as "pretty long and depressing, with long dark winters. A couple months of summer. Cold. Everything was involving indoor stuff," and stated that "[i]f you weren't involved in few sporting things that were available, and you weren't involved in any church groups, you were definitely into the bar scene.  That was all that was left."  (RT 7456.)   Jerry also testified that rampant alcoholism in the

area caused problems, stating that the Nome area "suicide rate is really high. Just anything relating with crime is extremely high. Really high depression. Just not a good scene to be in." (Id.)

Petitioner's sister Polly Reasner also described Nome and its environs in her testimony, identifying numerous photos of the area, including typical buildings and the family's fishing camp. (RT 7532-37.) Reasner agreed that heavy drinking was an issue in Nome, that their parents drank a lot as well, noting that "people from the villages will come to Nome to buy groceries and the intent to party . . . It's just very, very bad." (RT 7550.) Reasner also stated that Nome residents sometimes allowed their homes to become worn down because "there isn't an upgrade law or anything," and agreed with characterization of Nome as a "fairly rustic rural community" (RT 7555.)

Bertha Adsuna, an Eskimo elder who knew the Carter family, saw Petitioner's mother "staggering a little" from the alcohol on occasion, which Adsuna agreed was a "real bad" problem in Nome. (RT 7582-84.) Adsuna also described the Nome weather as "nine months winter and three months summer," with very cold and dark winters. (RT 7586-87.) Adsuna stated that while only about 3,000 people lived in Nome when she first moved there in the 1950's, there were approximately eight or nine bars. (RT 7588-89.)

Harriet Brown, a missionary in Nome, also agreed that the primary problem faced by the native population was alcohol. (RT 7617-18.) Brown believed that the alcohol problem contributed to child neglect, and that the problem was particularly hard to combat in winter as people would freeze to death after leaving the bars. (RT 7618-19.)

Beth Farley, Petitioner's classmate and family friend, stated that she eventually left Nome due to the alcohol abuse problem. (RT 7638, 7653.) Farley noted that the alcohol use was not limited to adults, stating that "I think kids drank with each other at the age of 12,"and that she was among them. (RT 7655.) Farley also noted that "[t]he suicide rate in Nome is very, very high. And what we call cabin fever in the winters, it was even higher. The darkness, isolation, no jobs, and the drinking, they just end up

killing themselves.  You have to fly in and out of Nome, we don't have any roads."
(Id.)  Farley believed that "[n]ot a whole lot" of the 97 people in her graduating class
were still alive, because of "suicides, illnesses, but mostly suicides because of alcohol
and drugs." (RT 7655-56.) Farley also described the prejudice against mixed race
people that existed in Nome.  (RT 7656.)

Ruth Butts, another friend and classmate, stated that the treatment of kids at
school "depended on how much Eskimo you were," and that "half-breeds," those with
Eskimo mothers and Caucasian fathers, were treated better than the "full-blooded
Eskimos."  (RT 7694.)  Butts also stated that in Petitioner's case, it was common
knowledge, and a source of teasing, that Jim Carter was not Petitioner's father.  (RT
7695-96.)

In fact, such testimony was extensive enough to provoke a sidebar discussion in
which the prosecution contested additional prospective testimony about Nome,
explaining that, "I don't mean to sound callous, but we're getting a little - - I mean, first
of all, this is the umpteenth witness about how miserable Nome is.  [¶] It's getting a
little redundant.  We know it's a terrible god forsaken hell hole of a place." (RT 7687.)
In response, the trial court conceded that "I must admit, I'm beginning to get a little
concerned about the redundancy of setting the scene," but acknowledged that "I think
people have a right to know what it was like in Nome."  (RT 7688.)   After this
discussion, Ms. Butts continued her testimony, and Ms. Wondsell also provided
testimony about her own observations with respect to prejudices in Nome.

In short, because numerous witnesses had already testified about the Nome
environment, as well as the alcoholism and depression rampant in the area, and the
prejudices faced by Native people, the exclusion of Dr. Ellanna's testimony on this
matter did not wrongly deprive Petitioner of mitigation evidence that had not been
otherwise allowed.  See Lockett, 438 U.S. at 604-05.

With respect to the second aspect of Dr. Ellanna's proposed testimony, Petitioner
fails to demonstrate that testimony about Jim Carter's racial prejudices and opinions

would have made any difference in the penalty phase verdict. While the Court is not persuaded that the exclusion of this testimony constituted federal error, even if the trial court erred in excluding the testimony, prejudice has not been shown.

As the trial court reasonably concluded, Dr. Ellanna's "testimony concerning Jim Carter relates to a time period when the defendant is probably about 12 years old . . . She has seen the defendant with his father two times, and obviously there was nothing inappropriate that was expressed or seen at that particular stage. [¶] Her foundation for her opinion about Jim Carter is based upon these staff meetings." (RT 7923.) The trial court noted that:

> The problem I have in listening to her testimony is that it is based only on those comments. And in addition, there is no showing at this particular stage, that the defendant, himself, was experiencing prejudice on the part of his stepfather, and it is very speculative. I mean I've allowed a lot to come in on this issue of prejudice, and I think the jury is well aware that prejudice exists in Nome now, and it did then. And therefore, the defendant may have been subjected to, and probably was subjected to some of the prejudice. And that, you know, I think ought to be there and is there, as well as the alcoholism.

(RT 7923-24.) The trial judge added that, "I just want to make it real clear, there is no evidence in terms of how Jim Carter treated Dean Carter directly as a result of any potential prejudice in that regard." (RT 7926.)

This conclusion was reasonable, as Dr. Ellanna's testimony about Jim Carter did not bear a connection to an "aspect of [the] defendant's character or record," as there was nothing to connect Jim Carter's expression of opinion in a staff meeting to his treatment of Petitioner, his step-son. Lockett, 438 U.S. at 604-05. Moreover, even if such testimony was excluded in error, the California Supreme Court was reasonable in concluding that Dr. Ellanna's testimony, on the whole, was of "marginal significance and unlikely to have swayed the jury." Carter, 36 Cal. 4th at 1275. Therefore, because the state supreme court's rejection of this claim was objectively reasonable, Petitioner is not entitled to habeas relief.

**c. James W.L. Park**

Finally, Petitioner asserts that the trial court erred in allowing extensive cross-

examination of witness James W.L. Park, a former San Quentin warden, legislative consultant, and clinical psychologist, which forced defense counsel to end the direct examination of that witness. (SAP at 236-37.) On direct appeal, the state supreme court examined Petitioner's claim and rejected it on the merits, reasoning:

> Outside the presence of the jury, the defense offered the testimony of James W.L. Park, an expert in prison operations, prison construction, and prisoner classification who had lengthy experience working in the California Department of Corrections. Park testified that prisons use audio-visual equipment, and that a prisoner with experience in this field would be a benefit to the prison system. Based upon his review of defendant's records of incarceration, Park stated that in his opinion defendant would make "an above[-]average adjustment" to living in a maximum security prison. Park further testified that defendant "would not be a danger to staff or to prisoners."
>
> The trial court ruled that Park could testify before the jury as to his opinion that defendant would adjust to life in prison, but also that if Park so testified, the prosecution would be permitted to cross-examine Park with regard to defendant's psychological testing results and history of violence and criminal behavior.[FN40]
>
>> FN40. The trial court's ruling included the following:
>>
>> "[Defendant's] status as a death row inmate will not come in.
>>
>> "... [Park] may not testify to what it's like to be ... a prisoner under a life without possibility of parole [LWOP] sentence in and of itself....
>>
>> "He may testify that based upon his experience, that an LWOP prisoner could utilize a trade as a video operator.
>>
>> "He will be allowed to testify as to his opinion that the defendant will make an adequate adjustment to state prison, but if that question is asked, the People may cross-examine him, including cross-examining him on his history of any violence or any criminal behavior.
>>
>> "[¶] ... [¶]
>>
>> "And [defendant's] entire record, and any psychological testing results that the people have can be raised by way of cross-examination of this particular witness, because that's information that that witness should have in forming such an opinion.
>>
>> "[The People] also [will] be allowed to cross-examine the witness and make it clear to the jury that this witness has not examined this defendant."
>
> Defense counsel thereafter informed the court that the defense would not call Park as a witness.

> On appeal, defendant contends "[t]he trial court's improper ruling effectively precluded the expert's testimony in violation of [defendant's] constitutional rights." We disagree. The proffered testimony sought to introduce into evidence certain experience and character traits of defendant that suggested he would adjust well to prison life and probably would not be dangerous to other inmates and staff. Had the defense introduced that evidence, the prosecution would have been entitled to cross-examine Park regarding defendant's psychological propensities and prior criminal record. (See *People v. Daniels* (1991) 52 Cal.3d 815, 882-883, 277 Cal.Rptr. 122, 802 P.2d 906.) The trial court did not preclude Park from testifying, nor unduly restrict the areas of inquiry pertaining to his proposed testimony, but instead simply made clear that if the defense offered evidence of defendant's character related to the likelihood of his adjustment to life in prison, the prosecution would be entitled to cross-examine the witness and seek to rebut his testimony. Under these circumstances, the defense for obvious tactical reasons declined to introduce Park's testimony. No error or abuse of discretion appears.

Carter, 36 Cal. 4th at 1275-76.

As an initial matter, in this instance the trial court did not exclude Park's testimony from the jury's consideration in violation of Eddings or Lockett. Instead, the trial court ruled that if the defense chose to present Park's opinion regarding Petitioner's anticipated adjustment to life in prison, the prosecutor would be allowed to cross-examine Park on the basis for that opinion, which would include Petitioner's prison and psychological records. Based on that ruling, defense counsel declined to present Park's proposed testimony.

Here, the parties concur that Park's proposed testimony was relevant penalty phase evidence, and the Supreme Court has concluded the same. See Skipper v. South Carolina, 476 U.S. 1, 7 n.2 (1986) ("[E]vidence of adjustability to life in prison unquestionably goes to a feature of the defendant's character that is highly relevant to a jury's sentencing determination.") Instead, Petitioner's contention appears limited to the scope of cross-examination the trial court intended to allow had Park testified, asserting that the trial court erred in holding that the "[c]ross-examination of Park had no bounds," as it would "exceed the limited scope of testimony he was to provide." (Pet. Merits Brief at 239.)

Yet, Petitioner fails to offer any authority to support his position that the prosecution lacks the right to attempt to rebut Park's testimony through cross-

examination. See generally Davis v. Alaska, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.") Nor does Petitioner cite any authority to support his contention that the trial court's ruling was error of constitutional dimension. See Wong, 130 S. Ct. 383 (expert testimony that a defendant had a likelihood for positive adjustment to prison setting would have opened door to questions about defendant's violent propensities or past violent conduct); see also Darden, 477 U.S. at 186 ("Any attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of Petitioner's prior convictions.")

Moreover, the record does not indicate that the trial court intended to allow "unlimited cross-examination" of Park. (SAP at 236.) Instead, the trial court actually ruled that Park would be subject to cross-examination on the foundation for his opinion that Petitioner would make a good adjustment to life in prison, which would necessarily include Petitioner's history of violence, prior criminal behavior, and psychological testing - information that Park would have reviewed or have been aware of in forming his conclusions, as follows:

> He will be allowed to testify as to his opinion that the defendant will make an adequate adjustment to state prison, but if that question is asked, the People may cross examine him, including cross examining him on his history of any violence or any criminal behavior.
>
> And I have seen a little bit of that type of subject matter in the prosecution's examination of some of the other witnesses.
>
> And his entire record, and any psychological testing results that the People have can be raised by way of cross examination of this particular witness, because that's information that that witness should have in forming such an opinion.
>
> They'll also be allowed to cross examine the witness and make it clear to the jury that this witness has not examined the defendant.
>
> So, the basis of the opinion is purely on whatever information he had that he's formed it on, but it does not include any psychological testing of this defendant.
>
> If, in fact, this witness is aware of psychological testing by another [sic] psychologists or psychiatrists, be prepared, because I'm going to allow it in, because that's part of what he's forming his opinion on.

(RT 8239.)

California law specifically provides that "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reason for his or her opinion." Cal. Evid. Code § 721(a). Here, Park, a licensed clinical psychologist, clearly indicated that his opinion that Petitioner would make an above average adjustment to prison was based on his review of Petitioner's "records of his prior incarcerations in various institutions." (RT 8196.) The trial court properly allowed cross-examination on that matter, and added that if Park's opinion was also based on psychological reports or testing, "I'm going to allow it in, because that's part of what he's forming his opinion on." Petitioner fails to show that this ruling was in error.

Accordingly, the Court cannot conclude that the California Supreme Court's rejection of this claim on appeal was contrary to, or an unreasonable application of, clearly established federal law. Petitioner does not merit habeas relief on this contention.

**d. <u>Allocution</u>**

Finally, Petitioner contends that the trial court erred in denying Petitioner's motion for allocution. (SAP at 237.) On direct appeal, the California Supreme Court rejected his claim of error, stating:

> Although acknowledging that the right of allocution is not recognized in California, defendant nevertheless contends the trial court erred in refusing his request to plead for mercy without being subject to cross-examination. No error appears. (See, e.g., <u>People v. Davenport</u> (1995) 11 Cal.4th 1171, 1209, 47 Cal.Rptr.2d 800, 906 P.2d 1068; <u>People v. Hunter</u> (1989) 49 Cal.3d 957, 989, 264 Cal.Rptr. 367, 782 P.2d 608.)

<u>Carter</u>, 36 Cal. 4th at 1276. Petitioner contends that the state supreme court's rejection of this claim on appeal was objectively unreasonable under section 2254, warranting habeas relief. (Pet. Merits Brief at 240.)

As noted above in this discussion of whether relief on this claim is precluded under Teague, see section IV-B, above, the Supreme Court has refrained from conclusively deciding  the issue of whether allocution is a right of constitutional magnitude.  See Hill, 368 U.S. 424 (1962).  However, the Ninth Circuit has found that "allocution is a right guaranteed by the due process clause of the Constitution." Boardman, 957 F.2d at 1530.

Federal courts do look to circuits as persuasive authority in applying clearly established law.  Davis, 384 F.3d at 638.  However, the Ninth Circuit has explicitly acknowledged that "we may not, of course, reverse a state court's decision simply because it is inconsistent with a rule established by a Ninth Circuit case."  Van Tran v. Lindsey, 2212 F.3d 1143, 1154 (9th Cir. 2000), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

In any event, Boardman is distinguishable from the instant claim.  Boardman involved a case in which a defendant was denied his request to *address the trial court* at a sentencing hearing.  See id., 957 F.2d at 1529-30 ("Our holding is limited to circumstances in which a defendant, either unrepresented or represented by counsel, makes a request that he be permitted to speak to the *trial court* before sentencing. If the trial court denies that request, the defendant has not received due process." (emphasis added.)  This differs in an important respect from Petitioner's claim of error.  During trial, Petitioner filed a motion "for allocution during the penalty phase of the trial, allowing the defendant to *address the jury* without being subjected to cross-examination."  (CT 2193) (emphasis added.)  Circuit courts that have addressed this particular issue have soundly rejected the notion that a capital defendant has a constitutional right to address the sentencing jury.  See United States v. Lighty, 616 F.3d 321, 365 (4th Cir. 2010) (concluding that "a defendant does not have a constitutional right to allocution before a jury in a capital sentencing hearing.), citing United States v. Barnette, 211 F.3d 803, 820 (9th Cir. 2000); United States v. Hall, 152 F.3d 381, 396 (5th Cir. 1998) ("We conclude that a criminal defendant in a capital case

does not possess a constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross-examination."), abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304 (2000).

Accordingly, the Court cannot conclude that the California Supreme Court's rejection of this claim on appeal was contrary to, or an unreasonable application of, clearly established federal law. Petitioner does not merit habeas relief on this contention.

**7. Admission of Ray Blevins' Preliminary Hearing Testimony**

Petitioner contends that the trial court erred in allowing the admission of Ray Blevins's Los Angeles preliminary hearing testimony at his San Diego trial, because (1) San Diego defense counsel were not given an opportunity to cross-examine him at the Los Angeles proceeding and (2) Los Angeles counsel failed to conduct a meaningful cross-examination due in part to the prosecution's failure to turn over an exculpatory forensic report in a timely manner. (Pet. Merits Brief at 243-44.)

The California Supreme Court rejected this claim on direct appeal, referencing the reasoning in Petitioner's Los Angeles case, stating:

> For the reasons we have set forth more extensively in the companion matter, *People v. Carter*, supra, 36 Cal.4th 1114, 32 Cal.Rptr.3d 759, 117 P.3d 476, 2005 WL 1939712, we reject defendant's contentions. Insofar as defendant's claims do not precisely mirror those set forth in the companion appeal, neither defendant's additional arguments nor the variants in their phrasing persuade us that the trial court committed an error or abuse of discretion prejudicial to defendant's case. Indeed, these claims are not deserving of additional discussion. (*People v. Laursen* (1972) 8 Cal.3d 192, 205, 104 Cal.Rptr. 425, 501 P.2d 1145.)

Carter, 36 Cal. 4th at 1270. In the Los Angeles companion case, the California Supreme Court rejected this claim, reasoning in relevant part:

> In the present case, defendant's motive and interest in cross-examining Blevins at the preliminary hearing were closely similar, if not identical to, defendant's objectives at the guilt phase of the trial-namely, to attempt to discredit the prosecution's theory as to the date on which defendant initially encountered Tok Kim (in turn, suggesting that someone other than defendant encountered Kim at the Lafayette bar on the evening of April 1, 1984). The record indicates that at the preliminary hearing, defense counsel sought to establish that Blevins saw defendant and Kim together around midday April 1, 1984, several hours prior to the time the prosecution's other witnesses placed the pair together initially.

> In view of the foregoing, we conclude the trial court properly, if implicitly, concluded that defendant's "motive and interest" in cross-examining Blevins at the preliminary hearing and at the trial were sufficiently similar to satisfy the requirements of Evidence Code section 1291.
>
> Defendant further contends the admission of Blevins's preliminary hearing testimony violated defendant's federal constitutional right of confrontation, because defense counsel's brief cross-examination constituted incompetent representation. We disagree. As we previously have explained: "as long as a defendant was provided the opportunity for cross-examination, the admission of preliminary hearing testimony under Evidence Code section 1291 does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective." (*People v. Samayoa*, *supra*, 15 Cal.4th 795, 851, 64 Cal.Rptr.2d 400, 938 P.2d 2; see also *People v. Zapien* (1993) 4 Cal.4th 929, 975, 17 Cal.Rptr.2d 122, 846 P.2d 704; *People v. Alcala* (1992) 4 Cal.4th 742, 784, 15 Cal.Rptr.2d 432, 842 P.2d 1192 [the requirement that the party have a similar interest and motive is satisfied notwithstanding the decision of defense counsel to alter the nature or scope of cross-examination].)
>
> It is undisputed that at the time of trial, Blevins was dead and thus unavailable as a witness. Blevins's testimony at the preliminary hearing, where defendant had an interest and motive to cross-examine him similar to what defendant had at the trial, therefore was admissible. The trial court did not err in permitting the prosecution to introduce that testimony against defendant at trial.

Carter, 36 Cal. 4th at 1173-74.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. However, "there has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." Barber v. Page, 390 U.S. 719, 722 (1968); see also Crawford v. Washington, 541 U.S. 36. 59 (2004) ("[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.") A defendant's opportunity to cross-examine a witness is satisfied when the cross-examination occurs under circumstances "closely approximating those that surround a typical trial." California v. Green, 399 U.S. 149, 165 (1970).

Here, it is uncontested that Mr. Blevins died prior to the San Diego proceedings and was therefore unavailable to testify at the San Diego trial. (See Pet. Merits Brief at 242; Merits Resp. at 145.) As such, Petitioner's Confrontation Clause claim concerns the sufficiency of Mr. Blevins's cross-examination at the Los Angeles preliminary hearing.

First, Petitioner alleges that his rights were violated because "Blevins's testimony was introduced in the San Diego trial even though Carter's San Diego counsel was never afforded an opportunity to cross-examine Blevins." (Pet. Merits Brief at 243.) The record reflects that both Los Angeles and San Diego counsel defended Petitioner on capital murder charges which included introduction of the Kim murder as "other crimes" evidence. As an initial matter, Petitioner fails to demonstrate that cross-examination by San Diego counsel would have substantially differed from that in Los Angeles. More importantly, whether or not Blevins was confronted by San Diego counsel is ultimately of no import to the resolution of this claim. The Sixth Amendment requires simply that "the *defendant* has had a prior opportunity to cross-examine," and in this instance, the defendant, with the assistance of his Los Angeles trial counsel, was provided with such an opportunity.

Second, Petitioner alleges that Los Angeles counsel failed to conduct an adequate cross-examination of Mr. Blevins. Petitioner notes that allegations relating to the death of Ms. Kim, which had been separately filed in Los Angeles, were dismissed after the preliminary hearing due to improper venue and lack of jurisdiction, although the facts were found admissible as "other acts" evidence. (SAP at 238.) Petitioner asserts that Los Angeles counsel unreasonably announced an intention to litigate the hearing on the assumption that the charges would be dismissed, and that "[b]ecause preliminary hearing counsel was litigating only a motion to dismiss based on venue, Mr. Carter's preliminary hearing counsel did not cross-examine Blevins with the same motive and interest that defense counsel would have had at trial." (Id. at 239-40.)

The California Evidence Code provides: "(a) Evidence of former testimony is not

made inadmissible by the hearsay rule if the declarant is unavailable as a witness and
... (2) [t]he party against whom the testimony is offered ... had the right and opportunity
to cross-examine the declarant with an interest and motive similar to that which he has
at the hearing." See Cal. Ev. Code § 1291.  Yet, "similar motive" is a state evidentiary
requirement, and not a requirement under the Confrontation Clause.  The Supreme
Court has simply held that a witness' prior testimony is properly admitted at a criminal
trial when the prosecutor is not at fault for the witness' unavailability and the prior
proceedings are not "significantly different from an actual trial to warrant distinguishing
the two cases for purposes of the Confrontation Clause." Green, 399 U.S. at 165.
Petitioner fails to offer any Supreme Court authority that supports his argument in this
respect.

In fact, while the Supreme Court recognized that "[a] preliminary hearing is
ordinarily a much less searching exploration into the merits of a case than a trial, simply
because its function is the more limited one of determining whether probable cause
exists to hold the accused for trial," the Court also stated that "there may be some
justification for holding that the opportunity for cross-examination of a witness at a
preliminary hearing satisfies the demand of the confrontation clause where the witness
is shown to be actually unavailable." Barber, 390 U.S. at 725-26.  This appears to be
such a case.  There is no question that Mr. Blevins was actually unavailable as a
witness, and it is clear that Petitioner was given the prior opportunity to cross-examine
and confront Mr. Blevins under circumstances "closely approximating those that
surround a typical trial." Green, 399 U.S. at 165.

Finally, Petitioner contends that the trial court erred in allowing the Blevins
testimony despite the prosecution's alleged misconduct in failing to timely reveal a
forensic report that could have allowed an additional avenue of cross-examination.
However, the Supreme Court has clearly indicated that "the right to confrontation is a
*trial* right, designed to prevent improper restrictions on the type of questions that
defense counsel may ask during cross-examination," and is not "a constitutionally

compelled rule of pretrial discovery." Pennsylvania v. Ritchie, 480 U.S. 39, 52 (1987); see also Delaware v. Fensterer, 474 U.S. 15, 20 (1985) ("[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.") Accordingly, any violation arising from the allegedly untimely disclosure of this report shall be considered in the adjudication of Petitioner's Brady claim regarding this issue. (See Claim 7, supra.)

In sum, as Blevins was obviously unavailable to testify at his San Diego trial, and Petitioner had been given an opportunity to cross-examine him at the Los Angeles preliminary hearing, Petitioner fails to demonstrate that his Confrontation Clause rights were violated. The California Supreme Court's rejection of this claim on appeal was neither contrary to, nor an unreasonable application of, clearly established federal law. Petitioner does not merit habeas relief on this claim.

///

///

**8. Denial of Motion to Strike Special Circumstances 4, 5, and 6**

Petitioner contends that the trial court erred in failing to strike special circumstances 4 (his prior conviction of the murder of Susan Knoll), 5 (his prior conviction of the murder of Jillette Mills), and 6 (his prior conviction of the murder of Bonnie Guthrie) to the Cullins murder. (SAP at 241.) Petitioner contends that the prior convictions are invalid, as "he was not afforded conflict free counsel or the effective assistance of counsel." (Id. at 242.) Petitioner generally contends that his Los Angeles convictions and death sentences were unconstitutional, that the California Supreme Court's decision affirming the convictions and sentence was objectively unreasonable, and incorporates by reference the section 2254 brief filed in support of his Los Angeles federal habeas petition. (Pet. Merits Brief at 245, citing Carter v. Martel, CV 06-4532 RGK, Doc. No. 73.)

On direct appeal, the California Supreme Court rejected this claim, reasoning:

> Defendant contends the trial court committed prejudicial error when it denied his motion to strike the prior-murder special-circumstance allegations derived from the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie, reflected in the Los Angeles County judgment rendered against defendant on January 30, 1990. Defendant challenged the prior convictions on the ground they were "constitutionally defective," because defendant "was denied the right to effective assistance of counsel" and "denied his constitutional right to testify at the guilt phase of the Los Angeles trial; he was erroneously denied his constitutional right to present a defense at the guilt phase of that trial; and the Los Angeles trial court erroneously failed to afford him a hearing on conflict of interest allegations between him and his attorneys, in violation of his right to counsel." Defendant further asserts that "failure to dismiss [the prior murder] special circumstances ... would deny [him] a fair trial and due process of law ... and would deny him protection against cruel and unusual punishment" in violation of the applicable state and federal constitutional guarantees.
>
> In the companion case, *People v. Carter*, *supra*, 36 Cal.4th 1114, 32 Cal.Rptr.3d 759, 117 P.3d 476, 2005 WL 1939712, we have upheld the judgment of death against defendant for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie. In so doing, we have rejected contentions that are substantially similar to those made in support of defendant's motion at the trial of the present case to strike the prior murder special-circumstance allegations-contentions that, by his own acknowledgment, he has included "to a large extent" here. (*Id.* at pp. 1156-1157, 32 Cal.Rptr.3d at pp. 791-793, 117 P.3d at pp. 503-505, 2005 WL 1939712.) As we have explained in that decision, the Los Angeles County murder convictions were valid, and therefore the San Diego trial court properly denied the motion to strike. Insofar as defendant's arguments regarding the validity of the prior murder convictions forming the basis for the prior murder special circumstance differ from the arguments made in his automatic appeal from the Los Angeles County judgment convicting him of those murders, we reject those arguments.

Carter, 36 Cal. 4th at 1262-63.

Prior to trial, Petitioner submitted a motion to strike the three prior convictions, based in part on People v. Sumstine, 36 Cal.3d 909 (1984) and People v. Coffey, 67 Cal. 2d 204 (1967), which provides criminal defendants with the right under California law to challenge a constitutionally defective prior conviction later used to enhance a criminal sentence. (See CT 614-624.) The trial court denied Petitioner's motion, again based on state law. (See RT 8700-12; 882-29.) Yet, as stated above, state evidentiary rulings are not cognizable on federal habeas review unless the ruling violated the Petitioner's due process right to a fair trial. Estelle, 502 U.S. at 70. Petitioner fails to cite to any clearly established federal law allowing this type of challenge. See Nunes v. Ramirez-Palmer, 485 F.3d 432, 443 (9th Cir. 2007) ("[T]he United States Supreme

Court has never recognized California's Sumstine doctrine as creating a liberty interest that is protected by the Fourteenth Amendment.") In fact, as noted in the discussion of Claim 8, the Supreme Court has concluded that "once a conviction is no longer open to direct or collateral attack in its own right . . . the conviction may be regarded as conclusively valid" and "[i]f that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under 2254 on the ground that the prior conviction was unconstitutionally obtained." Coss, 532 U.S. at 403-04. As such, the state court's rejection of this claim cannot be contrary to, or an unreasonable application of, clearly established federal law.

In this case, even if the trial court erred in denying the motion to strike the prior convictions, Petitioner fails to demonstrate that the error rendered his trial "fundamentally unfair." Ortiz-Sandoval, 81 F.3d at 897; Jammal, 926 F.2d at 919. There is no evidence that special circumstances 4, 5, and 6 were considered by the jury in their penalty phase verdict or by the trial court in its sentencing determination. A review of the state record clearly indicates that after the trial court denied the motion to strike, the parties agreed that the Los Angeles convictions would *not* be presented to the jury, as follows:

> Mr. Bumer: We will do the - - Mr. Pippin's suggestion was that we admit those, and then that they not go to the jury.
>
> The Court: Four, Five and Six as special circumstances are not going to be brought to the jury's attention.
>
> Mr. Bumer: Right.
>
> The Court: Is that the agreement, People?
>
> Mr. Pippin: Yes.
>
> The Court: Is that the agreement, Defense?
>
> Mr. Bumer: Yes.

(RT 7220-21.) When the defendant admitted the truth of the prior Los Angeles convictions for the record, the trial court again reiterated that "[t]he promise has been from the People that they'll not introduce into evidence the Los Angeles convictions.

[¶] We're only talking about the special circumstances Los Angeles convictions at this time. [¶] They'll not introduce these into evidence as aggravating factors in the penalty phase." (RT 7226.) Additionally, when pronouncing sentence, the trial court specifically noted that "I am not considering the convictions concerning [Jennifer S.], Mills, Knoll, and Guthrie. I'm considering only facts presented to me in trial as to those particular crimes." (RT 8865.)

Moreover, under California law, the finding of one special circumstance is sufficient to qualify a criminal defendant for the death penalty, and those special circumstances may be considered in aggravation at the penalty phase. See Cal. Penal Code 190.2; 190.3. Here, the jury found true three special circumstances: murder by means of lying in wait, murder in the course of a robbery, and murder in the course of a burglary. While the lying in wait special circumstance was later invalidated on direct appeal, the jury also considered two valid special circumstances, either one of which could have supported the judgment. Despite Petitioner's claim of prejudice from the introduction of the Los Angeles convictions, the record explicitly indicates that the jury was never apprised of, and the judge declined to consider, the three prior murder convictions or death sentences.[31] As such, Petitioner fails to demonstrate any prejudice arising from the trial court's refusal to strike these special circumstances.

Accordingly, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. The claim does not merit habeas relief.

**K. Claim 11- Challenge to Impartiality of Trial Judge in Petitioner's Case**

In this claim, Petitioner contends that Judge Melinda Lasater, the San Diego Superior Court judge who presided over his trial proceedings, was biased due to her past working and personal relationship with one of the prosecutors assigned to

---

[31] Indeed, the parties and trial court discussed and agreed that prospective prosecution penalty phase witnesses from the Los Angeles or San Diego jails would be admonished not to mention death row or Petitioner's Los Angeles convictions. (See RT 7238, 7243-44.)

Petitioner's case- James Pippin. (SAP at 243-45.) Respondent maintains that Petitioner is barred from bringing this claim on federal habeas review due to state procedural default, and asserts that, even were this Court able to review the claim on the merits, the state supreme court's rejection of this claim on appeal was not contrary to, nor an unreasonable application of, clearly established federal law. (Ans. at 215.)

The California Supreme Court considered and rejected this claim on direct appeal, reasoning as follows:

> On November 5, 1990, several months prior to the commencement of trial, defendant filed a motion pursuant to Code of Civil procedure section 170.1, subdivision (a)(6), to disqualify San Diego County Superior Court Judge Melinda J. Lasater from presiding at his trial.[FN16]
>
> > FN16. Code of Civil Procedure section 170.1, subdivision (a) provides in pertinent part:
> >
> > "(a) A judge shall be disqualified if any one or more of the following is true:
> >
> > "[¶] ... [¶]
> >
> > "(6) For any reason (A) the judge believes his or her recusal would further the interests of justice, (B) the judge believes there is a substantial doubt as to his or her capacity to be impartial, or (C) a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial. Bias or prejudice toward a lawyer in the proceeding may be grounds for disqualification."
>
> The basis for defendant's motion was that Judge Lasater had maintained a "working relationship and a friendship with the prosecutor in this case [San Diego County Deputy District Attorney James Pippin] such that a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." [FN17]
>
> > FN17. In defendant's statement of disqualification, one of his attorneys, Josephine Dedina, declared: "I accompanied Deputy District Attorney James Pippin to his office to arrange a telephone call to Judge Lasater to set a schedule for hearings. Mr. Pippin stated that he had known Judge Lasater for a long time. He had been her supervisor when she worked as a Deputy District Attorney. Mr. Pippin informed me that Judge Lasater had participated in his daughter's wedding in the summer of 1990. Mr. Pippin also stated that if the defense in this case filed the usual defense motions to declare the death penalty unconstitutional, he knew Judge Lasater would immediately deny them. [¶] This past working relationship, where the judge was the subordinate to the prosecutor, together with a relationship where Judge Lasater participated in the prosecutor's daughter's wedding several months ago,

> constitute facts that a person aware of those facts might reasonably entertain a doubt that the judge would be able to be impartial."

Judge Lasater thereafter conducted a hearing in which she reviewed her contacts with Mr. Pippin that spanned a period of approximately 16 years, noting the dates when they had worked together and general information pertaining to their social contacts. During the hearing, Judge Lasater recalled, among other things, that she and Mr. Pippin had worked together in the San Diego County District Attorney's Office until she left that office in 1987, that her family and his had gone camping with other families, that her husband had purchased Mr. Pippin's son's dirt bike approximately 10 years prior to the hearing, that there had been sporadic social contacts at parties, that she had performed the wedding of Mr. Pippin's daughter at his daughter's request in August 1990, that his daughter gave her a necklace similar to necklaces given to the bridesmaids, and that Mr. Pippin's daughter had "house sat" for her approximately one year earlier, for which his daughter had been paid a "minimal amount." Judge Lasater attached a copy of the hearing transcript to her answer.[FN18]

> FN18. Judge Lasater's answer, in pertinent part, declared: "The defendant in this case has expressed concern over my ability to be impartial due to a perceived personal relationship with the prosecutor in this case, Mr. James Pippin. After reviewing the statement of disqualification, I conducted a hearing with all parties and their counsel present in which I detailed the contacts I could remember with Mr. Pippin over the last 17 years.... [¶] Although I was with the district attorney's office for almost 13 years, I have had relatively few contacts with Mr. Pippin. He was my supervisor for only four months in 1974, more than 15 years ago. During my last five years with the district attorney's office, I was a division chief assigned to the Juvenile Division and Mr. Pippin was assigned as a division chief in the Superior Court division. We were essentially equals in this capacity and had very little contact. [¶] The social functions we both attended were incidental to our professional responsibilities with the district attorney's office, rather than a reflection of any close personal friendship. Our social interaction over the years has been no different than that of any other member of the legal community who occasionally engages in social activities with members of the profession. [¶] It is common practice for judges of this Court to perform wedding ceremonies for members of the legal community and their families. My agreement to perform the wedding ceremony for Mr. Pippin's daughter was such an arrangement and was done at his daughter's request, rather than Mr. Pippin's. I was not paid to perform the ceremony and specifically indicated that no fee should be paid. [¶] Mr. Pippin's alleged comments regarding my predilection in ruling on motions dealing with constitutional challenges to the death penalty, are also unfounded. As I stated at the time of the hearing referenced above, I have never seen such a motion and would consider it premature to assume such a posture until I had been

> presented with the issue and reviewed it. [¶] I am neither biased nor prejudiced for or against Mr. Pippin, the defendant or his counsel, and am satisfied that I can perform my duty to decide the issues presented fairly and impartially in this case."

On November 30, 1990, Judge Allen J. Preckle, selected by agreement of the parties, conducted a hearing on defendant's motion. Relying on *United Farm Workers of America v. Superior Court* (1985) 170 Cal.App.3d 97, 104, 216 Cal.Rptr. 4, and *Leland Stanford Junior University v. Superior Court* (1985) 173 Cal.App.3d 403, 408, 219 Cal.Rptr. 40, the court observed that "[t]he standard [for disqualification set forth in Code of Civil Procedure, section 170.1, subdivision (a)(6)] is fundamentally an objective one." Reviewing the nature of the professional and social contacts between Judge Lasater and Mr. Pippin, the court viewed "as weightless, particularly given the substantial passage of time, the assertion that a reasonable person would doubt Judge Lasater's impartiality because of her past association with Mr. Pippin.... [¶] ... [¶] This court is further satisfied that any, albeit unreasonable doubt, concerning Judge Lasater's impartiality in this case would be erased by a reasonable person's being apprised of Judge Lasater's excellent reputation for integrity and fierce independence. [¶] This court, therefore, finds that a reasonable person, aware of all the facts, would not reasonably entertain a doubt that Judge Lasater will be able to be impartial in this case." The court thereafter denied defendant's motion.

Defendant did not seek review in the Court of Appeal by way of a petition for writ of mandate, the procedure required by Code of Civil Procedure section 170.3, subdivision (d).[FN19]

> FN19. Code of Civil Procedure, section 170.3, subdivision (d), provides: "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought within 10 days of notice to the parties of the decision and only by the parties to the proceeding."

In his appeal to this court, defendant contends that the superior court below erred in denying his motion to disqualify Judge Lasater. Acknowledging his failure to comply with the writ review requirement set forth in Code of Civil Procedure section 170.3, subdivision (d), defendant nevertheless asserts as a "structural defect" reviewable on appeal the "deni[al of] due process of law in violation of [the] state and federal Constitutions because the judge who presided over his case and who rendered the sentence of death was not impartial."

We find no merit in defendant's position. His failure to comply with the requirements of Code of Civil Procedure, section 170.3, subdivision (d), precludes him from challenging the denial of his statutory disqualification motion on appeal from the judgment rendered in the trial court. (*People v. Brown* (1993) 6 Cal.4th 322, 333, 24 Cal.Rptr.2d 710, 862 P.2d 710 (*Brown* ).)

Even if we were to overlook the procedural deficiency inherent in defendant's challenge to the denial of his disqualification motion, we

would find no merit in the assertion, implicit in defendant's argument, that Judge Lasater had a responsibility to recuse herself in view of her prior professional and casual social relationship with Mr. Pippin. Defendant provides no statutory or case law authority in support of that position, and we are aware of none. Because virtually all judges are drawn from the ranks of the legal profession, such prior relationships are neither unusual nor dispositive. (See *United Farm Workers of America v. Superior Court*, *supra*, 170 Cal.App.3d 97, 100, 216 Cal.Rptr. 4["[T]he proper performance of judicial duties does not require a judge to withdraw from society and live an ascetic, antiseptic and socially sterile life. Judicial responsibility does not require shrinking every time an advocate asserts the objective and fair judge *appears* to be biased. The duty of a judge to sit where not disqualified is equally as strong as the duty not to sit when disqualified."].)

In our view, Judge Preckle correctly determined that on the facts presented in the pleadings below, a reasonable person would not entertain a doubt as to Judge Lasater's impartiality. (See *United Farm Workers of America v. Superior Court, supra*, 170 Cal.App.3d at pp. 105-106, 216 Cal.Rptr. 4; cf. *Sincavage v. Superior Court (*1996) 42 Cal.App.4th 224, 230-231, 49 Cal.Rptr.2d 615 [disqualification proper where, 13 years earlier, judge had been a prosecutor representing the People in other proceedings against the defendant].) Accordingly, disqualification was not mandated in the present case.

Defendant asserts a nonstatutory due process claim based upon evidence of bias adduced at trial. We need not decide whether defendant has forfeited this claim by failing to file a writ petition on this ground (see generally *Brown*, *supra*, 6 Cal.4th at p. 336, 24 Cal.Rptr.2d 710, 862 P.2d 710), because his claim lacks merit. Specifically, defendant cites Judge Lasater's contempt order, issued on the eve of the penalty phase (June 3, 1991), against defense counsel and defendant for failure to provide penalty phase discovery to the prosecution, as well as Judge Lasater's observation, made in considering defendant's application to modify the death sentence rendered by the jury, that defendant "frankly had no intention of testifying in Los Angeles." FN20

FN20. Far from exhibiting bias, Judge Lasater's comment in fact was made while explaining the basis for the court's denial of defendant's claim that he had been denied his right to testify in the Los Angeles proceedings. Her comment was based upon her review of the transcripts of both proceedings as well as her discussions with defendant under seal, and was made in the specific context of expressing the view that defendant "was using [the denial of the right to testify] issue as a tactical means for obtaining a reversal...."

Neither of the actions cited by defendant, extracted from a trial court record in excess of 9,000 pages, remotely approaches the threshold required to establish the existence of judicial bias. (See *People v. Clark* (1992) 3 Cal.4th 41, 143, 10 Cal.Rptr.2d 554, 833 P.2d 561 ["The question for us to decide is whether the judge 'officiously and unnecessarily usurp[ed] the duties of the prosecutor ... and in so doing create[d] the impression that he [was] allying himself with the prosecution....' "].) Moreover, our independent review of the entire record reveals a trial court judge who was scrupulously fair and courteous to each

> side, and whose rulings exhibited neither bias nor prejudice. We therefore reject defendant's claim.

Carter, 36 Cal. 4th at 1240-44.

**1. Petitioner's Failure to Follow Proper Procedures for Challenging Judge**

Respondent contends that Petitioner is procedurally barred from bringing this claim in the instant federal habeas proceedings because Petitioner failed to seek review of the California Superior Court's ruling in the California Court of Appeals, as required under California Code of Civil Procedure section 170.3(d). (Ans. at 216.) Based on the Court's review of the Second Amended Petition, Petitioner's Motion for Evidentiary Hearing pleadings, and the Merits Brief, it appears Petitioner has failed to address the procedural default issue other than a generalized assertion that he is able to demonstrate cause any prejudice to excuse "any default." (Traverse at 39.)

In any event, for the reasons discussed above in section IV of this Order, the Court will proceed to the merits of Claim 11 rather than engaging in a complex procedural default analysis. See Franklin, 290 F.3d at 1232, citing Lambrix, 520 U.S. at 525.

**2. Merits**

Aside from the issue of procedural default, Petitioner's claim does not warrant habeas relief, as he fails to demonstrate that the California Supreme Court's rejection of this claim on appeal was contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts.

"[T]he Due Process clearly requires a 'fair trial in a fair tribunal' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Bracy v. Gramley, 520 U.S. 899, 904 (1997), quoting Withrow v. Larkin, 421 U.S. 35, 46 (1975). Additionally, a court must indulge a "presumption of honesty and integrity in those serving as adjudicators" in reviewing a claim of judicial bias. See Withrow, 421 U.S. at 47. "[W]hen a defendant's right to have his case tried by an

impartial judge is compromised, there is structural error that requires automatic reversal." Greenway v. Schriro, 653 F.3d 790 (9th Cir. 2011), citing Tumey v. Ohio, 273 U.S. 510, 535 (1927); see also Chapman v. California, 386 U.S. 18, 23 (1967).

Actual bias need not be proven in order to establish a due process violation. See Aetna Life Insurance Company v. Lavoie, 475 U.S. 813, 825 (1986), citing In re Murchison, 349 U.S. 133, 136 (1955). Indeed, the Supreme Court has acknowledged that a presiding judge with a "direct, personal, substantial pecuniary interest" in the outcome of a case would violate constitutional due process guarantees, yet at the same time specifically cautioned that:

> All questions of judicial qualifications may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion.

Tumey, 273 U.S. at 523. Aside from cases of direct financial interest, the Supreme Court has also recognized that certain situations in which a judge has become personally involved in proceedings involving the litigant can violate due process, even without a demonstration of actual bias. See e.g. Mayberry v. Pennsylvania, 400 U.S. 455, 465 (1971) (defendant who verbally excoriated judge presiding over his criminal trial was entitled to have criminal contempt proceedings presiding over by another judge with whom he had not "embroiled in a running, bitter controversy."); Johnson v. Mississippi, 403 U.S. 212 (1971) (judge who previously been a named defendant in a civil rights suit brought by that individual, and had made remarks about civil rights litigants, could not preside over a defendant's contempt hearing).

Here, Petitioner attempts to demonstrate bias by virtue of Judge Lasater's prior employment and social history, as detailed above. However, even given the periodic social contacts and the fact that, over 15 years prior to trial at issue, that Judge Lasater had been under the supervision of Mr. Pippin for four months when both were employed at the San Diego District Attorney's office, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was unreasonable.

For instance, while Petitioner attempts to dwell on the "extensive and substantial" nature of the supposed relationship between the trial judge and prosecutor, these assertions find a modicum of support in the record. The state record does not support Petitioner's contention that the trial judge was a "longtime close personal friend" of the prosecutor. (Pet. Merits Brief at 249.) Instead, the state record reflects that the trial judge recalled "relatively few contacts" with the prosecutor when both were employed at the district attorney's office, and added that "[t]he social functions we both attended were incidental to out professional responsibilities with the district attorney's office, rather than a reflection of any close personal friendship. Our social interaction over the years has been no different than that of any other member of the legal community who occasionally engages in social activities with members of the profession." (CT 253.)

Petitioner contends that the judge's and prosecutor's families embarked on "exclusive camping trips." (Pet. Merits Brief at 249.) Yet again, the record differs slightly,[32] reflecting that during her prior employment at the district attorney's office, which ended in 1987, several years before trial, "groups of eight or more families" often camped together, and the group sometimes included both her family and Mr. Pippin's family. (CT 258.)

Petitioner also emphasizes that the trial judge was "so close to the Pippin family that she not only attended but participated in the wedding ceremony and celebration for Pippin's daughter," and that "[p]erhaps nothing is more emblematic and symbolic of the closeness between Judge Lasater and Pippin than the necklace his daughter gifted to the judge. That necklace is the same necklace presented to some of Pippin's daughter's most beloved friends." (Pet. Merits Brief at 249-50.) However, the record reflects the trial judge engaged in the "common practice" of performing wedding ceremonies for

[32] The record also fails to support Petitioner's contention that "she also purchased Pippin's son's motorcycle." (Pet. Merits Brief at 249.) The record reflects the trial judge's recollection that, ten years prior to the 1990 trial proceedings, "[m]y husband did purchase his son's dirt bike...probably around 1979 or 1980." (CT 258.) Petitioner fails to indicate the basis for his assertion that it was the trial judge, rather than her spouse, that purchased the bike.

those associated with the legal community, that the request came from Mr. Pippin's daughter rather than Mr. Pippin.  (CT 253.)  Judge Lasater also notes that she "had lunch with his wife, his daughter and his son in law certainly to plan the ceremony," that she paid for the lunch, did not accept money for performing the ceremony, and that Mr. Pippin's daughter gave her a necklace in return, similar to the necklace given to the bridesmaids who served in the wedding.  (CT 259.)  When considered in context, the record fails to demonstrate that these professional or social ties created an appearance of bias "too high to be constitutionally tolerable."  Withrow, 421 U.S. at 47.

With respect to the prosecutor's comments that "he knew" the judge would deny "the usual defense motions to declare the death penalty unconstitutional," Petitioner fails to demonstrate that the prosecutor's ill-advised remarks evidence any bias on Judge Lasater's part.  While the prosecutor did not deny making such remarks, he asserted that his statement was taken "out of context" and was partially borne because he had "been trying to get these attorneys to file whatever motions they're going to file as soon as they possibly can," given the fact that they had been on the case for five years at that point.  (CT 261.)  After hearing some discussion on the contents of the exchange between the prosecutor and defense counsel regarding the motions, Judge Lasater stated:

> Okay.  Well, if it assists anybody, for the record, I do not believe I have ever discussed with Mr. Pippin anything having to do with any death penalty motions, or the constitutionality of them because frankly, I have never seen one before.
>
> I think it would be rather presumptuous on my part to have formed an opinion prior to being presented one.
>
> So, I'm not even sure what the canned motions would look like if they were presented to me.
>
> So, he may have been expressing his own opinion in the context in which he stated it, but I will want to make it also clear from the Court's perspective that I have not had any discussions with him concerning the death penalty, or any death penalty motions, or the constitutionality of the death penalty.

(CT 263.)  In a footnote to the Merits Brief, Petitioner generally contends that "[t]he

many unsupportable rulings in favor of the State," discussed in Claim 10 "also erase any doubt that this friendship affected the case," but fails to offer any factual support for this assertion. (Pet. Merits Brief at 250 n. 84.) Meanwhile, the California Supreme Court indicated that "our independent review of the entire record reveals a trial court judge who was scrupulously fair and courteous to each side, and whose rulings exhibited neither bias nor prejudice." Carter, 36 Cal. 4th at 1244. Petitioner fails to demonstrate that the state court's conclusion was objectively unreasonable.

Moreover, the record reflects that, at the disqualification hearing, Judge Preckel properly recognized that the "issue is not limited to the existence of an actual bias." (RT 51, quoting United Farm Workers of America v. Superior Court, 170 Cal.App.3d 97 (Cal. Ct. App. 1985).) The judge discussed the prior employment history and "loose social relationship" between Judge Lasater and Mr. Pippin, and noted that the request to officiate at the wedding came from Pippin's daughter and mother and "[n]o showing has been made of any involvement by Mr. Pippin in the request made of Judge Lasater." (RT 52.) Judge Preckel then concluded that "[t]his Court is further satisfied that any, albeit unreasonable doubt, concerning Judge Lasater's impartiality in this case would be erased by a reasonable person's being apprised of Judge Lasater's excellent reputation for integrity and fierce independence." (RT 52-53.)

Petitioner also argues that his case bears "a striking resemblance" to the Ninth Circuit's decision in Hurles v. Ryan, 650 F.3d 1301 (9th Cir. 2011), as both cases allegedly used a fact-finding process that was "fundamentally flawed." (Pet. Merits Brief at 252-53.) The fact-finding process may be found deficient in a case where, for example, a state court: (1) "makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence," (2) "plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, or (3) "has before it, yet apparently ignores, evidence that supports petitioner's claim." Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir. 2004).

Here, Petitioner contends that like the judge in Hurles, Judge Lasater supplied additional facts based on her own "memory and assertions" that were never subject to cross-examination or other testing, Judge Preckel never afforded him discovery or an evidentiary hearing on the judicial disqualification motion, and he was denied the opportunity for such factual development on state habeas review. (Id. at 253-54.) Yet, the trial record reflects that at the disqualification hearing Judge Preckel inquired whether defense counsel wished to present any additional evidence, counsel stated "We have nothing further in the way of any factual allegations to add, Your Honor." (RT 49.)

Moreover, Petitioner's case is easily distinguishable from Hurles in several other significant respects. The Ninth Circuit specifically indicated that the Hurles case contained "extreme" facts, as the trial judge in that case inserted herself in interlocutory appellate proceedings on the issue of her prior denial of a defense motion for the appointment of two counsel. That judge, who was expected to be merely a "nominal" participant in such proceedings, instead personally appeared at such proceedings, filed a responsive pleading defending her ruling, and was represented by counsel from the state Attorney General's office at the proceedings. The Ninth Circuit emphasized that the trial judge's involvement was so out of bounds that "[i]n fact, the court issued an opinion solely to point out the impropriety of the judge's actions and to set a precedent against any future involvement of that kind by a judge in a special action proceeding." 650 F.3d at 1322.

In Hurles, the trial judge continued to preside over the defendant's trial, and eventually sentenced him to death.[33] Then, on state post-conviction review, the same trial judge reviewed the defendant's due process claim based on the prior interlocutory proceedings and considered the issue of her own failure to recuse herself. In rejecting

[33] In fact, the Ninth Circuit placed particular emphasis on the fact that under Arizona state law at the time, "the judge in question was the sole arbiter of the defendant's death sentence; she alone weighed the evidence and determined that Hurles deserved to die. This practice is no longer constitutionally permissible in the wake of Ring v. Arizona." Id. at 1322 (citation omitted).

that claim, the trial judge:

> did not review her participation in the special action and the statements in her brief and conclude that they did not constitute a potential for bias, nor did she review the Arizona Court of Appeals's decision and conclude that it indicated no unconstitutional potential for bias. Rather, she supplied additional facts that, in her judgment, rendered her conduct proper and prevented the brief's contents from being attributable to her.

Id. at 1313.

In contrast, when Petitioner's defense counsel filed a motion to disqualify Judge Lasater based on her prior collegiate and social interaction with Mr. Pippin, Judge Lasater proceeded to set forth at a hearing her recollections of all prior contacts with Mr. Pippin and requested that the parties agree on another judge to consider the matter. (CT 252-65.) Superior Court Judge Preckel, selected by agreement of both parties, held a hearing on the matter and ruled that Judge Lasater was not biased and denied the motion.  (RT 53; CT 2568.)  Petitioner fails to draw significant parallels to Hurles in this respect, as there is no evidence to indicate that Judge Lasater improperly inserted herself into a disputed issue in which she was only a "nominal" participant.

Additionally, the Hurles trial judge also made statements about the case that the Ninth Circuit characterized as "troubling" and which "display a familiarity with, and prejudgment of, the facts of his case long before any evidence had actually been presented." Id., 650 F.3d at 1318.  In hearing a motion for appointment of second chair counsel, the trial judge called the case "simple," despite the prosecution's list of 22 witnesses and the yet unknown number of defense witnesses, and characterized the scientific evidence as "minimal," despite acknowledging that "there would be, at a minimum, blood, fingerprint, and footprint analysis."  Id. at 1319.

As such, Hurles is also distinguishable from the instant case in this respect. Petitioner fails to allege or offer any indication that Judge Lasater prejudged his case. The only alleged instance of bias emanated from the district attorney's actions in advising defense counsel that he anticipated the judge would deny routine motions contesting the constitutionality of the death penalty.  The prosecutor later characterized

his comments as generalized and speculative, and the Judge Lasater informed all parties that she had never discussed the death penalty with Mr. Pippin, nor would she prejudge a motion.

In sum, Petitioner fails to demonstrate that the professional or social ties between Judge Lasater and prosecutor Pippin created an appearance of bias "too high to be constitutionally tolerable." Withrow, 421 U.S. at 47. Nor do the prosecutor's remarks on the likely disposition of certain motions undermine the California Supreme Court's conclusion, that an " independent review of the entire record reveals a trial court judge who was scrupulously fair and courteous to each side, and whose rulings exhibited neither bias nor prejudice." Carter, 36 Cal. 4th at 1244.

Ultimately, the Court cannot conclude that the state supreme court's rejection of this claim on appeal was contrary to, or an unreasonable application of, clearly established federal law. Williams, 529 U.S. at 412-13. Petitioner is not entitled to habeas relief on Claim 11.

**L. Claim 12-Insufficient Evidence**

In Claim 12, Petitioner alleges that the evidence is insufficient to sustain his convictions for felony murder, robbery, burglary, and lying in wait, as well as the special circumstances of robbery and burglary with respect to the crimes against Janette Cullins, and that the evidence is also insufficient to sustain his convictions for the rape, oral copulation and robbery of Barbara S. (SAP at 247.) Respondent maintains that the California Supreme Court's rejection of this claim was reasonable and is entitled to deference. (Ans. at 219.)

The California Supreme Court considered and rejected this claim on direct appeal, reasoning as follows:

> Defendant contends the evidence was insufficient to support his conviction of the crimes committed against Barbara S. and Janette Cullins, as well as the prior murder and lying-in-wait special-circumstance findings. "In reviewing a criminal conviction challenged as lacking evidentiary support, '"the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence-that is, evidence which is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable

doubt." [Citation.]' (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754].) The same standard of review applies to special circumstance allegations. (*People v. Maury* (2003) 30 Cal.4th 342, 396 [133 Cal.Rptr.2d 561, 68 P.3d 1].) An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)" (*People v. Combs* (2004) 34 Cal.4th 821, 849, 22 Cal.Rptr.3d 61, 101 P.3d 1007.)

1. The Crimes Committed Against Barbara S.

Defendant contends his conviction of the crimes committed against Barbara S. is not supported by sufficient evidence. He is mistaken.

As we have noted (32 Cal.Rptr.3d pp. 845-849, 117 P.3d pp. 549-553, *ante*), one day after having been rejected by Polly Haisha and Cathleen Tiner, defendant arrived in San Diego on March 25, 1984, having made plans to travel to Mexico that day with Susan Loyland, who departed from San Diego without him. Janell Barksdale, the next-door neighbor of Barbara S. and Susan Loyland, observed defendant approaching the victims' residence on the evening of March 25. That evening, defendant broke into Loyland's residence, stole some of her tip money from a concealed location that previously had been revealed to him, and raped at knifepoint Barbara S., Loyland's housemate.

Barbara S. provided details of the rape, oral copulation, robbery, and burglary, including the circumstances that her assailant's voice sounded familiar to her and that weeks later she recognized the voice as defendant's. At trial, she identified defendant as the man who attacked her. Susan Loyland established that defendant had seen the location where she had concealed the money determined to have been taken from her bedroom, and explained why she suspected defendant might have been Barbara S.'s assailant.

Defendant glosses over the foregoing highly incriminating evidence, instead emphasizing Barbara S.'s general uncertainty and inability to identify her assailant in the immediate aftermath of the attack. Defendant also asserts the prosecution "clearly bootstrapped" its case in the Barbara S. sexual assault to the "other crimes" evidence implicating defendant in the murders of Susan Knoll, Jillette Mills, Bonnie Guthrie, and Janette Cullins, the death of Tok Kim, and the sexual assault of Jennifer S. He further asserts that the evidence supporting the convictions was undermined by the fact that the trial court excluded evidence indicating that Barbara S. suffered from alcoholism in the spring of 1984.[FN30]

FN30. Defendant assigns error to the trial court's ruling, made pursuant to Evidence Code section 352, excluding the proffered testimony of Susan Loyland that Barbara S. suffered from alcoholism.

After conducting a foundational hearing at the People's request, outside the presence of the jury, in which Loyland described her own alcoholism and daily drug usage in the spring of 1984, the trial court explained at length its reasons for excluding Loyland's proffered testimony, stating that although the evidence "could be relevant," its admission "is

> going to take us in a circle of evidence that is ... going to be nonproductive and [cause] undue consumption of time." The court added: "I'm not precluding that subject of [Barbara. S.] being an alcoholic being raised by other witnesses if the foundation can be laid."
>
> The trial court's ruling conformed to the requirements of Evidence Code section 352. The proffered testimony regarding Barbara S.'s alleged alcoholism was marginally relevant and likely would have consumed an undue amount of court time. No abuse of discretion appears.
>
> Moreover, even were we to conclude that the trial court ruled incorrectly, any such error plainly would have been harmless in view of the overwhelming evidence that defendant broke into the residence shared by Barbara S. and Susan Loyland, stole money belonging to each, and sexually assaulted Barbara S.

None of defendant's points is persuasive. Barbara S.'s identification of defendant as the man who assaulted and robbed her at knifepoint in her residence was supported by her housemate's testimony that money was stolen from a concealed location known to defendant, and by a neighbor's testimony that defendant walked toward the residence on the night of the attack. Thus, the prosecution's evidence implicating defendant in the attack on Barbara S. more than adequately meets the substantial evidence standard summarized above. (*People v. Combs*, *supra*, 34 Cal.4th at p. 849, 22 Cal.Rptr.3d 61, 101 P.3d 1007.) [FN31]

> FN31. In view of our holding, above, we reject as without merit defendant's related claim that the "insufficiency of the evidence" supporting the sexual assault crimes perpetrated against Barbara S. led to error at the penalty phase when the trial court admitted this evidence in aggravation pursuant to section 190.3, factor (b) ("criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence"). As noted, the evidence was sufficient; therefore defendant's argument fails.

2. The Crimes Committed Against Janette Cullins

Defendant contends the evidence is insufficient to sustain his conviction of murder, robbery, and burglary stemming from crimes committed at the residence of Janette Cullins on or about April 12, 1984. He challenges on similar grounds the jury's true findings as to the burglary, robbery, and lying-in-wait special circumstances. With the exception of the last special circumstance, we find unpersuasive each of these assertions.

The evidence adduced at trial established that defendant visited Janette Cullins's apartment on the afternoon of April 12, 1984, asking her new roommate, Cheri Phinney, how long Phinney planned to be there. That evening, Cullins attended the symphony with her friend, Cathleen Tiner, who last saw Cullins at approximately 11:00 p.m., when Cullins departed to return to her apartment. A neighbor of Cullins observed the distinctive white Datsun 280 ZX in which defendant subsequently was arrested,

parked with its engine running for several minutes late that evening. A number of Cullins's friends unsuccessfully attempted to contact Cullins on April 13.

A visitor to Cullins's apartment on April 14 noticed wood chips on the floor by the front door-evidence consistent with a forced entry. Cullins's body was found partially clothed in the bedroom closet, and her neck bore a ligature mark. The concealment of the body in a closet and the cause of Cullins's death-asphyxia due to strangulation-bore a strong resemblance to the circumstances of the Susan Knoll/Jillette Mills murders in Culver City three days earlier.

Cullins's wallet containing her various items of identification was recovered from a location near where the distinctive Datsun 280 ZX was parked that same week. The wallet also contained Bonnie Guthrie's identification, strongly suggesting that one person had murdered and robbed both women.

On April 13, 1984, a man wearing a dark jacket made a withdrawal from Cullins's bank account. Four days later, in Arizona, a paper bearing the word "SHYLAS," a bank passcard bearing Cullins's name, and a black jacket were among the items found in defendant's possession at the time of his arrest.

The foregoing evidence amply supports the jury's conclusions that late in the evening of April 12, 1984, defendant, with the requisite felonious intent, forced his way into Cullins's apartment, encountered Cullins, compelled her to disclose her bank password, then fatally strangled her, concealed her body in her bedroom closet, took her wallet, and subsequently depleted her bank account. The evidence thus established the elements of the charged offenses-burglary, robbery, and murder-as well as the elements of the burglary and robbery special circumstances.

In reaching our conclusion, we reject defendant's contention that the prosecution failed to establish that defendant acted with felonious intent. Nor do we find persuasive his related contention that the robbery and burglary special-circumstance findings were improper because the crimes were merely incidental to the murder or intended to facilitate or conceal the murder. (See *People v. Zapien* (1993) 4 Cal.4th 929, 984-985, 17 Cal.Rptr.2d 122, 846 P.2d 704.) The requisite intent for each crime, and supporting each of these special circumstances, readily may be inferred from the evidence. (See *People v. Matson* (1974) 13 Cal.3d 35, 41, 117 Cal.Rptr. 664, 528 P.2d 752 ["Although the People must show that a defendant charged with burglary entered the premises with felonious intent, such intent must usually be inferred from all of the facts and circumstances disclosed by the evidence, rarely being directly provable. [Citations.] When the evidence justifies a reasonable inference of felonious intent, the verdict may not be disturbed on appeal."]; see also *People v. Ochoa*, *supra*, 19 Cal.4th at pp. 413-414, 79 Cal.Rptr.2d 408, 966 P.2d 442 [In reviewing a claim of insufficient evidence as to special circumstance findings, """we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the [allegations] beyond a reasonable doubt.''" [Citation.]"].)

The requisite intent and all essential elements were present here. Cullins's

apartment showed signs of a forced entry consistent with an intent to commit a felony. The evidence that the doorjamb had been pried, producing a scattering of wood chips near the front door, supported the burglary charge and the burglary special circumstance.

The circumstance that defendant harbored an intent to rob Cullins-quite independent of his intent to murder her-may be inferred from the evidence that he obtained her bank account password prior to fatally strangling her. The circumstances of the break-in, murder, robbery, and theft, together with defendant's hurried, loud, and dramatic departure in the stolen vehicle consistent with a perpetrator's escape from a crime scene, amply support the inference of defendant's intent to commit burglary. (*People v. Moody* (1976) 59 Cal.App.3d 357, 363, 131 Cal.Rptr. 923.)

With regard to defendant's contention that the lying-in-wait special circumstance was not supported by substantial evidence, the People contend the evidence adduced at trial suggested that defendant accomplished his entry prior to Cullins's arrival home. The People urge that no other explanation for the forcible entry, indicated by the presence of the wood chips, was adduced at trial, and that it reasonably could be inferred that defendant was lying in wait for his victim from the forced entry, as well as from the presence of Jillette Mills's stolen vehicle, with its engine running for several minutes, at the approximate time Cullins likely returned to her apartment. (See *People v. Hillhouse*, *supra*, 27 Cal.4th at pp. 500-501, 117 Cal.Rptr.2d 45, 40 P.3d 754; *People v. Michaels* (2002) 28 Cal.4th 486, 516-517, 122 Cal.Rptr.2d 285, 49 P.3d 1032.)

We reject the People's position on this point. The evidence in support of the lying-in-wait special circumstance-essentially, the wood chips and the car with its engine running-appears unduly reliant upon the inference suggested by the prosecution that defendant arrived prior to Cullins's return home in order to attack her by surprise. The wood chip evidence tended to show forced entry, not that the entry occurred prior to Cullins's arrival. Cullins may have arrived at her apartment before defendant did, and he may have forced his way in while she was undressing elsewhere in the apartment. Under the latter scenario, the lying-in-wait special circumstance would rely upon the neighbor who heard the car engine running, and the time of that event cannot be pinpointed. Moreover, the car idling, besides occurring at an uncertain time, does not strongly imply that defendant was waiting in the car to attack Cullins; if defendant had planned a home invasion when Cullins arrived home, he likely would have turned off the engine so as not to attract attention. We therefore set aside the special circumstance of lying in wait.

At the time of defendant's arrest, he was fleeing California in a vehicle that had belonged to murder victim Jillette Mills, and was in possession of personal property that linked him to each one of the murdered women, including the murder victim in the present case. As noted, Janette Cullins's body was concealed in a manner similar to that used to hide the bodies of Susan Knoll and Jillette Mills. Each of these women, and Bonnie Guthrie, had been fatally strangled. No reasonable explanation, other than defendant's culpability for the charged offenses, presented itself at trial. Indeed, the evidence in support of the charged crimes and burglary and robbery special circumstances was overwhelming.[FN32]

> FN32. In view of our conclusion that substantial evidence supports defendant's convictions and the burglary and robbery special-circumstance findings, we find no merit in defendant's related contention that the trial court erred in denying his pretrial motion to dismiss the substantive charges and strike those special circumstance allegations. For the same reason, we reject defendant's contention that the trial court erred in denying his motions for judgment of acquittal made during and at the conclusion of the prosecution's case-in-chief.

Carter, 36 Cal. 4th at 1257-62.

In reviewing a claim of insufficient evidence to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). In other words, "the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324. A habeas court must begin with "explicit reference to the substantive elements of the criminal offense as defined by state law." Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004), quoting Jackson, 443 U.S. at 324 n.16. Because this petition is governed by AEDPA, in order to merit relief, Petitioner must also demonstrate that the state court's adjudication of his claim involved an objectively unreasonable application of Jackson. See Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005) ("After AEDPA, we apply the standards of Jackson with an additional layer of deference.")

Petitioner appears to take particular issue with the credibility of several testifying witnesses, including Barbara S., Janice Barksdale, Cheri Hofer Phinney, and the officers involved in the collection of evidence at the Cullins' crime scene. However, it is clear that "under Jackson, the assessment of the credibility of witnesses is generally beyond the scope of [habeas] review." Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004), quoting Schlup v. Delo, 513 U.S. 298, 330 (1995). In reviewing claims of insufficient evidence, the Ninth Circuit has repeatedly indicated that "[e]ven if a few of the government's witnesses were somewhat unbelieveable," a reviewing court "must

respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict." United States v. Sherwood, 98 F.3d 402, 408 (9th Cir. 1996), citing United States v. Gillock, 886 F.3d 220, 222 (9th Cir. 1989), quoting United States v. Ramos, 558 F.2d 545, 546 (9th Cir. 1977). As the Jackson standard "does not permit a court to make its own subjective determination of guilt or innocence," this Court may not, and shall not, re-weigh the evidence or make its own assessment regarding the credibility of witnesses. Jackson, 433 U.S. at 319 n. 13. Given the deference accorded to the jury's credibility determinations under Jackson and the additional deference given to the state court's decision under AEDPA, this Court's analysis is limited to a determination of whether the state court was objectively unreasonable in finding the evidence presented at trial, viewed in the light most favorable to the prosecution, to be sufficient for any rational trier of fact to find true all of the elements of the convictions and special circumstances.

**1. Crimes Against Janette Cullins**

With respect to the crimes against Ms. Cullins, Petitioner asserts that the state failed to prove that Petitioner "possessed the requisite intent for robbery or burglary." (Pet. Merits Brief at 258.) Petitioner contends that "[a]ccording to the prosecution's own case, Carter's primary purpose was to kill Cullins, not to commit larceny or any other felony," and the evidence is therefore insufficient to support his felony-murder conviction or the special circumstance findings. (Id.) Petitioner specifically argues that the state court's reliance on the pry marks on the victim's apartment door and wood chips scattered in the entry way were not credible evidence of forced entry, as "there were indications that the wood chips could have come from the police sawing off the doorjamb," and several witnesses failed to mention seeing the wood chips or damage to the door prior to the arrival of law enforcement personnel at the scene. (Id. at 260.) Petitioner also argues that the other evidence cited in support of the intent element,

including Petitioner's possession of the victim's bank account passcode and testimony about his hurried departure from the crime scene, did not demonstrate intent to commit burglary or robbery prior to entering her apartment.  (Reply at 98.)

Under California Penal Code section 189, a conviction of first degree murder under a felony murder theory requires proof of (1) the unlawful killing of a human being, whether intentional or not (2) that the killing took place during the commission or attempted commission of a felony, including robbery and burglary, and (3) that the defendant had the specific intent to commit the underlying felony.  (See CALJIC 8.21, CT 2295.)

As the state court reasonably concluded from the available evidence, a rational trier of fact could certainly have found that Petitioner possessed the requisite intent for robbery and burglary, and was therefore guilty of felony-murder.  San Diego police personnel testified at trial that they observed and photographed what appeared to be pry marks on the victim's apartment door, as well as wood particles and debris on the ground, and opined that the marks indicated forced entry of the residence.  (See RT 4516-20- in which Detective Thwing testified that the pry marks he observed showed that someone had forced entry into the apartment, or had at least attempted to do so; see RT 4806-07, in which Detective Dreis testified that he observed the pry marks, which appeared sufficient to gain entry; see also RT 5391, in which evidence technician Dan Nuckolls testified that, "There definitely were tool marks.  It appeared that the door was forced.")

Ms. Hofer, Ms. Cullins' roommate-to-be, testified that when she arrived at the apartment on Saturday, the day Ms. Cullins' body was discovered, she noticed that the carpet had wood chips and dirt.  (RT 4842-43.)  Hofer explained that she noted the condition of the carpet because Ms. Cullins had vacuumed the carpet on Thursday and a carpet cleaning had been scheduled for Friday.  (Id.)  Ms. Hofer acknowledged that she had not immediately discussed the door or wood chips with the police until later in the investigation, in late 1984 or early 1985, but noted that when she last left the

apartment prior to the crime, there was no damage to the doorjamb. (RT 4856-57.) Nancy McEachern, Ms. Cullins' departing roommate, stated that she used her key to gain entry to the apartment on both Friday and Saturday and that the key worked in the lock on those days. (RT 4936-37.) Ms. McEachern stated that "I just zeroed in on the little keyhole" and did not notice any pry marks. (RT 4936.)

A neighbor of Ms. Cullins identified Ms. Mills' white Datsun as the car she saw late in the evening of April 12, idling outside the Cullins' apartment and leaving in a hurry approximately fifteen minutes later. (RT 5816-24.) Petitioner was observed driving Mills' white Datsun by several witnesses both before and after the time of the murder and related crimes. (See RT 4922-25, 5242-50.) Ms. Cullins' wallet was later recovered in an area near the San Diego harbor where the white Datsun was also seen. (RT 4810-17, 5420-28.)

Petitioner first contends that "there is insufficient evidence to warrant the conclusion that the wood chips were the result of a forced, unlawful entry, rather than from the actions of law enforcement." (Pet. Merits Brief at 260.) However, even had the wood chips resulted from law enforcement actions (of which there is no evidence, only Petitioner's conjecture), Petitioner fails to explain the pry marks on the victim's apartment door, which is evidence supporting the burglary conviction and special circumstance. Indeed, evidence technician Nuckolls declined to collect the wood chips evidence from the scene, explaining that "[w]e didn't feel it was relevant. I had photographed it and shown it in place, and then took the piece of the doorjamb." (RT 5405-06.) While Petitioner contends that the evidence and testimony concerning the wood chips and pry marks was not persuasive or credible, the province of this Court is not to re-try the case or re-assess the credibility of the evidence. In any event, it is evident from the Court's review of the state record that Petitioner's trial counsel questioned police personnel, as well as Ms. Phinney and Ms. McEachern, about their observations of the wood chips and pry marks. The jury was therefore aware of the conflicting inferences that could have been drawn from that evidence, and could

reasonably have concluded that the wood chips and pry mark evidence and testimony supported the burglary charge and special circumstance.

In addition, the evidence supporting the robbery and burglary convictions was certainly not limited to the pry marks and wood chips discussed above. Rodney Beverly, a bank employee, noted that the activity on Ms. Cullins ATM card on April 13 included an inquiry with no withdrawal, then a second entry in which $60 was withdrawn, nearly depleting the account of funds. (RT 4904-10.) The ATM surveillance tape showed a man wearing a black jacket making the April 13 withdrawal. (RT 4910-13, 5480-85.) Meanwhile, when Petitioner was arrested he was in possession of a black jacket similar to the one on the video surveillance camera. (RT 4085.) Several witnesses who had contact with Petitioner in the days and weeks before the homicide noted that he wore a black jacket. (RT 4296-300, 4373-79.) Additionally, a pocket of the jacket found in the Datsun Petitioner was driving at the time of his arrest contained a torn telephone directory page with the address of Ms. Cullins' bank and a grocery receipt with the word Shylas written on the reverse side. (RT 4090-91.) Ms. Cullins' bank passcard was also among the contents of the Datsun. (RT 3976.) Susan Seminoff testified that Ms. Cullins chose Shylas as her bank passcode and was relatively secretive about the code, covering it up when she used the ATM. (RT 4895-4904.) Document examiner Sandra Homewood testified that while she could not identify or eliminate Petitioner as the author of the word Shylas on the receipt, Ms. Cullins' writing was more consistent with the writing on that note. (RT 4485-98.)

With respect to this evidence, Petitioner asserts that there is a lack of proof that Petitioner obtained Ms. Cullins' bank passcode prior to her death rather than after her death, and urges the Court to conclude that the state court's decision in this respect was unreasonable. However, upon review of the record, the Court is compelled to conclude that there is no evidence to support a conclusion that Petitioner somehow obtained Ms. Cullins passcode *after* her death, while there is evidence in the record supporting the conclusion that Petitioner obtained her bank card and passcode prior to her death.

Witnesses testified at trial that Ms. Cullins was secretive about her bank passcode and the jury could reasonably infer that she would not have given it out freely, much less to a man with which she was only recently acquainted, and whose phone calls and attention she had noticeably avoided. From the evidence presented, the jury could have drawn a reasonable inference that Petitioner forced Ms. Cullins to write down or otherwise reveal the passcode to him prior to, or in the course of, the homicide. Even were this evidence of such a nature that it could support the alternate conclusion that Petitioner somehow obtained the passcode after her death, the Supreme Court specifically instructs that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume- even if it does not affirmatively appear in the record- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. Therefore, despite the fact that Petitioner is able to conceive of alternate conclusions that could be drawn from the evidence presented, this Court must nonetheless view the evidence in the light most favorable to the prosecution and resolve any conflicting inferences in their favor as well.

In sum, it is evident that the jury could reasonably have believed the testimony of Ms. Phinney and the San Diego police officers who stated that they noticed wood chips near the front door of Ms. Cullins' apartment, rather than the testimony of Nancy McEachern, who did not recall observing any pry marks or wood chips, but who, by her own admission, had "zeroed in" on the keyhole and was not necessarily paying mind to the condition of the door. Moreover, the jury was presented with evidence that the Datsun Petitioner drove was not only seen outside Cullins' apartment, but had also been parked near the San Diego harbor earlier in the week, in the vicinity of where Ms. Cullins' wallet was later found. Additionally, video surveillance showed a man in a black jacket using Cullins' ATM card, and when Petitioner was arrested, he was found in possession of Ms. Cullins' bank passcard, a slip of paper containing her passcode, and a black jacket similar to that worn by the man on the video surveillance tape

making a withdrawal from her bank account.

Based on this Court's review of the state court record, it is clear that the evidence was sufficient for a rational trier of fact to find Petitioner guilty of felony murder, as well as the robbery and burglary special circumstances, with respect to the death of Ms. Cullins.   Accordingly, the state court's rejection of this claim was objectively reasonable.

**2.     Crimes Against Barbara S.**

With respect to the crimes against Barbara S., Petitioner contends that "in light of the facts surrounding the identification of Mr. Carter, the evidence against Mr. Carter is insufficient to support a verdict." (SAP at 253.)  Petitioner primarily asserts that the victim's identification is not credible due to her initial description which did not match Petitioner, her inability to offer identifying features in the hours and the day after the attack, and continued uncertainty in the weeks after the attack.  (Id.)  Petitioner also argues that the witness identification testimony of Barbara S. and her neighbor Janelle Barksdale is suspect, and that such testimony cannot constitute reasonable support for the verdict under Jackson.  (Pet. Merits Brief at 265, Merits Reply at 101.)

Under California Penal Code section 261, a conviction of rape requires the prosecution to prove a defendant engaged in an act of sexual intercourse with a non-spouse, against the will of that person, and that the act was accomplished either by the means of force or fear of immediate and unlawful bodily injury against that person. (See CALJIC 10.00, CT 2315-16.)  Under section 288(a) of the California Penal Code, a conviction of oral copulation by force or fear requires the prosecution to prove an act of oral copulation, against the will of the other person, and that the act was committed by force or fear of immediate and unlawful bodily injury.  (See CALJIC 10.40.2, CT 2318.)  Under section 211, a conviction of robbery requires the prosecution to prove that the defendant had possession of property, taken from another person's immediate presence and against their will, and that the taking was accomplished by force, fear or intimidation and was committed with the intent to deprive the person of that property.

(See CALJIC 9.40, CT 2319.)

As the state court reasonably concluded from the available evidence, a rational trier of fact could certainly have found that Petitioner was guilty of the charged crimes against Barbara S. Several witnesses testified that Petitioner had plans to go to Mexico on March 25 with Susan Loyland, who he was dating, and her friends, but he failed to meet them at the bus station as planned and they went without him. (RT 3832-33, 38664-65, 5797-98, 6049.)

Janelle Barksdale, a neighbor of the victim, told police about a stranger she saw in the area the evening of Barbara S.'s attack walking in the direction of Barbara's home, and re-contacted the police years later to identify Petitioner as the assailant after seeing his photo in the newspaper. (RT 3721-33.) Barksdale acknowledged that she initially told police the man was under six feet tall, when Petitioner was over six feet tall, but explained that her identification was about his face, not his height. (RT 3742-50.)

Barbara S. testified as to the events of March 25, when she was woken from sleep by a man dragging her out of bed, putting a knife to her throat, asking about money, and then sexually assaulting her. (RT 3868-74.) Barbara also heard the assailant go into her purse and Loyland's bedroom at different points during the attack; after the attack, both her keys and Loyland's money were missing. (RT 3996-4007.) Barbara testified that she believed Petitioner was her attacker. (RT 3887.) Barbara conceded that she initially told police she could not identify the assailant, but stated that she placed the assailant's voice when she saw Petitioner in the news, and at that point she was "certain" and it "scared hell out of me." (RT 4010-13.) After further questions pertaining to her initial inability to describe or identify the assailant, Barbara noted that she told the police that he was part Eskimo, and in doing so, the police erroneously assumed the assailant was short and fat when she actually meant he was slim and tall. (RT 4040-44.)

Susan Loyland spoke with Barbara S. at the hospital on the evening of the attack,

and acknowledged that Barbara told her that she could not identify the assailant.  (RT 3917.)  Loyland recalled asking Barbara at one point after the attack whether Petitioner could have been the assailant, but did not recall Barbara's response.  (RT 3917-18.)  After the assault, San Diego police searched for a potential suspect named Dean based on information and a description provided by Loyland.  (RT 4186-87, 4209-13.)

Detective Ken Creese, who interviewed Barbara S. the day after the assault, noted that the victim remained upset and only provided a limited description of the assailant, of a male in his 20's, and stated that she was unable to identify him, as she never saw his face.  (RT 4132-41.)  Barbara S. conceded that she initially told Detective Creese that she was unable to identify the assailant, but explained that "I had an idea, at that time."  (RT 4154-57.)  Detective Creese stated that it was routine to re-interview victims of crimes such as assault, because additional information often surfaces once the initial trauma settles.  (RT 4185-86.)

The evidence also showed that during February and March 1984, Petitioner had been to the Barbara S./Loyland residence on multiple occasions, and had met or spoken to Barbara S. several times.  (RT 3822, 3854-57.)  After the assault on Barbara, Loyland noticed that her tip money, which she kept concealed in a jar in her room, was missing, and that whoever took it would have known where she kept it.  (RT 3897-3903.)  Moreover, while Loyland and Petitioner had previously remained in contact when he went out of town, Loyland did not hear from Petitioner again after the March 25 assault.  (RT 3913-16.)

As outlined above, Petitioner presents a general challenge to the credibility of the witness testimony identifying him as the assailant, arguing that the evidence offered is not sufficient to support these convictions.  Petitioner notes that Barbara S.'s initial description "provided just a few general characteristics about her assailant" and that her identification at trial was made despite multiple earlier statements that she was unable to identify her attacker.  (Pet. Brief at 262.)  Petitioner argues that Janelle Barksdale's initial identification was of a man considerably shorter than Petitioner, and her

identification of him occurred years later and was based on a newspaper photo naming Petitioner as a murder suspect.  (Reply at 101.)  Petitioner also notes that there was a lack of any physical evidence tying him to the scene and that the evidence of Loyland's missing money "could just have easily described any man" who had been to the victim's home and seen where Loyland hid her money.  (Pet. Brief at 263-64.)

Petitioner relies on United States v. Wade, 388 U.S. 218 (1967) to argue that the "highly suspect identifications" made by Barbara S. and Janelle Barksdale do not constitute the type of "reliable, substantial, credible evidence contemplated by Jackson."  (Reply at 101.)  Petitioner argues that the Wade Court "noted 'the high incidence of miscarriage of justice' caused by mistaken eyewitness identifications, and warned that 'the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest.'"  (Pet. Brief at 263-64, citing Wade, 388 U.S. at 228.)  Yet, the Supreme Court's decision in Wade concerned a defendant's right to counsel at a post-indictment lineup, and the Court held that such a proceeding constituted a critical stage of the prosecution at which an accused was entitled to the assistance of counsel.  Id., 388 U.S. at 236-37.  Wade is not a general indictment against the use of eyewitness identification evidence, nor does it persuasively support Petitioner's argument that the witness identification testimony in this case in insufficient evidence to sustain the convictions.

In any event, "under Jackson, the assessment of the credibility of witnesses is generally beyond the scope of [habeas] review."  Bruce, 376 F.3d at 957, quoting Schlup, 513 U.S. at 330.  As such, this Court will not engage in a re-evaluation of the credibility of these witnesses.  The jury was presented with the evidence concerning Barbara S.'s initial inability to identify her assailant as well as Ms. Barksdale's description and delayed identification of Petitioner.  As stated above, this Court "must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by

assuming that the jury resolved all such matters in a manner which supports the verdict." Sherwood, 98 F.3d at 408, citing Gillock, 886 F.3d at 222, quoting Ramos, 558 F.2d at 546.  It is evident that the jury could reasonably have believed the testimony of Barbara S., identifying Petitioner as her assailant, and Ms. Barksdale, identifying Petitioner as the man she saw in the neighborhood that evening.  In addition, their testimony was supported by the fact that Petitioner failed to meet Susan Loyland and her friends to go to Mexico that day, that he had been to the Loyland/Barbara S. residence and knew the location of Ms. Loyland's hidden money, and that he failed to contact Ms. Loyland again after the date of the assault.

As for Petitioner's argument that the evidence about Ms. Loyland's hidden money and Petitioner's knowledge of her room does not implicate him alone, the Supreme Court specifically instructs that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume- even if it does not affirmatively appear in the record- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.  Therefore, despite the fact that Petitioner is able to speculate that another (unknown and unnamed) individual could have known about the location of the hidden money, this Court must apply Jackson and presume that the trier of fact resolved the potential conflict in favor of the prosecution.

Here, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. Based on this Court's review of the state court record, it is clear that the evidence was sufficient for a rational trier of fact to find Petitioner guilty of the rape, oral copulation and robbery of Barbara S..  The state court's rejection of this claim did not involve an objectively unreasonable application of Jackson, nor was it based upon an unreasonable determination of the facts.  See Juan H., 408 F.3d at 1274.  Petitioner is not entitled to habeas relief on Claim 12.

**M. Claim 13- Cumulative Error**

In Claim 13, Petitioner alleges that the cumulative effect of constitutional violations that occurred during both the guilt and penalty phases of his trial violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (SAP at 255.) Petitioner asserts that "instances of juror misconduct, prosecutorial misconduct, and ineffective assistance of counsel deprived [Petitioner] of a fair trial, and the cumulative effect of these errors prejudiced him," and moves for an evidentiary hearing on this claim. (Mot. at 137.) Respondent maintains that the California Supreme Court's rejection of this claim on appeal is entitled to deference. (Ans. at 225.) Respondent also contends that Petitioner "fails to explain how an evidentiary hearing is needed to address his claim of cumulative error," and asserts that in this instance, there is no factual dispute in existence that an evidentiary hearing could resolve. (Opp. at 40.)

The California Supreme Court considered and rejected this claim on direct appeal, reasoning:

> Defendant contends that the cumulative effect of the asserted errors committed at his trial led to a miscarriage of justice, requiring reversal of the guilt and penalty phase judgments. Having determined that defendant's trial was nearly free of error, and that, to the extent error was committed, it clearly was harmless, we conclude that defendant's claim of cumulative error lacks merit.

Carter, 36 Cal. 4th at 1281.

It is possible that the "cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers, 410 U.S. at 290 n.3, 302-03. However, as discussed in the adjudication of the other claims contained in the Petition, Petitioner has failed to demonstrate error of a constitutional dimension occurred in his case. Accordingly, "there is nothing to accumulate to a level of a constitutional violation." Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002), citing Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999).

Thus, based on an independent review of the state record, the Court cannot

conclude that the California Supreme Court's rejection of this claim was objectively unreasonable, and Petitioner is not entitled to habeas relief or evidentiary development of this claim.

## N. Claim 14 - Trial Court's Inclusion of Certain Jury Instructions Violated Petitioner's Constitutional Rights

In Claim 14, Petitioner asserts that the trial court "erroneously gave a number of improper and unconstitutional jury instructions, including CALJIC Nos. 2.01 (sufficiency of circumstantial evidence), 2.02 (sufficiency of circumstantial evidence to prove specific intent), 2.50 (evidence of other crimes), 2.50.1 (evidence of other crimes proved by a preponderance of the evidence), 2.50.2 (definition of preponderance), 8.83 (special circumstances, sufficiency), and 8.83.1 (special circumstances, sufficiency to prove required mental state)," which "impaired the presumption of innocence, lightened the prosecution's burden of proof beyond a reasonable doubt and amounted to mandatory conclusive presumptions of guilt." (SAP at 260-61.)

Petitioner additionally notes that the prosecutor was also allowed to present "improper and prejudicial 'other crimes' evidence" consisting of the "Kim (Alameda) and Knoll, Mills, Guthrie (Los Angeles) homicides, and alleged sexual assault against [Jennifer S.] (Ventura)" which the jury was erroneously allowed to consider under §190.3 in making their penalty determination. (SAP at 261.)

On direct appeal of Petitioner's San Diego conviction, the California Supreme Court considered and rejected this claim, reasoning as follows:

> Defendant raises a number of contentions that are virtually identical or substantially similar to claims raised on appeal from the Los Angeles County death judgment rendered against him for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie, and which we have rejected in the companion case of *People v. Carter*, *supra*, 36 Cal.4th 1114, 32 Cal.Rptr.3d 759, 117 P.3d 476, 2005 WL 1939712. These contentions are as follows: 1) the trial court's pattern jury instructions to the jury were inappropriate; 2) the delay between the pronouncement of defendant's death sentence and his execution renders the entire process unconstitutional; and 3) the use of lethal gas as a method of execution is unconstitutional.

> For the reasons we have set forth more extensively in the companion matter, *People v. Carter*, *supra*, 36 Cal.4th at pages 1201-1214, 32 Cal.Rptr.3d at pages 828-838, 117P.3d at pages 535-543, 2005 WL 1939712, we reject defendant's contentions. Insofar as defendant's claims do not precisely mirror those set forth in the companion appeal, neither defendant's additional arguments nor the variants in their phrasing persuade us that the trial court committed an error or abuse of discretion prejudicial to defendant's case. Indeed, these contentions are not deserving of additional discussion. (*People v. Laursen*, *supra*, 8 Cal.3d at p. 205, 104 Cal.Rptr. 425, 501 P.2d 1145.)

Carter, 36 Cal. 4th at 1277-78. As noted in the above opinion, the court set forth more extensively the grounds for its rejection of this claim in the direct appeal opinion issued regarding Petitioner's Los Angeles County convictions and sentences, as follows:

> The trial court instructed the jury pursuant to several pattern jury instructions at the conclusion of the guilt phase, including CALJIC Nos. 2.01 (sufficiency of circumstantial evidence-generally), 2.02 (sufficiency of circumstantial evidence to prove specific intent), 2.50 (evidence of other crimes), 2.50.1 (evidence of other crimes by the defendant proved by a preponderance of the evidence), 2.50.2 (definition of preponderance of the evidence), 8.83 (sufficiency of circumstantial evidence to prove special circumstance), and 8.83.1 (sufficiency of evidence to prove mental state). Defendant contends that decisions rendered by this court rejecting constitutional challenges to these instructions (see, e.g., *People v. Wilson*, *supra*, 3 Cal.4th 926, 942-943, 13 Cal.Rptr.2d 259, 838 P.2d 1212; *People v. Mickey*, *supra*, 54 Cal.3d 612, 669-671, 286 Cal.Rptr. 801, 818 P.2d 84) are "inconsistent with principles set forth by the United States Supreme Court" and should be reconsidered.
>
> Defendant has provided no basis for reconsidering our prior decisions upholding the validity of these pattern jury instructions. (See, e.g., *People v. Wilson*, *supra*, 3 Cal.4th 926, 942-943, 13 Cal.Rptr.2d 259, 838 P.2d 1212; *People v. Mickey*, *supra*, 54 Cal.3d 612, 669-671, 286 Cal.Rptr. 801, 818 P.2d 84.) We therefore reject defendant's challenge.

Carter, 36 Cal. 4th at 1188. Petitioner also raised this claim as Claim 14 in the second state habeas petition, which the California Supreme Court rejected on the merits, as untimely, as previously raised and rejected on appeal, and "insofar as it alleges that several standard guilt phase instructions were erroneous," as successive. (See Supp. Lodgment No. 4.) Respondent, while noting the state supreme court's imposition of procedural bars in the second state habeas petition, does not assert that the claim is procedurally defaulted, instead contending that on direct appeal, the "California Supreme Court rejected it on the merits in a decision entitled to deference under

AEDPA." (Ans. at 228.)

In order to prevail on a claim of instructional error, clearly established federal law provides that a petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." Henderson v. Kibbe, 431 U.S. 145, 154 (1977), quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973). "'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" Boyde v. California, 494 U.S. at 378, quoting Cupp, 414 U.S. at 146-147.

Petitioner first contends that language contained in CALJIC 2.01 and 8.83 requiring proof beyond a reasonable doubt was absent from CALJIC 2.02 and 8.83.1, rendering the latter two instructions constitutionally infirm. (Pet. Merits Brief at 273-74.) Petitioner separately argues that CALJIC 2.50, 2.50.1, and 2.50.2 improperly lowered the prosecution's burden of proof and "permitted the jury to convict him based on 'other crimes' evidence that was found, not under a reasonable doubt standard, but under a preponderance of the evidence standard." (Id. at 279.)

Upon review of the state record, the Court is not persuaded that jury instructions given in his case "impaired the presumption of innocence, lightened the prosecution's burden of proof beyond a reasonable doubt and amounted to mandatory conclusive presumptions of guilt." (SAP at 261.) As noted by Respondent, the record reflects that the jury in Petitioner's case was "repeatedly instructed as to the burden of proof in other instructions" not mentioned by Petitioner. (See CT 2284- CALJIC 2.90 stated in part that "The People have the burden of proving each and every element of the crimes and the allegations charged aganist [sic] the defendant beyond a reasonable doubt."; CT 2285- CALJIC 2.91 stated in part that "The burden is on the People to prove beyond a reasonable doubt that the defendant is the person who committed the crime with which he is charged."; CT 2295- CALJIC 8.21 instructed that in order to find the Petitioner guilty of felony murder "The specific intent to commit Robbery and/or Burglary and the commission or attempted commission of such crime must be proved beyond a

reasonable doubt."; CT 2304- CALJIC 8.80 instructed in part that "The People have the burden of proving the truth of a special circumstance. A special circumstance must be proven beyond a reasonable doubt. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.") The state record also clearly reveals that the jury was separately and specifically instructed as to the presumption of innocence. (CT 2284- CALJIC 2.90 states that "[a] defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.")

As a related matter, Petitioner specifically argues that CALJIC 2.50.1 allowed the jury to convict Petitioner on a lesser standard of proof than beyond a reasonable doubt, because that instruction directed the jury that the other crimes must only be proven by a preponderance of the evidence before it could be considered. (Reply at 105.) Petitioner contends that, "as given, the jury instruction allowed the jury to infer that if the prosecution proved by a preponderance that the other crimes evidence occurred, then the jury could consider that evidence for 'any purpose' including to prove that Carter committed the charged crimes." (Reply at 106.) Yet, the plain meaning of CALJIC 2.50.1 belies this argument, as the instruction reads in relevant part:

> Within the meaning of the preceding instruction, such other crime or crimes purportedly committed by a defendant must be proved by a preponderance of the evidence. *You must not consider such evidence for any purpose* unless you are satisfied that the defendant committed such other crime or crimes.

CALJIC 2.50.1 (emphasis added).

Thus, the jury was clearly directed that unless the other crimes were proven by a preponderance of the evidence, they were *prohibited from considering that evidence for any purpose*. Petitioner's contention that once proven, the jury could <u>use</u> the other crimes evidence "for any purpose" is an inaccurate reading of the instruction.

In sum, despite any confusion potentially engendered by the challenged instructions, the state record shows that the trial judge properly instructed the jury that

the prosecution bore the burden of proof as to the charged crimes and special circumstances. Viewing the jury instructions as a whole, Petitioner fails to demonstrate that these purported instructional errors "so infected the entire trial that the resulting conviction violated due process." See Estelle, 502 U.S. at 72; Henderson, 431 U.S. at 154; Cupp, 414 U.S. at 147.

Petitioner also contends that penalty phase instructions given in CALJIC 8.85 and 8.87 violated his constitutional rights because they did not clarify that the jury could not double or triple-count the other crimes evidence pertaining to the Jennifer S. assault, the Kim death, the Mills, Knoll and Guthrie murders, and the criminal acts relating to the assault on Barbara S.

Pursuant to California Penal Code § 190.3, the trial court instructed that the jurors should consider the following aggravating factors, if found to be applicable:

> (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.
>
> (b) The presence or absence of criminal activity by the defendant, other than the crimes for which the defendant has been tried in the present proceeding, which involve(d) the use or attempted use of force or violence or the express or implied threat to use force or violence.
>
> (c) The presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings.

(CT 2357-58; RT 8551.) Petitioner alleges error arising from the fact that the trial judge did not specifically instruct the jury that the circumstances of those prior crimes should not be double or triple-counted under (b) and/or (c).

Respondent maintains that because "[t]hese claims were not raised in the current petition" that they "require no response." (Merits Resp. at 163 n. 22.) In the Reply, Petitioner asserts that this is not a new claim, as he "originally made this claim in his direct appeal," and that "it was subsequently incorporated into Carter's state exhaustion petition." (Merits Reply at 106.) While Petitioner may have previously raised this contention before the state court, this Court's review of the Protective Petition, First Amended Petition, and Second Amended Petition reveal that Petitioner failed to raise

this claim on federal habeas review until the filing of the Merits Brief in January 2012, over five and a half years after the initiation of the instant proceedings.  In any event, even if Petitioner were to request and the Court were to permit amendment of the petition to include this contention, it is without merit for the reasons indicated below.

As a general matter, Petitioner fails to offer any record support for this contention that it was "reasonably likely" that the jury double or triple counted the other crimes evidence and/or the Barbara S. assault.  (Pet. Merits Brief at 284.)  Petitioner merely asserts that "[a]bsent a pointed instruction telling the jury that they could not consider Carter's prior criminal acts as evidence relevant to multiple factors, there was no safeguard in place to ensure that the jury did not double count and/or triple count those acts against Carter."  (Id.)

There is no indication that such impermissible activity occurred in this case.  Indeed, it appears that the trial court attempted to offer guidance to the jury in applying the aggravating factors to the evidence present.  The jury was instructed with CALJIC 8.86, in which the trial judge indicated that concerning *convictions* of other crimes, evidence had been presented regarding Petitioner's prior conviction for residential burglary, stating that "[y]ou may not consider evidence of any other crime as an aggravating circumstance." (CT 2362.)  This instruction appears to be clearly directed to factor (c), which concerns the presence or absence of a prior felony *conviction*.

The jury was also instructed pursuant to CALJIC 8.87, in which the trial court listed the *criminal activity* alleged, including crimes against Jennifer S. (rape, forcible oral copulation, assault with a deadly weapon, and robbery), TokChum Kim (robbery and murder), Jillette Mills (murder, robbery and rape), Susan Knoll (murder, rape, robbery), Bonnie Guthrie (murder, rape, robbery), Barbara S. (rape, forcible oral copulation, robbery), and possession of a deadly weapon in jail, again instructing that "[a] juror may not consider any evidence of any other criminal activity as an aggravating circumstance."  (CT 2363-64.)  This instruction appears to be clearly directed to factor (b), which concerns the presence or absence of prior *criminal activity*.

Petitioner relies on the Ninth Circuit's decision in Daniels v. Woodford, 428 F.3d 1181 (9th Cir. 2005) in support of his contention. (See Pet. Merits Brief at 284-85.) Daniels is however, distinguishable, as it was a case where the jury erroneously found and double counted a multiple murder *special circumstance*, once for each victim, and that, coupled with other errors as well as a jury instruction directing the jurors that if aggravation outweighed mitigation, they "shall" impose the death penalty, warranted a grant of habeas relief. See Daniels, 428 F.3d at 1212-14. In this case, Petitioner argues that the jury could have potentially considered the other crimes evidence and the Barbara S. assault under several different categories of aggravating factors, which first, is a different type of double counting. However, as explained above, in the instant case the trial judge instructed the jury which crimes could be considered under which factor. (See CT 2362-64; RT 8554-56.) Moreover, in Daniels, it was undisputed that the jury erroneously found and considered two multiple murder special circumstances, while in the instant case, Petitioner merely suggests that due to a lack of clarification there is a "reasonable likelihood ... the jury in this case improperly calculated the weight to be assigned to the defendant's criminal activity." (Pet. Merits Brief at 285.) This Court finds no such likelihood on the facts presented.

Additionally, in Daniels, the Ninth Circuit affirmed the district court's grant of penalty phase relief in light of the cumulative effect of errors, stating that due to "the court's refusal to change venue, its decision to remove Roth as counsel, and its appointment of inexperienced counsel-the court's failure to instruct the jury that it could not double count the multiple-murder special circumstance gave the jury one more improper reason to tip the scales against Daniels." Id. at 1214. Petitioner's case fails to present any similar cumulative error. (See Claim 13, supra.)

Again, viewing the jury instructions as a whole, Petitioner fails to demonstrate that the alleged instructional errors outlined in the instant claim"so infected the entire trial that the resulting conviction violated due process." See Estelle, 502 U.S. at 72; Henderson, 431 U.S. at 154; Cupp, 414 U.S. at 147. Petitioner fails to demonstrate that

the state supreme court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on Claim 14.

///

///

**O. Claim 15- Denial of Full and Fair Suppression Hearing**

Petitioner contends that he "was deprived of a full and fair hearing on the violations of his Fourth Amendment rights because the prosecutors misrepresented to the court and defense counsel that the search and seizure of Mr. Carter were effectuated pursuant to a valid warrant," which resulted in the trial court's application of an "erroneous, and more exacting standard to Mr. Carter's attempt to vindicate the violation of his rights." (SAP at 267.) Petitioner additionally asserts that trial counsel's preparation and presentation of the suppression motion was ineffective. (Id. at 268.) Respondent maintains that Petitioner had a full and fair opportunity to litigate this matter and "simply declined to take advantage of it when he refused to establish his standing to assert the constitutional violation," and asserts that the California Supreme Court's rejection of this claim on appeal is entitled to deference under AEDPA. (Ans. at 230.)

On direct appeal of Petitioner's San Diego conviction, the California Supreme Court rejected this claim, reasoning as follows:

> Defendant raises a number of contentions that are either virtually identical or substantially similar to certain claims raised on appeal from the Los Angeles County death judgment rendered against him for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie-contentions that we have rejected in the companion appeal in *People v. Carter*, *supra*, 36 Cal.4th 1114, 32 Cal.Rptr.3d 759, 117 P.3d 476, 2005 WL 1939712. These contentions are as follows: 1) defendant's motion to suppress the evidence seized from his person and from the stolen Datsun 280 ZX improperly was denied...
>
> For the reasons we have set forth more extensively in the companion matter, *People v. Carter*, *supra*, 36 Cal.4th 1114, 32 Cal.Rptr.3d 759, 117 P.3d 476, 2005 WL 1939712, we reject defendant's contentions. Insofar as defendant's claims do not precisely mirror those set forth in the companion appeal, neither defendant's additional arguments nor the variants in their phrasing persuade us that the trial court committed an

> error or abuse of discretion prejudicial to defendant's case. Indeed, these claims are not deserving of additional discussion. (*People v. Laursen* (1972) 8 Cal.3d 192, 205, 104 Cal.Rptr. 425, 501 P.2d 1145.)

Carter, 36 Cal. 4th at 1269-70. In the direct appeal opinion issued regarding Petitioner's Los Angeles County case, the court set forth more extensively the grounds for its rejection of this claim, reasoning:

> Defendant contends the trial court erred in denying his section 1538.5 motion to suppress evidence seized from his person and from Jillette Mills's vehicle following his arrest. Defendant asserts that his detention and arrest were unlawful because they were not supported by probable cause and that the search of his person and the vehicle violated state and federal constitutional guarantees against unreasonable search and seizure. We reject defendant's position as to each of these points.
>
> At the pretrial hearing on defendant's motion, Robert Dapser, the Arizona law enforcement officer who stopped and detained defendant on April 17, 1984, testified that he initiated the traffic stop only after receiving a call that a "white Datsun 280 Z with California personalized [license] plates" had been seen driving in a dangerous manner and after the officer personally observed a vehicle that matched that description driving erratically. Upon directing the driver to pull over and stop, Officer Dapser approached the vehicle, observed beer bottles and a burnt portion of a marijuana cigarette inside, and detected the scent of alcohol as well as the faint smell of burnt marijuana. Defendant's eyes appeared to Dapser to have been "rather glossed over," indicating to Dapser that defendant "was under the influence of something." Dapser took defendant into custody for possession of the marijuana cigarette and advised him of his rights under *Miranda*, *supra*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, "for driving under the influence of alcohol and/or drugs." Less than 10 minutes later, Dapser was notified to detain the vehicle and all occupants at the request of law enforcement officials located in Culver City, California.
>
> At the conclusion of the hearing on defendant's motion to suppress, the trial court denied the motion, finding: "I think the officer did have sufficient cause to stop, detain, and then arrest Mr. Carter under the facts and observations."
>
> On appeal, defendant's arguments are substantially similar to his assertions in the trial court. For the following reasons, we find them unpersuasive.
>
> "'An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] "The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review." [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling

on the third, which is a mixed fact-law question that is however predominantly one of law, ... is also subject to independent review.' (*People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].)" (*People v. Alvarez* (1996) 14 Cal.4th 155, 182, 58 Cal.Rptr.2d 385, 926 P.2d 365 (Alvarez); see also *People v. Superior Court* (*Keithley*) (1975) 13 Cal.3d 406, 410, 118 Cal.Rptr. 617, 530 P.2d 585 [the trial court's findings must be upheld if supported by substantial evidence].)

"The Fourth Amendment, made applicable to the states through the Fourteenth Amendment's due process clause (*Mapp v. Ohio* (1961) 367 U.S. 643, 643-660, 81 S.Ct. 1684, 1685-1694, 6 L.Ed.2d 1081 [, 1081-1093, 84 A.L.R.2d 933]; *Wolf v. Colorado* (1949) 338 U.S. 25, 27-28, 69 S.Ct. 1359, 1361-1362, 93 L.Ed. 1782 [, 1785-1786], overruled on another point, *Mapp v. Ohio*, *supra*, 367 U.S. at pp. 654-655, 81 S.Ct. at pp. 1691-1692 [6 L.Ed.2d at pp. 1089-1090] ), guarantees 'the people' '[t]he right ... to be secure ... against unreasonable searches and seizures....' '[A] Fourth Amendment "seizure" occurs when a vehicle is stopped at a checkpoint' by a law enforcement officer. (*Michigan Dept. of State Police v. Sitz* (1990) 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 [, 420].) 'The question thus becomes whether such [a] seizure [ ] [is] "reasonable" under the Fourth Amendment.' (*Ibid*.)" (*Alvarez*, *supra*, 14 Cal.4th at pp. 182-183, 58 Cal.Rptr.2d 385, 926 P.2d 365; see also *Terry v. Ohio* (1968) 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 [for any type of detention, the overall standard to which the government must adhere is that of reasonableness]; *People v. McGaughran* (1979) 25 Cal.3d 577, 584, 159 Cal.Rptr. 191, 601 P.2d 207 ["the officer may temporarily detain the offender at the scene for the period of time necessary to discharge the duties that he incurs by virtue of the traffic stop"].)

Further, any challenge to the admissibility of a search or seizure must be evaluated solely under the Fourth Amendment. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1171, 9 Cal.Rptr.2d 834, 832 P.2d 146; *In re Lance W*. (1985) 37 Cal.3d 873, 879, 210 Cal.Rptr. 631, 694 P.2d 744; see also *California v. Greenwood* (1988) 486 U.S. 35, 38, 108 S.Ct. 1625, 100 L.Ed.2d 30.) "'An illegal search or seizure violates the federal constitutional rights only of those who have a legitimate expectation of privacy in the invaded space or the seized thing. (*United States v. Salvucci* (1980) 448 U.S. 83, 91-92 [100 S.Ct. 2547, 2553, 65 L.Ed.2d 619, 628].) The legitimate expectation of privacy must exist in the *particular area searched or thing seized* in order to bring a Fourth Amendment challenge.' (*People v. Hernandez* (1988) 199 Cal.App.3d 1182, 1189, 245 Cal.Rptr. 513, italics in original.)" (*People v. McPeters*, *supra*, 2 Cal.4th 1148, 1171, 9 Cal.Rptr.2d 834, 832 P.2d 146.) The burden is on the defendant to establish that a legitimate expectation of privacy (*Rawlings v. Kentucky* (1980) 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633) was violated by government conduct.

Our independent review has not disclosed any error in the superior court's application of these principles. In the present case, defendant, as the driver of a stolen vehicle, lacked a legitimate expectation of privacy to contest the search of that vehicle. (See *Rakas v. Illinois* (1978) 439 U.S. 128, 141, fn. 9, 99 S.Ct. 421, 58 L.Ed.2d 387 ["'No interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress,

> when its fruits are proposed to be used against him. This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched.'"]; accord *People v. Melnyk* (1992) 4 Cal.App.4th 1532, 1533, 6 Cal.Rptr.2d 570.) To accept defendant's assertion that he had a legitimate expectation of privacy while driving a stolen vehicle would be to overlook the word "unreasonable" in the Fourth Amendment's proscription against "unreasonable searches and seizures."
>
> As noted, Officer Dapser received information that a specific vehicle was being driven recklessly-information that soon was corroborated when he saw it drive by. Therefore, he had a reasonable basis to stop the vehicle and detain the driver. Upon encountering defendant, Dapser had further indicia of unlawful conduct: defendant's eyes appeared glazed, the odor of alcohol and marijuana wafted from the car's interior, the passenger-side floorboard was littered with beer bottles, and a burnt marijuana cigarette was visible. Because possession of marijuana was a felony in Arizona at that time, the officer's observations provided him with a reasonable basis to arrest defendant and take him into custody.
>
> Thus, even if we were to assume defendant's expectation of privacy was reasonable, his challenge to the seizure of incriminating evidence fails because his detention and arrest were lawful, thereby eliminating any reasonable expectation of privacy that would have existed had the vehicle not been stolen. (*New York v. Belton* (1981) 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768.) Nor are we persuaded that the length of the detention prior to arrest-less than 10 minutes-was, as defendant asserts, "for an excessive time waiting for the dispatcher's report," or that Officer Dapser's ultimately unsuccessful search for the marijuana cigarette during that period required "an inordinate amount of time."
>
> In sum, the trial court properly denied defendant's motion to suppress the evidence recovered from Jillette Mills's vehicle.

Carter, 36 Cal. 4th at 1139-42. Petitioner raised the claim as claim VI in the first state habeas petition,, which the state supreme court denied, stating:

> Claim VI is denied on the merits. To the extent this claim reasserts issues raised and rejected on appeal, it is procedurally barred under *In re Waltreus*, *supra*, 62 Cal.2d 218, 225. To the extent this claim is based upon the record and was not raised on appeal, it could and should have been raised on appeal and hence is barred under *In re Dixon*, *supra*, 41 Cal.2d 756, 759. To the extent this claim asserts a violation of petitioner's rights under the Fourth Amendment, it is not cognizable on habeas corpus. (*In re Harris* (1993) 5 Cal.4th 813, 830; see also *In re Clark* (1993) 5 Cal.4th 750, 767 (*Clark*); *In re Sterling* (1965) 63 Cal.2d 486, 487-488; *In re Lessard* (1965) 62 Cal.2d 497, 503.)

(Lodgment No. 113.) Petitioner also raised this claim as Claim Fifteen of the second state habeas petition, which the California Supreme Court denied on the merits, as untimely, as previously raised and rejected on appeal, and stating that "To the extent

claim 15 alleges a violation of the Fourth Amendment, it is not cognizable on habeas corpus. (*In re Sterling* (1965) 63 Cal.2d 486, 487.)"  (See Supp. Lodgment No. 4.) Respondent, while acknowledging the state court's imposition of procedural bars in the first and second state habeas petitions, does not assert that the claim is procedurally defaulted, instead contending that on direct appeal "the California Supreme Court rejected it on the merits in a decision entitled to deference under AEDPA."  (Ans. at 230.)

As an initial matter, Petitioner asserts that the state supreme court did not reach the merits of this claim, and argues that he is entitled to *de novo* review of Claim 15. (See Pet. Brief at 290.)  However, as recounted above, the state court issued a reasoned rejection of the claim on direct appeal.  Despite the state supreme court's failure to utilize the word "merits," it is clear that the state court's decision went to the merits, rather than to procedural grounds, as indicated by the court's conclusion that "neither defendant's additional arguments nor the variants in their phrasing persuade us that the trial court committed an error or abuse of discretion prejudicial to defendant's case." Carter, 36 Cal. 4th at 1270.  Moreover, as noted above, the California Supreme Court explicitly rejected this claim on the merits in both the first and second state habeas petitions.  (See Lodgment No. 113, Supp. Lodgment No. 4.)  Accordingly, contrary to Petitioner's contention, the California Supreme Court's denial of Claim 15 is entitled to deference under AEDPA.

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that the evidence obtained in an unreasonable search or seizure was introduced at his trial."  Stone v. Powell, 428 U.S. 465, 494 (1976).  A habeas court's inquiry is limited to whether a petitioner had an "opportunity" to litigate the matter, not whether he actually availed himself of that opportunity, nor whether the matter was correctly adjudicated by the state court.  See Ortiz-Sandoval, 81 F.3d at 899; see also Gordon, 895 F.2d at 613 ("Whether or not [Petitioner] did in fact litigate this fourth

amendment claim in state court, he did have the opportunity to do so.")  In order to determine whether a petitioner had a full and fair opportunity to litigate his claim, the Ninth Circuit has indicated that a habeas court should consider the extent to which the matter was considered by both the state trial and appellate courts.  See Abell v. Raines, 640 F.2d 1085, 1088 (9th Cir. 1981); see also Locks v. Sumner, 703 F.2d 403, 408 (9th Cir. 1983) (same).

Petitioner contends that the prosecution misrepresented the existence of a search warrant, causing the trial court to apply an erroneous standard to Petitioner's suppression motion, and depriving Petitioner of a full and fair opportunity to litigate his Fourth Amendment claim.  (SAP at 267.) Petitioner brought a motion to suppress before the trial court, arguing search was warrantless and that the prosecution bore the burden of justifying a warrantless search and seizure. (CT 104-12.)  The prosecution opposed Petitioner's suppression motion, arguing that the motion was inadequate.  (CT 126-38.)  The state argued that regardless of the warrant issue, "[i]n order to contest a search or seizure, the defendant must establish he has standing, that is, a legitimate expectation of privacy in the property searched or seized."  (CT 132.)  The prosecutor also argued that Petitioner, who was the moving party in the instant motion, bore the burden of establishing a prima facie case of illegality, and maintained that Petitioner's initial detention and arrest were lawful based on the Petitioner's erratic driving and the officer's observations.  (CT 132-35.)  He also contended that "[t]he defendant had no proprietary interest in the car, and no reasonable expectation of privacy," and thus no standing to contest the search of Ms. Mills' car.  (CT 137.)  Petitioner also filed additional points and authorities in support of his motion to suppress, first reiterating his argument that the initial stop was "without sufficient cause," that "the prosecution bears the burden of justifying the stop," and that the arrest was unlawful.  (CT 172-75.)  Petitioner also argued that he had standing to challenge the stop, arrest and search, and asserted that he should be granted automatic standing because were he "compelled to forego his Fifth Amendment rights in order to assert his Fourth Amendment rights, he

would be placed in an intolerable situation."  (CT 191.)

The state record reflects that a superior court judge attempted to hold a hearing on the suppression motion, at which Petitioner took the position that he should be granted automatic standing and declined any attempt to demonstrate standing. (I-14 RT 12-20.)  The prosecution refused to stipulate to standing.  (I-14 RT 26.)  The court then unsuccessfully attempted to attain a stipulation regarding the lack of a search warrant. (I-14 RT 27-28.)  The court also attempted to go forward on the motion regardless of the standing issue, clearly stating that "I do not intend to grant automatic standing" but offering that "the defense may go forward, should they choose, with the motion."  (I-14 RT 29.)  The prosecutor objected to proceeding with the motion before resolving the standing issue, and clarified that regarding the warrant, "we are unable to prove there was a search warrant.  We shouldn't have to because we don't need a search warrant to search something that he doesn't have a right to complain about for the search."  (I-14 RT 32.)  In response, the Court reiterated that:

> I'm not finding standing.  I particularly told you I would not find standing until I hear the evidence.  I would wish to make a ruling on the issue of standing and the issue of the facts if that be the case at the conclusion of the hearing.  I am inviting both sides to go forward with the evidence. [¶] The defendant is the proponent of the motion and has specifically declined to go forward.  [¶]  And I am offering the District Attorney a chance to stipulate that there was no warrant and to prove up the lack of warrant, or to prove that there was a warrant, or to prove as they choose.

(I-14 RT 33.)  The court also warned the parties that "[i]f neither side will go forward, I will make a ruling."  (I-14 RT 34.)  Petitioner clarified his final position on the matter, stating:

> Mr. Carter is not going to waive his Fifth Amendment rights in order to take advantage of his Fourth Amendment rights and should not be put to that election and it's as simple as that. [¶] The Court will not give us standing and so we are without standing and we have nothing to go forward on. [¶] Our position is that he's entitled under the circumstances of this case and under the text of the conflicting constitutional rights to an automatic standing.

(I-14 RT 36.)  The Court denied the motion, stating:

> I will find that both sides have been invited to go forward, no one will in fact put on evidence. [¶] That the law under Proposition 8, the defense

> must have standing to raise the 1538.5 as he has filed papers to show that he wishes to. And he must show that standing if he wishes to go forward. [¶] I have offered a chance to simply reserve that ruling and to go forward on the issue as to the hearing and make a finding after the hearing because there is no evidence put on. [¶] The decision is against the party who had the burden of proof to go forward on the situation. The defense proposed the motion and the decision is against the defense. The motion is denied.

(I-14 RT 37.)

Petitioner contends that "[b]ecause resolving the standing issue would have required Carter to waive his Fifth Amendment right to silence and testify, the defense was unable to proceed with the motion." (Pet. Merits Brief at 290, citing I-14 RT 33.) While it is evident the trial court inquired about the existence of a search warrant, it is also apparent that the trial court was similarly concerned with whether Petitioner had standing to contest the search. As a defendant bears the burden of establishing an expectation of privacy to contest a search and seizure, the state court's ruling was not unreasonable. See Rawlings v. Kentucky, 448 U.S. 98, 104. In Simmons v. United States, the Supreme Court declared "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." Simmons, 390 U.S. 377, 394 (1968). Petitioner's argument before the trial court acknowledged the Court's holding in Simmons, and instead expressed concerns regarding the potential of using Petitioner's testimony against him in the penalty phase, for impeachment, or for the prosecution's investigatory purposes. In so arguing, Petitioner failed to cite any precedent holding that such potential use was constitutionally offensive, and when the trial court ultimately declined to grant automatic standing, Petitioner chose not to proceed with the suppression motion by attempting to demonstrate standing. Here, Petitioner similarly fails to cite clearly established federal law supporting his position.

In fact, the Supreme Court has acknowledged the issue of using such testimony as impeachment remains an open question. See United States v. Salvucci, 448 U.S. 83, 93-94 ("This Court has not decided whether Simmons precludes the use of a

defendant's testimony at a suppression hearing to impeach his testimony at trial.") However, the Salvucci Court noted that while they had not directly addressed the issue, "[a] number of courts considering the question have held that such testimony is admissible as evidence of impeachment." Id. at 93 n.8. Indeed, the Ninth Circuit has approved the use of suppression hearing testimony to impeach a defendant's credibility at trial. See United States v. Beltran-Gutierrez, 19 F.3d 1287, 1291 (9th Cir. 1994) ("The Fifth Amendment protected him from the use of his suppression hearing testimony in the Government's case in chief to prove his guilt. It did not protect him from impeachment for testifying falsely."); see generally Harris v. New York, 401 U.S. 222, 225 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury.") A similar analysis leads the Court to reject Petitioner's contention that using suppression hearing testimony at the penalty phase or as a hypothesized basis for investigation would violate constitutional guarantees, as Petitioner fails to establish that either such use would violate his Fifth Amendment rights.

Ultimately, this Court's inquiry is limited to whether Petitioner was deprived of the *opportunity* to litigate his Fourth Amendment claim, and here, Petitioner declined to pursue the claim in the trial court. Additionally, Petitioner's argument appears to be directed at the state court's substantive determination on the standing issue rather than at whether Petitioner was afforded an adequate opportunity to litigate his constitutional claim, and is not appropriate for consideration on federal habeas review on that basis. See Siripongs, 35 F.3d at 1321 (rejecting a Fourth Amendment claim where the federal habeas petitioner's argument "goes not to the fullness and fairness of the opportunity to litigate the claim, but to the correctness of the state court resolution, an issue which Stone v. Powell makes irrelevant.")

Moreover, this Court notes that the search and seizure issue was fully briefed at the trial court level, was discussed at a hearing before a superior court judge, was briefed on both direct appeal and state habeas review, and that the state supreme court

issued a reasoned decision rejecting the claim on direct appeal. See Abell, 640 F.2d at 1088 (factors relevant to a determination on whether a petitioner had a full and fair opportunity to litigate his Fourth Amendment claim should include the extent to which the claim was briefed and considered at both the state trial and appellate court levels). Taking these facts into consideration, Petitioner fails to establish that the state deprived him of a full and fair opportunity to litigate this claim.

In any event, even were Petitioner to demonstrate that the state court did not afford him a full and fair opportunity to litigate his claim, his claim is without merit. In order to establish entitlement to habeas relief on a Fourth Amendment claim, the Supreme Court has stated that:

> [W]e hold only that a federal court need not apply the exclusionary rule on habeas review of a Fourth Amendment claim absent a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim at trial and on direct review. Our decision does not mean that the federal court lacks jurisdiction over such a claim, but only that the application of the rule is limited to cases in which there had been both such a showing and a Fourth Amendment violation.

Stone, 428 U.S. at 495 n. 37. Here, Petitioner fails to demonstrate any Fourth Amendment violation, for even were this Court to assume Petitioner had a legitimate expectation of privacy in a stolen vehicle, the record clearly reflects that Officer Dapser had a reasonable basis for the initial stop (reckless driving), detention (odor of alcohol and marijuana and Petitioner's appearance), and arrest (beer bottles in the vehicle and a marijuana cigarette in view) which reasonably and properly led to the search of that vehicle. For the same reasons, Petitioner's contention with respect to the allegation of ineffective assistance of counsel also fails on the merits. Petitioner generally contends that "counsel should have proceeded with the motion despite the court's offer of automatic standing." (SAP at 268.) However, in the Los Angeles cases, trial counsel pursued the suppression motion despite the standing issue and the trial court denied the motion. As such, for the reasons stated above, Petitioner fails to demonstrate any reasonable probability that, had Petitioner's San Diego trial counsel pursued the suppression motion, the result of the proceedings would have been different. See

Strickland, 466 U.S. at 694.

Accordingly, the Court cannot conclude that the state supreme court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.  Petitioner is not entitled to habeas relief on Claim 15.

**P.      Claim 16- Systemic Death Penalty Claims**

Claim 16 alleges that Petitioner's convictions, confinement and death sentence violated the Fifth, Sixth, Eighth and Fourteenth Amendments due to "numerous constitutional errors with respect to California's death penalty statute."  (SAP at 268.) Petitioner advances several allegations contending that California's death penalty statute and appellate review process violates the United States Constitution as well as international law.  Petitioner previously raised this claim as claim XII in the first state habeas petition (case no. S096874) and as claim 16 in the second state habeas (exhaustion) petition (case no. S153780).  The California Supreme Court considered and rejected this claim on the merits in the first petition, stating in relevant part, "Claims IX, X, XI, XII, and XIII are denied on the merits."  (Lodgment No. 113.)  In the second state habeas petition, the California Supreme Court again denied this claim on the merits, with the exception of Claim 16.C, Petitioner's claim that lethal injection constitutes cruel and unusual punishment, which the state supreme court rejected as premature.  (Supp. Lodgment No. 4.)

**1.      Political Considerations Dominate the Death Penalty Review Process in California**

In Claim 16.A, Petitioner alleges that his convictions, confinement and sentence are illegal and unconstitutional "because the California Supreme Court has labored under political and economic pressures which do not permit it to decide death penalty cases in a fair and impartial manner, resulting in a capital sentencing scheme which is applied in an arbitrary and capricious manner."  (SAP at 268-69.)  Petitioner presented this claim as claim XII in the first state habeas petition and as claim Sixteen in the second state habeas petition.  In each state habeas petition, the California Supreme

Court denied this claim on the merits without a statement of reasoning. (See Lodgment No. 113, Supp. Lodgment No. 4.) Respondent maintains that the state supreme court's rejection of this claim on state habeas review was reasonable and contends that the claim is "wholly unjustified, unsupported, and provides no basis for habeas relief." (Ans. at 235.)

Due process guarantees include the right to a fair trial by an impartial and unbiased judge. Tumey v. Ohio, 273 U.S. 510 (1927); see also In re Murchison, 349 U.S. 133, 136 (1955) (A "fair trial in a fair tribunal is a basic requirement of due process.") Moreover, as Respondent correctly notes, there is a "presumption of honesty and integrity in those serving as adjudicators" that one must overcome in order to establish a claim of bias. Withrow v. Larkin, 421 U.S. 35, 47 (1975). Petitioner fails to offer any evidence rebutting this presumption.

Instead, Petitioner generally observes that in 1986, three California Supreme Court justices "were voted out of office primarily because of the Court's reversal rate in death penalty cases," and concludes that "[a]s the retention election of 1986 proved, for a California Supreme Court justice to keep his or her job, death sentences must be affirmed." (SAP at 269, 272.) Yet Petitioner fails to support this conclusory assertion with anything implicating error or impropriety in his capital adjudication process. Petitioner offers nothing demonstrating that the state supreme court justices who adjudicated *his* direct appeal in 2005, or his state habeas petitions in 2006 and 2010, labored under political or economic pressures which caused them to resolve those actions against Petitioner.

In sum, there is nothing in the record to suggest that the California Supreme Court did anything other than carefully and thoroughly consider Petitioner's case, and Petitioner fails to demonstrate that the state supreme court's rejection of this claim was objectively unreasonable. Accordingly, based on an independent review of the record, Claim 16.A does not merit habeas relief.

**2. Execution After Lengthy Confinement on Death Row Constitutes**

**Cruel and Unusual Punishment**

In Claim 16.B, Petitioner contends that his execution after over twenty years of confinement under a death sentence "would constitute cruel and unusual punishment, and violate international law, covenants, treaties and norms." (SAP at 274.) Respondent maintains that Petitioner fails to establish a right to habeas relief, and notes that while the title of this claim refers to violations of international law, "none of [Petitioner's] allegations address international law." (Ans. at 236-37 n. 52.)

Petitioner presented this claim to the California Supreme Court as Claim XXII on direct appeal, and the state court rejected the direct appellate claim[34] in a reasoned opinion, stating:

> Defendant raises a number of contentions that are virtually identical or substantially similar to claims raised on appeal from the Los Angeles County death judgment rendered against him for the murders of Susan

---

[34] The companion matter refers to the direct appeal opinion concerning Petitioner's Los Angeles County convictions and sentence, and the relevant portion of that opinion is as follows:

> Defendant was sentenced to death on January 30, 1990, and counsel was appointed to pursue his automatic appeal more than four years later, on March 18, 1994. Defendant contends that the passage of this period of time, in addition to the approximately eleven years that have elapsed since then (during which time defendant has pursued his automatic appeal and claims on habeas corpus in state and federal court), are "largely the result of inadequate resources provided by the state to review death verdicts, and the complexity of review mandated by past abuses." Defendant contends that in view of these asserted circumstances, the judicial process compels him "to endure the uncertainty and ever-present tension on death row for such an extended period of time constitut[ing] cruel and unusual punishment in violation of the Eighth Amendment...." (*Ibid.*) (See *Lackey v. Texas* (1995) 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (memo. opn. on den. of cert. by Stevens, J.) [observing that neither retribution nor deterrence is served when prisoners serve 17 years under a sentence of death].)
>
> Defendant's contention resembles a claim that we declined to address in *People v. Barnett* (1998) 17 Cal.4th 1044, 1182-1183, 74 Cal.Rptr.2d 121, 954 P.2d 384. As we explained in *Barnett*, "[b]ecause defendant's claim is dependent upon evidence and matters not reflected in the record on appeal, we decline to consider it at this juncture." (*Id.*, at p. 1183, 74 Cal.Rptr.2d 121, 954 P.2d 384.) For similar reasons, we decline to address defendant's claim.

Carter, 36 Cal. 4th at 1213.

> Knoll, Jillette Mills, and Bonnie Guthrie, and which we have rejected in the companion case of *People v. Carter*, *supra*, 36 Cal.4th 1114, 32 Cal.Rptr.3d 759, 117 P.3d 476, 2005 WL 1939712. These contentions are as follows: 1) the trial court's pattern jury instructions to the jury were inappropriate; 2) the delay between the pronouncement of defendant's death sentence and his execution renders the entire process unconstitutional; and 3) the use of lethal gas as a method of execution is unconstitutional.
>
> For the reasons we have set forth more extensively in the companion matter, *People v. Carter, supra*, 36 Cal.4th at pages 1201-1214, 32 Cal.Rptr.3d at pages 828-838, 117 P.3d at pages 535-543, 2005 WL 1939712, we reject defendant's contentions. Insofar as defendant's claims do not precisely mirror those set forth in the companion appeal, neither defendant's additional arguments nor the variants in their phrasing persuade us that the trial court committed an error or abuse of discretion prejudicial to defendant's case. Indeed, these contentions are not deserving of additional discussion. (*People v. Laursen*, *supra*, 8 Cal.3d at p. 205, 104 Cal.Rptr. 425, 501 P.2d 1145.)

See Carter, 36 Cal. 4th at 1278. Petitioner again presented the claim to the California Supreme Court as Claim 16B in the second state habeas petition. The state supreme court rejected the claim on the merits without a statement of reasoning. (See Supp. Lodgment No. 4.)

As an initial matter, the Court agrees with Respondent that Petitioner fails to elaborate on, or substantiate the allegation regarding international law violations emanating from Petitioner's lengthy incarceration under a sentence of death. Accordingly, the Court rejects the international law aspect of Claim 16B. See James, 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.")

With respect to Petitioner's central contention, the Supreme Court has never held that execution following a lengthy term of incarceration on death row constitutes cruel and unusual punishment, and has repeatedly declined to address the question. See Lackey v. Texas, 514 U.S. 1045 (1995) (mem.) (Stevens, J., discussing denial of certiorari and observing that the claim has not been addressed, noting "the Court's denial of certiorari does not constitute a ruling on the merits"); see also Thompson v. McNeil, ___ U.S. ___, 129 S.Ct. 1299 (2009) (mem.); Smith v. Arizona, 552 U.S. 985 (2007) (mem.); Foster v. Florida, 537 U.S. 990 (2002) (mem.).

Nevertheless, several circuit courts, including the Ninth Circuit, have specifically addressed this issue, and each have firmly rejected this claim. See e.g., Allen v. Ornoski, 435 F.3d 946, 958-60 (9th Cir. 2006) (collecting cases), citing White v. Johnson, 79 F.3d 432, 437-39 (5th Cir. 1996); see also Thompson v. Secretary for Department of Corrections, 517 F.3d 1279, 1284 (11th Cir. 2008) ("Especially given the total absence of Supreme Court precedent that a prolonged stay on death row violates the Eighth Amendment guarantee against cruel and unusual punishment, we conclude that execution following a 31-year term of imprisonment is not in itself a constitutional violation.").

Accordingly, the Court cannot conclude that the state supreme court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to habeas relief on Claim 16.B.

**3. Lethal Injection Constitutes Cruel and Unusual Punishment**

In Claim 16.C, Petitioner alleges that "the manner of execution, lethal injection, constitutes cruel and unusual punishment," and as a result, his conviction and death sentence were unlawfully imposed in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. (SAP at 276-77.) Respondent maintains that the California Supreme Court rejected this claim on state habeas review as premature,[35] asserts that "[l]ethal injection as a general form of execution does not violate the Eighth Amendment's proscription against cruel and unusual punishment, and notes that Petitioner is not foreclosed from challenging the California execution protocol as a section 1983 action, which "would not be barred as an impermissible or successive habeas action." (Ans. at 237-40.)

Petitioner acknowledges that while "this claim is presently unripe," he has raised it on federal habeas review in order to "preserve his right to review if ever necessary."

---

[35] Claim 16C, also raised as Claim 16C in Petitioner's second state habeas exhaustion petition, was denied in relevant part as follows: "Claims 5 and 16 (subclaim C) are denied as premature without prejudice to renewal after an execution date is set. (*People v. Abilez* (2007) 41 Cal.4th 472, 536; *People v. Lawley* (2002) 27 Cal.4th 102, 169, fn. 25.)" (Supp. Lodgment No. 4; case no. S153780.)

(SAP at 178.) Petitioner adds that, "if at a later date lethal injection in California is held to be unconstitutional, the State may attempt to execute Mr. Carter using lethal gas . . . If, in the future, the State returns to that method of execution, Mr. Carter will seek leave of this Court to challenge that execution method further," and again "raises it here to preserve his right to review, if ever necessary." (SAP at 178-79.) Respondent does not dispute that this claim is currently unripe for review. (See Ans. at 240.)

The Court agrees that this claim is presently unripe for review, as Petitioner does not yet have a set execution date. Moreover, the Court recognizes that the California execution procedures and protocol have been the subject of continuing litigation in both the state and federal courts, and the most recently announced procedure is currently under judicial review. See Morales v. Cate, 623 F.3d 828, 831 (9th Cir. 2010). Accordingly, Claim 16 subpart C is denied without prejudice as premature. As such, evidentiary development of the claim is not warranted.

**4. Narrowing Process is Left to Unconstitutional Prosecutorial Discretion**

In Claim 16.D, Petitioner contends that "because the penalty of death and execution in California is arbitrarily and capriciously imposed depending on the county in which the defendant is charged, and the relevant statutes fail to sufficiently narrow the class of offenders who are eligible for the death penalty," Petitioner's conviction and sentence stand in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. (SAP at 281.) Respondent maintains that the California Supreme Court's rejection of this claim on appeal was reasonable, consistent with federal law, and is entitled to deference. (Ans. at 240.)

In addition to presenting this claim in the first and second state habeas petitions, Petitioner presented this claim to the California Supreme Court as claim XXI on direct appeal. On direct appeal, the California Supreme Court rejected the claim in a reasoned opinion, stating that:

> The circumstance that under California law an individual prosecutor has discretion whether to seek the death penalty in a particular case did not

> deny defendant his constitutional rights to equal protection of the laws or to due process of law. (*People v. Barnett*, *supra*, 17 Cal.4th 1044, 1179, 74 Cal.Rptr.2d 121, 954 P.2d 384; *People v. Ray*, *supra*, 13 Cal.4th 313, 359, 52 Cal.Rptr.2d 296, 914 P.2d 846; *People v. Crittenden* (1994) 9 Cal.4th 83, 152, 36 Cal.Rptr.2d 474, 885 P.2d 887; see also *Gregg v. Georgia* (1976) 428 U.S. 153, 225, 96 S.Ct. 2909, 49 L.Ed.2d 859 (conc. opn. of White, J.) ["Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decisions by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts."].) Moreover, nothing in the present case even remotely suggests that defendant's constitutional rights were denied by the decision of the San Diego County prosecutor to seek the death penalty. To the contrary, the evidence of defendant's penchant for overpowering young women and strangling them to death amply demonstrates that the prosecutor's decision to seek the death penalty was neither arbitrary nor capricious, but rather an appropriate exercise of prosecutorial discretion in response to defendant's criminal rampage across California. Defendant, an apparently unremorseful serial killer and rapist, is precisely the type of individual against whom virtually any California prosecutor would seek the death penalty. Defendant is totally unconvincing in suggesting otherwise.

Carter, 36 Cal. 4th at 1280. The claim was also raised as claim XI in the first state habeas petition and as claim 16 in the second state habeas petition, and was summarily denied on the merits in both petitions. (See Lodgment No. 113, Supp. Lodgment No. 4.)

The Supreme Court has long held that prosecutorial discretion in pursing capital charges does not, standing alone, offend constitutional principles of equal protection, due process, or cruel and unusual punishment. See Jurek v. Texas, 428 U.S. 262, 274 (1976); Proffitt v. Florida, 428 U.S. 242, 254 (1976); Gregg v. Georgia, 428 U.S. 153, 199-200 (1976); see also Campbell v. Kincheloe, 829 F.2d 1453, 1465 (9th Cir. 1987) (recognizing that prior challenges to state capital punishment statutes on the basis of unrestrained prosecutorial discretion have been "explicitly rejected" by the Supreme Court). The California Supreme Court has applied federal precedent to numerous capital cases in this state. See People v. Williams, 16 Cal.4th 153, 278 (Cal. 1997), quoting People v. Keenan, 46 Cal.3d 478, 505 (Cal. 1988) ("[P]rosecutorial discretion to select those eligible cases in which the death penalty would actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual

punishment."), citing Jurek, 428 U.S. at 274, Profitt, 428 U.S. at 254, Gregg, 428 U.S. at 199-200.

In order to establish a claim of constitutional dimension, a petitioner must demonstrate that "the decisionmakers in his case acted with discriminatory purpose." McClesky, 481 U.S. at 292 (emphasis in original). Without "exceptionally clear proof," this Court cannot infer that the prosecutors abused their discretion in pursuing the death penalty in Petitioner's case. Id. at 297. In fact, the Supreme Court has specifically noted that "[a]bsent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decisions by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts." Gregg, 428 U.S. at 225 (White, J., concurring).

Here, Petitioner fails to offer any evidence indicating that the prosecutors in his case acted impermissibly in pursuing capital charges. Instead, Petitioner generally alleges that the California capital scheme, which entrusts unlimited latitude in charging to the individual prosecutor, allows the death penalty to be pursed in an arbitrary manner. (SAP at 281-86.) This is insufficient to state a constitutional claim for relief in this regard, and Petitioner fails to demonstrate that the state supreme court's rejection of this claim was objectively unreasonable. Claim 16.D is without merit.

**5. California's Death Penalty Statute[36]**

In Claims 16.E and 16.F, Petitioner alleges that "the California capital statutory scheme is so overly broad and inclusive because it contains so many special circumstances that it fails to perform the constitutionally required narrowing function," in violation of his rights under the Eighth and Fourteenth Amendments to the United

[36] In the Motion for Evidentiary Hearing, Petitioner cites to Claim 16-E (entitled "California's Death Penalty Scheme Fails to Properly Narrow the Class of Persons Eligible for the Death Penalty," but actually quotes the heading for Claim 16-F ("The California Death Penalty Does Not Distinguish Between Death and Non-Death Eligible First Degree Murders") in asserting the claim. (Compare SAP at 286,289; Mot. for EH at 140.) As the two claims are substantially similar in nature and both are supported by the declaration of Steven Shatz, the Court will consider and adjudicate the claims together.

States Constitution. (SAP at 287.) Petitioner states that he intends to prove his claim at an evidentiary hearing "through the declaration and testimony of Steven Shatz." (Mot. for EH at 140.) Respondent maintains Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim on appeal was unreasonable, and thus does not warrant an evidentiary hearing. (Opp. at 41.)

The California Supreme Court considered and rejected this claim on appeal, stating:

> Defendant contends that many features of California's capital sentencing scheme, singly and in combination, violate the federal Constitution. We previously have rejected similar challenges, and because defendant has not presented any persuasive reason for us to reconsider those rulings, we decline to do so.
>
> The 1978 death penalty law does not violate the Eighth Amendment by failing to distinguish between death-eligible and non-death-eligible murders in a meaningful and nonarbitrary way...The special circumstances set forth in the statute are not overinclusive by their number or by their terms, nor have these categories been construed in an overly inclusive manner.

Carter, 36 Cal. 4th at 1278. (citations omitted.)

Petitioner states that he also raised the claim in both the first and second state habeas petitions, and the state supreme court rejected both claims on the merits without a statement of reasoning. Therefore, to the extent that he alleged new facts in those pleadings, the Court will conduct an independent review of the record with respect to those portions of the claim.[37] See Pirtle, 313 F.3d at 1167.

Since Furman v. Georgia, 408 U.S. 238 (1972) (per curiam), the United States Supreme Court has required states to limit the class of murderers to which the death penalty may be applied, holding that in order to survive constitutional scrutiny, a death

---

[37] In the Motion for Evidentiary Hearing, Petitioner contends that this claim was raised on state habeas review and the state court denied the claim without prejudice as premature, and that the Court should therefore conduct a de novo review of this claim. (See Mot. at 140.) This assertion is incorrect. A review of the record reveals that the June 17, 2010 California Supreme Court Order clearly states that "All claims, expect for Claims 5 and 16 (subclaim C) are denied on the merits." (Supp. Lodgment No. 4; case no. S153780.) The Court will review this claim pursuant to the standard outlined above.

penalty statute must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 876 (1983).

Petitioner explains that, at the time of the homicides in this case, there were 26 special circumstances under California Penal Code section 190.2(a) that could make a criminal defendant death-eligible. (Mot. for EH at 142.) Petitioner asserts that because the "death penalty applies to the vast majority of first-degree murders" it runs afoul of the Eighth Amendment in its failure to perform the narrowing function required under clearly established federal law. (Id. at 143; SAP at 287.) Petitioner contends that the failure of the California death penalty statute to perform this narrowing function are set out in further detail in two studies conducted by Professor Steven F. Shatz, and offers the January 14, 2009 declaration of Shatz in support of his claim. (Ex. 106 to SAP.) Professor Shatz conducted two studies on California murder convictions in an attempt to determine the death sentence rate in this State, and to compare that rate to the death penalty statutes that were at issue in the Court's Furman decision.

The first Shatz study was conducted on a statewide survey of California cases involving murder convictions to attempt to determine "(1) the degree to which the special circumstances listed in California Penal Code § 190.2 limit death-eligibility for persons convicted of first degree murder and (2) to determine what percentage of persons convicted of first degree murder who are statutorily death-eligible are sentenced to death, i.e., California's death sentence rate." (Ex. 106 at 2.) The second study concerned murder conviction cases solely in Alameda County, but involved determinations similar to that in the statewide study. (Id.)

Petitioner observes that the capital statute, California Penal Code 190.2, contained twenty-six special circumstances at the time of the homicide in Petitioner's case, argues that the result of this statute is that "nearly all murders in California can be capitally charged," and contends that the statute is thus unconstitutionally overbroad.

(Mot. EH at 288.) Based on figures advanced in Professor Shatz's study, Petitioner asserts that "[a] statutory scheme in which 84% of convicted first degree murderers are death-eligible does not "genuinely narrow." (Ex. 106 at 10; Mot. at 288.)

Professor Shatz then compared the results from his studies and responses from the State in another habeas case, with the statistics mentioned in Furman, in which the Supreme Court observed that "it is thought that from 15% to 20% for those convicted of murder are sentenced to death in States where it is authorized." Furman, 408 U.S. at 387 n. 11 (dissenting opinion of Burger, C.J.) Based on a comparison of the gathered results to those noted in Furman, Shatz concludes that the California death penalty statute does not survive constitutional scrutiny, reasoning that:

> If the death sentence rate is only 11.4% (Statewide study), 12.5% (Statewide study applying Carlos), 12.6% (Alameda Study) or even 14.2% (the State's own calculations), the scheme has a greater risk of arbitrariness than those in existence at the time of Furman, and is therefore in violation of the Eighth Amendment.

(Ex. 106 at 11.)

However, what Petitioner fails to acknowledge is that California's death penalty statute has been repeatedly upheld by the Ninth Circuit, and in the absence of clearly established federal law overruling those cases, this Court is constrained to apply Ninth Circuit precedent. The Ninth Circuit has previously held that the "special circumstances" section of California's death penalty statute, Cal. Penal Code § 190.2, satisfies constitutional requirements. Karis v. Calderon, 283 F.3d 1117, 1141 (9th Cir. 2002); Mayfield v. Woodford, 270 F.3d 915, 924 (9th Cir. 2001) ("A reasonable jurist could not debate, therefore, that the 1978 California statute, which narrowed the class of death-eligible defendants at both the guilt and penalty phases, was constitutional.") Moreover, the United States Supreme Court previously upheld California's 1977 death penalty statute, reasoning that "[b]y requiring the jury to find at least one special circumstance beyond a reasonable doubt, the statute limits the death sentence to a small sub-class of capital-eligible cases." Pulley v. Harris, 465 U.S. 37, 53 (1984). In so deciding, the Supreme Court noted that while "[t]he 1977 statute was replaced in late

1978 by the substantially similar provisions now in effect," that "[f]or the most part, however, what is said [about the 1977 statute] applies equally to the current California statute." Id. at 40 n.1.

In California, imposing the death penalty on a criminal defendant requires a determination of death eligibility and an additional death qualification judgment performed by the factfinder.  For death-eligibility, a jury must not only convict a defendant of a charged first-degree murder for which the death penalty is a proportionate punishment, but also must additionally find at least one of the special circumstances enumerated in California Penal Code § 190.2 to be true.  See Tuilaepa v. California, 512 U.S. 967, 972 (1994).  If the jury does so, the trial proceeds to a penalty phase where the jury must then take a separate list of sentencing factors into consideration under Cal. Penal Code § 190.3 and make an individualized determination of the punishment based on considerations including the circumstances of the crime as well as the defendant's history and character.  Id. at 972-73.  In fact, the 1978 California statute is also comparable in composition and effect to several  state statutes upheld as constitutional by the United States Supreme Court.  See Gregg, 428 U.S. 153; Profitt, 428 U.S. 242; Jurek, 428 U.S. 262 (Georgia, Florida, and Texas capital statutes found to sufficiently narrow the class of defenders eligible for the death penalty through either aggravating factors or by the definition of capital offenses, properly considered mitigation, and guided the discretion of the sentencer.)  At any rate, the fact remains that the Ninth Circuit has consistently upheld the constitutionality of the 1978 California statute.  See Karis, 283 F.3d at 1141; Mayfield, 270 F.3d at 924.

Ultimately, the statistical study and arguments thereon advanced by Petitioner fail to set forth a persuasive case for relief on this claim.  Taking into account the Supreme Court decisions subsequent to Furman and the Ninth Circuit's repeated affirmance of the constitutionality of California's 1978 death penalty statute, this Court cannot conclude that the state supreme court's rejection of this claim on appeal was contrary to, or an unreasonable application of, clearly established federal law.  Williams, 529

U.S. at 412-13. Petitioner fails to demonstrate that the facts alleged, if proven, would entitle him to relief. See Earp, 431 F.3d at 1167. Therefore, Petitioner does not warrant an evidentiary hearing nor habeas relief on this claim.

**6. California's Sentencing Factors Violate the Eighth Amendment**

In Claim 16.G, Petitioner contends that several sentencing factors in California's death penalty statute, specifically factors (a), (d), and (k), are unconstitutional, and related deficiencies in the jury instructions on certain factors compounded the error in his case, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (SAP at 292-93.) Respondent maintains that the state supreme court's rejection of this claim was reasonable and is entitled to deference. (Ans. at 244.)

In addition to presenting this claim in the first and second state habeas petitions, Petitioner presented this claim to the California Supreme Court as claim XXI on direct appeal. The California Supreme Court rejected the claim in a reasoned opinion, stating that:

> Section 190.3, factor (a) does not bias the determination of penalty in favor of death, in violation of the Eighth Amendment, as defendant acknowledges.[FN42] (See *People v. Duncan* (1991) 53 Cal.3d 955, 978-979, 281 Cal.Rptr. 273, 810 P.2d 131; *People v. Murtishaw* (1989) 48 Cal.3d 1001, 1020, 258 Cal.Rptr. 821, 773 P.2d 172.)
>
> FN42. Section 190.3 provides in relevant part:
>
> "In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1."
>
> The use in section 190.3, factor (d) of the adjective "extreme" does not act as a barrier to the jury's proper consideration of defendant's evidence in mitigation.[FN43] (See *People v. Morrison*, supra, 34 Cal.4th 698, 729, 21 Cal.Rptr.3d 682, 101 P.3d 568.) Nor was it reasonably probable that, because of factor (d), the jury failed properly to weigh defendant's evidence in mitigation. To the contrary, we observe that the trial court in the instant case instructed the jury pursuant to section 190.3, factor (k) (factor (k)) as reflected in CALJIC No. 8.85, which provided the jury wide latitude to consider any extenuating circumstance in determining penalty.[FN44] (See *People v. Holt*, *supra*, 15 Cal.4th at p. 698, 63 Cal.Rptr.2d 782, 937 P.2d 213 [upholding the validity of factor (d), in view of factor (k) ]; *People v. Benson* (1990) 52 Cal.3d 754, 804, 276 Cal.Rptr. 827, 802 P.2d 330["[T]here is no reasonable likelihood that the

jury would have inferred from [CALJIC No. 8.85, subd. (k) ] that they could not consider mental or emotional disturbance of any degree whatever in mitigation of penalty"].)

FN43. Under factor (d), the trier of fact may, in determining the penalty to be imposed, take into account "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance."

FN44. Pursuant to CALJIC No. 8.85, the trial court instructed the jury: "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable: [¶] ... [¶] (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character, background, social history or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial...."

Notwithstanding defendant's assertion that the factor (k) instruction is the least accurately understood of California's sentencing factors, contributing to "pronounced" "constitutional harm," we repeatedly have rejected challenges to its validity. (See, e.g., *People v. San Nicolas*, *supra*, 34 Cal.4th at pp. 675-676, 21 Cal.Rptr.3d 612, 101 P.3d 509; see also *Boyde v. California* (1990) 494 U.S. 370, 381, 110 S.Ct. 1190, 108 L.Ed.2d 316 [upholding a predecessor version of factor (k) ].) We do so again here. We also observe that defendant does not demonstrate that the jury misunderstood its function in the present case.

Carter, 36 Cal. 4th at 1278-79.

Petitioner first challenges the constitutionality of factor (a) in section 190.3, asserting that because this instruction "provides that 'the existence of any special circumstances found to be true pursuant to Section 190.1' is an aggravating factor to be considered at penalty phase," that the actual effect of factor (a) is to "insure that before the penalty phase begins there will always be one aggravating factor already established." (SAP at 293.) Petitioner asserts that this factor deprives the jury from giving full consideration to the evidence in mitigation and places the jury closer to a death sentence than a sentence of life without the possibility of parole. (Id.) However, a prior identical challenge to the constitutionality of factor (a) was firmly rejected by the United States Supreme Court, which specifically held:

> Petitioners' challenge to factor (a) is at some odds with settled principles, for our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty. See, *e.g.*, Woodson [v. North Carolina, 428 U.S. 280 (1976)] , 428 U.S., at 304, 96 S.Ct., at 2991 ("consideration of ... the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death"). We would be hard pressed to invalidate a jury instruction that implements what we have said the law requires. In any event, this California factor instructs the jury to consider a relevant subject matter and does so in understandable terms. The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence.

Tuilaepa v. California, 512 U.S. 967, 976 (1994). Petitioner fails to demonstrate that the state supreme court's decision was contrary to, or an unreasonable application of Tuileapa. Accordingly, Petitioner's claim of constitutional error with respect to factor (a) is without merit.

With respect to factor (d), Petitioner contends that because the word "extreme" was not deleted from the description of the mitigating factor of "extreme mental and emotional disturbance" in Petitioner's case, it was "reasonably probable that, in violation of the Eighth Amendment, the jury did not weigh Mr. Carter's mitigating evidence unless they concluded that it rose to 'extreme' levels." (SAP at 293.) However, as Petitioner concedes, in Blystone v. Pennsylvania, 494 U.S. 299 (1990), the Supreme Court upheld the Pennsylvania capital statute which, like the California capital sentencing scheme, uses the word "extreme" in front of the term "extreme mental and emotional disturbance." The Supreme Court rejected the contention that "these instructions impermissibly precluded the jury's consideration of lesser degrees of disturbance" as the "judge at petitioner's trial made clear to the jury that these were merely items it could consider, and that it was also entitled to consider 'any other mitigating matter concerning the character or record of the defendant, or the circumstances of his offense.'" Id. at 308.

Nonetheless, Petitioner attempts to distinguish his case from that prior holding, arguing that the Blystone Court based its decision "on the assumption that a jury will

understand that despite the reference to "extreme" in factor (d), mental or emotional disturbance of a lessor degree may be considered under factor (k)."  (SAP at 293.) Petitioner contends that factor (k) may be erroneously used as an aggravating factor rather than its intended use in mitigation, and cites to studies indicating that factor (k) is the "least accurately understood of California's sentencing factors."  (SAP at 294.)

As an initial matter, a prior version of factor (k) was upheld by the Supreme Court in Boyde, 494 U.S. at 381.  Later, in Ayers v. Belmontes, 549 U.S. 7 (2006), the Supreme Court relied on Boyde as well as Brown v. Payton, 544 U.S. 133 (2005), to articulate that "[t]his Court's cases establish, as a general rule, that a jury in such circumstances is not reasonably likely to believe itself barred from considering the defense's evidence as a factor "extenuat[ing] the gravity of the crime," and to conclude that "[t]he factor (k) instruction is consistent with the constitutional right to present mitigating evidence in capital sentencing proceedings."  Id. at 24.

Moreover, in this instance, Petitioner's argument that the jury may have misunderstood factor (k) to be aggravating is belied by the record.  The trial court specifically instructed the jury that "[t]he factors set forth in subparagraphs d, e, f, g, h, i, j, and k above can only be considered by you as mitigating factors.  The absence of a mitigating factor is not and cannot be considered by you as an aggravating factor." (RT 8554.)

A jury is presumed to understand and follow the trial court's instructions. Weeks, 528 U.S. 225, 233-34 (2000); Marsh, 481 U.S. at 211.  Here, there is no record basis to support Petitioner's assertion that his penalty phase jury was confused or failed to understand the proper application of factor (k).  See e.g. McDowell v. Calderon, 130 F.3d 833, 837 (9th Cir. 1997) (en banc) (reversing death sentence where jury sent trial court a note during deliberations in which the "plain language of the jury's request for guidance demonstrates that eleven jurors were confused about the law and erroneously believed they could not consider eight aspects of [the petitioner's] background as mitigating evidence.")

At any rate, even were there a possibility that the jury could have misunderstood the breadth of mitigation allowed consideration by factor (k), it was ameliorated by the detailed instructions provided by the trial court. The trial court specifically informed the jury that it was allowed to consider with factor (k), "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime; and any sympathetic or other aspect of the defendant's character, background, social history, or record that the defendant offers *as a basis for a sentence less than death*, whether or not related to the offense for which he is on trial." (RT 8552-53; see also CT 2359.) (emphasis added.) The factor (k) instruction explicitly indicated it applied to evidence presented for use "as a basis for a sentence less than death," and Petitioner fails to offer any factual basis indicating that the jury misunderstood it or applied it in error.

The Court cannot conclude that the state supreme court's rejection of this claim on appeal was contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to habeas relief on Claim 16.G.

**7. International Law**

In Claim 16.H, Petitioner alleges that his "convictions, confinement and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and comparable decisional law because the death penalty is unconstitutional and violates international law." (SAP at 295.)

The claim was raised as claim 16 of the second state petition and was denied on the merits. (See Supp. Lodgment No.4.) Respondent maintains that the California Supreme Court's rejection of this claim was reasonable, and asserts that Petitioner fails to demonstrate standing to invoke international law jurisdiction "because the principles of international law apply to disputes between sovereign governments and not between individuals." (Ans. at 245.) (citations omitted.)

Petitioner generally asserts that because neither due process nor the Eighth Amendment is a "static concept," that "inasmuch as the law of nations now recognizes

the impropriety of capital punishment as regular punishment, it is unconstitutional in this country inasmuch as international law is a part of our law," and cites Roper v. Simmons, 543 U.S. 551, 575 (2005), in noting that the Supreme Court "has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishment.'" (SAP at 296.)

Upon review, Petitioner's citation to the Unites States Supreme Court decision in Roper does not support the instant claim, as the Court's holding in that case was limited to a prohibition on the execution of individuals who had committed their offenses as *juveniles*, based in part on overwhelming international disapproval and disuse of that practice, acknowledging that "it is fair to say that the United States now stands alone in a world that has turned its face against the *juvenile death penalty*." Id., 543 U.S. at 577 (emphasis added). The Court cannot draw similar parallels to the instant claim, noting that at present, 58 countries retain the death penalty in law or in practice. (See Amnesty International website- http://www.amnesty.org/en/death-penalty/abolitionist-and-retentionist-countries, last visited September 25, 2012.)

Moreover, to the extent Petitioner asserts that customary international law, also known as jus cogens, would prohibit the application of the death penalty in Petitioner's case, it does not create a private right of action. In Buell v. Mitchell, 274 F.3d 337 (6th Cir. 2001), the Sixth Circuit explained:

> We hold that the determination of whether customary international law prevents a State from carrying out the death penalty, when the State otherwise is acting in full compliance with the Constitution, is a question that is reserved to the executive and legislative branches of the United States government, as it is their constitutional role to determine the extent of this country's international obligations and how best to carry them out.

Id. at 376.

In evident agreement with the Sixth Circuit's reasoning, the Ninth Circuit has held that "customary international law is not a source of judicially enforceable private

rights in the absence of a statute conferring jurisdiction over such claims." Serra v. Lappin, 600 F.3d 1191, 1197 (9th Cir. 2010) (declining to imply a private right of action in favor of prisoners alleging government's payment of low wages violated jus cogens norms of international law.) As such, Petitioner's claim must fail, for he "can point to no statute that brings [his] claim within [this Court's] purview." Id. In any event, while the United States is clearly in the minority among nations of the world in its retention of capital punishment, Petitioner fails to provide persuasive evidence demonstrating that the abolition of capital punishment has "risen to the level that the international community as a whole recognizes it as jus cogens, or a norm from which no derogation is permitted." Buell, 274 F.3d at 373.

Accordingly, based on an independent review of the record, the Court must conclude that the California Supreme Court's rejection of this claim on state habeas review was objectively reasonable, and that the state court did not clearly err in its application of controlling federal law in denying this claim.

**8. Lack of Inter-case and Intra-case Proportionality**

In Claim 16.I, Petitioner contends that the failure to conduct inter- and intra- case review of his case at trial renders his conviction and sentence unconstitutional under the Fifth, Sixth, Eighth and Fourteenth Amendments. (SAP at 297.) Respondent points out that the Supreme Court has held inter-case proportionality review is not constitutionally required, specifically in relation to California's death penalty statute, and maintains that the state supreme court's rejection of this claim was reasonable and is entitled to deference. (Ans. at 247-48.) The claim was raised as claim 16 in the second state habeas petition and was denied on the merits. (See Supp. Lodgment No. 4.)

This claim has been explicitly rejected by both the Supreme Court and the Ninth Circuit. In Pulley v. Harris, 465 U.S. 37 (1984), the Supreme Court held that inter-case proportionality review of death sentences is not constitutionally required, and upheld the California death penalty statute despite the lack of such review. See Harris, 465 U.S. at 42-51; see also Allen v. Woodford, 395 F.3d 979, 1018 (9th Cir. 2005) (holding

that neither due process, equal protection, nor the Eighth Amendment require proportionality review). In light of clearly established federal precedent foreclosing this claim, Petitioner fails to demonstrate error of constitutional magnitude.

Ultimately, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Williams, 529 U.S. at 412-13. Habeas relief is not warranted on Claim 16.I.

**9.    Jury Unanimity Beyond A Reasonable Doubt Required for Any Fact that Increases Maximum Punishment; Findings that Aggravation Outweighs Mitigation Must be Unanimous and Beyond a Reasonable Doubt**

In Claims 16.J and 16.K, Petitioner contends that his conviction and sentence are unconstitutional: (1) "because the jury was not asked to determine, unanimously and beyond a reasonable doubt, the existence of at least one aggravating factor, and whether the aggravating factors outweighed the mitigating factors" and (2) "because of the constitutionally inadequate sentencing procedure employed at his trial" wherein the jury was not required to make those findings unanimously and beyond a reasonable doubt. (SAP at 298-302.)

These contentions were raised before the California Supreme Court on direct appeal as part of Claim XXI. (See Lodgment No. 101 at 372.) The state supreme court considered and rejected them on the merits, as follows:

> Defendant contends that many features of California's capital sentencing scheme, singly and in combination, violate the federal Constitution. We previously have rejected similar challenges, and because defendant has not presented any persuasive reason for us to reconsider those rulings, we decline to do so.
>
> ...
>
> The trial court did not err in failing to instruct the jury (or otherwise require) that the jury must agree unanimously as to aggravating circumstances, that all aggravating factors must be proved beyond a reasonable doubt, that aggravation must outweigh mitigation beyond a reasonable doubt, and that death must be found to be the appropriate penalty beyond a reasonable doubt. (*People v. Carpenter*, supra, 15

Cal.4th at p. 421, 63 Cal.Rptr.2d 1, 935 P.2d 708; *People v. Berryman* (1993) 6 Cal.4th 1048, 1101-1102, 25 Cal.Rptr.2d 867, 864 P.2d 40.)

Carter, 36 Cal. 4th at 1278, 1280. Petitioner also raised this contention as part of Claim 16 in the second state habeas petition, and the California Supreme Court again rejected it on the merits. (See Supp. Lodgment No. 4.)

Petitioner argues, that pursuant to Ring v. Arizona, 536 U.S. 584 (2002) and Apprendi v. New Jersey, 530 U.S. 466 (2000), a sentencing jury must make each of the § 190.3 findings in aggravation unanimously and beyond a reasonable doubt, and must also determine unanimously and beyond a reasonable doubt whether the aggravation outweighed the mitigation. (SAP at 298.) Respondent contends that neither Apprendi nor Ring compels the result Petitioner advocates, and maintains that the California Supreme Court's rejection of Petitioner's contentions did not constitute an unreasonable application of clearly established federal law. (Ans. at 248-51.)

In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. The Apprendi Court distinguished Walton v. Arizona, 497 U.S. 639, 647-49 (1990), which upheld the trial judge's determination of the ultimate penalty of death, rather than life imprisonment, based upon facts beyond those proven to the jury. Apprendi, 530 U.S. at 496-97. The primary issue resolved in Apprendi was whether the judge, as opposed to the jury, must find the facts supporting imposition of an increased sentence.

In Ring, the Supreme Court reversed Walton and held that the Sixth Amendment requires the jury, rather than the judge, to find the existence of such factors supporting imposition of the death penalty. In Schriro v. Summerlin, 542 U.S. 348 (2004), the Supreme Court acknowledged that Ring "altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment." Schriro, 542 U.S. at 353.

Petitioner argues that both Ring and Apprendi remain at odds with the proceedings in his case, as his jury "was not asked to determine, unanimously and beyond a reasonable doubt, the existence of at least one aggravating factor, and whether the aggravating factors outweighed the mitigating factors." (SAP at 299.) However, California's capital scheme has significant differences from the Arizona statute that was the subject of Ring- in California, no additional *facts* must be found at the penalty phase in order for the death penalty to be imposed. In fact, the Ring Court specifically cited Justice O'Connor's dissent in Apprendi to clarify that the Arizona capital statute was unique among capital schemes in that "[a] defendant convicted of first-degree murder in Arizona *cannot receive a death sentence* unless a judge makes the factual determination that a statutory aggravating factor exists. Without that critical finding, the *maximum sentence* to which the defendant is exposed is life imprisonment, and not the death penalty." Ring, 536 U.S. at 596, citing Apprendi, 530 U.S. at 538 (emphasis added). Conversely, in California, it is the special circumstances finding at the *guilt phase* proceedings that makes a criminal defendant death-eligible. As such, a California penalty phase jury could impose a sentence of death without finding additional aggravating factors beyond considering the circumstances of the crime of which the defendant was convicted, as provided for by section 190.3(a) of the California Penal Code, so long as that jury determined that those circumstances outweighed any mitigating circumstances presented during the penalty phase proceedings. As such a determination does not include fact finding that would increase the penalty for first degree murder beyond the statutory maximum, the California capital statute does not run afoul of either Ring nor Apprendi.

More importantly, neither Apprendi nor Ring dictate the rules advocated by Petitioner, either that the constitution requires a capital jury to (1) unanimously find a factor in aggravation beyond a reasonable doubt before such evidence can be considered in its penalty phase deliberations or (2) to unanimously agree that at least one factor in aggravation outweighs the evidence in mitigation prior to the imposition of the death

penalty. Ultimately, Petitioner fails to cite persuasive federal authority that compels the rule he desires. Accordingly, Petitioner fails to demonstrate California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. Habeas relief is not warranted on Claim 16.J or 16.K.

**10. <u>Penalty Phase Instructions are Unconstitutionally Vague</u>**

In Claim 16.L, Petitioner contends that the "penalty phase jury instructions, taken as a whole, did not give the jury in this case sufficient guidance to permit it to return a constitutionally valid death penalty." (SAP at 302.) Specifically, Petitioner contends that the jury instructions were vague and failed to properly indicate which section 190.3 factors were permitted to be considered only in mitigation, and failed to instruct that the absence of mitigation was not aggravation, creating a risk that the jury would wrongly utilize factors in mitigation in a way that made the imposition of a death sentence more likely. (<u>Id.</u> at 304.)

Petitioner raised this claim as claim XXII on direct appeal and again as claim 16 in the second state habeas petition. The California Supreme Court rejected the claim on direct appeal, reasoning as follows:

> The trial court's failure to delete inapplicable factors from the instructions given to the jury did not violate defendant's rights under the Fifth, Sixth, Eighth, or Fourteenth Amendments. (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 421, 63 Cal.Rptr.2d 1, 935 P.2d 708.) Moreover, as defendant acknowledges, the trial court instructed the jury pursuant to CALJIC No. 8.85 that "only those factors that are applicable on the evidence adduced at trial are to be taken into account in the penalty determination in the individual case." We therefore reject defendant's contention that he was deprived of his right to an individualized sentencing determination based upon permissible factors relating to him and the crimes he committed.

<u>Carter</u>, 36 Cal. 4th at 1280. On state habeas review, the state supreme court rejected claim 16 summarily on the merits. (See Supp. Lodgment No. 4.) Respondent maintains that the state supreme court's rejection of this claim is entitled to deference. (Ans. at 252.)

Petitioner contends that "[t]he court's instructions failed to apprise the jurors that (d), (e), (f), (g), (h), (i), (j), and (k) of the California Penal Code were mitigating only and could not be considered in aggravation" and because "[t]he court never instructed

the jury that the absence of mitigation was not aggravation," such erroneous instruction created "the risk, if not the likelihood that jurors would use the mitigating factors in a way that made the imposition of death more likely."  (SAP at 303-04.)

To prevail on a claim of instructional error, a petitioner must demonstrate that the contested error "so infected the entire trial that the resulting conviction violated due process."  See Estelle, 502 U.S. at 72; Henderson, 431 U.S. at 154, quoting Cupp, 414 U.S. at 147.  Here, the Ninth Circuit has previously rejected the argument that California's death penalty statute is impermissibly vague in that it allows jurors to consider the absence of numerous mitigating circumstances to be aggravating circumstances.  Bonin, 59 F.3d at 848.  The Ninth Circuit has also approved the practice of reading to the jury the entire list of sentencing factors even if some of the factors did not apply in that particular case, as "[t]he reading of the complete list gave the jury more guidance, not less."  Williams v. Calderon, 52 F.3d 1465, 1481 (9th Cir. 1995).

Moreover, Petitioner's contention is explicitly refuted by the state record, which reveals that after reading the jury the entire list of sentencing factors, the trial court instructed the jury with CALJIC 8.85 in relevant part as follows:

> The factors set forth in subparagraphs (d), (e), (f), (g), (h), (i), (j) and (k) above can only be considered by you to be mitigating factors.  The absence of a mitigating factor is not, and cannot be considered by you as, an aggravating factor.

(CT 2361.)  A jury is presumed to understand and follow the trial court's instructions. Weeks, 528 U.S. at 233; Marsh, 481 U.S. at 211.  Petitioner's jury was specifically instructed that the contested factors were only to be considered in mitigation and the absence of any of those factors could not be considered as aggravation, and the Court must presume the jury understood and followed such instruction. Petitioner's argument lacks merit.

Accordingly, the Court cannot conclude that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the

facts. Williams, 529 U.S. at 412-13. Habeas relief is not warranted on Claim 16.L.

## VII. CERTIFICATE OF APPEALABILITY

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") amended 28 U.S.C. § 2253 to require a "certificate of appealability" for § 2254 cases on a claim-specific basis. Specifically, section 2253(c) provides:

> (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> >
> > (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

The Supreme Court has elaborated on the application of this requirement, stating that "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy section 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) ("Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that Petitioner will not prevail.")

Additionally, the Supreme Court has stated that a claim may also warrant a certificate of appealability when the "questions are adequate to deserve encouragement to proceed further." Barefoot v. Estelle, 463 U.S. 880, 893 (1983), overruled in part on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997). Mindful of the "relatively low" threshold for granting a certificate of appealability, Jennings v. Woodford, 290 F.3d 1006, 1010 (9th Cir. 2002), and that a petitioner does not need to demonstrate "that

he should prevail on the merits," Lambright v. Stewart, 220 F.3d 1022, 1025 (9th Cir. 2000), the Court finds Claims 3 and 4 suitable for a COA.

## VIII. CONCLUSION

For the reasons discussed above, Petitioner's request for evidentiary development on Claims 1-5, 7, 13, 16.C and 16.E is **DENIED,** Respondent's request to dismiss portions of Claims 1, 2, 6, 7, 8, and 10 on the basis of procedural default is **DENIED**, and Petitioner's request for habeas relief on Claims 1-16 is **DENIED**. The Court concludes that habeas relief is not warranted on the claims contained in the Second Amended Petition and **DENIES** all claims on the merits.

The Court will, in the final order, **GRANT** a COA on Claims 3 and 4 and **DENY** a COA on Claims 1-2 and 5-16.

**IT IS SO ORDERED**.

DATED: March 18, 2013

Hon. Roger T. Benitez
United States District Judge